**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **SPHERATURE INVESTMENTS LLC,** | § | **Case No.: 20-42492** |
| *et al.* | § | |
| | § | |
| **Debtors.**[1] | § | **Joint Administration Requested** |

**DECLARATION OF ERIK TOTH IN SUPPORT OF**
**VOLUNTARY PETITIONS AND FIRST DAY MOTIONS**

I, Erik Toth, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that

the following statements are true and correct and within my personal knowledge:

1.     My name is Erik Toth ("Toth").  I am the Chief Restructuring Officer of

SPHERATURE INVESTMENTS, LLC d/b/a WORLDVENTURES HOLDINGS, LLC

("WorldVentures").  I have held this position since November 17, 2020.  My business address and

telephone number are as follows:

> Larx Advisors, Inc.
> Attn: Erik Toth, Managing Partner
> 2600 Network Blvd, Suite 600
> Frisco, TX 75034
> Phone: 972.294.5884

2.     I submit this Declaration based on personal knowledge in support of (a) the

voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the

"Bankruptcy Code") filed by the Debtors on December 21, 2020 (the "Petition Date") before the

United States Bankruptcy Court for the Eastern District of Texas, Sherman Division ("Bankruptcy

---

[1] The **Debtors** in the above-captioned jointly administered chapter 11 bankruptcy cases (**Cases**) are: Spherature Investments LLC ("**Spherature**") EIN#5471; Rovia, LLC ("**Rovia**") EIN#7705; WorldVentures Marketing Holdings, LLC ("**WV Marketing Holdings**") EIN#3846; WorldVentures Marketplace, LLC ("**WV Marketplace**") EIN#6264; WorldVentures Marketing, LLC ("**WV Marketing**") EIN#3255; WorldVentures Services, LLC ("**WV Services**") EIN#2220. The Debtors' corporate headquarters and service address in this district is 5100 Tennyson Parkway, Plano, TX 75024.

Court") at the lead case number 20-42492 (joint administration requested) ("Cases"); and (b) the

following motions:

A.    MOTION FOR JOINT ADMINISTRATION [DKT. 3];

B.    NOTICE OF DESIGNATION AS COMPLEX CHAPTER 11 BANKRUPTCY CASE [DKT. 7];

C.    MOTION TO EXTEND TIME TO FILE SCHEDULES AND STATEMENTS [DKT. 8];

D.    MOTION TO ESTABLISH INTERIM NOTICE PROCEDURES [DKT. 9];

E.    MOTION FOR ORDER (I) AUTHORIZING THE DEBTORS TO (A) MAINTAIN EXISTING INSURANCE COVERAGE AND EXISTING INSURANCE PREMIUM FINANCING AGREEMENTS, (B) SATISFY ALL PREPETITION OBLIGATIONS RELATED TO THAT INSURANCE COVERAGE IN THE ORDINARY COURSE OF BUSINESS, AND (C) RENEW, SUPPLEMENT, OR ENTER INTO NEW INSURANCE COVERAGE IN THE ORDINARY COURSE OF BUSINESS, AND (II) GRANTING RELATED RELIEF [DKT. 10];

F.    MOTION FOR ORDER (I) AUTHORIZING THE DEBTORS TO HONOR PREPETITION OBLIGATIONS TO CUSTOMERS, (II) AUTHORIZING THE DEBTORS TO INCUR AND ENTER NEW CUSTOMER OBLIGATIONS IN THE ORDINARY COURSE, AND (III) AUTHORIZING THE DEBTORS TO MAINTAIN AND ADMINISTER CUSTOMER PROGRAMS AND PREPETITION OBLIGATIONS RELATED THERETO [DKT. 13];

G.    MOTION TO PAY PRE-PETITION SALARIES AND WAGES [DKT. 16];

H.    MOTION FOR AUTHORITY TO PAY TAXES / MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE PAYMENT OF CERTAIN PREPETITION TAXES AND FEES AND (II) GRANTING RELATED RELIEF [DKT. 17];

I.    MOTION FOR ENTRY OF INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL [DKT. 18];

J.    MOTION PURSUANT TO 11 U.S.C. SECTION 366, FOR ENTRY OF INTERIM ORDER DETERMINING ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES AND RESTRAINING UTILITY COMPANIES FROM DISCONTINUING, ALTERING OR REFUSING SERVICE [DKT. 19]; and

K.      MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE USE OF EXISTING CASH MANAGEMENT SYSTEM, (B) MAINTAIN EXISTING BANK ACCOUNTS, (C) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS, (D) MAINTAIN EXISTING BUSINESS FORMS; (II) EXTENDING TIME TO COMPLY WITH SECTION 345 OF THE BANKRUPTCY CODE; AND (III) GRANTING RELATED RELIEF ("TREASURY AND CASH MANAGEMENT MOTION").

The foregoing are collectively the "First Day Motions."

3.      I further submit this Declaration to assist this Court and parties-in-interest in understanding the circumstances that compelled the commencement of the Debtors' Cases.

4.      The relief sought in the First Day Motions should enable the Debtors to effectively administer their bankruptcy estates ("Estates"). I have reviewed the First Day Motions, and I believe the requested relief is necessary to ensure the success of the Debtors' reorganization efforts.

5.      Except as otherwise indicated, all facts as set forth in this Declaration are based upon my personal knowledge, my review of relevant documents (including all First Day Motions), or my opinion based upon experience, knowledge, and information concerning the Debtors.  If called upon to testify, I would testify competently to the contents set forth in this Declaration.

## PROCEDURAL BACKGROUND

6.      On December 21, 2020, the Debtors commenced these Cases by filing voluntary petitions under chapter 11 of title 11 of the United States Code.

7.      The Debtors have continued to operate and manage their businesses and affairs as debtors-in-possession, pursuant to Bankruptcy Code sections 1107 and 1108(a).

8.      The Office of the United States Trustee (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in this Case.

## RELEVANT FACTUAL BACKGROUND

### A.    The Debtor's History

9.    October 5, 2005, the Debtor organized solely for the purpose of providing access to unique travel and lifestyle experiences through a membership based direct sales business and later acquired a wholly-owned travel product and fulfilment company. WorldVentures provides its travel products and services to individual and group leisure and corporate travelers in the United States and abroad.  The company is made up of ninety-four (94) wholly owned legal entities operating as branches, offices, and subsidiaries across the world and is collectively managed as WorldVentures.  The company markets its products and services through a network of Independent Sales Representatives ("Sales Reps") which market and sell travel memberships and associate travel packages across multiple subscription levels.

10.    Each of the Debtors is a limited liability company organized under the laws of the State of Nevada.  WorldVentures is governed by three managers comprising the board ("Board") (Wayne T. Nugent, James Calandra and Russell Nelms) and its officers.  James Calandra and Russell Nelms were added as independent Board members on December 3, 2020, to advise on the filing of these Cases and the related restructuring of the Debtors' assets and liabilities.

11.    In addition to the Spherature Investments LLC (f/k/a World Ventures), WorldVentures retains ownership in the following affiliated Debtor parties to these Cases: (a) Rovia, LLC (wholly-owned subsidiary of WorldVentures); (b) WorldVentures Marketing, LLC (wholly-owned subsidiary of WorldVentures; (c) WorldVentures Services, LLC (wholly-owned subsidiary of WorldVentures Marketing Holdings, LLC); (d) WorldVentures Marketing Holdings, LLC (wholly-owned subsidiary of WorldVentures); and (e) WorldVentures Marketplace, LLC (wholly-owned subsidiary of WorldVentures Marketing Holdings, LLC) (collectively, "WorldVentures", "Debtors" or "Petition Entities").  WorldVentures acts as a consolidated

management entity for the Debtors and their subsidiaries and affiliates, providing oversight, direction, and governance support, and may provide forms of financial assistance.

**B.**   **The Debtors' Assets and Operations**

12.   WorldVentures' primary revenue stream, in order of significance to the Debtors, is as follows: membership sales, travel sales, representative business system sales, and other marketing and promotions sales. The Debtors' primary markets, in order of significance to the Debtors, are the Americas, Asia, Europe, and Africa.  WorldVentures' revenue is derived solely from its Sales Reps and the membership and travel related sales they generate.

   A.   <u>Membership Sales:</u> The sale of memberships allows the purchasers to access exclusive travel opportunities at discounted rates compared to retail costs. Memberships are offered to purchases in four tiers, each with increasing levels of access to travel amenities and benefits.  Membership dues are billed to the purchaser monthly generally through recurring transactions.

   B.   <u>Travel Sales:</u> Travel products and services are offered on a stand-alone and package basis primarily through the merchant and agent business models.

      i.  Under the merchant model, the Debtors facilitate the booking of hotel rooms, airline seats and destination services from travel suppliers and acts as the merchant of record for such bookings.  The majority of the Debtors' merchant travel transactions relate to the sales of packaged vacations.

      ii.  Under the agent model, the Debtors act as the agent in the transaction, passing reservations booked by the purchaser to the relevant travel provider. The Debtors receive commissions or ticketing fees from the travel supplier and/or purchaser.  For certain agency, airline, hotel and car transactions, the

Debtors may also receive fees from global distribution system partners that control the computer systems through which these reservations are booked.

C.    <u>Representative Business System Sales:</u> In accordance with the Representative Agreements, details provided below, each Sales Rep is required to pay a one-time enrollment fee and a recurring monthly fee for their own replicated website which provides access to online training tools, presentations, important product documents, and other assets that help the Sales Reps manage their WorldVentures business.

D.    <u>Other Marketing and Promotions Sales:</u>  The Debtors provide Sale Reps with access to purchase sales aides and other promotional and marketing materials to facilitate the growth of the Sales Reps' business.  Sales Reps are also provided with opportunities to participate in training conventions for an up-front attendance fee.

13.    As of the Petition Date, the WorldVentures global enterprise employs 105 employees (the "<u>Employees</u>") globally, 85 employees are affiliated with the Petition Entities. Additionally, the Debtors contract with approximately 60,000+ Independent Sales Representatives whose commissions are calculated based on the current published commissions plan, and terms of their subcontract agreement are outlined in their Independent Sales Representative Contracts.

14.    The Debtors' "going concern" "assets" are predominately the Sales Reps themselves as the primary source of revenue to the enterprise; however, there is a cache of inventories that is made up of promotional merchandise, training materials, apparel, and other merchandise offered to customers at convention events or through online purchasing.  Property and equipment consist of leasehold improvements, computer, and video equipment, furniture,

fixtures, software, and other equipment at the Debtors' facilities. The Debtors' assets also include

merchant reserves, cash deposits and accounts receivable.

15.     The Debtors' day-to-day management is led by a complement of corporate officers

and supported by an organization of general and administrative staff.

**C.     The Independent Sales Representative Contracts**

16.     Individual that wish to become and Independent Sale Representatives enter into a

1-year auto renewable agreement (the "Representative Agreements") and pay an initial fee and

make monthly payment(s) (the "RBS Fees") in exchange for full access to the WorldVentures

Representative Business System ("RBS") platform.

17.     Sales Reps are under no obligation to purchase any products of services of the

Debtors.  The Sales Reps receive commissions on membership sales to end-use customers.  No

commissions are paid for recruiting new Sales Reps and there is no compensation derived from a

Sales Rep's personal purchase.  Commissions are paid weekly and monthly based upon

performance.  Performance, and therefore commissions, is measured on a tiered basis with caps

on weekly and monthly compensation.

18.     Representative Agreements contain certain terms and conditions that govern the

relationship.  In particular, each Sales Rep agrees to non-solicit and non-compete provisions during

and for a period of 1-year following the termination of their agreement with the Debtors.  The

relationship is also governed by Policies and Procedures ("Policies") agreement.  The purpose of

these Policies is to define the relationship between the Debtors and the Sales Reps, to set standards

of permissible business conduct and practices, to protect the business relationships, goodwill, trade

secrets, confidential information, including the Debtors' business methods and strategies, and to

protect and support Sales Reps via the ethical and compliant building of their business.

D.      **The Debtors' Pre-Petition Date Indebtedness**

(i)      **Secured Notes Payable**

19.      On November 3, 2017, the Debtors entered into that certain Security Agreement ("Initial Security Agreement") which provided for multiple secured notes ("Notes") issued by various individuals and entities ("Secured Parties") as listed below.  The Debtors also entered into that certain Note and Warrant Purchase Agreement as of November 3, 2017, which provided for the right to purchase membership interest units exercisable at $0.012 per unit.  The Notes then totaled $3,100,000, with an original maturity of November 3, 2018.  The Debtors subsequently repaid $100,000 of principal and the remaining balance was extended to November 3, 2019.  On October 30, 2019, the Debtors executed that certain First Amendment to the Security Agreement ("Amended Initial Security Agreement") in which they amended the maturity to November 30, 2020 ("Maturity").  On December 31, 2019, the Debtors entered into an Amended and Restated Security Agreement ("Restated Security Agreement") by and between Montgomery Capital Advisers, LLC, a Texas limited liability company, as Collateral Agent on behalf of the Secured Parties.  The Security Agreement extended the maturity date to November 30, 2020 and expanded the total principal balance of the Notes to $5,500,101.  In conjunction with the Restated Security Agreement, the Debtors executed a certain Amended and Restated Note and Warrant Purchase Agreement and Warrant Agreement with each of the Secured Parties.  These certain agreements, dated December 31, 2019, provided for the right to purchase membership interest units exercisable at $0.02199598 per unit.  The Notes bear an annual interest rate of 16% payable quarterly.  No principal payments are made until maturity, when the full principal balance plus all accrued interest is due.

20.      The Secured Parties and the associated outstanding principal balance and Warrant Units are listed in the table below:

| Investor | Principal | % | Warrant Units |
|---|---|---|---|
| Montgomery Capital Partners II, LP | $ 1,239,629 | 22.5% | 563,571 |
| Jae W. Chung | 1,068,145 | 19.4% | 485,609 |
| Bowling Capital Partners, Ltd. | 505,000 | 9.2% | 229,587 |
| Montgomery Capital Partners, LLC | 435,766 | 7.9% | 198,112 |
| Montgomery Capital Advisers, LLC | 167,383 | 3.0% | 76,097 |
| B. Terrell Limited Partnership | 223,177 | 4.1% | 101,463 |
| STRATA Trust Co, Custodian FBO TAM IRA | 200,000 | 3.6% | 90,926 |
| Steven A. Hall Irrevocable Trust | 250,000 | 4.5% | 113,657 |
| Maribess Miller | 100,000 | 1.8% | 45,463 |
| TWL Group, LP | 200,000 | 3.6% | 90,926 |
| Boog-Scott Family LP | 200,000 | 3.6% | 90,926 |
| Massoud Bayat AR Sole/Sep Prop Trust | 100,000 | 1.8% | 45,463 |
| Reza Bayat & Khatereh Tabandeh Trust, Rev | 100,000 | 1.8% | 45,463 |
| MA Ceres LLC | 100,000 | 1.8% | 45,463 |
| Type A Management LLC | 250,000 | 4.5% | 113,657 |
| Mulkey Holdings LLC | 250,000 | 4.5% | 113,657 |
| TBF Loose Holdings LLC | 111,000 | 2.0% | 50,464 |
| | $ 5,500,101 | 100.0% | 2,500,503 |

21.     The Debtors' obligation to repay the loans from the Secured Parties was evidenced by seventeen (17) separate promissory notes.  The Notes were secured (a) on a parity basis with each other; (b) by a lien on and security interest on all the Debtors' assets pursuant to the Restated Security Agreement; and (c) a lien on the federal income tax refund for 2016 of Wayne Nugent and Susan Nugent, residents of the State of Texas.

**(ii)     The 2020 Payroll Protection Program Loans**

22.     On or about March 27, 2020, Congress enacted, and the President signed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), and § 1102 of the CARES Act established the Paycheck Protection Program (the "PPP") as a convertible loan program under § 7(a) the Small Business Act (15 U.S.C. § 363(a)).  The travel and leisure industry which the Debtors operate was particularly hard hit by the global pandemic as geographical regions went into various stages of lockdown and implemented travel restrictions.  As a result, the Debtors

applied for relief with the SBA under the program.  The Debtors received $6,526,604 in funding under the program across five (5) separate legal entities as provided from in the table below.  The Debtors believe that they have complied with all the provisions and requirements for loan forgiveness.  As of the Petition Date, the Debtors have not yet submitted to their lending institutions the SBA Form 3508 requesting loan forgiveness.  The first opportunity for the Debtors to submit an application for forgiveness will occur in the first quarter of 2021 once the fourth quarter 2020 IRS Form 940/941 filings are complete.

| Legal Entity | PPP Loan Amount |
|---|---|
| WorldVentures Holdings, LLC | $   4,150,886 |
| WorldVentures Services, LLC | 1,619,757 |
| WorldVentures Marketing, LLC | 464,097 |
| Rovia, LLC | 269,103 |
| Rovia Corp Services, LLC | 22,761 |
| | $   6,526,604 |

### (iii)    **The Related Party Payables**

23.     Incorporated in the Accounts Payable and Representative Commissions current liability accounts are payables to majority owner Mr. Wayne Nugent.  As of November 20, 2020, these payables totaled $5,177,625.85.  Under the Accounts Payable account $1,862,219.88 related to a compensation plan tied to revenue generation ($1,773,430.78) and the reimbursement for travel, meals, entertainment, and other incidentals associated with normal course of business activity ($88,789.10).  Additionally, $3,315,405.97 related to the unpaid commissions earned by Mr. Nugent attributable to the Representative Commissions compensation plan then in place.

**E.**     <u>**Events Leading to Chapter 11**</u>

24.     The Debtors' operating model is based on an international sales force of independently contracted representatives that actively solicit program memberships that provide access to discounted travel and leisure experiences that range from group travel, individual travel, corporate events, and concierge services.  The representatives receive compensation in the form of commissions based on the level of sales of memberships they achieved on a weekly and monthly basis.  A majority of travel sales are transacted via credit card on the Debtors' online travel platform operated under the affiliate Rovia, LLC and available at www.dreamtrips.com.  Membership transactions are achieved when a person signs up to be a customer through the Debtors' online membership platform operated under the affiliate WorldVentures Marketing, LLC and available at www.worldventures.biz.  Individuals have the opportunity to sign-up to be a Sales Rep through this same platform.  Members pay in initial sign-up fee and a recurring membership charged to the member's credit card.  Each Sales Rep pays an initial sign-up fee and a recurring business system fee charged to the Sales Rep's credit card.

25.     Starting in 2015 and continuing until December 2016, revenue grew 32.9% from $612 million to $813 million as the business expanded into new international markets.  During this period of rapid growth, business leadership did not implement proper systems and controls to monitor profitability and cash flow.  A flawed commission structure was exploited by bad actors; in addition, around the same timeframe, overzealous Sales Reps in new markets began to aggressively market products in markets where the Debtors were not authorized to conduct business.  This behavior was most prevalent within the Asian markets and the aggressive nature resulted in a higher commissionable rate than any other region.  As a result, gross profit dropped from 30.2% in 2015 to 11.9% in 2016.  During that same period operating expenses only increased 27% from $124.4 million to $158.3 million; however, net income dropped from a profit of $47.6

million to a loss of $66.4 million.  In an effort to absorb losses, the business began to accumulate

past due trade payables and commissions.  To compound the liquidity issues, on or about April

2017 to May 2018, the Debtors were exposed to additional questionable activity in which stolen

credit cards were used to book memberships and travel packages for non-members; this abuse

resulted in approximately a 30% cancellation rate of trips.  Revenue declined from $533 million

in 2017 to $341 million in 2018.  Without adequate fraud and abuse management systems in place

to provide monitoring, the Debtors experienced investigations by regulatory bodies in multiple

markets resulting in fines and penalties.  Moreover, individual Sales Reps were investigated by

regulatory bodies, which further exacerbated the negative impact on the brand's reputation as

penalties, fines, and damaging press, were levied upon the system.  In response to the dramatic

impact to liquidity, the Debtors continued to withhold commissions payments and accumulated

over $42 million of an unpaid commission liability.

26.     In 2018, as revenue declined to $341 million the Debtors took further actions to

adjust pricing, yielding an 11% improvement in gross profit from 26% in 2017 to 37% in 2018,

and reduced operating expenses by $53 million in an attempt to preserve liquidity and recover

from the devastating incident.  The Debtors returned to profitability in 2018 and ended the year

with $17 million in net income.  By 2019, revenues seemed to stabilize at $335 million and

operating expenses were cut by another $14 million.  In an effort to increase revenue, earned

commissions were permitted to deviate programmatically from the published contractual structure

without the desired benefit causing gross profit margin dropped from 37% to 29% and net income

margin was down to only 2%.  By March 2020, the situation deteriorated to the point where the

then Chief Executive Officer resigned, and the Debtors were left to regroup and bring in a new

leadership. The Debtors hired Mr. Michael Poates as Chief Operating Officer to lead a reorganization and restructuring of the business.

27.     The COVID-19 global pandemic decimated the travel and leisure industry and the ensuing lockdowns, travel restrictions and economic downturn created a compounding effect that had a material adverse financial impact on the Debtors.  Many factors, including the steep decline in the travel and leisure market, which has impaired the ability of Sales Reps to sell travel products and memberships, have resulted in the failure of the Debtors to attract and retain members and customers as originally forecasted.

28.     All the above factors led to the Debtors' inability to service their debt obligations.

29.     Before the Petition Date, and as a result of discussions among the Debtors and the Collateral Agent, on behalf of the Secured Parties, the parties agreed that the Debtors would conduct negotiations with another direct sales business, Seacret Direct, LLC ("Seacret"), regarding a possible acquisition or merger of the two.  On July 22, 2020, the Debtors and Seacret executed a Co-Marketing Agreement where the Debtors' Sales Reps were permitted to purchase and sell Seacret's products with no reciprocity provided to the Debtor.  This relationship appeared to be mutually aligned and beneficial and therefore on November 10, 2020, the Debtors and Seacret executed a non-binding Letter of Intent ("LOI") agreement to outline the proposed transaction considerations in an effort to consummate a definitive asset purchase agreement by an undefined day in November 2020.  Subsequently, on November 11, 2020, the Debtors' Chief Executive Officer, under financial duress and against the guidance of the Debtor's Chief Legal Officer and Chief Operating Officer, among others, executed a Limited Solicitation Agreement ("Solicitation Agreement") with Seacret.  This agreement, among other provisions outlined in the LOI, gave exclusive right to Seacret to "solicit any WVM (WorldVentures Marketing, LLC, an affiliate of

the Debtor) Sale Representatives and enlist only such WVM Sales Representatives to join Seacret's downline organization and otherwise be associated with Seacret, as independent contractors, in order to sell current and future Seacret products and services and directly receive a commission or other form of compensation from Seacret for such sales." Furthermore, the agreement purports to require WorldVentures to "waives, and agrees not to enforce, any non-competition provisions or similar restrictions that might exist in any agreement between WVM and the WVM Sales Representatives."

30. Since the second quarter of 2020, the Debtors have pursued strategic alternatives to bolster their liquidity and position their business for a possible sale, absent the existence of any alternative to recapitalizing the Debtors. As the deterioration of sales and the acceleration of migration of Sales Rep to Seacret continued, the Debtors hired Erik Toth ("Toth") and Larx Advisors, Inc. ("Larx") to serve as Chief Restructuring Officer ("CRO") to the Debtors to review, develop and implement strategic alternatives including the possibility to seek the projections of bankruptcy.

31. As discussions and negotiations with Seacret stalled and an agreement on the terms and conditions of a purchase agreement seemed too distant, the Debtors, in conjunction with Larx, developed and distributed solicitation documents to a pool of over two hundred potentially interested parties. The marketing process also included the Collateral Agent. Collaborative discussions with the Collateral Agent resulted in a two-week extension to the Maturity date of the Notes.

32. The Debtors filed these Cases to effectuate a sale of their assets and/or equity interests. The filing of these Cases and the confirmation of the plan are the Debtors' best option

to preserve and maximize the value of their assets and business and create the greatest return to the Debtors' creditors.

## THE FIRST DAY MOTIONS

33.    I have read each of the First Day Motions in detail. All of the relief requested in the First Day Motions is necessary and critical to preserve the delicate status quo of the Debtors as fledgling debtors-in-possession under 11 U.S.C. 1107 and 1108. The Debtors' filed each of the First Day Motions for the purpose of minimizing disruptions to the Debtors' ordinary course of business operations.  All of the relief requested in the First Day Motions is vital to minimize disruptions to the Debtors' ordinary course of business operations. The Debtors believe that all of the relief requested in the First Day Motions is an exercise of sound business judgment in the best interests of the Estates, their creditors and all parties in interest to these Cases. The Debtors request the relief sought in the First Day Motions in good faith and with the goal to streamline operations as debtors-in-possession for the sole purpose of preserving the going concern value of their assets in order to maximize the return to their creditors. All relief requested in the First Day Motions is necessary to achieve these goals. Without the relief requested in the First Day Motions, the Debtors' ordinary course of business operations would be substantially and materially disrupted, leading to imminent and irreparable harm to the value of the Debtors' assets. At this critical phase of these Cases, the Debtors need to instill confidence in their customers, employees, Sales Reps, vendors and related third parties doing business with the Debtors in the ordinary course. All of the relief requested in the First Day Motions is required to instill such confidence and preserve the integrity of these business relationships. Without that confidence and preservation of the status quo of the Debtors' ordinary course of business operations, the Debtors will suffer irreparable harm due to the disruption of their business operations.

**A.**     **Notice of Complex Designation**

34.     The Debtors submit that these Cases qualify as "Complex Chapter 11 Cases" because:

> (a) The Debtors have a total debt of more than $10 million;
>
> (b) There are more than 50 parties-in-interest in this case; and
>
> (c) The Debtors have a significant need for simplification of noticing and hearing procedures to reduce delays and expense.

**B.**     **Treasury and Cash Management Motion**

35.     In their Treasury and Cash Management Motion, the Debtors request permission to: (a) continue to use their Cash Management System (as defined below); (b) honor certain pre-petition obligations related to the use of the Cash Management System; (c) continue using debit, wire, credit card and ACH payments as warranted; (d) maintain certain existing bank accounts and existing forms; and (e) continue the use of intercompany treasury systems employed in the ordinary course of business prior to the Petition Date.  The Cash Management System facilitates the Debtors' cash monitoring, forecasting, and reporting, and enables the Debtors to maintain control over the administration of their bank accounts.  Without the requested relief, the Debtors would be unable to maintain their financial operations effectively and efficiently, which would cause significant harm to the Debtors' operations and its estate.

36.     Before commencing these Cases, the Debtors managed their cash receivables and payables through a domestic cash management system (the "Cash Management System") maintained by Prosperity Bancshares, Inc. ("Prosperity"), Citibank, N.A. ("Citibank") and Titan Bank, N.A. ("Titan," and collectively with Prosperity and Citibank, the primary "Cash Management Banks").  Given limitations on banking institutions in the State of Hawaii, the Debtor is compelled to maintain an account with a de minimis balance at the Bank of Hawaii to facilitate

operations in that State.  A list of the accounts in the current Cash Management System, including

the Bank of Hawaii account, is described in detail in the Treasury and Cash Management Motion.

37.    In the Treasury and Cash Management Motion, the Debtors have also requested

authority to (a) maintain and continue to use any or all of their existing accounts in the names and

with the account numbers existing immediately before the Petition Date; provided, however, that

the Debtors have reserved the right to close some or all of their existing accounts and operate new

debtor-in-possession accounts; (b) deposit funds in and withdraw funds from any such accounts

by all usual means, including checks, wire transfers, automatic clearinghouse transfers, electronic

funds transfers, or other debits; and (c) treat their existing bank accounts (and all accounts opened

post-petition) for all purposes as debtor-in-possession accounts.

38.    The Debtors' Cash Management System constitutes an ordinary course and

essential business practice and provides significant benefits to the Debtors and their estate,

including, among other things, the ability to control corporate funds, ensure the maximum

availability of funds when necessary, and reduce borrowing costs and administrative expenses by

facilitating the movement of funds and by providing more timely and accurate account balance

information.  Specifically, in the ordinary course of business prior to the Petition Date, the Debtors

routinely operate on a detailed infrastructure of intercompany transfers to one or more foreign

affiliates to assist in the finance of the WorldVentures enterprise's global revenue. The Debtors

receive millions of dollars per month from foreign operations. From time to time, in order to

preserve the integrity of those foreign operations and the substantial revenue derived therefrom,

the Debtors' Cash Management System requires intercompany transfers to fund payments to

foreign affiliates of the Debtors for bridge financing of ordinary course of business expenditures.

If the intercompany treasury system was interrupted, the substantial revenue stream obtained from

the foreign affiliates and global operations would likely be substantially diminished. In order to preserve the status quo of those international operations and substantial foreign revenue stream, the Debtors seek temporary preservation of the intercompany treasury system and Cash Management System until such time as the Debtors can work with the U.S. Trustee's office concerning satisfaction of 11 U.S.C. 345 and the U.S. Trustee's guidelines. With a brief continuance and "breathing room" to assess the most efficient restructuring of the Cash Management System, the Debtors can ensure the foreign revenue stream continues to benefit the Estates.

39.     Having to replace the current Cash Management System immediately on the Petition Date would be costly and disruptive of the orderly collection of revenues by the Debtors, resulting in a significant adverse effect on the Debtors' operations and sale efforts.

40.     In addition, the Debtors, in the Treasury and Cash Management Motion, have requested that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtors to make all disbursements by check as the Debtors conduct many transactions through ACH and wire transfers and other similar methods.  If the Debtors' ability to conduct transactions by debit, wire, ACH transfer, or other similar methods is impaired, the Debtors may be unable to perform under certain contracts, their business operations may be unnecessarily disrupted, and their Estates may incur additional costs.

41.     The Debtors also request that the Court authorize the Cash Management Banks to (a) continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors-in-possession, without interruption and in the ordinary course of business and only to the extent authorized by order of the Court and (b) accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be honored or dishonored

consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date and that such bank not be deemed to be liable to the Debtors or their estate on account of such pre-petition check or other item honored post-petition.

42.     As part of the Cash Management System, the Debtors utilize numerous business forms in the ordinary course of their business operations.  To preserve funds and assist in the efficient administration of their Estates, the Debtors have sought authority to use pre-existing business forms and check stock; provided, however, that once the Debtors' current stock of business forms has been exhausted, the Debtors will, when reordering, require the designation "Debtor-in-Possession," the corresponding case number, and all other related information required by the Guidelines.

43.     The U.S. Trustee has pre-approved at least two (2) of the Cash Management Banks, Prosperity Bank and Citibank, as authorized depositories which is backed by the Federal Deposit Insurance Corporation (the "FDIC").

44.     Titan and Bank of Hawaii, the other Cash Management Banks, while not an authorized depository, are FDIC insured and intend to execute a depository agreement with the U.S. Trustee and take any necessary steps to comply with section 345 of the Bankruptcy Code.

**C.      Emergency Motion for Use of Cash Collateral: (A) Interim and Final Orders (I) Authorizing the Debtor's Limited Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Adequate Protection to Pre-petition Lender Pursuant to 11 U.S.C. §§ 361, 362, 363, and (B) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "Cash Collateral Motion")**

45.     The Debtors have an immediate need to use the Pre-Petition Lenders' cash collateral (the "Cash Collateral") to continue the operation of their business.  Without such funds, the Debtors will not be able to pay costs and expenses, including but not limited to wages, salaries, commissions, professional fees, general and administrative operating expenses, lease operating

expenses, utilities, taxes, insurance premiums, and technology costs that arise in administration of these Case sand in the ordinary course of the Debtors' business operations.

46.     The Debtors are without sufficient funds, other than the Cash Collateral, to continue operations until a final Cash Collateral hearing.  Failure to obtain interim approval of their request to timely pay ongoing costs and expenses will result in immediate and irreparable harm to the Debtors and their Estates.  The request for interim authorization seeks only that amount of Cash Collateral necessary to avoid immediate and irreparable harm to the Debtors' assets pending a final hearing.

47.     Absent the ability to use the Cash Collateral, the Debtors will be forced to shut down their operations abruptly, which will negatively impact the value of their assets and reduce or eliminate any prospect for a successful reorganization and confirmation of the Debtors' Chapter 11 Plan.   Accordingly, the Debtors request authority to (a) use the Cash Collateral on an interim basis in accordance with the proposed interim budget and interim order attached to the Cash Collateral motion; (b) use the Cash Collateral on a final basis; and (c) provide adequate protection to the Pre-Petition Lenders.

48.     To protect the Pre-Petition Lenders' interest in the Cash Collateral, the interim order proposes to grant them adequate protection in the form of an equity cushion, valid and perfected additional and replacement security interests and liens and a super priority administrative expense claim to the extent of any diminution of value in their collateral, subject to the terms and conditions of the proposed interim order.

49.     The total debt owed to the Pre-Petition Lenders under the Notes does not exceed $5,695,392.00 as of the Petition Date. This amount is comprised of $5,500,101.00 in principal and $195,291.00 in accrued and unpaid interest, as of the Petition Date. The Pre-Petition Lenders assert

a lien on the Debtors' assets to secure the alleged indebtedness. The Debtors' assets included in

the Pre-Petition Lenders' asserted liens are, among others, cash, accounts receivable, merchant

reserves and inventory.  I have reviewed the Debtors' books and records extensively concerning

the status and current value of these assets. As of the Petition Date, these assets alone totaled:

| Asset Category | Dollar Value |
|---|---:|
| Cash (Unrestricted) | $3,327,220 |
| Accounts Receivable | $1,222,031 |
| Merchant Reserves | $5,625,964 |
| Inventory | $343,285 |
| **Total** | **$10,518,500** |

50.     As such, as of the Petition Date, the Pre-Petition Lenders hold an equity cushion of

not less than $4,823,108.00. The equity cushion completely protects the Pre-Petition Lenders

during the entire 13-week Budget period for the entirety of the projected cash diminution. The Pre-

Petition Lenders are never under-secured. Thus, the replacements are not even necessary.

However, out of an abundance of caution, the replacement liens are granted along with a super-

priority administrative expense claim under 11 U.S.C. 503 and 507 to ensure almost zero risk that

the Pre-Petition Lenders' collateral position as of the Petition Date is preserved.

51.     The Debtors reserve all rights to challenge the amount of the Pre-Petition Lenders'

alleged indebtedness and the extent, validity, and/or priority of the alleged liens asserted by the

Pre-Petition Lenders against the Debtors' assets. None of the recitals herein shall be deemed to be

an admission or waiver of the Debtors' rights, remedies, disputes, claims, causes of action,

objections or other challenges to the claims, debts, liens or other rights asserted by the Pre-Petition

Lenders against the Debtors. Rather, the recitations of the Petition Date balance of the Pre-Petition

Lenders' claim and the Petition Date value of the asserted collateral are provided solely for the

purpose of demonstrating the equity cushion available to the Pre-Petition Lenders as more than

sufficient adequate protection under 11 U.S.C. 361 for the Debtors' use of the Pre-Petition

Lenders' Cash Collateral.

**D.**    **Emergency Motion for an Order Authorizing (a) Payment of Pre-Petition Employee Wages, Salaries, Commissions, and Payroll Taxes, and (b) Honoring of Existing Benefit Plans and Policies in the Ordinary Course of Business (the "Wage Motion")**

52.    As more fully detailed in the Wage Motion, the Debtors' workforce consists of 85

employees.  In the Wage Motion, the Debtors seek Court authority to: (a) pay any and all pre-

petition wages due to the Debtors' Employees and Sales Reps for work performed pre-petition,

whether accrued or currently due and payable that would qualify for priority treatment under 11

U.S.C. 507(a)(4) (collectively, the "Compensation Obligations"); (b) continue to honor any and

all of the Debtors' pre-petition Employee Benefit Obligations (the "Benefit Obligations"),

including but not limited to, insurance payments, 401(k) matches, cell phone plans, credit cards,

and any benefit premiums incurred in connection with these Benefit Obligations; (c) continue

paying the Compensation Obligations, Benefit Obligations, Employee Reimbursement

Obligations, Payroll Tax Obligations, and all fees and costs incident to the foregoing, including

amounts owed to third-party administrators and governmental authorities (collectively, the

"Employee Obligations"); and (d) continue administering all of the Employee Obligations in the

ordinary course of business, at their discretion.  The Debtors further seek an order directing all

Cash Management Banks to receive, process, honor, and pay any and all checks, electronic fund

transfers, and automatic payroll transfers drawn on the Debtors' disbursement accounts

(collectively, the "Disbursement Accounts"), whether such checks were presented or fund transfer

requests were submitted before or after the Petition Date, to the extent that such checks or transfers

related to any of the Employee Obligations.

53.    The Debtors seek to minimize the personal hardship that would be visited upon

Employees if they are not paid when due and to maintain the morale of its essential workforce at

this critical time.  The Debtors will have sufficient funds to pay all requested amounts as and when due, assuming they are granted authority to use cash collateral.[2]  All payments made on account of the Employee Obligations and programs will be made in accordance with any budget approved by this Court with respect to the use of cash collateral.

54.     In the ordinary course of business, the Debtors outsource their payroll and related functions to Automatic Data Processing Inc dba ADP LLC ("ADP") pursuant to the Client Service Agreement dated February 6, 2018 (the "Agreement").

55.     The Debtors, through ADP, ordinarily pay Employees bi-weekly.  The amount of the bi-weekly payroll for the Debtor fluctuates each pay period.

56.     The Employees were most recently paid on December 18, 2020.  The Debtors have funded this payroll by depositing funds with ADP before the Petition Date.  Consequently, the Debtors are current on payroll through December 18, 2020.

57.     The Debtors provide a 401(k) matching contribution program and other employee benefits to their Employees through ADP (the "401(k) Program").

58.     Additionally, the Debtors provide various vacation and insurance benefits to their Employees.

59.     The Debtors, in the ordinary course of business, reimburse Employees for a variety of expenses, which include, among other things, business-related travel and business-related expenses.

60.     The Debtors maintain eight (8) company credit cards with AMEX with a $50,000.00 combined spending limit (the "AMEX Credit Cards").  The AMEX Credit Cards are used for routine business charges.  Although charges may fluctuate from month to month, the

---

[2] Contemporaneously with the filing of the Wage Motion, the Debtor has sought authority to use cash collateral.

Debtors expend approximately $32,000.00 per month to pay off the charges made to the AMEX Credit Cards.  As of the Petition Date, the Debtors are current for charges that have been incurred but either not yet billed, or billed, but not yet paid.

61.     The Debtors' Employees are central to their ordinary course business operations. A significant deterioration in employee morale at this critical time undoubtedly would have a devastating impact on the Debtors, their Sales Reps, customers, and vendors, the value of the Debtors' assets and going concern enterprise value, and the ability to continue operations.  The total amount sought to be paid herein is relatively modest compared with the size of the Debtors' overall business and the importance of the Employees.

62.     In addition to the Employees, the Debtors use the Sales Reps to drive revenue in the ordinary course of the Debtors' business operations.  In exchange for the revenue generated by the Sales Reps, the Debtors owe sales commissions to the Sales Reps.  Pursuant to 11 U.S.C. 507(a)(4)(A), sales commissions earned by an individual within the 180 days prior to the Petition Date are entitled to priority payment. In these Cases, among the approximately 60,000 Sales Reps working as independent contractors to the Debtors, a _maximum_ total of $15,858.20 in unpaid sales commissions were earned during the week prior to the Petition Date.

63.     At a maximum, the Sales Reps can earn up to a weekly total of $37,000.00 in sales commissions in the aggregate. The sales commissions are calculated on a weekly basis beginning on the Saturday of each week. The Debtors were current on all domestic sales commissions earned prior to the week-ended prior to the Petition Date.  The Petition Date was after business hours on Monday, December 21, 2020. As such, the prepetition sales commission week is 3 days (Saturday, December 19, 2020; Sunday, December 20, 2020; and Monday, December 21, 2020). Three (3) days out the seven (7)-day total of $37,000.00 = $15,858.20 (3/7 = 42.86%; 42.86% x $37,000 =

$15,858.20). Thus, among the total 60,000 Sales Reps, only a maximum of $15,858.20 in sales commissions could possibly be earned but unpaid as of the Petition Date. This amount split among the 60,000 Sales Reps is certainly under the $13,650.00 priority cap imposed by section 507(a)(4) of the Bankruptcy Code.

64.    As such, the Debtors respectfully request permission to pay a maximum of $15,858.20 in sales commissions earned by the Sales Reps prior to the Petition Date in compliance with and under the $13,650.00 per person priority cap imposed by section 507(a)(4) of the Bankruptcy Code.

**E.    Emergency Motion to Authorize (a) Continued Liability, Property, and Other Insurance Programs, (b) Payment of All Obligations in Respect Thereof, and (c) The Ability to Enter into Premium Financing Agreements in the Ordinary Course of Business (the "Insurance Motion")**

65.    In the Insurance Motion, the Debtors request authorization to (a) continue various Insurance Policies uninterrupted, in the ordinary course of business; and (b) enter into Premium Financing Agreements in the ordinary course of business.

66.    In connection with the operation of their businesses, the Debtors maintain business, cyber and travel related insurance. Instead of paying the entire insurance premium related to the policies in a lump sum, the Debtors have entered into a Premium Financing Agreement with AFCO, which allows the Debtors to pay their annual premium in 10 monthly installments. The Debtors' annual financed premiums are $356,569.02, with $71,794.00 down payment, interest at 5.04% and 10 payments of $29,139.47 per month.

67.    The nature of the Debtors' businesses makes it essential to maintain their Insurance Programs on an ongoing and uninterrupted basis. The non-payment of any premiums, deductibles, or related fees under any of the Insurance Programs could result in termination of existing policies,

declination to renew insurance policies or refusal to enter into new insurance agreements in the future.

**F.    Motion for Interim and Final Orders (a) Authorizing Adequate Assurance of Payments to Utilities; (b) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services; and (c) Establishing Procedures for Resolving Requests for Additional Assurance of Payment (the "Utilities Motion")**

68.    In the Utilities Motion, the Debtors request authority to make adequate assurance payments to utility companies currently providing or that will provide services to the Debtor (the "Utility Companies"), prohibiting the Utility Companies from altering, refusing, or discontinuing services to the Debtors on account of the bankruptcy filing or the non-payment of pre-petition amounts owed and establishing certain procedures for resolving utility company requests for additional assurance of payment.

69.    A list of the Debtors' Utility Companies is attached as an exhibit to the Utility Motion.  On average, the Debtor's current aggregate monthly utility usage is approximately $279,200.00.  Uninterrupted utility services are critical to the Debtors' ability to operate, provide services to their Sales Reps and customers, maintain the value of their businesses and to maximize value for the benefit of their creditors.  The Utility Services provided to the Debtors are incurred in the Debtors' ordinary course of business. The Utility Services are essential, critical and necessary to preserve the Debtors' ordinary course of business operations. Without any and all of the Utility Services provided by the Utility Companies, as set forth in the Utilities Motion, the Debtors' operations would be disrupted and irreparably harmed.  These ongoing post-petition costs for Utility Services are included in the Budget proposed for the Debtors' cash collateral usage to finance its ordinary course of business operations.

70.    Having uninterrupted access to the technology-based Utility Services that the Utility Companies provide is essential to the Debtors' ongoing operations due to the digital nature

of the Debtors' business. Access to such Utility Services is also critical for the Debtors to maintain and maximize the value of their businesses for the benefit of their creditors. The Debtors rely on these technology services to communicate and facilitate interactions with employees, sales representatives and customers, host the Debtors' data in offsite and secure locations, and manage the Debtors' robust technological infrastructure. Should any of these Utility Companies refuse or discontinue service, even for a brief period, the Debtors would face a prohibitive increase in costs necessary to ongoing operations. The Debtors would also be unable to compete with other travel business within their industry because the travel business industry heavily relies on online marketing and the ability for customers and sales representatives to book travel reservations virtually in locations across the globe. Lastly, the cost of locating alternative providers and reestablishing the data hosting services would be prohibitively expensive and time-consuming during a crucial period in the Debtors' reorganization. As fledgling debtors-in-possession, the Debtors must conserve all resources during the first month of these Cases to ensure minimal disruption to ordinary business operations and maintain its revenue stream to maximize the reorganization process.

71.     As mentioned above, the Debtors must maintain the ability to run their computer servers and communications equipment on a near-constant basis, and the Debtors cannot continue to operate without the cooperation of the Utility Companies. Should any Utility Company discontinue service, even for a brief period of time, the Debtors would likely experience a significant disruption to their operations and suffer irreparable harm during such interruption. Such a cessation would be detrimental to the Debtors' operations, result in a substantial loss of revenue, and irreparably harm and jeopardize the Debtors' reorganization efforts.

72.     The Debtors have proposed adequate assurance of payment to each identified Utility Company.  In most cases, payment of additional amounts above the proposed Adequate Assurance is unnecessary.   I anticipate that the cash flow from operations, cash on hand, and the assets described in this Declaration will be sufficient to pay all post-petition obligations to the Utility Companies.

**G.     Motion for Order Authorizing the Debtor to Pay Pre-petition Sales, VAT, Use, Property, and Other Taxes And Related Obligations (the "Tax Motion")**

73.     By the Tax Motion, the Debtors seek (a) authority, but not direction, to pay pre-petition taxes to the respective taxing authorities (collectively, the "Taxing Authorities") listed on the exhibit attached to the Tax Motion ("Taxes"); (b) authority to pay any pre-petition Taxes for which the applicable payment was remitted, but had not cleared the Debtors' bank accounts as of the Petition Date; and (c) authorization for the Debtors' banks to receive, honor, process and pay any and all checks drawn, or electronic fund transfers requested relating to the Taxes.

74.     The relief is being requested as certain Taxes may constitute "trust fund" taxes and thus are not property of the Debtors' Estates, and the failure to pay certain Taxes could result in a lien being placed on the Debtors' property and/or such taxes constitute priority claims.  The failure to pay the Taxes could disrupt the Debtors' operations and reorganization efforts and impair their successful reorganization. Further, some or all of Taxes will qualify for priority treatment under 11 U.S.C. 507(a)(8), and as such, the Taxes will have to be paid in full before a distribution to general unsecured creditors can be made.

75.     To my knowledge, the Debtors have sufficient liquidity to pay such amounts as they become due in the ordinary course of business.  The relief sought in the Tax Motion is necessary to the continued operation of the Debtors' businesses and preservation the value of the Debtors' Estates.

**H.** **Emergency Motion Seeking an Extension of Time to File Schedules, Lists, and Statements of Financial Affairs (the "Extension Motion")**

76.     Pursuant to Bankruptcy Rule of Procedure 1007(a)(5), the Debtors seek an extension of time in which it is required to file its Schedules of Assets and Liabilities ("Schedules") and its Statement of Financial Affairs ("SOFAs").

77.     Due to the complexity of the Debtors' Cases, total assets and liabilities, and the large number of creditors, including Sales Reps, the Debtors need additional time in which to create accurate Schedules and SOFAs as of the Petition Date.

78.     The requested extension of time to file Schedules and SOFAs in these Cases is not sought for the purposes of delay and will not prejudice any party in interest to these Cases. The requested extension is sought to ensure the most orderly administration of the Estates.

## CONCLUSION

79.     Approval of the First Day Motions is in the best interests of the Debtors, their Estates, their creditors and all parties in interest to these Cases.

80.     I have reviewed this Declaration and I hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing statements are true and correct and within my own personal knowledge.

81.     Declarant further sayeth not.

**Executed this 22 day of December, 2020.**

/S/ ERIK TOTH
Erik Toth
Chief Restructuring Officer
Spherature Investments LLC f/k/a
WorldVentures Holdings, LLC