**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **SPHERATURE INVESTMENTS LLC,** | § | **Case No.: 20-42492** |
| *et al.*[1] | § | |
| | § | **Joint Administration Requested** |
| Debtor. | § | |

**REGULATORY CLAIMANTS' OMNIBUS OBJECTION TO AND RESERVATION OF**
**RIGHTS WITH RESPECT TO FIRST DAY MOTIONS [ECF NOS. 8, 9, 13, 16, 18, 21]**

Melody Yiru, on behalf of herself and those similarly situated (the "Regulatory Claimants") by and through their undersigned counsel, hereby object (the "Omnibus Objection") or otherwise take the following position as to the following "First Day" motions (collectively referred to as the "First Day Motions" or the "Motions") filed by the above-captioned debtor and affiliated debtors (collectively, the "Debtors") as follows:

- Motion to Extend Time to File Schedules and Statements [Dkt. 8];

- Motion to Establish Complex Case Notice Procedures [Dkt. 9];

- Motion to Honor Prepetition Obligations to Customers [Dkt. 13];

- Motion to Pay Prepetition Wages, Salaries and Commissions [Dkt. 16];

- Motion to Use Cash Collateral [Dkt. 18];

- Motion to Maintain Treasury and Cash Management Systems [Dkt. 21].

---

[1] The "Debtors" in the above-captioned jointly administered chapter 11 bankruptcy cases ("Cases") are: Spherature Investments LLC ("Spherature") EIN#5471; Rovia, LLC ("Rovia") EIN#7705; WorldVentures Marketing Holdings, LLC ("WV Marketing Holdings") EIN#3846; WorldVentures Marketplace, LLC ("WV Marketplace") EIN#6264; WorldVentures Marketing, LLC ("WV Marketing") EIN#3255; WorldVentures Services, LLC ("WV Services") EIN #2220.

I.

## PRELIMINARY STATEMENT

Prior to the petition date, the Debtors were operators and promoters of a worldwide ponzi scheme and pyramid scheme. While the Debtors unquestionably belong in Bankruptcy Court, the Debtors here are attempting what no other such similar illegal enterprise has before; to reorganize a ponzi scheme as a going concern with the imprimatur of Federal Court Orders. Allowing these cases to proceed as a "reorganization" would facilitate wrongdoers in robbing Peter to pay Paul, taking income from new victims to pay commission of existing middle men representatives and those "kingpins" at the top of the organization. Instead, this case should ultimately proceed to liquidation as was the case in the bankruptcy of *In re TelexFree, LLC*, Case No. 14-40987 (Bankr. D. Mass.).[2] At minimum, more evidence is needed to determine whether the Debtors' admitted pre-bankruptcy misconduct is truly rooted in the past, and whether the suggested re-vamped model proposed by the CRO complies with existing Federal law and applicable regulatory standards. The Debtors have not identified which of their "Representatives" they will be compensating, how much such representatives will be compensated, and for what purpose.

The Debtors' requests for relief in the First Day Motions should be denied because creditors and parties-in-interest were not given sufficient notice of to evaluate the relief requested, and the Debtors have failed to meet their evidentiary burdens for the relief requested for at least the reasons stated below. A meeting of creditors pursuant to Section 341 has not been held, and no official committee of creditors or ad hoc committee of regulatory claims have yet been formed. Bankruptcy schedules, the Statement of Financial Affairs, and other required documents have not been filed. Therefore, the Court should either sustain the Regulatory Claimants' Objection or adjourn the hearing on these Motions to a later date to allow any official committee or other parties in interest a meaningful opportunity to evaluate the Motions. The Regulatory Claimants also

---

[2] https://www.bostonglobe.com/2020/07/09/business/telexfree-bankruptcy-judge-approves-150-million-pyramid-scheme-victims/. The Bankruptcy Court in *Telex* made ultimate findings that the Debtors were operating a pyramid scheme and ponzi scheme.

expressly reserve their right to object to any amendments made to the First Day Motions, or any other additional relief requested in any subsequently-filed motion.

II.

## BACKGROUND

Late into the December holiday season, and without providing any notice to Regulatory Claimants or their Counsel as required under the Federal Rules of Bankruptcy Procedure, the Debtors commenced their bankruptcy cases. The Debtors claim they have commenced these Chapter 11 proceedings based on the circumstances brought on by COVID-19 in March of 2020. The truth is, Debtors' problems began long before March of 2020 and involve a malady of a different sort; the Debtors' business model has been infected by the operation of a worldwide ponzi scheme and a pyramid scheme. These Debtors and various individuals have been operating an illegal business enterprise since 2005.  Ponzi schemes and pyramid schemes are ultimately destined to fail.  COVID-19 merely accelerated the collapse of this particular scheme.

Government regulatory authorities in Norway akin to the Department of Justice and the Federal Trade Commission, issued a ban against WorldVentures' continued operation, and found it was operating a pyramid scheme. WorldVentures strenuously challenged the governmental ban. This culminated into a blistering 24-page opinion finding on no uncertain terms, that the ban on operations should remain in place, and further that the Debtors were operators of a pyramid scheme. *See* Exhibit 1.  WorldVentures appealed to the Supreme Court in Norway. The Norwegian High Court affirmed the Court of Appeal's decision and the ban on Debtors' operations remained. Since then, things have only gotten worse for the Debtors.

Several reports and complaints of participants in the WorldVentures' business model evidence a violation of Federal wire laws, violations of the Foreign Corrupt Practices Act, a violation of the FTC standards concerning the operation of a multi-level marketing company, and violation of the consumer protection statutes of each state, including California which has a broad consumer remedial statute. This has culminated into a financial collapse, the banning of the

enterprise's venture in several other geographical localities, various investigations, and the failure to pay commissions.

Melody Yiru is the lead plaintiff in a Class Action that has been pending since 2017 in the Northern District of Texas, Case No. 3:17-cv-02155-S. [Lindemann Decl., Exhibit 2.]  In the Class Action, the Plaintiffs assert direct claims that the Debtors are operating an illegal pyramid scheme and endless chain under Federal and California law, and are otherwise engaging in illegal business practices. Based on the filing of the Debtors' Bankruptcy Case, there are additional derivative claims belonging to the estate concerning the Debtors' operation of a ponzi scheme and a pyramid scheme that overlap with the remedies requested in Ms. Yiru's litigation. Total restitution due to the pyramid and ponzi scheme victims exceeds $1.2 billion dollars.

III.

## **ARGUMENT**

Four principles for Courts to consider with regard to first day motions are:

First, the requested relief should be limited to that which is minimally necessary to maintain the existence of the debtor, until such time as the debtor can affect appropriate notice to creditors and parties in interest. In particular, a first day order should avoid substantive rulings that irrevocably determine the rights of parties.

Second, first day orders must maintain a level of clarity and simplicity sufficient to allow reasonable confidence that an order will effect no unanticipated or untoward consequences.

Third, first day orders are not a device to change the procedural and substantive rights that the Bankruptcy Code and Rules have established. In particular, first day orders should provide no substitute for the procedural and substantive protections of the plan confirmation process.

Fourth, no first day order should violate or disregard the substantive rights of parties, in ways not expressly authorized by the Bankruptcy Code.

*In re The Colad Group, Inc*., 324 B.R. 208, 213-14 (Bankr. W.D.N.Y. 2005).

Accordingly, the relief sought in the First Days, if granted at all, should only be granted on an interim basis, with a final hearing set so that an ad hoc committee of regulatory claimants or

official committee can be form, as well as other governmental or regulatory agencies can review and respond to the final relief sought, preferably after the schedules are filed and the Section 341 meeting of creditors is held.  The Regulatory Claimants reserve all rights to further object to the final relief sought through the First Day Motions.

### A. Illegal Business Ventures Are Not Entitled to Operate as Going Concerns in Bankruptcy

Although there has been no finding *domestically* that the Debtors are operating a worldwide ponzi scheme and pyramid scheme, the trend in Texas has been to determine similar nation-wide schemes operating from Texas to be illegal pyramid models subject to a ban on operations and an Order to pay restitution to pyramid scheme victims.[3]  After disclosures are made and discovery is had, the workings of this enterprise will show an even clearer picture of pyramid and ponzi misconduct because there are no legitimate consumers that can be masked through a self-manufactured product.[4]  In addition, the appellate tested Norwegian ruling affirming the ban of the Debtors, encapsulates a foreign business model which was run domestically, and in a uniform fashion in the United States.  The declaration offered in support of the First Day Motions does concede some of the Debtors' checkered past, but does not explain how things have changed and how the current operations are not simply resorting to "business as usual." The First Day Motions suggest that the CRO has not been installed in direct management and oversight over the day-to-

---

[3] In October of 2019, Plano based Advocare, was banned by the United States Federal Trade Commission (FTC) and required to pay $150 million.
https://starlocalmedia.com/planocourier/news/plano-based-advocare-fined-150m-for-ftc-pyramid-scheme-charges/article_5d47f558-e5e1-11e9-bb58-9f8aa7a358e5.html.

Another similar Dallas company, Neoria, LLC, was sued by the FTC in November of 2019 for operating a pyramid scheme.
https://www.ftc.gov/news-events/blogs/business-blog/2019/11/ftc-alleges-neora-formerly-known-nerium-operates-illegal.

[4] A similar "travel package" pyramid multi-level marketing company, YTB International, was banned in California.
https://oag.ca.gov/news/press-releases/brown-ends-ytbs-online-travel-pyramid-scheme.

day operations of the business, including the coming and going of proceeds to the Debtors' distributors or representatives. Debtors who derive income illegally may not reorganize or operate under the Bankruptcy Code. *Cf. Burton v. Maney* (*In re Burton*), 610 B.R. 633 (B.A.P. 9th Cir. 2020) (debtors may not operate a business that illegally derives income from marijuana); *In re Malul*, No. 11-21140 MER, 2020 WL 1486775 (D. Colo. March 24, 2020) (same); *In re Pharmagreen Biotech, Inc.*, No. 20-50780-BTB (Bankr. D. Nev. Oct. 7, 2020).

Simply, the Debtors have not presented sufficient evidence that they have turned the page and that they have discontinued the operation of their pyramid scheme and ponzi scheme. Further proceedings should be conducted after the Debtors finish making their disclosures in these Cases, reasonable discovery is afforded, and an evidentiary hearing is conducted. Until such time, the use of estate property should not be used to pay Debtors insiders, conspirators, and those whom the Estates have significant avoidance power claims against. If the Motions are granted at all, they should be granted on a limited basis and solely pay lower level employees who can assist the CRO in preparing and filing schedules.

### B.   The Deadline to File Schedules Must Occur Before the Final Hearings on the First Day Motions

The Debtors have requested a 30-day extension to file their Schedules. [ECF No. 8.] The Regulatory Claimants do not oppose this extension so long as the Debtors file their schedules and statements at least seven days in advance of the date that parties in interest have to file their final opposition to the First Day Motions. If the Final Hearings cannot be conducted to afford parties in interest the right to review schedules in advance of the Final Hearings, the extension should be limited to fourteen days so parties are afforded due process in these proceedings and so that they can adequately prepare for the final hearings. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Otherwise, the Motion should be denied.

C.  **The Notice Motion [ECF No. 9] May Not Be Used to Eliminate Service on Victims**

The Regulatory Claimants agree that the cost of mailing each and every filing in this case to the entire creditor body would be prohibitive, beyond the documents referenced in the proposed Order.  ECF No. 9-1, ¶ 3. First, it is unclear if Debtors' notice program has captured all potential victims, and whether the Debtors have included the e-mail and address of all active and inactive representatives.  Ms. Yiru was not noticed by Stretto with the filing of this bankruptcy case, nor were other representatives of Debtors that counsel knows may be victims of the Debtors' ponzi scheme. Defendants must serve all "representatives" who have enrolled by e-mail, and confirm with the Court and parties in interest that the Debtors have made best efforts to include each e-mail address in their database for the Representatives affected by this illegal enterprise.  Since Debtors have the e-mail addresses for all victims readily available at the push of a button, and the Debtors are utilizing a reputable servicing agent Stretto who has the capability of cost-effectively pushing notice via e-mail, all notices and pertinent filings should be served on the representatives who lost money with the Debtors, via e-mail. Except for receiving safeguards and assurances that the entire class of representatives have been included in the notice program, and serving such representatives via e-mail with pertinent filings, the Administrative Claimants do not oppose the balance of the relief requested in the Notice Motion.

D.     **Except to Pay Non-insider Employees critical for providing information to complete Debtors' schedules, the Debtors' Wage Motion [ECF No. 16] Should Be Denied**

The Regulatory Claimants oppose payment to insiders and independent contractors who may be defendants of avoidance power claims in these cases.  The Debtors have provided no information as to the Independent Contractors they would like to compensate, nor have they satisfied the requisite elements under 507(a)(4)(b) to paying independent contractors.  Except for paying the salaries of lower level employees necessary to provide information to assist the CRO and parties in interest with evaluating these Debtors, the proposed payments are inappropriate at this time.

1.      The Debtors Have Not Satisfied the Requirements to Pay Independent Contractors
        under the Bankruptcy Code

Buried in the Motion, the Debtors have asked for authority to pay "sales commissions"

concerning *some* of the "60,000 sales representatives" who are "independent contractors."  [ECF

No. 16, p. 9.] The request fails initially, because the Debtors have not identified with <u>any evidence</u>,

the names of the independent contractor representatives to be paid, the necessity for payment, the

prospects of reorganization, whether the recipients are "insiders" of the Debtor, whether the

Representatives' claims are within the time limits established by 11 U.S.C. Sec. 507, and that the

payment will not render the estate administratively insolvent.  *See In re Pioneer Health Sers., Inc.*,

570 B.R. 228 (Bankr. S.D. Miss. 2017) (reviewing the necessity doctrine and denying payment of

pre-petition wages).  There is not even a ballpark as to how *much* will be paid to this group.  Thus,

the request to pay Debtors' independent contractors fails.

Even if necessary detail had been provided to creditors and parties in interest, the Debtors

must still establish pursuant to 11 U.S.C. § 507(a)(4)(B), that "the independent contractor must

have been acting as such for the debtor with regard to the sale of goods or services in the ordinary

course of the debtor's business. In addition, during the 12 months preceding the earlier of the date

of the filing of the petition or the cessation of the debtor's business, the independent contractor

must have earned from the debtor at least 75 percent of the total amount earned by such

independent contractor from the sale of goods or services." 4 COLLIER ON BANKRUPTCY ¶

507.06[3][b] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.); *see also In re Ecosmart*, Case

No. 2:15-bk-27139-RK (C.D. Cal. Nov. 16, 2015) (denying request to pay independent contractors

since requirements of Section 507(a)(4)(B) were not met). The priority claims of independent

contractor sales commissions are subject to the same monetary and time limitations as wages and

salaries. *See Meyers v. Heffernan*, 740 F. Supp. 2d 637, 648 (D. Del. 2010).

Here, the Debtors have not demonstrated which "debtor" the representatives were acting

on behalf of, nor have they identified that each contractor was selling a "good or service" and that

each contractor earned from the "debtor" at least 75 percent of the total amount earned by such independent contractor.   Having failed to meet these fundamental requirements of Section 507(a)(4)(B), the request to pay the independent contractor representatives cannot be granted.   As a matter of equity, this matter should not be considered until further determinations are made in the case.

2.   The Debtors Have Not Established That Paying Insiders Is Warranted nor <u>Necessary</u>

The two general overriding policies of permitting payment to insiders include (i) to preserve the value of the estate for the benefit of its creditors and (ii) to prevent the unjust enrichment of insiders of the estate at the expense of its creditors. *In re AMR Corp.*, 490 B.R. 158, 164-65 (Bankr. S.D.N.Y. 2013); *In re Delta Air Lines, Inc.*, 2010 WL 423279 (Bankr. S.D.N.Y. Feb. 3, 2010) (insider claims are not to be paid to the extent not worth the value of the services) *citing Pepper v. Litton*, 308 U.S. 295 (1939).

The Debtors have not identified which of the employees are "insiders" under the United States Bankruptcy Code. [Dkt. 16-1.]   The Debtors have the burden to prove that they require the services of the various insiders provided for in the notices and that the proposed compensation is reasonable.   *See Matter of All Seasons Indus., Inc.*, 121 B.R. 822, 826-27 (Bankr. N.D. Ind. 1990). "[W]here the proposal is to continue compensating management upon the same terms and conditions as existed prior to the case, the presumption also extends to include the compensation of management insiders. This presumption is rebuttable, however, if "exigent circumstances are present" or "there is the potential for, and the prima facie appearance of, abuse." *Id*. at 825 *citing Lyon & Reboli*, 24 B.R. at 154–155. *See also In re Zerodec Mega Corp*., 39 B.R. 932, 935 (Bankr. E.D. Pa. 1984) (terms of insider compensation fixed and improved on the eve of insolvency). *Id*. at 825-26.

There is simply insufficient evidence at the beginning of this case to pay those who are "insiders" under the Bankruptcy Code as part of the wage motion.  Only non-insider, lower level employees who are aiding the CRO to complete schedules should be compensated.

3.      The Insiders and Independent Contractors Should Not be Compensated Now Based on Avoidance Power Claims Against Them

Section 502(d) of the Bankruptcy Code provides in relevant part:

> [T]he court shall disallow any claim of any entity from which property is recoverable under section [550] of this title, unless such entity . . . has . . . paid the amount . . . for which such entity . . . is liable . . . .

11 U.S.C. § 502(d).

The purpose of section 502(d) of the Bankruptcy Code is to prevent entities, which hold property subject to turnover or avoidance, from receiving a distribution of estate assets until such property is first returned to the estate. *See In re Mid Atl. Fund, Inc.*, 60 B.R. 604, 609 (Bankr. S.D.N.Y. 1986). This statute is a claims avoidance provision that requires bankruptcy courts to disallow claims to the extent that a creditor violates provisions of the Bankruptcy Code regarding voidable preferences and turnover actions. *Chapman v. Charles Schwab & Co. (In re Chapman)*, 269 B.R. 201, 207 (Bankr. N.D. Ill. 2001) (*citing* section 502(d) of the Bankruptcy Code); *accord Seta Corp. of Boca, Inc. v. Atl. Comput. Sys. (In re Atl. Comput. Sys.)*, 173 B.R. 858, 861 (S.D.N.Y. 1994); *see also* 4 COLLIER ON BANKRUPTCY ¶ 502.05[1] ("[s]ection 502(d) is operative: (1) when the trustee has secured an order to the claimant for a turnover of property under sections 542 and 543; (2) when the trustee, having successfully avoided transfers under the sections dealing with the trustee's avoidance powers, may proceed under section 550; (3) when a set-off has been found avoidable and the amount of the property thus set-off is recoverable to the estate."). Section 502(d) serves the policy goal of ensuring compliance with judicial orders. 4 COLLIER ON BANKRUPTCY ¶ 502.05[1] (*citing Campbell v. United States (In re Davis)*, 889 F.2d 658,

661(5th Cir. 1989)); *accord Enron Corp. v. Springfield Assocs., LLC* (*In re Enron Corp.*), 379

B.R. 425, 435 (S.D.N.Y. 2007).  11 U.S.C. § 502(d) prohibits payments to those who are culprits

of a ponzi scheme.  *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 120-

21 (Bankr. S.D.N.Y. 2011).

Simply, there is no telling how much money will be left in this case, and victims are owed

over a billion dollars.  Until parties in interest can get a handle on the avoidance power claims

against insiders and non-essential lower level employees, payments to insiders should be withheld

now.

E.     **Customer Obligations May Only Be Honored to Enforce a Legitimate Business
       Model [ECF No. 13]**

The Debtors request authority to honor certain obligations under the customer programs

for products and services sold, administer customer programs in a manner consistent with past

practices and in the ordinary course, and to continue or terminate customer programs.  [ECF No.

13-1, Proposed Order.]  If this were a typical business with typical customers, the relief would be

appropriate and customary in a Chapter 11 proceeding.  However, in this instance the Debtors have

not explained the financial consequences and results of "honoring obligations" with their tens of

thousands of representatives.  This is not a typical "customer" relationship.  The Representatives

provide significant funds and were left holding the bag.  The "middle men" those in between the

top of the pyramid and the field of victims abused, should not have their "customer" obligations

honored.  If this enterprise is selling legitimate travel packages to individuals outside of the

organization, i.e. those who never joined the Debtors' as representatives, such customer

obligations may be honored.  Except for this very limited subset of obligations, the Motion must

be denied.

F.     **The Debtors' Cash Management Motion [ECF 21] Should Be Denied**

Through the Cash Management Motion, the Debtors seek entry of an order authorizing the

continued use of Debtors' existing cash management system, prepetition bank accounts, and

business forms; continue to perform intercompany transactions, waiving compliance with the

investment and deposit requirements of section 345(b) of the Bankruptcy Code and granting "related relief." [*See* ECF No. 21, p. 2].

Section 345(a) of the Bankruptcy Code requires the trustee or a debtor in possession to deposit or invest money of the estate so that it will result in the "maximum reasonable net return. . . [while] taking into account the safety of such deposit or investment." Section 345(b) requires that estate funds be deposited or invested so as to ensure that the funds are protected for the benefit of creditors. *See* 11 U.S.C. § 345(b). Section 345 of the Code and the Guidelines are both designed to ensure that creditors' interests are also protected.

Generally, unless the funds are insured, guaranteed, or backed by the full faith and credit of the United States Government or its agencies, the institution holding the estate funds must post a bond in favor of the United States or, in the alternative, deposit securities pursuant to U.S.C. § 9303 as security. To ensure that trustees and debtors in possession meet their responsibilities to safeguard funds in accordance with Section 345, the United States Trustee monitors fiduciaries and depositories. *See United States Trustee Program Policy and Practices Manual*, Volume 7, "Banking and Bonding," ("Manual"), § 7-1.1, pp. 1-2, at https://www.justice.gov/ust/file/volume_7_banking_and_bonding.pdf/download.

The Uniform Depository Agreement between the depository and the United States Trustee requires the depository to maintain collateral, unless an order of the bankruptcy court. In addition to being a basic requirement to utilize chapter 11, compliance with the United States Trustee guidelines will ensure that banks can identify bank accounts for debtors-in-possession, ensure that they are in compliance with the requirements of 11 U.S.C. § 345(b), and that all post-petition monies received by the debtor will be readily identifiable and easily accounted for during the pendency of this case. provides otherwise, in an amount of no less than 115 percent of the aggregate bankruptcy funds on deposit in each bankruptcy estate that exceeds the FDIC insurance limit. *See* Manual, §7-1.2.1, p. 2. The Manual states that under no circumstances should a chapter 11 debtor, trustee, or examiner establish accounts in financial institutions or depositories outside

the United States without prior approval of the United States Trustee or the bankruptcy court. *See* Manual, § 7-1.2.3, pp. 4-5.

All depositories are required to maintain collateral, unless an order of the bankruptcy court provides otherwise, in an amount no less than 115 percent of the aggregate bankruptcy funds on deposit in each bankruptcy estate that exceeds the FDIC insurance limit. *See* Manual, § 7-1.3, pp. 5-6. Pursuant to the UDA, each authorized depository is required to provide quarterly reports for all bankruptcy estate accounts on deposit at all branches of the depository within the district. See Manual, § 7-1.3.2, p. 6. Compliance with the United States Trustee Guidelines will ensure that banks can identify bank accounts for debtors-in-possession, ensure that they are in compliance with the requirements of 11 U.S.C. § 345(b), and ensure that all post-petition monies received by the Debtor will be readily identifiable and easily accounted for during the pendency of this case.

The Regulatory Claimants object to the Cash Management Motion for the following reasons:

(1) the unconfirmed U.S. bank accounts and unregulated Foreign accounts do not provide sufficient transparency and security to creditors and parties in interest, and must be closed;

(2) The Debtors' Forms and website must notify prospective distributors and current distributors, that the Debtors are in bankruptcy, and may not be maintained;

(3) The Debtor should not be permitted to engage in intercompany transfers with non-debtor parties without further disclosures and further Court Order;

(4) The Proposed Order requests several problematic provisions that go beyond the Relief in the Motion and that which is permitted under the Bankruptcy Code.

1. <u>The Debtors Should Close Their Pre-Petition Accounts When Practicable and Sweep Funds to Authorized DIP Accounts</u>

First, the Debtors' requested relief should not be granted on extremely short notice, with little time for most creditors and parties in interest to formulate and file a written response to the First Day Motions. Additionally, certain parties with interests directly tied to the Debtors' business

operations and this bankruptcy case (*e.g.*, regulatory agencies including the FBI, DHS, FTC, and the DOJ, state attorneys general, and the U.S. Attorney's office) appear to have not been given notice of the filing of or hearing on these First Day Motions. An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314 (internal citations omitted).

The Debtors use the wires and mails for a dizzying array and high number of national and international transactions [*see* ECF No. 21, Ex. C].  Out of the 20 institutions, and hundreds of accounts, only two of Debtors bank have been determined to carry reserves necessary by the Department of Justice and the United States Trustee to be authorized; Bank of Texas and Prosperity. *See* Approved Depositories Region 6, https://www.justice.gov/ust-regions-r06/file/authorized_depository.pdf/download (last visited December 25, 2020).[5]

The Debtors are operating a worldwide ponzi scheme and pyramid scheme.  It is important that the monies received in this case from new victims be deposited in a registered and authorized debtor-in-possession account pursuant to the Bankruptcy Code.  In addition, the Debtors must be required to segregate all revenues received from those enrolled as representatives with Debtors, or whom purchase travel packages as representatives, in a segregated debtor-in-possession account approved under the UST's guidelines.

The Cash Management Motion does not contain sufficient evidence to support Debtors' assertions that their business operations will be disrupted or that compliance with the Bankruptcy Code and Guidelines would have an adverse impact on the operations of the Debtors. If any bank holding a specific account owned by the Debtors is not an authorized depository, the Debtor should transfer the assets therein to an authorized depository to be held in a Debtor in Possession account

---

[5] The CRO notes in his Declaration that Citi is approved.  The version we consulted did not note CITI as being approved.  However, if Citi is approved, the Regulatory Claimants have no objection to the Debtors opening an authorized Debtor in possession account with Citi.

after receiving Court authorization. Before this relief is granted, the Court should require the Debtor to substantiate its assertions and demonstrate exactly how and to what extent transferring its accounts to an approved depository would adversely impact its operations. Debtors should open debtor-in-possession accounts and sweep monies from pre-petition accounts into authorized DIP accounts. The Regulatory Claimants do not oppose a short period of time to effectuate this sweep.

2.  The Debtors Should Not Be Allowed to Maintain Existing Business Forms

The Debtors propose that "upon depletion" of the Debtors' "stock of business forms," they will then consider reflecting their status to third parties and the public as debtors-in-possession. [*See* ECF No. 21, p. 16]. This request is Debtors' latest device to avoid having to disclose to new victims that they are contracting with an entity in bankruptcy. Of course, the con relies on the impression that vast amounts of wealth can be made from the distributorship and bankruptcy gets in the way of that narrative. Tellingly, the Debtors do not disclose to the Court how many forms they have and when they expect such existing stock to be depleted. The Debtors' checks, wires, ACH transfers, policies and procedures manual, terms and condition document, and website must all indicate that the Debtors have filed a bankruptcy case with contact information or a web-link for the proposed distributor, vendor, or ensnared victim to learn more about the bankruptcy case. This is not an appropriate case for Debtors to maintain their existing forms, and Debtors' request in this regard should be denied. At minimum, the Debtor should be Ordered to stamp all forms, policies manuals, terms, and checks with the stamp reflecting the Debtors are in bankruptcy.

3.  The Debtors should not be authorized to engage in intercompany transfers with non-debtor parties without Proper Notice and Disclosures Pursuant to 11 U.S.C. § 363.

Buried in Debtors' "cash management motion" is a request by the Debtors to "engage in certain intercompany financial transactions with "each other" and "certain non-Debtor foreign affiliates." [*See* ECF No. 21, p. 16.] This provision is highly objectionable. There are no monetary limits, no indication of who is the recipient of this money, no indication as to who these "foreign

affiliates" are, and no stated purpose for the transactions. Given the Debtors are operating a worldwide ponzi scheme and pyramid scheme, the concern is even more pronounced here than in most chapter 11 proceedings. If the Debtors require Court authority to make transfers of funds pursuant to 11 U.S.C. § 363, the Debtors must file a noticed Motion and identify the specific parties involved. This request is not appropriate for a first day motion.

4.   Other Provisions in the Proposed Order are Improper and Should Not Be Approved

The Debtors have requested authority to honor checks written pre-petition. [*See* ECF No. 21-1, Proposed Order, p. 3, ¶5]. This should not be authorized because several bankruptcy Courts have held that such payments which have been dubbed straddle payments, may be unauthorized pursuant to 11 U.S.C. § 549. The Debtors have also requested permission to pay "all prepetition checks" "authorized under this Order," but do not identify with any specificity or clarity what pre-petition payments they require Court authorization for. [*Id.* at ¶8.] Third, the Debtors should not be permitted to "set off mutual post-petition obligations" and engage in intercompany transactions, all without further Court Order. [*Id.* at ¶¶ 12-13.] Finally, the Debtors' proposed Order is inconsistent with the relief requested in the Motion. In the Motion, the Debtors request extension of the time by which they must comply with 11 U.S.C. § 345, but in the proposed order, the Debtors request "waiver" of Section 345. [*Id.* at ¶ 16.]. This inconsistency must be dealt with if the Motion is to be granted in part, such that the Debtors are afforded a reasonable period of time to close their pre-petition accounts and sweep money into DOJ approved accounts.

G.   **The Purported Secured Creditors Should Not Be Extended a Superpriority On An Interim Basis**

The Debtors purport to give a group of "Secured Parties" (ECF No. 18-4) super priority status on their unspecified and unsubstantiated claim through a "cash collateral" motion. First, there is no identification in the Cash Collateral Motion as to ***how much*** was lent to the Debtors or ***how much*** is owed to the "secured creditors." The "Notes," "Security Agreements," nor evidence of the loans actually having been funded, is attached to the cash collateral motion. Without these

basic details, the Cash Collateral Motion cannot be approved insofar as it requests that a group of secured creditors who hold warrants be given superpriority status.  There is also no evidence under penalty of perjury that the amounts indicated in the Notes and Security Agreements were funded by the purported secured parties.  Given the dearth of evidence as to the agreements and notes, the Debtors' request must be denied on this record.

Second, no disclosure has been made as to whether any or all the "Secured Creditors" (or their officers, managers, directors) are "Insiders" as that term in the United States Bankruptcy Code.  Insider transactions are subject to a heightened and rigorous scrutiny.  *See In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (denying debtor's motion to assume restructuring support agreement and stating that the "heightened scrutiny" standard closely examines transactions involving insiders); *see also OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.*), 340 B.R. 510, 523 (Bankr. D. Del. 2006) ("[A]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms' length with the debtor.")

It also bears noting that the Secured Parties allegedly received security on December 31, 2019, which is within one year of the filing of the Bankruptcy Case.  The security agreements would thus, be subject to avoidance under 11 U.S.C. § 507 to the extent insiders may be involved or the warrants could be characterized as insider transactions. As presently framed, and on the current record, the Motion can be granted, but super-priority status should not be given to the Secured Creditors on an emergency basis on this limited record.

## IV. **<u>CONCLUSION</u>**

The First Day Motions should be denied.  In the alternative, minimum relief should be granted to allow the Debtors to provide the CRO with information to file schedules.  A trustee in this case is likely, if not inevitable, and the CRO should be restrained to spend limited funds that should ultimately be distributed to victims of the Debtors' pyramid and ponzi scheme.

DATED: December 28, 2020

Respectfully submitted by:

/s/ *Blake J. Lindemann*
Blake J. Lindemann
California Bar No. 255747
E-mail:  blake@lawbl.com
**LINDEMANN LAW FIRM, APC**
(*pro hac vice pending*)
433 N. Camden Drive, 4th Floor
Beverly Hills, CA 90210
Telephone No: 310-279-5269
Facsimile No: 310-300-0267

-and-

Rachel E. Montes
Texas Bar No. 45005925
Montes Law Group, PC
1121 Kinwest Parkway, Ste. 100
Irving, TX 75063
Telephone No: 214-522-9401
Facsimile No: 214-522-9428
Rachel@MontesLawGroup.com


COUNSEL FOR CREDITOR MELODY YIRU
AND THOSE SIMILARLY SITUATED


## CERTIFICATE OF SERVICE

On December 28, 2020, I electronically submitted the foregoing document with the clerk of the court of the U.S. Bankruptcy Court, Eastern District of Texas, using the electronic case filing system of the Court. I hereby certify that I will serve the parties individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ *Blake J. Lindemann*
Blake J. Lindemann

# Exhibit 1

# OSLO DISTRICT COURT

**JUDGMENT**

| | |
|---|---|
| **Pronounced:** | 27 September 2016 at Oslo District Court, |
| **Case no:** | 15-202315TVI-OTIR/05 |
| **Judge:** | District Court Judge     Jon Østensvig |

WorldVentures Marketing, LLC          Counsel Halvor Manshaus

**versus**

The Norwegian State, represented
by the Ministry of Culture          Counsel  Arne Johan Dahl

**No restrictions on the right to public reproduction**

**JUDGMENT**

The case concerns the validity of the Norwegian Gaming Board's administrative decision of 24 November 2014, which did not grant an appeal against the Norwegian Gaming and Foundation Authority's administrative decision to order cessation of parts of the plaintiff's activity in Norway. The case concerns in particular the question of whether the plaintiff's activity was in contravention of the prohibition on pyramid-like sales schemes laid down in Section 16 second paragraph of the Norwegian Lottery Act.

## 1    Background to the case

The plaintiff – WorldVentures Marketing, LLC (WorldVentures) – is a US-registered company in the WorldVentures Group, based near Dallas in the USA. WorldVentures currently conducts business in approximately 30 countries, with more than 700 employees and several hundred hired consultants. A key part of the business consists of selling memberships in DreamTrips, which on the company's website is referred to as a *'vacation club and lifestyle community'*. Members of DreamTrips have access to buying holiday trips from WorldVentures that are specially designed by that company, and they also have access to some other services and products. Members pay USD 199.99 on joining and a subsequent monthly fee of USD 49.98, in the following referred to as membership fees. The membership is not subject to any lock-in period or notice period. In Norway, general rules on cancellation periods are also applicable. Worldwide membership is stated to have been approximately 100,000 at the start of January 2013 and approximately 430,000 in May 2016.

Membership is not bought directly from WorldVentures. The company has linked up with a great many independent dealers and sellers who sell membership in DreamTrips directly to consumers, i.e. without using traditional sales channels. The sellers pay USD 99.99 on joining and a subsequent monthly fee of USD 10.99, in the following referred to as representative business system (RBS) fees. The sellers can recruit an underlying pyramid-structured sales organisation. The sellers get a commission from WorldVentures based on their own and their subordinates' sales of memberships, as regulated in more detail in a compensation plan. They do not get a commission based on the RBS fees paid by subordinate sellers. The business model for selling memberships is thus based on network sales or multi-level marketing (MLM). Many of the sellers have also bough membership in DreamTrips themselves.

WorldVentures has conducted business in the USA since 2005, and started its business in Norway in 2010. Based on queries concerning the company's activity in Norway, the Norwegian Gaming and Foundation Authority (the Gaming Authority) initiated a supervisory procedure in spring 2013. The Gaming Authority wanted to clarify whether the activity was in contravention of the prohibition laid down in Section 16 of the Lottery Act. The Gaming Authority prepared the case by obtaining information and documentation about the activity. A meeting was also held with WorldVentures, and correspondence took place with the

company's attorneys.

Based on a supervisory report dated 19 February 2014, the Gaming Authority gave WorldVentures advance notice of an administrative decision pursuant to Section 14a of the Lottery Act to order cessation the sale of memberships, RBS participation and related products, because the scheme was assumed to be in contravention of Section 16 second paragraph of the Lottery Act.  WorldVentures contested that this was the case, but the Gaming Authority upheld its assessment and, on 30 April 2014, it adopted an administrative decision pursuant to Section 14a of the Lottery Act, with the following conclusion:

> *'All sales of memberships, RBS participation and DreamTrips products to participants in WorldVentures in Norway must cease, because they are in contravention of Section 16 second paragraph of the Lottery Act.'*

WorldVentures appealed the decision, and the Gaming Authority decided to defer implementation on certain conditions pending a decision in the appeal case. The Gaming Authority's administrative decision was upheld by the Gaming Board in a decision of 24 November 2014. According to the information provided, WorldVentures subsequently complied with the order.

WorldVentures submitted a petition for a preliminary injunction, but the Office of the Chief City Judge of Oslo did not grant this petition in its ruling of 2 January 2015. On 23 October 2015, WorldVentures sent a notice of its intention to bring legal action and a claim for reversal of the administrative decision to the Gaming Authority. It appears that this was forwarded to the Ministry of Culture with a copy to the Gaming Board, without the claim for reversal being expressly considered.

The District Court received WorldVentures' notice of proceedings against the State represented by the Ministry of Culture on 17 December 2015, in which it entered a claim for the decision of the Gaming Board to be declared invalid, alternatively that it be repealed in whole or in part. In its notice of intention to defend of 18 February 2016, the State entered a claim that judgment be pronounced in its favour.

The main hearing was hels in Oslo Courthouse during the six days from 15 to 22 August 2016. The parties attended with their respective counsel, and WorldVentures was also represented by a co-counsel. WorldVentures was represented by the head of the group's legal department, while the State was represented by two senior advisers from the Gaming Authority. Fifteen witnesses gave evidence, including the aforementioned representatives of the parties, and case documents and other evidence were presented as mentioned in the court records.

When asked by the judge, the parties confirmed that WorldVentures Marketing, LLC is the correct plaintiff; re the general reference to WorldVentures in the administrative decisions, and that the plaintiff was WorldVentures Holding, LLC in the case submitted to the Office of the

Chief Judge of Oslo.

## 2      WorldVentures Marketing, LLC's statement of claim and arguments

WorldVentures submitted the following statement of claim at the main hearing:

1. *Principal claim: that the Gaming Board's administrative decision of 14 November 2014 be declared invalid and without effect.*

2. *Alternatively, that the Gaming Board's administrative decision be repealed in whole or in part to the extent that it goes further than there are grounds for.*

3. *In any case, that the State be ordered to cover the full costs of the case for WorldVentures Marketing, LLC.*

In brief, WorldVentures argued as follows in support of its statement of claim:
The administrative decision was based on incorrect application of law, incorrect and incomplete facts and assessment of the wrong issues.

The Court shall review all aspects of the decision. There is no basis for reluctance on the part of the Court to review the Gaming Board's assessments. The facts of the case at the time when the decision was made are decisive; such, however, that factual evidence can be presented subsequently to clarify the situation that prevailed when the decision was made.

WorldVentures is engaged in the sale of membership products in the form of network sales /MLM, and is otherwise like any other business. The sellers get their commission from the sale of products, which in turn are the result of significant investments and labour. This is real and sustainable economic activity and not a camouflaged pyramid scheme that falls under the scope of the Act. The purpose and result of the scheme are to generate profits by selling real services for which there is a demand and not by getting new participants to invest at the bottom of a pyramid structure.

Section 16 second paragraph of the Lottery Act is based on the Unfair Commercial Practices Directive and what is known as the *'Blacklist'*. It is not permitted to set further conditions such as *'market utility'* or a requirement for actual utilisation. Services and rights are products within the meaning of the Directive. The prohibition must be given a restrictive interpretation, and any doubt shall be to the benefit of the company. The prohibition shall apply to the grossest cases only, and WorldVentures' activity is nowhere near falling into that category. The interests of consumers are protected by other and less invasive provisions of the consumer legislation. It is illustrative that Norway is the only country where WorldVentures' activity has been prohibited. The administrative decision is based on misunderstandings and prejudices relating to MLM activities.

One fundamental error in the decision is that the members and sellers – as well as the

membership fees and RBS fees – are considered together. This entails a complete absence of analysis – and a fundamentally incorrect assessment and misunderstanding – of the business model and revenue flows. This has resulted in a number of incorrect assessments in relation to the conditions laid down by law. A more detailed analysis shows that dealers and members have quite different roles, rights and obligations, even if many act in both roles. The distinction between the different groups and revenue flows is absolutely fundamental and it is actually and legally implemented in this case and fully transparent. That many people have both roles is of no consequence to the deliberations in the case and is, moreover, completely natural in a business model based on direct sales. Furthermore, in foreign markets that have been allowed to develop, a relatively high number will be members only. Any overall consideration of this must be based on the specific circumstances, which is not the case here; see Norwegian Supreme Court Report Rt-2009-661.

Another error is the failure to consider and rely on the activity being sustainable, and not in the nature of a pyramid scheme that is pre-destined to collapse when new persons are no longer recruited to pay contributions. The accounts show that there are sufficient revenue flows at all times to cover the dealers' commissions without members being recruited. When a member leaves, the commission stops, and there is also an agreed cap on the commission. Lack of sustainability is a fundamental condition for such a business even falling under the scope of the prohibition in the Act; see the ECJ's decision in *4finance* and Rt-2009-661.

The Gaming Board's assessment that a pyramid-like system exists is incorrect. The Board has incorrectly considered members and dealers and membership fees and RBS fees together, and not conducted specific assessments. As opposed to what was the case in Rt-2009-661, there are no grounds for considering these factors together in the present case. When considered correctly and separately, it is clear that the members are not part of the company's sales system, which is an MLM system and therefore has a pyramid structure when seen in isolation.

No consideration is paid for the status of participant – neither by the sellers nor by the members or the two together. Payments by members and RBS fees are incorrectly confused in the administrative decision, and this is also not discussed further. It is overlooked that the RBS fee as a whole is paid to and kept by WorldVentures, and thus does not constitute payment for participant status and, in any case, not an overprice. As regards payments by members, no overprice can be deemed to have been charged as payment for participant status.

The sellers have no possibility of earning an income from other people's payment for participant status. No consideration is paid for participant status; see above. Whichever way you look at it, the RBS fee accrues to WorldVentures, and the sellers do not get a commission for recruiting new sellers. A member never becomes a participant in the sales scheme, so that contributions paid by members are irrelevant in this context and cannot in any case be deemed to constitute contributions.

The business's revenues cannot in any case be ascribed to '*specific*' recruitment. Concerning membership fees, the consumers are willing to pay for such membership, and so it must be assumed that the payment corresponds to the market value of the membership. The Directive and the Act stress that the sale or consumption of a product, service or other provision is relevant. The Gaming Board's point of departure is misconceived when it states that the value consists purely of the possible return of the member's contribution in the form of discounts on trips bought. The Gaming Board states incorrectly that reward points, the price guarantees and concierge services have no value, and fails to consider the value of the online travel agency (OTA). The Gaming Board states incorrectly that WorldVentures has not documented the basis for its revenues. Without conducting an independent assessment, the Gaming Board supports the Gaming Authority's view that the sale of products represents no more than 5% of the turnover. It is an incorrect and much too narrow approach when decisive weight is given to the actual use of the membership benefits.

The State is unable to explain how '*less than 5%*' is calculated as revenues from the sale of products. Based on the figures relied on by the State itself, the sale of trips represents 5.6%. Furthermore, it is not reasonable to use total revenues – both payments by members and RBS fees – in this context. The fact that reward points may be used for 90% of the trips has also been disregarded.

The Court must decide the market value of the membership – something that requires a complex overall assessment. Decisive weight cannot be given to actual use or '*market utility*'. Use of the figures from 2012 is incorrect, because the figures would have been at the global level at the time when the administrative decision was made had it not been for the supervisory procedure. The time for assessing the value of the membership is the time of purchase, and the value that the product represents to the buyer at that time; ref. the witness Finpå. The price of the concierge service cannot be set to the procurement price for WorldVentures and it must be assumed to be of significant value for each individual member, regardless of the extent to which it is actually used. The OTA is used and represents a real value. Members can order reasonable trips, are offered a price guarantee and the possibility of simple online planning. The Gaming Board has also overlooked the real value of the membership, which enables members to enjoy curated high-quality travel experiences, socialising with others, professional facilitation arrangements and a number of other elements. They are also given a Dream Price Promise and a price guarantee. Family members are included in the membership and can enjoy membership rights, and there is also a cancellation period and no lock-in period. It must be assumed that a membership paid by an employer would be considered a taxable benefit.

An active member will quickly enjoy benefits that exceed the contribution paid. That passive members fail to avail themselves of these benefits does not reduce the value of their membership. The members get what they are promised in the marketing. A high membership turnover is common to all subscriber relationships and is not a manifestation of low value.

The overall assessment must be based on the cross-border nature of the business, and not on the situation in Norway alone.

The conclusion is that the administrative decision is invalid on grounds of incorrect facts and application of the law.

Procedural errors exist that may have had consequences for the administrative decision; see Section 41 of the Public Administration Act.

The case has not been sufficiently clarified; see Section 17 of the Public Administration Act. The duty under Section 16 third paragraph of the Lottery Act does not relieve the authorities of the duty to clarify the case. WorldVentures has responded to all requests, submitted considerable amounts of documentation and actively sought to clarify the case and all aspects of the scheme. The Gaming Authority incorrectly focused on the situation in Norway and the actual discounted purchases of trips only. Moreover, the duty set out in Section 16 third paragraph of the Lottery Act is limited to providing information to show that incoming revenues do not fall under the scope of the provision, and WorldVentures has done that. WorldVentures did not receive adequate guidance on how to meet the duty of documentation; see Section 11 of the Public Administration Act. The Gaming Board did not make its own assessments and has now acknowledged that several relevant factors were not understood or considered.

Sufficient grounds were not provided for the administrative decision; see Section 25 of the Public Administration Act. There are more stringent requirements for the application of the law in cases that have to do with EEA rules, and also because this decision is particularly invasive.

The Gaming Board is subject to the procedural requirements mentioned above and shall consider the case independently within the framework provided for in Section 34 of the Public Administration Act.

The decision to impose a prohibition pursuant to Section 14 of the Lottery Act is in any case highly invasive and disproportionate. Less invasive measures could have been chosen. The administrative decision is therefore unlawful pursuant to non-statutory rules on abuse of power. This also entails that the decision must be limited to what is necessary; see the alternative statement of claim.

It is also a procedural error that no consideration was given to reversing the administrative decision even though a petition for reversal was submitted.

## 3 The State's statement of claim and arguments

The State represented by the Ministry of Culture submitted the following statement of claim at the main hearing:

1. *That the Court find in favour of the State represented by the Ministry of Culture.*

2. *That the State represented by the Ministry of Culture be awarded the costs of the case.*

In brief, the State argued as follows:

There is no evidence of the administrative decision being based on errors that would render it invalid.

The courts may review all aspects of the decision with a view to determining whether the conditions in Section 16 second paragraph of the Lottery Act are met. The Courts should nevertheless exercise caution when reviewing the expert assessments. Concerning the choice of sanction pursuant to Section 14a of the Lottery Act, it is only the question of whether there has been abuse of power that can be examined. Reviews by the Courts are based on the facts that formed the legal basis for the decision at the time when it was made.

It is the plaintiff that carries the burden of proving the invalidity of the decision. WorldVentures has also had the possibility of clarifying the facts, and also has a duty to provide documentation; see Section 16 third paragraph, where this is further underlined.

Section 16 second paragraph of the Lottery Act constitutes a complete harmonisation of the prohibition on pyramid promotional schemes set out in in point 14 in Annex I to the Unfair Commercial Practices Directive (2005/29/EC). The prohibition under the Act entails more stringent rules in that it also applies to pyramid-like sales schemes with elements of effective economic activity.

It is the activity in Norway that is the subject of the assessment; see Sections 2 and 4 of the Lottery Act.

Annex I and the Act are rather generally worded in order to prevent circumvention. What is decisive is an overall assessment of the real content of the scheme, and the designations used are of no consequence. Subjective factors and motivation are of no consequence.

In this case, there is no basis for distinguishing between members and sellers or between the revenue flows derived from each of these. Nearly all [the participants] in Norway held both roles, and this is underlined in the marketing, in the incentive schemes, and in the way some of the trips were carried out in Norway. That there is no legal obligation to take on both roles is of no consequence as this is how it actually worked in Norway. All payments were made to the same company, and the activities of the sellers were not separated out as a separate activity. The entire sales scheme must be considered as a whole; it would otherwise be very easy to circumvent the prohibition.

Seen as a whole, the sales scheme has a pyramid-like structure.

The participants pay a direct consideration for their status as participants. The payment is in

any case largely an indirect payment for participant status because what the participants receive in return in their different roles is highly overpriced; see the condition concerning a link between revenues and recruitment.

The participants pay for the possibility of earning an income derived from payments by other participants. In his capacity as a seller, the participant gets a commission on his own recruitment of new members, but he also gets more indirect financial gains through recruiting the members to also become sellers, who in turn generate a commission to the participant.

More than half the commissions paid for recruitment in Norway were financed by revenues from the recruitment of new participants and not by revenues from the sale or consumption of goods or services.

Gross sales of trips in Norway in 2012 and 2013 represented a very small part of the total turnover, which largely consisted of contributed membership fees and RBS fees, which must be deemed to constitute revenues from recruitment. Concerning the argument relating to sustainability, a distinction must be made between revenues from *'real'* or *'effective economic activity'* and revenues from *'economic contributions of its participants'*.

What is decisive with a view to determining whether the participants paid an overprice that must be deemed to constitute payment for participant status, is what values the participants on average actually received from the scheme in return for their contributions.

The membership only offered limited direct access to services, but the possibility of buying trips at what was stated to be discounted prices. In Norway, only a very small proportion of the members actually ordered a trip, and there was also a significant membership turnover. Based on the figures provided by WorldVentures, the Gaming Board has estimated that the sale of trips represented approximately 5% of the company's revenues in Norway. This means that the real value received by an average member in return for his contribution, namely the discount on purchased trips, was less than this. The reward point scheme has not been demonstrated to be of particular value. There is nothing to support that access to the online travel agency was of value to the members, and the same applies to the concierge service. The membership cannot otherwise be assumed to have any *'immaterial value'*.

On the whole, the membership is highly overpriced, since the members got very little in return for their contributions. The membership fees were in actual fact almost entirely payment for participant status in the sales scheme.

The RBS fee is included in the overall assessment. There is no basis for claiming that the participants were given something in return in the form of brochures, training, access to web pages etc. This amount, too, was in actual fact payment for participant status in the sales scheme.

At the participant level, the contributions effectively entailed little more than a possibility of recruiting new members, and at the national level in Norway, there was not sufficient effective economic activity to generate revenues to cover commissions to the sellers. To an overwhelming degree, the business concerned reallocation of participant fees.

The decision was not made on inadequate grounds; see Section 25 of the Public Administration Act and case law relating to the requirements of that Act. The case has been sufficiently clarified; see Section 17 of the Public Administration Act. This must also be seen in light of WorldVentures' statutory duty to provide information set out in Section 16 third paragraph ff. of the Lottery Act. Since the Court is fully competent to review the case, possible procedural errors are in any case of no consequence. No errors were made, and it is in any case of no consequence that reversal [of the decision] was not considered.

It is contested that the exercise of discretion relating to Section 14a of the Lottery Act was arbitrary or highly unreasonable.


## 4 The District Court's assessment

### 4.1    The issues for assessment in the case and some legal points of departure

It followed from the Gaming Board's decision that WorldVentures' business in Norway must largely cease because it was considered to be in contravention of Section 16 second paragraph of the Lottery Act. The key issue in the case is whether the decision was invalid because it was based on incorrect or incomplete facts or on incorrect application of the law; see sections 4.3 to 4.7 below. In addition, it is argued that the decision suffers from procedural errors, and also that the use of the authority to intervene provided for in Section 14a of the Lottery Act qualifies as being unreasonable or arbitrary; see sections 4.8 and 4.9 below. The Court considers the legal action to have been rather widely angled, both in terms of facts and legal arguments. In its deliberations, the Court has given particular weight to those factors that, in the Court's opinion, have a bearing on the assessment of the lawfulness of WorldVentures' business in Norway at the time when the administrative decision was made.

In the present case, the Court may examine the application of law, the findings of facts and the conclusions of law as well as whether there are significant procedural errors – all within the framework of what is invoked by the parties. In some areas of law where the relevant administrative bodies possess special competence and experience, there may be grounds for being reluctant to review the expert assessments that have been made. In the present case, the Court does not consider the question of whether such reluctance is warranted, as this is not decisive for the outcome. When reviewing the Gaming Board's use of the chosen sanction pursuant to Section 14a of the Lottery Act, the Court's review is limited to examining whether it is highly unreasonable, arbitrary or based on other forms of abuse of power pursuant to the non-statutory rules on this point.

The Court's review is based on the facts as they appeared at the time when the administrative decision was made; see *inter alia* the statement in Rt-2012-1985 paragraph 79. This means that the Court may only examine the facts that formed the legal basis for the Gaming Board's decision; such, however, that it may rely on any new evidential facts that shed light on the facts that formed the basis for the decision at the time it was made.

The Court bases its decision on what appears to be the most probable facts according to the evidence presented. It is the party who claims that the decision is invalid who must demonstrate the probability that the facts support this claim. If there is lack of clarity relating to the evidence in a situation where one party had the opportunity or was encouraged to clarify and document a matter, this may have an impact on the assessment of evidence.

In the present case, this must also be seen in conjunction with Section 16 third paragraph of the Lottery Act, from which it follows that the private party to the administrative proceedings may be ordered to document certain facts, namely that

> *'...the person's income can be specifically ascribed to the sale or consumption of goods, services or other benefits, rather than the recruitment of others to the scheme.'*

If a person is ordered to fulfil such an obligation, it means that the authorities are not under any obligation to refute undocumented pleadings submitted by the private party in support of such facts. The opposite also applies in that the authorities must be able to rely on the private party's information about relevant facts without claiming further documentation. The general duty of examination / duty to provide guidance [*sic*] must also be seen in the light of the above.


4.2    *The prohibition on pyramid-like sales schemes*

The prohibition on pyramid-like sales schemes is evident from Section 16 second paragraph seen in conjunction with the first paragraph of the Lottery Act:

> *'It is prohibited to establish, operate, participate in or promote pyramid games or similar schemes. The prohibition is understood to cover any scheme where consideration is paid for the possibility of gaining an income that is only derived from the recruitment of others to the pyramid game etc.*
> *The prohibition in the first paragraph includes pyramid-like sales schemes where consideration is paid for the possibility of gaining an income specifically derived from the recruitment of others to the scheme and not from the sale or consumption of goods, services or other benefits.'*

Section 16 second paragraph of the Lottery Act formed part of the full harmonisation of Norwegian law with the Unfair Commercial Practices Directive (2005/29/EC) and the general prohibition in Article 5 of the Directive. Pursuant to Article 5(5), an annex (Annex 1) was adopted listing certain forms of activity that *in all circumstances* were to be considered unfair

and prohibited. Annex I point 14, which forms the basis for Section 16 second paragraph of the Lottery Act, is worded as follows in the English version:

> '*Establishing, operating or promoting a pyramidpromotional scheme, where a consumer gives consideration for the opportunity to receive compensation that is derivedprimarily from the introduction of other consumers into the scheme rather than from the sale or consumption of products*.'

The parties agree that the Norwegian provision is in accordance with the Directive, and also that ECJ case law in the area is of relevance to the interpretation of the Norwegian provision. Referring to the Advocate General's opinion in the ECJ case *4finance*, WorldVentures has pointed out that the purpose of Annex I has been to *'single out the practises that were most clearly heinous',* and that the prohibition must therefore be given a restrictive interpretation. The Court agrees with this point of departure, but cannot see that this element of interpretation relating to the Directive and the wording of the Act should have any decisive bearing on the outcome of the present case.

Even though WorldVentures conducts its business in several countries, the Court agrees with the State's assessment that the administrative decision must be based on the business that is conducted in Norway and that applies to consumers domiciled in this country. It follows from Section 2 of the Lottery Act that the Act's geographical area of application is Norwegian territory, and the same applies to the supervisory authorities' powers to enforce the Act. In the Court's opinion, it also follows from this that what is decisive in the present case is whether the business in Norway was in contravention of the prohibition in the Act, and that it is of no consequence whether the business in other countries or globally, in an imagined assessment, would have fallen outside the scope of Section 16 second paragraph of the Lottery Act.

The prohibition in Section 16 and other parts of the Lottery Act can be administered by the Gaming Authority by ordering that the unlawful condition be rectified or that the activity cease or be closed down; see Section 14a of the Lottery Act.

The current version of Section 16 of the Lottery Act entered into force on 1 January 2006. The prohibition on out-and-out pyramid games and any camouflaged versions of out-and-out pyramid games, which is of long standing in Norway, was upheld in Section 16 first paragraph of the Lottery Act. It is stated in Proposition No 97 to the Odelsting (2004–2005) that the provision in Section 16 second paragraph of the Lottery Act aims to extend the area of application of the prohibition in this area. The prohibition on pyramid games turned out to be difficult to administer and easy to circumvent, particularly in that some undertakings had certain elements of effective economic activity, while the predominant part of their turnover was derived from the recruitment of new participants. It was assumed that the harmful effects for consumers of some such pyramid-like sales schemes could be of the same nature as in the case of out-and-out pyramid games, and that such schemes were therefore also not worthy of protection.

It is clear from the preparatory works to the Act that the relatively open and flexible wording of the prohibition was chosen intentionally so as not to facilitate the adaptation of sales schemes and contravention of the prohibition. For example, the chosen form of organisation/ incorporation and the designations chosen for the scheme in question or its various elements are of no consequence. An overall assessment shall be made of the real content of the activity, based on the criteria mentioned in the wording of the Act. The motives or objectives of those who are behind or participate in the activity are also of no consequence. As mentioned above, no detailed assessment is required of how gross or reprehensible these are deemed to be, given that the activity falls under the scope of the conditions laid down in the Act.

It is evident from the wording of the Act and the preparatory works to the Act that four cumulative conditions must be met for the activity to be considered an unlawful pyramid-like sales scheme:

– the sales scheme must have a pyramid-like structure, i.e. the participants must have the possibility of achieving financial gains from participants at a lower level;

– the participants pay a consideration in return for participating in the sales scheme;

– the participants have a possibility of deriving an income from the consideration paid by other participants to participate; and

– the disbursement of such income to the participants is primarily/predominantly financed by the revenues of the undertaking that are derived from the recruitment of new participants rather than the sale and consumption of products.

The Court's assessment of the above-mentioned conditions are discussed in sections 4.4 to 4.7 below.

*4.3    The question of whether members and sellers should be considered together*

In the present case, the Court finds it of paramount importance to the further assessment of the above-mentioned conditions whether, as far as WorldVentures' business in Norway is concerned, a distinction should be made between members and sellers, and between the revenue flows derived from each of these groups.

If the members and the agreement regulating membership in DreamTrips are considered in isolation, it would not be natural to say, for example, that they participate in a pyramid-like structure, and, in their capacity as members, they also do not have the possibility of recruiting participants or gaining an income from other participants' payments Those who pay for their membership may avail themselves of the membership benefits and do not otherwise participate in the sales scheme.

If the sellers, and the terms of the agreements and compensation plan regulating their activity, are considered in isolation, there is hardly a basis for saying that their activity falls under the scope of the prohibition. They are part of a pyramid-like structure in the same way as the sellers of any MLM undertaking, but their income is derived from the considerations paid by members who buy membership from the sellers or their underlying sales organisation, and it is not linked to income from the recruitment of new sellers who are to participate in the sales scheme.

The Court agrees with the State that there is no factual basis in the present case for claiming that the assessment must be based on there being a distinction between the members and the sellers, and between the revenue flows derived from the two groups. As mentioned above, the Court's point of departure is that an assessment must be made of the real content of the activity in Norway at the time when the administrative decision was made and of how this actually worked. How the scheme was organised and divided and the designations used for its different parts were of minor importance.

In a letter of 27 June 2013 to the Gaming Authority, WorldVentures stated the following:

> 'Concerning the number of persons to which these figures relate, these are stated to be (as of the end of May): The total number of sales representatives (comprises those who are sales representatives only as well as those who are both sales representatives and "customers") amounts to 3,539 persons. Of these, 73 are sales representatives only and 115 are "customers" only.'

The Court understands this to mean that at least 95% of the persons [involved in the scheme] in Norway were both sellers and members. This in itself indicates that no distinction can be made between the two roles for the purpose of assessing the real content of the activity. Neither the membership agreement nor the sales representative's agreement entailed any legal obligation to also take on the other role. The Court finds this of little significance given the actual situation whereby the relevant persons in Norway were in practice both sellers and members. That it is apparently common in MLM activities for the sellers to also have bought the product themselves does not automatically mean that a distinction should be made between these roles when considering the real content of the activity.

Several other factors in the case support the view that, in the assessment, no distinction can be made between the roles or revenue flows. On the whole, the Court understands the invitation to participate included in the presented marketing material to concern both membership and the *'business opportunity'* associated with becoming a seller. It is true that information about the two roles tends to be presented in different sections of the video films and the written information, but, on the whole, the Court has no doubts that the intention is for people who are recruited to take on both roles simultaneously. The wording of the contract form used for sellers must also be understood to point in the same direction. The invitation to become both a

seller and a member is also illustrated by use of the slogan '*Make a living, living'* for
marketing purposes.

The compensation plan for the sellers links the commission to the sellers' own sale of
memberships but also to sales of memberships by recruited sellers. The Court understands this
system to mean that there is a strong financial incentive, not only to sell memberships, but also
to recruit people to become both members and sellers. This supports the view that no
distinction can be made between the roles in an assessment of the real content.

The *'Refer 4 pay no more'* scheme points in the same direction. In brief, it means that a
member who refers a person to buy membership from a seller earns reward points and does not
have to pay the monthly membership fee. The fact that, in practice, the referring members are
also the sellers to whom they refer also supports the view that there are no real grounds for
distinguishing between the two roles.

Documentation of some DreamTrip stays for members in Norway in 2012 and 2013 also
shows that training and similar of sellers have taken place on some of these trips, another
factor that supports the view that, in practice, there was no distinction between the roles of
seller and member in Norway.

The Court understands that both membership fees and RBS fees have been paid to the same
company and into the same account. The Court considers it of minor significance that these
have been entered as separate revenue items in the company's accounts.

In summary, the Court believes that the assessment of the conditions in Section 16 second
paragraph of the Lottery Act shall be based on the real content of the activity at the time the
administrative decision was made, and that no basis exists in that connection for distinguishing
between the sellers and the members' activities or between the revenue flows derived from
these two roles. In the following, the Court considers the sellers and the members together as
participants in WorldVentures' activity in Norway.

### 4.4    Pyramid-like sales structure

It is not contested by WorldVentures that, seen in isolation, the sellers in Norway were
organised in a pyramid structure. They were able to build a subordinate sales organisation and
get commissions on their own sale of memberships and sales of memberships by recruited
sellers. This is also clear from the company's own overviews of sellers at different levels and
from the structure of the compensation plan. However, WorldVentures has contested that the
members are organised in such a structure.

The Court concluded above that there are no grounds for making a distinction between the
roles of member and seller when assessing the conditions in Section 16 second paragraph of

the Lottery Act. Based on how this functioned in Norway, the Court considers that the activity seen as a whole had a pyramid-like sales structure. The Court stresses that such a structure is not a problem in itself, provided that the participants' income or the undertaking's revenues are not predominantly derived from the recruitment of new participants.

### 4.5    Consideration in return for participant status

It is not disputed that, in their capacity as members, the participants paid a fee of USD 199.99 on joining, followed by a monthly fee of USD 49.98. In their capacity as sellers, the participants paid USD 99.99 on joining, followed by a monthly fee of USD 10.99.This means that almost all the participants paid a total of USD 970 in the course of the first year, followed by USD 731 in subsequent years.
The parties disagree as to whether the participants' payments should be deemed to constitute consideration in return for participant status in a sales scheme. WorldVentures takes the view that nobody paid for participant status in a sales scheme, but that the members paid for their membership in DreamTrips and associated benefits, and that the sellers paid for access to RBS, training, sales materials etc.

The Act's condition concerning participant payments does not require the consideration to be expressly classified as a participant fee; nor does it require the consideration to be of a certain scope. On this point, too, it is the actual circumstances that are decisive. Payment for participation can also be deemed to take place where the consideration paid does not correspond to the value of the goods, services or other benefits that the person who pays receives from the scheme – in other words, an overprice. It may then be concluded that indirect payment is made for the status of participant.

In the present case, the Court agrees with the State that the payments made by the participants must be deemed to constitute payment for participation in the sales scheme. In this connection, too, the roles of members and sellers and the consideration paid for these roles must be considered together. As will be concluded by the Court in section 4.7 on the relationship between revenues from recruitment and revenues from the sale of other benefits, the Court is of the opinion that the undertaking's revenues, largely consisting of the different types of consideration paid by the participants, did not correspond to the real value of the membership benefits or of access to RBS. With reference to this, the Court considers that it is quite clear that the participants' payment of membership fees and RBS fees must, at least indirectly and predominantly, be deemed to constitute payment in return for participant status in the sales scheme.

### 4.6    The possibility of deriving an income from recruiting others to the sales scheme

Furthermore, the Court finds that, through payment for participation, the participants were given

an opportunity to derive an income from the contributions paid by other participants. On this point, too, the Court's point of departure is that it is neither possible to distinguish between the roles of members and sellers nor between the revenue flows from these two roles; see section 4.3 above.

In their capacity as sellers, the participants were given an opportunity to earn a commission calculated on the basis of the membership fees paid by new participants. At the same time, they were given an opportunity to earn a commission on sales of memberships by the sellers they themselves had recruited. Since the sellers were in practice also members, and since new members were in practice also sellers, and since they all paid membership fees and RBS fees, the reality was that the participants had an opportunity to gain an income from the recruitment of others to the sales scheme.

That this was organised so that the commission was calculated on the basis of the membership fee fraction of the consideration paid by new participants is of no consequence in the assessment of the reality of this. The decisive point is that the participants were given an opportunity to derive an income from new participants who, in practice, were paying for their membership and for access to selling memberships and recruit new sellers in the sales scheme.

4.7    *Relationship between revenues from the sale of products and revenues from recruitment*

For the activity to be deemed to constitute an unlawful, pyramid-like sales scheme, it is a further condition that the income that the participants are able to earn is *'specifically derived'* from the recruitment of new members and not from *'the sale or consumption of goods, services or other benefits'.* In the preparatory works to the Act, this is understood to mean that it is a condition for deeming the sales scheme unlawful that more than 50% of the undertaking's revenues can be ascribed to the recruitment of new members.

Such a scheme means that the number of new members who pay participant fees to the sales scheme must continue to grow in order to finance the compensation paid to participants further up in the structure. It is a typical feature of out-and-out pyramid games and of many pyramid-like sales scheme that they are pre-destined to collapse, because it will not be possible in the long term to recruit a sufficient number of new participants and thus generate the revenues required to cover commitments to existing participants. When such a collapse occurs, the most recently recruited participants lose their contributions because these have been used to pay participants at a higher level.

For how long such a scheme can continue to work will depend on its detailed organisation, however. If some part of the revenues used to pay the participants is derived from the sale of products and services of real value, the scheme can survive for a long time. The same is true if the commitment to pay the participants is conditional on each individual participant being capable of actually generating revenue by recruiting new members. The prohibition in the Act does not, in the Court's opinion, provide for a condition whereby it must be substantiated that

the sales scheme will stop working and, if so, at what time.

On this point, WorldVentures has claimed that the scheme was sustainable and therefore falls outside the scope of the provision. It has been claimed that it was not necessary to recruit new members in order to meet the commitment to pay commissions to the sellers. The global accounting figures show that the amount contributed in membership fees in 2013, 2014 and 2015 was almost double the amount of the commissions paid to the sellers, and that the commissions paid represented approximately 30% of total revenues. Reference has also been made to there being an agreed cap on the sellers' commissions, and to the fact that, when members leave the scheme and stop paying membership fees, the seller's commission will be reduced proportionately.

According to the Court's understanding of the accounting figures that have been presented in evidence, the global undertaking was sustainable in the sense that the membership fees received clearly exceeded the commissions paid to the sellers. However, the Court cannot see that this is decisive for its assessment of the case. The key question is whether the undertaking's revenues in Norway, predominantly consisting of the participants' payment of membership fees and RBS fees, must be deemed to primarily constitute revenues from recruitment and not from the sale or consumption of products; see Section 16 second paragraph of the Lottery Act. The preparatory works to the Act and statements by the ECJ in *4finance* both show that it is the undertaking's revenues from the consumption and sale of products – *'effective economic activity'* – that is relevant when deciding whether an activity is sustainable. That the scheme can be sustainable by including direct monetary contributions from its participants – *'economic contribution of its participants'* – does not mean that the scheme can be deemed to be sustainable in this context. If such revenues were to be included in the calculations, it would mean that not even a scheme funded purely by recruitment would fall under the scope of the prohibition.

According to the Court's understanding of the parties, the actual dispute consists of whether and to what degree the revenues from membership fees and RBS fees must in fact be deemed to constitute revenues derived from recruitment and not from the sale or consumption of goods, services or other benefits. As far as the Court can see, it is clear in the present case that, if all or the major part of these revenues are regarded as revenues derived from recruitment and not from the sale or consumption of products, as assumed by the Gaming Board, then the scheme falls under the scope of the relevant condition in Section 16 second paragraph of the Lottery Act.

In other words, the Court is required to adopt a standpoint as to whether more than half of WorldVentures' revenues linked to Norway were derived from payments by participants at the time when the administrative decision was made. Concerning the part of the undertaking's revenues that consists of membership fees and RBS fees, the Court finds that, insofar as the participants have not received anything in return for the consideration paid, the overprice must

be deemed to constitute participant payment.

On this point, the Court agrees with the State that the important question when assessing the overprice [issue] is whether the participants in Norway actually received or consumed goods, services or other benefits in return. The right to avail oneself of a service can also be of value, but the Court agrees with the State that, in a more detailed assessment of the real value of such a right, the important factor must be the actual extent to which the service in question is used. The Court is of the opinion that the wording used to describe the condition in the Act and in Annex I, the opinions expressed in the preparatory works and in the criminal case Rt-2009-1601, all show that it is the benefits that the participants actually receive and avail themselves of in return that must be decisive for the assessment. Statements by the ECJ and the Advocate General in *4finance* point in the same direction. Moreover, the Court assumes that it would be almost impossible in practice to apply the condition contained in the prohibition provided for in the Act, unless the value of what the participants actually receive in return was normally considered to be decisive for the assessment.

On that basis, the Court has considered the factual information provided about the situation as regards WorldVentures' activity in Norway prior to the administrative decision.

Based on the presentation of evidence, the Court concurs with the assessment in the Gaming Board's decision, in which the Board agreed with the Gaming Authority's assessment in its decision and supervisory report. No evidence has been presented before the Court that would give grounds for any other assumption than that the undertaking's revenues in Norway – which in turn were used to pay commission to the participants – were very largely derived from contributions by participants and not from the consumption or sale of goods, services or other benefits.

As mentioned in section 4.4 above, almost all the members paid a total of USD 970 in the course of the first year, potentially followed by USD 731 in subsequent years, in membership fees and RBS fees. The Court has considered the extent to which benefits were provided in return for these contributions, or whether an overprice has been charged and, if so, must be deemed to constitute revenue derived from the participants' fees.

Concerning the value of the membership in DreamTrips, the Court takes as its starting point that this only to a limited extent conferred any immediate rights to services or other products. The membership permitted members to buy trips composed by WorldVentures. WorldVentures has stated, and the State has also relied on this, that the trips were sold at a 20–45% discount compared with corresponding trips offered by the market. The membership also entitled members to use a concierge service and online travel agency, whether in connection with trips or otherwise, and the members earned reward points that could be used as partial payment when buying trips.

The Court starts by assessing the value of the right to by discounted trips. The information provided

by WorldVentures showed a total turnover in Norway of approximately USD 3.5 million in 2012 and USD 3.2 million in 2013. Commissions to sellers amounted to USD 1.1 million in 2012 and 1,9  USD 1.9 million in 2013. Norwegians booked trips for a total of USD 209,000 in 2012 and USD 217,000 in 2013, amounts that represented 5–7% of the total turnover for these years, while the rest consisted mainly of contributions from the participants.

According to information provided by WorldVentures, the average number of members in Norway was about 2,900 in 2012 and 3,400 in 2013. These figures do not reflect the constant membership turnover, which meant that a significantly higher number of people actually participated as temporary members during these years. Hence, the average member booked trips for a very low amount compared with the membership fee he contributed. The Court takes the view that, what the members got in return for this element of their membership, namely the right to buy trips, lies in the value of the discount. Based on the information provided by WorldVentures concerning the size of the discount, it is clear to the Court that the value of this return service amounted to well under 5% of the consideration paid for being a member. It is somewhat unclear to the Court whether the Gaming Board and the Gaming Authority refer to the value of the discount or the value of the trips that were booked. Regardless of how we look at this, the Court finds that the Gaming Board was correct in its assessment that the return benefit of being entitled to buy trips was of very limited real value to the average member.

The Court also agrees with the State that little evidence has been provided regarding the value of the reward points. The Court understands that these were introduced as from the summer of 2014. This meant that reward points were earned on payment of membership fees, trips etc., which could subsequently be used as partial payment for trips. Based on the presentation of evidence, the Court understands that members in Norway made very limited use of such points. Use of this reward was also linked to the purchase of trips, which was done to a very limited extent compared with the total sales. The exact value of this return service is therefore difficult to determine, but it seems clear that this cannot in any case have been great enough to be decisive in the assessment of the case.

Concerning the value of the online travel agency, the Court is of the opinion that there are no factual grounds for claiming that this was a return benefit of any particular real value to the members. Information has been provided that the portal offered members the opportunity to buy trips etc. subject to a price guarantee, but the Court was presented with little evidence as to how much it was actually used and the value that such a guarantee might have generated for the members in Norway. The OTA is a website affiliated to WorldVentures and DreamTrips that offers members the possibility of simple and practical travel planning, rather than having to search for such additional services elsewhere. Members may also use the OTA in connection with trips other than DreamTrips. The Court finds it difficult to see that it has been documented that this represented a return benefit to members in Norway of such a value that it would have consequences for the Court's assessment in the case.

The Court finds that evidence has not been presented that the benefit to members of having access to the concierge service, whether in connection with trips or otherwise, is of any significant real value. Based on the presentation of evidence, the Court concludes that only limited use was made of this service, particularly outside the USA. The Court agrees with the State that no evidence has been presented to show that the actual use of or possibility of using this service has a value that can be given much weight in the assessment.

No other evidence has been presented in the case to substantiate that the quality or content of the membership itself should otherwise be assigned any real value in this connection.

Specifically relating to the part of the payment referred to as the RBS fee, the Court is of the opinion that it has not been documented that anything noteworthy has been received in return, so that this must also primarily be seen as income from the recruitment of sales participants. The Court agrees with the State that evidence has not been presented to show that what the participants received in the form of marketing material, training, access to web pages etc. so that they could operate as sellers, can be deemed to constitute return services corresponding to more than a very small part of the RBS fee paid.
Accordingly, the Court concludes that the condition of the Act that the undertaking's revenues must largely be derived from the recruitment of participants in the sales scheme and not from the consumption or sale of goods, services or other benefits, is clearly met in the present case.

Based on what was mentioned in sections 4.3 to 4.7, the Court concludes, on that basis, that WorldVentures' activities in Norway at the time of the administrative decision constituted a pyramid-like sales scheme in contravention of the prohibition in Section 16 second paragraph of the Lottery Act, as assumed by the Gaming Board. In that connection, the Court will add that sales of DreamTrips' trips also form an integral part of the sales scheme considered by the Court, so that this element also falls under the scope of the prohibition, as also assumed by the Gaming Board. The prohibition does not apply to the sale of any other products apart from this.

### 4.8   Procedural errors

WorldVentures has argued that the Gaming Board's decision, and its assessment that the activity came under the scope of the prohibition in Section 16 second paragraph of the Lottery Act, in any case suffers from procedural errors whereby it must be set aside as invalid; see Section 41 of the Public Administration Act. Reference is made to the authorities having failed to fulfil their duty to clarify a case before making an administrative decision and that sufficient grounds for the decision were not provided; see Sections 17 and 25 of the Public Administration Act.

These arguments cannot succeed. As mentioned above, the courts are competent to review all aspects of the administrative decision that have to do with the application of the prohibition in

Section 16 second paragraph of the Lottery Act. The Court has considered this question above, based on the evidence presented in court, and it has arrived at the same conclusion as the Gaming Board. Hence, there are no grounds for setting aside the administrative decision on the basis of the procedural errors invoked; see, for example, Rt-2013-258 and Rt-1969-1053.

The Court would nonetheless like to add that it cannot see that any such procedural errors were made. The Gaming Board has either expressly, or by concurring with the Gaming Authority' prior assessments, adopted a standpoint regarding the arguments submitted by WorldVentures in the course of the administrative procedure.
As far as the Court can see, the relevant conditions of the Act have been reviewed and discussed and the factual circumstances of relevance to the assessment and the conclusion have been described. Nor has the case been demonstrated to have been inadequately clarified by the authorities prior to making the administrative decision. Information about the activity in Norway was obtained from WorldVentures to the extent that this was necessary in order to consider the case. It also carries weight that the private party to the case is a large, professional player with a statutory duty to document the source of its revenues in Norway and that is also capable of understanding what was relevant to disclose and present in evidence.

WorldVentures also considers it a procedural error when the authorities failed to adopt a standpoint to the petition for reversal in connection with the submitted notice of legal action. The present case concerns the validity of the Gaming Board's administrative decision and not a subsequent decision not to consider a reversal [of that decision]. Any error in the processing of the petition for reversal will thus in any case be of no consequence for the claim in the present case.

### 4.9     Arbitrary or highly unreasonable decision

WorldVentures has argued that the administrative decision to order cessation of the activity pursuant to Section 14a of the Lottery Act must be repealed *'in whole or in part'* regardless of whether the activity is unlawful pursuant to Section 16 second paragraph of the Lottery Act. Reference is made to the fact that Section 14a of the Lottery Act is a 'may' provision and that the choice of sanctions by the authorities was very invasive in this case. Other sanctions such as an order to rectify [the unlawful condition] could have been attempted, or the condition could have been rectified by providing better guidance.

According to the Court's understanding, it is argued that the authorities' decision to order cessation (of the activity) must be deemed invalid because it must be deemed to be arbitrary or highly unreasonable and thus comes under the scope of the non-statutory rules on invalidity on grounds of abuse of powers.

This argument cannot succeed. Based on the presentation of evidence, it is not found to have been substantiated that the order to cease the activity that was deemed to be unlawful pursuant

to Section 14a of the Lottery Act was based on an arbitrary assessment or qualified as being unreasonable. The Court cannot review the detailed assessment by the authorities of whether it was expedient to first try less invasive measures such as to rectify [the unlawful condition]. The Court would like to point out, nonetheless, that rectification pursuant to Section 14a of the Lottery Act can appear to be a less relevant sanction where a whole sales scheme falls under the scope of Section 16 of the Lottery Act, compared with a situation where there is a more limited breach of the Act.

### 4.10    Conclusion

In the above, the Court has arrived at the conclusion that the Gaming Board's administrative decision cannot be set aside and declared invalid on any grounds, and it thus finds in favour of the State.

## 5      Costs of the case

The State represented by the Ministry of Culture has succeeded on all counts, and is, in principle, entitled to coverage of its legal costs by WorldVentures; see Section 20-2 (1) and (2) of the Dispute Act. The Court cannot see that there are any weighty grounds pursuant to subsection (3) for granting exemption from the main rule that the losing party shall cover the full costs of the case. The questions that have been decisive for the Court's assessment of the facts and application of the law and for the outcome in the case have not appeared particularly doubtful. That a prohibition on an activity that is in contravention of Section 16 second paragraph of the Lottery Act cannot be seen to have been heard by a court after the amendment of the Act, is also not a circumstance that is sufficient to exempt from the liability to cover the opposite party's costs of the case.

In its final statement of costs of 5 September 2016, the State has claimed coverage of NOK 327,370, consisting of the counsel's fees, witness expenses and some photocopying. The Court is of the opinion that what is claimed by the State can be assumed to be reasonable and necessary expenses in light of the nature and scope of the case and the duration of the main hearing; see Section 20-5 of the Dispute Act. WorldVentures is ordered to pay the above-mentioned amount to the State.

## RENDITION OF JUDGMENT

1   The Court finds in favour of State represented by the Ministry of Culture.

2   WorldVentures Marketing, LLC shall pay the costs of the case in the amount of
NOK 327,370 – three hundred and twenty seven thousand three hundred and
seventy kroner – to the State represented by the Ministry of Culture within two
weeks of service of judgment.

The Court rose.

Jon Østensvig (signature)<br>Jon Østensvig

Please find enclosed the guidelines on the right to appeal in    civil cases.

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| MELODY YIRU, aka SHI YIRU, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 3:17-CV-02155-S |
| WORLDVENTURES HOLDINGS, LLC, *et al.*, | § § § | |
| Defendants. | § § § | |

**<u>PLAINTIFF'S RENEWED FIRST AMENDED COMPLAINT</u>**

I.    **INTRODUCTION TO THE CASE**

1.    As the Federal Trade Commission has again enunciated this year, evidence of a pyramid scheme comes in the form of both design as well as in practice.  *FTC v. James Noland et al.*, Case No. 2:20-cv-00047-DWL, transcript of proceedings, Dkt. No. 105 (D. Ariz. February 16, 2020).  The compensation plan, the commission documents, the supposed terms and conditions, and the marketing materials and website here reflect the *design* of a pyramid scheme.

2.    So too, is WorldVentures a pyramid scheme *in practice*.  Here, 100% of the purchases were by individuals who are affiliates within the program. Thus, the overwhelming volume of individuals are purchasing for the business opportunity and not strictly for the retail product.  Finally, the FTC speaks of the "loss position," i.e. whether a substantial number of those who have joined the organization, pay more than they receive back from the company.  Here, at minimum, 97% of the representatives of WorldVentures are in a "loss position."  *See also* Ginger Jin, former director of the FTC's Bureau of Economics; Andrew Stivers, FTC deputy director; and Douglas Smith, FTC economist, "The Alchemy of a Pyramid: Transmuting business opportunity into a negative sum wealth transfer." *SSRN* (Dec. 3, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3497682.  These are the sorts of fact questions that cannot be decided on a motion to dismiss.

3.    As stated last month by FTC Commissioner Noah Phillips in his individual capacity, former Chief Counsel to U.S. Sen. John Cornyn: "this past year has been an active one for the FTC on many fronts, but in particular with respect to activities involving illegal multi-level marketing. Sellers beware: we've been aggressive in the cases we've been pursuing, the remedies we're seeking, and our willingness to go to court. Some watching today may not like everything we've been doing, and I regret that my remarks are unlikely to put them at ease." *Keynote Remarks of Commission Phillips at the DSA Legal & Regulatory Summit* (October 15, 2020) (complete remarks at  https://www.ftc.gov/public-statements/2020/10/keynote-remarks-commissioner-phillips-dsa-legal-regulatory-summit).

4.      WorldVentures' business practices is equally and in some respects, more egregious than the three exemplar cases Commissioner Phillips discussed in his remarks.  WorldVentures represented to Plaintiff Melody Yiru that she could "make a lot of money," "double your profits," and make an extra $20,000 by recruiting others to become WorldVentures "sales representatives." Plaintiff and members of the class all joined WorldVentures and became "sales representatives."

5.      However, Plaintiff did <u>not</u> make money as promised. Like the hundreds of thousands of WorldVentures representatives before and after her, Plaintiff failed. Plaintiff and the class failed even though they were committed and put in the time and effort. They failed because they were doomed from the start by a WorldVentures marketing plan that systematically rewards recruiting representatives over sales of travel packages, and WorldVentures is nothing more than a site that compiles travel package plans from the website (often at prices significantly in excess of what a consumer can obtain from Expedia). Only 3% of the members of WorldVentures will see a profit, according to WorldVentures own statistics.

6.      Defendants run an illegal pyramid scheme. Defendants have been banned from operating in Norway based on the Court system there finding that they were operating an illegal pyramid scheme.  Defendants take money in return for the right to sell travel membership services and the right rewards for recruiting other participants into the pyramid.

7.      Accordingly, Plaintiff, for herself, and all others similarly situated, and the general public, allege:

II.      **TYPE OF ACTION**

8.      Plaintiff sues for herself and for all persons who were WorldVentures representatives from May 1, 2013 until the present under California's Endless Chain Scheme Law (California's Penal Code § 327 and California Civil Code § 1689.2), California's Unfair Competition Law (Business and Professions Code §17200 *et seq.*), False Advertising Law (Business and Professions Code §17500), and Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* against all defendants for the operation and promotion of an inherently fraudulent endless chain scheme.

9.     Plaintiff also brings a declaratory relief Count that the entire purported contract is illusory, and thus a purported "choice of law," and other provisions in the so-called "agreement," are not enforceable pursuant to 28 U.S.C. §§ 2201 and 2202.

10.     Plaintiff files her renewed First Amended Complaint based on the challenges to the original First Amended Complaint that were ruled by this Court to be moot, and the subsequent Amended Final Award issued by AAA Arbitrator Hon. Carlos G. Lopez (ret.) on October 26, 2020.

III.   **PARTIES**

11.     Plaintiff Melody Yiru aka Shi Yiru is and at all relevant times was an individual who resided in Los Angeles County, California. Yiru became an WorldVentures representative in September of 2015. Plaintiff was deceived by WorldVentures' misleading opportunity believing the opportunity was a legitimate way to earn money (even though that was false), and Plaintiff Yiru did in fact lose money as a result of Defendants' unfair, unlawful, and fraudulent business practice. Yiru's injuries arise from the predicate acts themselves in that she provided a monthly payment to WorldVentures for over a year, she put significant effort into the opportunity, the WorldVentures entities were destined to fail as an illegal Ponzi scheme and pyramid scheme, and the money Yiru placed into the scheme was used by the Individual defendants as later defined, to live lavish life styles, and was reinvested in the business to create an air of propriety including office space, lavish trips, and conferences. Since Yiru's money went into the use or investment by Defendants as racketeering income, Plaintiff was injured.

12.     Yiru paid WorldVentures a start-up amount of $510.92 on or about September of 2015, and then monthly amounts ranging between $110.98 and $114.98 per month from October 1, 2015 to April 4, 2017, totaling $2,675.00. Yiru was recruited by WorldVentures, the defendants and her upline Meihong Liu. She was told that the only way to earn money was to recruit others.

13.     WorldVentures and the Individual Defendants who created, countenanced, and pedaled the marketing program, represented to Yiru that WorldVentures was a "home-based business with low overhead and $150 million in revenue." Further the presentation falsely stated that "for every $199 sale, you receive $20." This representation suggestively suggested and

implied that a "sale" was possible, when in reality the mentioning of "sale" meant in practice the recruitment of a new representative.

14.     WolrdVentures and the Individuals Defendants tout that an "average bonus" of $1,500 can be made, stating that 90 customers will be in the left line and 90 customers in the right line.  To effectuate these representations, WorldVentures presents a picture that demonstrates a recruiting endless chain.  The representation of customers with the chain is false because if a person is recruited within the network and signs up as a representative and below the participant in the chain, the person cannot be characterized as a "customer."

15.     WorldVentures Holdings, LLC, is a limited liability company under the laws of Nevada with its principal place of business in Nevada ("WV II").

16.     WorldVentures, LLC ("WV") is a Nevada limited liability company that is part of the corporate family of WorldVentures, and responsible for the acts alleged in this Complaint. WV, at all times relevant in this Complaint, did business in the State of California.

17.     WorldVentures Marketing, LLC ("WorldVentures") is another company that is part of the corporate family of WorldVentures, as is responsible for the acts alleged in this complaint. WorldVentures, at all times relevant in this Complaint, did business in the State of California.

18.     WorldVentures Foundation ("Foundation") is a Texas Corporation that is part of the corporate structure of WorldVentures, and responsible for the acts alleged in this Complaint. Foundation, at all times relevant in this Complaint, did business in the State of California. Foundation is registered to do business in the State of California with the California Secretary of State.

19.     Defendant Wayne Nugent ("Nugent") is a natural person and resident of the State of Texas.  He may be served with process at 1524 Van Winkle Drive, Plano, Texas, or wherever he may be found.  At all times relevant in this Complaint, Nugent reached the top one percent of distributors, has arranged for significant downlines and chains of recruited distributors, has unlawfully placed promoters and henchmen in higher positions of the chain, has maintained websites and training and recruitment videos, and is considered to be the spokesperson and leader

of the WorldVentures' entities.  The promotional and recruitment videos, seminar materials, and presentations were promoted and created by Nugent in the course of conducting the enterprises' affairs, and not conducting his own individual affairs.  Nugent was aware at all times as a promoter of the scheme that the revenues reaped in the business were primarily derived from recruitment of new representatives, as opposed to the sale of legitimate retail products.  On the WorldVentures' website, its co-founder Wayne Nugent's profile even proclaims that he is "the most passionate evangelist for Network Marketing as the premier distribution channel of leisure travel."  Nugent had meetings with secretly placed representatives in the organization that were not representatives as part of the field who were actually doing the work, Nugent improperly offered bonuses to certain individuals based on recruitment, he knew that the WorldVentures business could not engage in legitimate retail sales, knew that countless and nearly all representations failed financially, and that WorldVentures could not make its commission payment, and in fact faltered on commission payments because the enterprise is a pyramid scheme and Ponzi scheme.

20.     Nugent has acted and continues to act as managing-member of Defendant WorldVentures, Foundation, and Defendant WV.

21.     Defendant Michael Azcue ("Azcue") is a natural person and resident of the State of Texas. He may be served with process at 6400 Windcrest #1134, Plano TX 75024, or wherever he may be found.  From formation of WorldVentures until at least December 15, 2015 Azcue acted as one of the two controlling managing-members of WorldVentures in concert with Defendant Nugent.

22.     Defendant Daniel Stammen ("Stammen"), is a natural person and resident of the State of Texas or wherever he may found.  Defendant Stammen has acted and continues to act as managing-member of Defendant.

23.     Defendant Michael Azcue ("Azcue") is a natural person and resident of the State of Texas. He may be served with process at 6400 Windcrest #1134, Plano TX 75024, or wherever he may be found. From formation of WorldVentures until at least December 15, 2015, Azcue reached the top one percent of distributors, have arranged for significant downlines and chains,

have maintained websites and authorized training and recruitment videos, and are considered to be the spokesperson and leader of the entities. The promotional and recruitment videos, seminar materials, and presentations were promoted and created by Azcue in the course of conducting the enterprises' affairs, not conducting his own affairs. Azcue was aware at all times as a promoter of the scheme through December 15, 2015, that the revenues reaped in the business were primarily derived from recruitment as opposed to the sale of legitimate consumer products, meaning it was an illegal endless chain under California law. Azcue had meetings with secretly placed representatives in the organization that were not the field actually doing the work, improperly offered bonuses as to certain individuals based on recruitment, knew that the business could not engage in legitimate retail sales, knew that people failed, and that WorldVentures could not make its commission payments because the enterprise is a pyramid scheme and a Ponzi scheme.

24.     Defendant Daniel Stammen ("Stammen"), is a natural person and resident of the State of Texas or wherever he may found. At all times relevant to this Complaint, Nugent reached the top one percent of distributors, have arranged for significant downlines and chains, have maintained websites and authorized training and recruitment videos, and are considered to be the spokesperson and leader of the entities. The promotional and recruitment videos, seminar materials, and presentations were promoted and created by Stammen in the course of conducting the enterprises' affairs, not conducting his own affairs. Stammen was aware at all times as a promoter of the scheme, that the revenues reaped in the business were primarily derived from recruitment as opposed to the sale of legitimate consumer products. Stammen had meetings with secretly placed representatives in the organization that were not the field actually doing the work, improperly offered bonuses as to certain individuals based on recruitment, knew that the business could not engage in legitimate retail sales, knew that people failed, and that WorldVentures could not make its commission payments because the enterprise is a pyramid scheme and a Ponzi scheme.

25.     Nugent, Stammen, and Azcue are hereinafter referred to as the "Individual Defendants."

26.    A significant portion of World Ventures' sales occur in the State of California.

III.    **JURISDICTION AND VENUE**

27.    Jurisdiction is conferred upon this Court because Defendants do business in this judicial district, they hold themselves out and market to this jurisdiction, and they actually conduct significant transactions in this jurisdiction.  Under Plaintiff's state law claims, more than 75% of those affected in the class (and perhaps more persons) are residents of the State of California. Supplemental jurisdiction exists over the state causes of action.

28.    Venue is proper in this Court because Defendants are subject to personal jurisdiction, in this District.  WorldVentures has been engaged in continuous and systematic business in California.  In fact, most of WorldVentures' representative sales originate from California.

29.    WorldVentures has a designated agent for service of process in this State or has its principal place of business here and have committed tortious acts in this State.

30.    Each of the Defendants named herein acted as a co-conspirator, single enterprise, joint venture, co-conspirator, or alter ego of, or for, the other Defendants with respect to the acts, omissions, violations, representations, and common course of conduct alleged herein, and ratified said conduct, aided and abetted, or is other liable.  Defendants have agreements with each other, and other unnamed Diamond Director co-conspirators and have reached agreements to market and promote the WorldVentures Pyramid as alleged herein.

31.    Defendants, along with unnamed Diamond Director co-conspirators, were part of the leadership team that participated with WorldVentures, and made decisions regarding: products, services, marketing strategy, compensation plans (both public and secret), incentives, contests and other matters.  In addition, Defendants and unnamed co-conspirators were directly and actively involved in decisions to develop and amend the distributor agreements and compensation plans.

32.    Plaintiff is presently unaware of the true identities and capacities of fictitiously named Defendants designated as DOES 1 through 100, but will amend this complaint or any subsequent pleading when their identities and capacities have been ascertained according to proof.

On information and belief, each and every DOE defendant is in some manner responsible for the acts and conduct of the other Defendants herein, and each DOE was, and is, responsible for the injuries, damages, and harm incurred by Plaintiff. Each reference in this complaint to "defendant," "defendants," or a specifically named defendant, refers also to all of the named defendants and those unknown parties sued under fictitious names.

33.    Plaintiff is informed and believes, and thereon alleges that, at all times relevant hereto, all of the defendants together were members of a single association, with each member exercising control over the operations of the association.  Each reference in this complaint to "defendant," "defendants," or a specifically named defendant, refers also to the above-referenced unincorporated association as a jural entity and each defendant herein is sued in its additional capacity as an active and participating member thereof. Based upon the allegations set forth in this Complaint, fairness requires the association of defendants to be recognized as a legal entity, as the association has violated Plaintiff and Class Members' legal rights.

34.    Plaintiff is further informed and believes and thereon alleges that each and all of the acts herein alleged as to each defendant was authorized and directed by the remaining defendants, who ratified, adopted, condoned and approved said acts with full knowledge of the consequences thereof, and memorialized the authority of the agent in a writing subscribed by the principal.

35.    Plaintiff is informed and believes and thereon alleges that each of the defendants herein agreed among each other to commit the unlawful acts (or acts by unlawful means) described in this Complaint.

36.    The desired effect of the conspiracy was to defraud and otherwise deprive Plaintiff and Class Members (as hereinafter defined) of their constitutionally protected rights to property, and of their rights under other laws as set forth herein.  Each of the defendants herein committed an act in furtherance of the agreement.  Injury was caused to the Plaintiff and Class Members by the defendants as a consequence.

IV.    **FACTS**

A.    **WorldVentures Operates a Pyramid Scheme That Was Banned In Norway**

37.    WorldVentures was founded in 2005 and purports to operate in 28 countries.  In 2015, WorldVentures had what it describes as 238,684 "sales representatives."  In 2015, WorldVentures claimed to have earned $650 million in revenue.  In 2017, WorldVentures estimated it would have $1 billion dollars in revenue, and claims it has 700,000 sales representatives.  WorldVentures operates in California, does business in California, and holds seminars in California to woo its latest victims. WorldVentures does not actually originate travel packages.  According to publicly available court filings, WorldVentures is generating positive operating net income cash flows well in excess of $20.0 million per year.

38.    Former Advisors of WorldVentures have disclosed publicly that from 2013 to 2015, WorldVentures continued to experience a significant amount of negative publicity specifically as to whether the company was a pyramid scheme.  Former advisors were brought into assist with these issues, but the company remains a pyramid scheme.  There were further problems that the exponential growth of WorldVentures' business in certain countries in Asia was due to inadequate oversight of sales representatives conducting business without WorldVentures having first obtained the required business license in each respective country.

39.    In May 2013, the Norwegian Gaming Board announced an investigation into WorldVentures' business activities.

40.    In February of 2014, the Country of Norway banned WorldVentures from the Country of Norway and concluded that WorldVentures' business program constitutes an illegal pyramid scheme because revenue almost exclusively comes from recruiting members and not the sale of travel residence.  In other words, the proceeds of WorldVentures stem from recruiting new participants into the business.

41.    WorldVentures appealed the Country of Norway's ruling, which WorldVentures' lost in November of 2014.  In February of 2016, WorldVentures sued the Norwegian Ministry of

Culture. On or about October of 2016, the lawsuit against the Norwegian Ministry was affirmed. The Norway Court most recently concluded that WorldVentures' revenue was generated from recruitment of affiliates and "not from the consumption of sale of goods, services or any other arrangement."  The Norwegian Court concluded WorldVentures looked like a pyramid scheme that had been previously ruled on in 2014.

42.     Rewards paid in the form of cash bonuses, where primarily earned for recruiting, as opposed to merchandise sales to consumers, constitute a fraudulent business model. *See F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878 (9th Cir. 2014).

B.     **How WorldVentures' Perpetuates Its Pyramid Scheme**

43.     WorldVentures purports to sell travel-related services based on club membership.

44.     A significant portion, and more than 80% of WorldVentures' travel plans, do not include air fare, but instead only include hotel and lodging accommodations.  The packages contemplate a guarantee refund if travel is cheaper, but in practice, this never happens and refunds are not consummated.

45.     There are three "membership" packages for WorldVentures consumers: "DreamTrips," "DreamTrips GOLD," and "Dream Trips PLATINUM."

46.     For "Dreamtrips," there is a $24.99 monthly fee and initial membership signup fee of $99.99 for each consumer. A member receives an initial 100 points enrollment, and 300 points annually towards travel packages.  The GOLD package requires a member to pay $199.99 initial membership fee and $49.99 per month.  The gold member receives an initial 200 points, and 600 points annually toward travel packages.  Finally, the PLATINUM membership requires a consumer to pay an initial membership fee of $299.99 and $99 per month.  The platinum member receives 300 points, and 1200 points annually.

47.     The general counsel of WorldVentures, and WorldVentures in the arbitration proceeding have made an out-right denial that WorldVentures is operating a pyramid scheme.

48.     The promotional materials of WorldVentures suggest that success can be had in WorldVentures through hard work.

49.     According to recent income disclosures that are not made, 70% of representatives do not make income, despite allegedly providing "every effort to provide training, tools, and support."  Only 3% of all representatives will receive a profit.

**C.     Members Receive Benefits Only Through the Performance of Those Downline to Them**

50.     If one person signs up underneath the participant through the "Platinum" membership, the upper line receives 200 points.

51.     If 4 people sign up as down lines in the Gold or Platinum membership, the monthly *membership is free* and the member receives $300.  In other words, the greater the pyramid is perpetuated by the consumer, membership becomes free.  Fees are deemed waived.

52.     If 6 people sign up as down lines in the Platinum membership, a $250 bonus is given in addition to the waiver of the membership fee.  If 12 people are signed up by a member, the consumer receives a free ipad3.  If 20 people sign up, the consumer receives a car bonus for a silver BMW in the amount of $600 per month. This is called the "wings and wheels" program. WorldVentures touts that its membership promises "fun, freedom, and fulfillment" through WorldVentures process.  A member "gets a percentage of everybody who pays through your referral network, it has opportunity to stretch around the world and create substantial income." WorldVentures further claims that representatives "make a lot of money," "double your profits," and make an extra $20,000 by recruiting others to become WorldVentures "sales representatives." WorldVentures represented to Plaintiff that the real money was in becoming an associate and recruiting others to join the program.

53.     Signifying how the travel package is of no value, the packages are overpriced, under-inclusive, and are significantly in excess of the price a consumer can obtain the equivalent travel packages from almost any online competitor - Cheap Tickets, Groupon, and Expedia.

54.    WorldVentures does not have its own travel deals.  It just scouts for deals and make a person pay to view them.  Turn over levels are high in each member's downline reflecting the nature of the scam.  That is, to make money, one has to constantly be recruiting new victims.

55.    Further, WorldVentures has at times given misleading information about their product to consumers prior to purchase, exaggerates the savings realized by their product, and fails to provide refunds for cancelled services.

56.    According to videos from David Pietsch of WorldVentures, with World Ventures "you are at the top of your company."  WorldVentures implicitly encourages its members to keep building the pyramid.

57.    A commission of $20 is received for each person a member signs up.  Every time the team sells membership, this is called a cycle and a member receives $200.  "3 sales right.  3 sales, left." According to WorldVentures, it does not matter how many travel packages are sold. All that matters is how many people are signed up in one's downline.  According to WorldVentures, the binary pays to infinity."  If a member has 60 persons in his/her downline (30 on the right, 30 on the left) that person obtains "senior membership" entitling them to $4,000-5,000 per month.  So in effect, if a person signs up 60 people, WorldVentures takes 15-20% of the profit, and the member receives other revenues for the downlines.

58.    Some of the top reps were paying the fees for some of their downline recruits themselves in order to maintain a high rank and appearance of success.  WorldVentures props up its prominent sales person by propping them up, and grandfathering them into the highest rank in the company even though they have not earned it.  Indeed, there is a secret compensation plan.

59.    This scheme is similar to *YTB*'s online Travel Pyramid Scheme that California State Attorney General Brown entered into a stipulated judgment to ban further operations. https://oag.ca.gov/news/press-releases/brown-ends-ytbs-online-travel-pyramid-scheme.

60.    During nearly the entire Class Period, WorldVentures did not make adequate income disclosure statement to its representatives or prospective representatives, particularly during nearly the entire time that Plaintiff Shi Yiru was a representative for WorldVentures, and

the four-year class period for participants of WorldVentures pre-dating the filing of this action, originally on May 1, 2017.

61.     These statements are deceptive income claims regarding the financial gains consumers will achieve by becoming representatives.  For example, WorldVentures advertises that those who sign-up for its business opportunity can make over $26,000 per week.   Its representatives also make unrealistic financial promises, such as being able to make millions of dollars per year.

62.     As explained herein, WorldVentures, through its actions and omissions, intended to, and did, conceal from Plaintiff and other representatives in the class during the Class Period material facts and information relating to WorldVentures' endless chain scheme and its deceptive earnings claims. Plaintiff did not discover, nor had they reason to discover, the information necessary for the causes of action set forth in this Complaint.

63.     WorldVentures' acts and omissions constitute a "continuing violation" such that any limitations period for Plaintiff' claims did not begin to accrue until the date of the last wrong or injury that is the subject of this action.

64.     During nearly the entire Class Period, WorldVentures did not make adequate income disclosure statement to its representatives or prospective representatives, particularly during nearly the entire time that Plaintiff Shi Yiru was a representative for WorldVentures.

65.     Instead WorldVentures made deceptive income claims regarding the financial gains consumers will achieve by becoming representatives.  Further, WorldVentures failed to account for the expenses one incurs in operating such a franchise.  For example, WorldVentures advertises that those who sign-up for its business opportunity can make over $26,000 per week.   Its representatives also make unrealistic financial promises, such as being able to make millions of dollars per year.

66.     WorldVentures makes false and misleading (affirmatively and by omission) in each of its Annual Income Disclosure Statement as follows:

a. World Ventures provides a chart that represents some level of success is involved:



WorldVentures Marketing, LLC - USA
## 2015 Annual Income Disclosure Statement

WorldVentures has designed its compensation plan to reward Independent Sales Representatives ("IRs") for: (1) successfully making personal sales of WorldVentures' retail products (DreamTrips, DreamTrips Gold and DreamTrips Platinum memberships); and (2) successfully building sales organizations, and training and motivating other team members to do the same. Below is an income breakdown.

| Promotion Level | High Commissions & Overrides | Median Commissions & Overrides | Minimum Commissions & Overrides | Average Commissions & Overrides | Percentage of Total |
|---|---|---|---|---|---|
| Enrolled Representative | $ 35,824.52 | $ 100.00 | $ 43.35 | $ 252.04 | 6.651% |
| Active Representative | $ 235,420.32 | $ 150.00 | $ 12.00 | $ 285.42 | 11.316% |
| Qualified Representative | $ 17,559.56 | $ 860.02 | $ 12.00 | $ 1,299.69 | 3.455% |
| Senior Representative | $ 72,600.00 | $ 7,534.02 | $ 720.00 | $ 8,477.23 | 0.561% |
| Director | $ 114,675.00 | $ 22,646.21 | $ 6,615.88 | $ 25,312.83 | 0.159% |
| Marketing Director | $ 163,626.80 | $ 49,799.79 | $ 15,552.00 | $ 57,971.18 | 0.072% |
| Regional Marketing Director | $ 364,200.00 | $ 116,490.22 | $ 58,442.49 | $132,513.49 | 0.018% |
| National Marketing Director | $ 630,600.00 | $ 238,645.12 | $ 164,365.00 | $313,657.03 | 0.005% |
| International Marketing Director | $ 1,129,150.00 | $ 409,280.00 | $ 135,295.00 | $532,487.35 | 0.007% |

At the end of December 2015 there were 238,684 WorldVentures IRs in the United States. During the period January 2015 to December 2015 ("Fiscal Period"), 22.24% of all IRs earned a commission or override, while 77.76% did not. The average annual commission or override earnings of all IRs, including those who did not earn a commission or override, was $300.35. The average annual commission or override earnings of that group of IRs who earned a commission or override was $1,348.82 and the median was $150.00. The data presented in the table above is based only on those IRs who earned a commission or override within the time period of January 2015 to December 2015.

**Notes:**
1. All amounts are represented in U.S. dollars.
2. These figures do not represent profits, nor do they consider expenses incurred by IRs in the promotion of their business.
3. Promotional levels represented in the table are based on ranks achieved at the end of the last week of December 2015. Refer to the WorldVentures Compensation Plan for full definitions of the Promotional Levels listed in the table.

**There are *no guarantees* regarding income. The success or failure of each Independent Representative in WorldVentures, like any other business, depends on the Independent Representative's own skill, dedication, personal effort, leadership qualities, and market available.**

b. The chart is a demonstrative misleading and includes various misrepresentations. The chart creates the affirmative representation and

representation by omission that all "representatives" make money.  The fine print says that 77.76% of the persons who are representatives "did not" without stating in fact those people did not make any money.  The first row is misleading suggesting, implying and affirmatively representing that "enrolled representative" comprise 6.651% of World Ventures representatives, when in actually, all persons who sign up for World Ventures, are at minimum "enrolled representatives."  Simply the first row should actually read:

| Promotion Level | High Comm. & Overrides | Median Comm. & Overrides | Minimum Comm. & Overrides | Average Comm. & Overrides | Percentage of Total |
|---|---|---|---|---|---|
| Enrolled Representative | Unknown | 0 | 0 | Unknown | 84.41% |

Instead, it reads as follows to create the belief that even those representatives on the "first level" of the pyramid are earning some reasonable income when in actuality they are not and 84.41% earn next to nothing, and the median of those 84.41% is zero revenues:

| Promotion Level | High Comm. Overrides | Median Comm. & Overrides | Minimum Comm. & Overrides | Average Comm. & Overrides | Percentage of Total |
|---|---|---|---|---|---|
| Enrolled Representative | $35,824.52 | 100 | 43.35 | 252.04 | 6.65% |

c.  Next, the "Active Representative" and "Qualified Representative" and "Senior" Representative" rows are smoke and mirrors, deliberately and explicitly misleading, and should be folded into the "Enrolled Representative" line. These three categories are listed separately to create the appearance that as a representative moves up the "pyramid" the median income increases and the average income increases.  Particularly, the last category "senior

representative" has only ½ of 1% of all representatives solely to create the perception of an increase before "director."  So in actuality, all four categories of "representative" enrolled, active, qualified and senior should be folded together because there is no material difference as to these "levels" except to create a façade of success, and if one combines these four rows, the following results are achieved:

| Promotion Level | High Comm. Overrides | Median Comm. & Overrides | Minimum Comm. & Overrides | Average Comm. & Overrides | Percentage of Total |
|---|---|---|---|---|---|
| Representatives | Unknown | 0 | 0 | $140.59 | 99.743% |

So shockingly, the chart misleadingly fails to identify that the median for 99.743% of all representatives of WorldVentures is zero, and while the average *yearly gross* revenue is $140.59.

d.  Next, the Income statement is false and misleading because the "high Commissions & Overrides" column reflects false highs, and/or artificially inflated highs based on "overrides."  "Override" is an undefined term in the disclosures.  WorldVentures has chosen a select few persons to represent the "high" for each of the sales categories by paying them an "override" having nothing to do with performance other than being the crony in the pyramid scheme.  Because the "highs" in each row are outliers and false outliers at that through overrides, the column should be eliminated in its entirety.

e.  So in truth, less than 1/3 of 1% are directors and make any money of substance.  The perception based on the chart is that there are four rows and there is a lot of potential for income.  Percentages lined up also are misleading because when actual "numbers" of persons are disclosed things become a lot more apparent.  For instance, the far-right column should really read:

    f.   Based on all of the misrepresentations and affirmative and misleading representations, the chart should read as follows:

| Promotion Level | People | Median Comm. & Overrides | Average Comm. & Overrides | Minimum Comm. & Overrides | Percentage of Total People |
|---|---|---|---|---|---|
| Representatives | 238,063 | $0.00 | $140.59 | 0 | 99.74% |
| Directors | 621 | $55,000 | $55,961.19 | 6,615.88 | 0.26% |
| Individual Defendants | 3 | $6-8 million | $4.5 mil. | $1-2 mil. | N/A |

    g.   Finally, the AIDS is misleading because it does not reflect "net earnings or income" for representatives, but instead, reflects "gross" revenues.  In a "note" buried towards the bottom of the AIDS page in smaller font than the chart, WorldVentures provides "these figures do not represent profits, nor do they consider expenses incurred by IRs in the promotion of their business." So the statements are highly misleading in that the profit for 99.7% of all members of WorldVentures (based on their requirement to pay monthly commission fees totaling $99.99 per month, is as follows:

| Promotion Level | People | Median Comm. & Overrides | Net Profit after paying commissions | Minimum Comm. & Overrides | Percentage of Total People |
|---|---|---|---|---|---|
| Representatives | 238,063 | $0.00 | -$1,057.77 | 0 | 99.74% |

       So in summary, the realistic fact is that 99.7% of WorldVentures enrollees average a *loss of* **-$1057.77 per year**.

       67.    As explained herein, WorldVentures, through its actions and omissions, intended to, and did, conceal from Plaintiff and other representatives in the class during the relevant period material facts and information relating to WorldVentures' endless chain scheme and its deceptive earnings claims. Plaintiff did not discover, nor had they reason to discover, the information necessary for the causes of action set forth in this Complaint.

68.     WorldVentures' acts and omissions constitute a "continuing violation" such that any limitations period for Plaintiff' claims did not begin to accrue until the date of the last wrong or injury that is the subject of this action.

69.     The pled facts and happenings in ¶¶ 37-68 herein were made by WorldVentures and approved, authorized, ratified, promoted, and countenanced by the Individual Defendants.

## V.     CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action as a class action under Fed. R. Civ. Procedure 23.

71.     Plaintiff seeks to certify a class pursuant to Fed. R. Civ. Proc. 23(a), 23(b), 23(c)(4), and 23(c)(5), if necessary.

72.     Plaintiff seeks to represent a nationwide class defined as follows: "All persons who were WorldVentures representatives who enrolled with an address in the United States from May 1, 2013 until the present." ("Class Period").

73.     Subject to confirmation, clarification and/or modification based on discovery to be conducted in this action, Plaintiff also seek to represent a sub-class in California, defined as follows:

"All persons who were WorldVentures representatives who enrolled with a California address from May 1, 2013 until the present."

74.     Excluded from the class are the Defendants, family members, this Court, and any "Director" of World Ventures, including without limitation the positions listed as "Director," "Marketing Director," "Regional Marketing Director," "National Marketing Director," "International Marketing Director."

75.     Plaintiff seeks relief for herself and all members of the class under California's Unfair and Deceptive Practices Acts, and California's Fraudulent Advertising Act.

76.     Plaintiff seeks to pursue a private attorney general action for injunctive relief for themselves and all members of the class who agreed to a choice of law, and they satisfy the standing and class action requirements.

77.     While the exact number of members in the Class and Subclass are unknown to Plaintiff at this time and can only be determined by appropriate discovery, membership in the class and subclasses is ascertainable based upon the records maintained by Defendant. It is estimated that the members of the Class are greater than 250,000 nationwide.

78.     Therefore, the Class and Subclasses are so numerous that individual joinder of all Class and Subclass members is impracticable under Federal Rule of Civil Procedure 23.

79.     There are questions of law and/or fact common to the class and subclasses, including but not limited to:

a.  Whether WorldVentures is operating an endless chain;

b.  Whether representatives paid money to WorldVentures for (1) the right to sell a product and (2) the right to receive, in return for recruiting others, rewards which were unrelated to the sale of the product to retail consumers;

c.  Whether WorldVentures' rules apply to Section 327 claims;

d.  If the WorldVentures rules do apply, are WorldVentures' rules effective;

e.  If the WorldVentures rules do apply, and WorldVentures' rules are effective, did WorldVentures enforce those rules;

f.  Whether WorldVentures or the Directors omitted to inform the Plaintiff and the plaintiff class that they were entering into an illegal scheme where an overwhelming number of participants lose money;

g.  Whether WorldVentures' Statements of compensation during the Class Period were deceptive and misleading;

h.  Whether WorldVentures' conduct constitutes an unlawful, unfair and/or deceptive trade practice under California state law;

i.  Whether WorldVentures' conduct constitutes unfair competition under California state law; and

j.  Whether WorldVentures' conduct constitutes false advertising under California state law in that the representations concerning price and competition of the travel

packages, was false, and below industry standard given the contribution to the distributorships.

80.     These and other questions of law and/or fact are common to the class and subclass and predominate over any question affecting only individual class members.

81.     Plaintiff's claims are typical of the claims of the class and subclasses because Plaintiff was a representative for Defendant WorldVentures and lost money because of the illegal scheme.

82.     Plaintiff's class is ascertainable because each representative/distributor of WorldVentures can be identified with name, e-mail address, physical address, and other information, in the computer database that WorldVentures has housed online and in Texas, since at least 2013.

83.     Plaintiff has limited the class statute of limitation period to four years from the date of original filing, which is the statute of limitations for a claim under RICO, the Unfair Competition Law, and Plaintiff's California claims.

84.     Plaintiff has standing to challenge the improper corrective amendments made to the class wide representative agreement and will do so during the course of the case, or if necessary at the time of trial.

85.     Plaintiff will fairly and adequately represent the interests of the class and subclass. Plaintiff's claims are typical of those of the class and subclasses. Plaintiff's interests are fully aligned with those of the class and subclass. And Plaintiff has retained counsel experienced and skilled in complex class action litigation.

86.     Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged, because such treatment will allow many similarly-situated persons to pursue their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

87.     Plaintiff knows of no difficulty likely to be encountered in the management that would precludes maintenance of this case as a class action.

88.     That WorldVentures may have made some changes in the form of its policies or terms of service does not alter the fact that *in practice*, the numbers will evidence WorldVentures was an illegal pyramid scheme and endless chain throughout the entire class period.

## COUNT I

### (ENDLESS CHAIN SCHEME; California Penal Code § 327 and California Civil Code § 1689.2)

(On behalf of the Class and the Subclass against all Defendants, including DOES 1-100)

89.     Plaintiff realleges all allegations, and incorporates previous allegations by reference.

90.     Section 1689.2 of the California Civil Code provides: A participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is based, and may recover all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme.

91.     The Defendants are operating an endless chain scheme under Section 327 of the Penal Code because they have independently, and together, contrived, prepared, set up, and proposed an endless chain.

92.     The WorldVentures operation constitutes an endless chain scheme for the disposal or distribution of property because putative class members, including Plaintiff, paid valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant. Specifically, Plaintiff paid a monthly amount to WorldVentures for the chance to receive compensation for introducing one or more additional persons.

93.     The WorldVentures' operation constitutes an endless chain because 99% of new distributors fail, and WorldVentures has a high attrition rate.

94.     The WorldVentures' operation constitutes an endless chain because revenues are derived primarily from recruitment as opposed to the sale of legitimate travel packages to end consumers.

95.     Almost none of the revenues Defendants has received are derived from any sale of a travel package to an individual outside of the organization, i.e. to a legitimate retail customer.

96.     Plaintiff and the class have suffered an injury in fact and have lost money or property because of WorldVentures' operation of an endless chain, business acts, omissions, and practices.

97.     Plaintiff and the class are entitled to:

    a.  rescind the contract upon which the scheme is based and recover all consideration paid under the scheme, less any amounts paid or consideration provided to the participant under the scheme;

    b.  restitution, compensatory and consequential damages (where not inconsistent with their request for rescission or restitution); and

    c.  attorneys' fees, costs, pre- and post-judgment interest.

## COUNT II

**(Unfair and Deceptive Practices Claims Under Cal. Bus, & Prof. Code § 17200, *et seq.*)**

(On behalf of the Class and the Subclass against all Defendants, including DOES 1-100)

98.     Plaintiff realleges all allegations, and incorporates previous allegations by reference.

99.     Many of the claims brought under this Second Cause of action that refer or relate to the unlawful, fraudulent or unfair "endless chain" of Defendants, are brought on behalf of Plaintiff and the Class.

100.    All claims brought under this Second Count that refer or relate to the unlawful, fraudulent or unfair the statements, the touted WorldVentures "business opportunity" are brought on behalf of Plaintiff, the Class, and the Subclass.

101.    WorldVentures has engaged in constant and continuous unlawful, fraudulent and unfair business acts or practices, and unfair, deceptive, false and misleading advertising within the meaning of the California Business and Professions Code § 17200, *et seq.* The acts or practices alleged constitute a pattern of behavior, pursued as a wrongful business practice that has victimized and continues to victimize thousands of consumers. The WorldVentures Sales and Marketing Plan Is Unlawful.

102.    WorldVentures (through its subsidiaries, related corporate entities, affiliates, and those entities in its corporation family) have violated the Foreign Corrupt Practices Act ("FCPA") by bribing officials in various countries (and agents of officials) using funds originating in United States bank accounts in various countries. Such bribes are masked and fraudulently concealed as "legitimate" book entry business expenses or bonuses paid out to higher level members of the WorldVentures organization. This conduct violates the FCPA, 15 U.S.C. §§ 78dd-1.

103.    WorldVentures makes these bribes for the purpose of influencing the acts or decisions of certain government agents in their official capacity to allow this illicit enterprise to operate internationally.

104.    WorldVentures further makes these bribes in violation of lawful duty and/or for the purpose of inducing the use of official influence to obtain or retain WorldVentures' pyramid business model and to make its business appear to be legitimate in the United States to class members and Plaintiff Yiru. It is challenging enough for legitimate companies to operate in various foreign countries, let alone a Ponzi scheme/pyramid scheme like WorldVentures.

105.    It is established law by the California Supreme Court, that a litigant asserting n unfair competition claim may borrow the FCPA and derivatively challenge such violations. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003).

106.    Under California Business and Professions Code § 17200, an "unlawful" business practice is one that violates California law.

107.    WorldVentures' business practices are unlawful under § 17200 because they constitute an illegal "endless chain" as defined under, and prohibited by, California Penal Code § 327.

108.    WorldVentures utilizes its illegal "endless chain" with the intent, directly or indirectly, to dispose of property in WorldVentures products and to convince representatives to recruit others to do the same.

109.    WorldVentures' business practices are unlawful § 17200 because they violate §17500 *et seq.*, as alleged in the Third Cause of Action.

110.    Under California Business and Professions Code § 17200, a "fraudulent" business practice is one that is likely to deceive the public.

111.    WorldVentures' business practices are fraudulent in four separately actionable ways: (1) WorldVentures' illegal and deceptive "endless chain"; (2) the touted, yet non-existent, WorldVentures "business opportunity" for everyone, including but not limited to WorldVentures' massive advertising campaign and the misleading statements of compensation.

112.    First, as detailed herein, Defendants promoted participation in the WorldVentures endless chain, which has a compensation program based on payments to participants for the purchase of product by participants, not the retail sale of products or services.

113.    WorldVentures has made numerous misleading representations about the business opportunity of WorldVentures and the income that a recruit or a distributor can realize by becoming a distributor and participating in the scheme.

114.    WorldVentures knew, or should have known, that the representations about the business opportunity of WorldVentures were misleading in nature.

115.    As a direct result of WorldVentures' fraudulent representations and omissions regarding the WorldVentures endless chain described herein, WorldVentures wrongly acquired money from Plaintiff and the members of the classes.

116.     Second, WorldVentures touted, in numerous different ways as part of a massive advertising campaign, a "business opportunity," which WorldVentures also repeatedly and in many ways represented, among other things, as being "for everyone" and allowing "full time" or "part time" opportunities.

117.     The massive advertising campaign included among other things, the website, emails, websites, presentations by WorldVentures, training, word of mouth among representatives, and events.

118.     As part of this campaign and a further inducement to potential representatives, WorldVentures made and disseminated Statements of compensation that further misled the public, among other things: (1) by using cryptic and technical terms known to WorldVentures but not to the general public or to those exploring the claimed "business opportunity," (2) by highlighting the "winners," *i.e.*, those that received compensation from WorldVentures, and the average gross compensation paid by WorldVentures to those winners, (3) by failing to disclose the actual number of "winners" as compared to the number of representatives who received no compensation from WorldVentures (i.e., the "losers"); and (4) by downplaying and omitting the risks and costs involved in starting an WorldVentures distributor relationship, and succeeding in such a representative role.

119.     In reality, the touted "business opportunity" was only for a select few, and those that were recruited specially. And these numbers did not include expenses incurred by representatives in the operation or promotion of their businesses, meaning there were likely more net losers who made no profit at all.

120.     WorldVentures knew, or should have known, that the selective information presented to representatives in the Compensation and its massive adverting campaign during that time frame touting its purported "business opportunity" was likely to mislead the public and did in fact mislead the public into believing there was a legitimate "business opportunity" in which representatives, or a large portion of them, could make money in either a full or part time capacity. In fact, however, there was no such "business opportunity," except for a very select few.

121.    As a direct result of WorldVentures' fraudulent representations and omissions regarding the Statement and the massive adverting campaign during that time frame and thereafter touting WorldVentures' purported "business opportunity" described herein, WorldVentures wrongly acquired money from Plaintiff and the members of the classes.

122.    The named Plaintiff has standing to bring these Section 17200 claims under the fraudulent prong and can demonstrate actual reliance on the alleged fraudulent conduct.

123.    For instance, Plaintiff has been in receipt of misleading and false financial statements, which promoted the WorldVentures' scheme and claimed "business opportunity" and contained material false representations regarding the success representatives could achieve through WorldVentures by purchasing products and recruiting others to do the same.

124.    There were other representations made to representatives as part of the massive advertising campaign regarding the claimed "business opportunity," on which Plaintiff or some of the Class Members, reasonably believed the representations they could succeed in the "business opportunity," did not return the refund, purchased WorldVentures products and did not immediately return them, signed up as WorldVentures representatives, and attempted to and recruited others to do the same. These other representations include, but are not limited to the following:

a. Emails from WorldVentures that promoted WorldVentures and contained materially false representations regarding the success that a distributor could achieve through WorldVentures by purchasing products and recruiting others to do the same.

b. Websites, such as www.WorldVentures.com, which promoted the fraudulent scheme through videos of Directors containing material false representations regarding the "business opportunity" available to representatives and the wealth that a distributor could get by agreeing to become an WorldVentures distributor.

c. Presentations by WorldVentures representatives which contained material false representations regarding the "business opportunity" and the success that a distributor could get through WorldVentures by purchasing products and recruiting others to do the same.

d. Presentations by WorldVentures, including the presentations described in this complaint, which contained material false representations regarding the "business opportunity" and the success that a distributor could get through WorldVentures by purchasing products and recruiting others to do the same.

e. Training and events where WorldVentures representatives made material false representations regarding the "business opportunity" and the success that a distributor could get through WorldVentures by purchasing products and recruiting others to do the same.

125.    To the extent proof of reliance is required of Plaintiff, WorldVentures, the Individual Defendants, and the Directors knew that Plaintiff and the class would reasonably rely on their representations and omissions, which would cause the Plaintiff and the class joining the fraudulent endless chain scheme and purchasing the products, and Plaintiff did in fact reasonably rely upon such representations and omissions.

126.    Indeed, had Plaintiff and the class known that WorldVentures and its Individual Defendants were promoting an endless chain, they would not have become WorldVentures representatives in the first place and, if learned after becoming a distributor, they would not have purchased WorldVentures products thereafter.

127.    Had Plaintiff and the class known that WorldVentures was promoting a "business opportunity" that did not exist except for a select few, they would not have become WorldVentures representatives in the first place and, if learned after becoming a distributor, they would not have purchased WorldVentures products thereafter.

128.    Finally, the fraudulent acts, representations and omissions described herein were material not only to Plaintiff and the class (as described in this complaint), but also to reasonable

persons. For instance, regarding the alleged "business opportunity" and representations in, and omissions from, the Statement, and on information and belief, a large percentage of individuals who signed up as WorldVentures representatives during this time frame expected that they could and would receive annual compensation at the approximate level of the "average earnings compensation," in total, disclosed in the Statements of Average Gross Compensation. Unfortunately, no such large percentage actually could or did earn such an amount.

129. Under California Business and Professions Code § 17200, a business practice is "unfair" if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury which outweighs its benefits.

130. For the reasons set forth herein and above, WorldVentures' promotion and operation of an unlawful and fraudulent endless chain, and its fraudulent representations and omissions regarding its purported "business opportunity," "Packaging and Handling" fees, and FedEx freight fees are also unethical, oppressive, and unscrupulous in that WorldVentures is and has been duping Plaintiff and the class out of billions, or at least hundreds of millions, of dollars.

131. WorldVentures' actions have few, if any, benefits. Thus, the injury caused to Plaintiff and the class easily and dramatically outweighs the benefits, if any.

132. Defendants should be made to disgorge all ill-gotten gains and return to Plaintiff and the class all wrongfully taken amounts.

133. Finally, Defendants' unlawful, fraudulent and unfair acts and omissions will not be completely and finally stopped without orders of an injunctive nature. Under California Business and Professions Code section 17203, Plaintiff and the class seek a judicial order of an equitable nature against all Defendants, including, but not limited to, an order declaring such practices as complained of to be unlawful, fraudulent and unfair, and enjoining them from further undertaking any of the unlawful, fraudulent and unfair acts or omissions described herein.

## COUNT III

**(False Advertising - California Business and Professions Code § 17500, *et seq.*)**

(On behalf of the Class and the Subclass against all Defendants, including DOES 1-100)

134.    Plaintiff realleges all allegations, and incorporates previous allegations by reference.

135.    All claims brought under this Third Claim for Relief that refer or relate to the false, untrue, fraudulent or misleading endless chain of Defendants are brought on behalf of Plaintiff and the Class.

136.    All claims brought under this Third Cause of Action that refer or relate to the false, untrue, fraudulent or misleading compensation and the touted WorldVentures "business opportunity" are brought on behalf of Plaintiff and the Class.  Further, WorldVentures alleges it has superior travel packages and price of travel better than the competition and other well-known websites, when these representations are in fact affirmatively false, or in the alternative false by omission.

137.    All claims brought under this Third Claim for Relief that refer or relate to the false, untrue, fraudulent or misleading are brought on behalf of Plaintiff and the Class.

138.    Defendants' business acts, false advertisements and materially misleading omissions constitute false advertising, in violation of the California Business and Professions Code § 17500, *et seq.*

139.    Defendants engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions regarding the purported "business opportunity," likely to deceive the public and include, but are not limited to, the items set forth above. WorldVentures knew, or should have known, that the representations about the business opportunity of WorldVentures were misleading in nature.

140.    Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Plaintiff and the class members to which it was not entitled. The Court should order Defendants to disgorge, for the benefit of Plaintiff and all other WorldVentures representatives in the class who signed a Distributor Agreement with WorldVentures governed by California law their profits and compensation and/or make restitution to Plaintiff and the class.

141.    Under California Business and Professions Code Section 17535, Plaintiff and the class seek a judicial order directing Defendants to cease and desist from all false advertising related

to the Defendants' illegal scheme, and such other injunctive relief as the Court finds just and appropriate.

142.    Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Plaintiff and the class members to which they were not entitled. The Court should order Defendants to disgorge, for the benefit of Plaintiff and all other WorldVentures representatives in the class who enrolled as Representatives and/or make restitution to Plaintiff and the class.

143.    Under California Business and Professions Code Section 17535, Plaintiff and the class seek a judicial order directing Defendants to cease and desist from all false advertising related to the Defendants' illegal scheme, and such other injunctive relief as the Court finds just and appropriate.

**COUNT IV**

**(RICO 18 U.S.C. § 1962(a))**

(On behalf of the Class and the Subclass against all Defendants, including DOES 1-100)

144.    Plaintiff realleges all allegations as if fully set forth herein, and incorporates previous allegations by reference.

145.    WorldVentures, Defendants, and others willfully and intentionally violated and continue to violate RICO and California law with the goal of obtaining money, directly and indirectly, through a pattern of racketeering activities in violation of the mail and wire fraud statutes,18 U.S.C. §§ 1341 and 1343, 18 U.S.C. § 1962(a), California Penal Code § 327, California Civil Code § 1689.2.

146.    WorldVentures has attempted to distinguish its business model from that of a pyramid scheme.

147.    WorldVentures has never systematically audited any income forms to ensure accuracy, and to ensure the business has legitimate retail sales.

148.    WorldVentures is aware that purchases of travel plans are done through its website and those internally in its organization almost completely, and thus its knowledge of the lack of

legitimate retail sales revenue suggests its intent to continue operating a pyramid scheme.

149.    WorldVentures has no control in place to certify that at least 70 percent of travel packages purchased were either sold or consumed by a legitimate retail customer, and not by somebody who is a representative or distributor.

150.    WorldVentures does not track retail sales.

151.    WorldVentures could determine whether travel packages were purchased with end consumers, but does not do so.

152.    The refund policies are insufficient and do nothing to negate the fact that WorldVentures requires a monthly fee to paid to continue participation, which Plaintiff Yiru paid in this instance for several months.

153.    Individual Defendant Nugent characterizes himself as Co-Founder and CVO of WorldVentures on his social media page. Nugent had the power to direct the enterprises affairs at all times and had supervisory involvement.

154.    In 2018, Defendant Wayne Nugent was the keynote speaker encouraging individuals to sign up, all the while having knowledge that revenues are derived primarily from recruitment. https://www.youtube.com/watch?v=gHBn0OH3TEw.

155.    Individual Defendant Stammen has characterized himself as the CEO, the head position of the enterprise, and at other times Chief of Business Development. In 2018, Stammen was one of the keynote speakers for WorldVentures.
https://www.youtube.com/watch?v=LX61SAgfqkg.

156.    WorldVentures is an enterprise on the brink of collapse in that it has failed to pay its distributors commissions that are owed.
https://www.iol.co.za/sundaytribune/news/worldventures-sued-for-millions-by-reps-16636860.

157.    The Chinese Government cracked down on WorldVentures for illegally operating in the China, and sending international wires to the United States.
https://www.mlmnewsreport.com/worldventures-bankrupt-distributors-resign-overunpaid-commissions/.

158.   Ultimately the illicitly obtained funds were siphoned to each of the Individual Defendants, except Azcue.

159.   In 2018, Government of Rwanda cautioned the public about Defendant WorldVentures operating illegally.   https://www.newtimes.co.rw/news/governmentcautions-public-world-ventures.

160.   WorldVentures was told to cease operating in China, Malaysia, and Taiwan. http://amlmskeptic.blogspot.com/2015/04/old-news-world-ventures-busted-in-china.html.

161.   On or about January of 2018, the following report of an employee of Defendants was made at https://www.glassdoor.com/Reviews/WorldVentures-Holdingsbankruptcy-Reviews-EI_IE284228.0,22_KH23,33.htm:

1. COO resigned in less than 1 year, due to company planning for bankruptcy and financial trouble.

2. President of Sales and International Marketing, resigned, due to company's financial trouble and planning for bankruptcy.

3. Chief Security Officer resigned due to legal problems.

4. Smartcard have 15 developers from Flye CEO friend's organization without delivering anything but jobs of Full time employees in CIO and CTO is in trouble.

5. HR asked every employee to sign "Conflict of Interest" document, where CEO of Flye (Old CTO of WV) have conflict of interest with 3 companies, not sure if they will request him to step down.

6. New CTO have 2 jobs. Not sure, where his loyalty lies.

162.   The named individual defendants, as promoters of the scheme, did not retain immediate control over the essential managerial conduct of the WorldVentures enterprise.

163.   Even if the Individual Defendants are no longer the CEO of WorldVentures, or head officers, the Individual Defendants functionally operate as lower rung participants or silent equity partners reaping a majority of the scheme's spoils, and receiving an infinite level deep, nearly all revenues from lower level person's recruitments.

164.    Plaintiff's realization of profits was not inexplicably tied to the success of the promotional scheme.

165.    The distribution and sale of travel packages is not something the SEC has found amenable to regulation under the federal securities laws.

166.    The marketing and recruitment aspects of WorldVentures' enterprise are not within the definition of a security.

167.    In the WorldVentures scheme, distributors themselves must recruit new participants.

168.    In the WorldVentures scheme, distributors themselves must recruit new participants in the travel package endless chain, primarily through their own recruiting and marketing activities.

169.    WorldVentures tells its distributors and the Plaintiff that they will have spent significant time, effort and work to earn money, WorldVentures attempts emphasize the retail aspects of the business, the promise of significant profits linked to becoming a distributor.

170.    WorldVentures characterizes its distributors as "independent contractors" in the purported distribution agreement it maintains on its website, negating the notion that the distributors are passive participants in the endless chain.  Plaintiff and the class of distributors, as reasonable consumers, were expected to contribute more than nominal and menial effort.

171.    Each of the Defendants are engaged in activities federal interstate and foreign commerce and are entities capable of holding a legal or beneficial interest in property. All Defendant "persons," as that term is defined by 18 U.S.C. §1961(3).

172.    The Defendants, including the Individual Defendants, together make up the "WorldVentures Enterprise" as an association of entities and individuals associated in fact to operate an illegal pyramid scheme. The WorldVentures Enterprise is not a legal entity within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4). The Defendants have been members of the WorldVentures Enterprise from at least April 2009 and continuing until the present (except for Mr. Azcue who asserts he is no longer involved after some specified date, but whom was part

of the enterprise through most of the Class Period). WorldVentures and each of the Individual Defendants are separate entities from the WorldVentures Enterprise and play separate and distinct roles in the operation of the WorldVentures Enterprise.

     a.  WorldVentures is the founder, architect, and beneficiary of the WorldVentures Pyramid. Through interstate wire and mails, WorldVentures coordinates the WorldVentures Enterprise, a worldwide scheme. It also pays and awards the commissions, bonuses, and other incentives to the Defendants and others.

     b.  WorldVentures employs the Defendant to coordinate operations of the WorldVentures Pyramid in the countries in which WorldVentures operates, including determining and coordinating points, bonuses, and other incentives.

     c.  WorldVentures employs the other defendants as its operational arm of the WorldVentures Enterprise in the U.S. WorldVentures employs the other defendants to conduct racketeering activities in the U.S.

     d.  WorldVentures employs the remainder of the Defendants to induce new recruits into the WorldVentures Pyramid, to induce representatives to purchase WorldVentures product, and to induce representatives to recruit additional representatives into the WorldVentures Pyramid. The Remaining Defendants also have an agreement with WorldVentures mandating that WorldVentures will not reform its fraudulent marketing plan without their consent.

173.    From at least April 2009 and continuing until the present, within the County of Los Angeles, and elsewhere, WorldVentures in association with the other defendants, did knowingly, willfully and unlawfully conduct and participate, directly and indirectly, in the conduct of the affairs of the WorldVentures Enterprise through a pattern of racketeering activity.

174.    The WorldVentures Enterprise functioned as a continuing unit over time through a hierarchical or consensual decision-making structure in that directives are issued by Stamen and Nugent, and at times Azcue.

175.    The alleged association exists for purposes other than simply to commit the

predicate acts as defined in Plaintiff's RICO counts. Specifically, the Defendants formed the various entities and acted as separate individuals to earn money through selling legitimate travel packages. Thus, the association exists for purposes other than to commit the predicate acts.

176.    From at least April 2009 and continuing until the present, WorldVentures with each other and the remaining defendants, executed a per se scheme to defraud through a pattern of racketeering made up of distinct acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. The WorldVentures Enterprise engaged in and affected interstate and foreign trade. The WorldVentures Enterprise transacts business through the instrumentalities of interstate commerce such as telephones, facsimile machines, the internet, email, and the United States mail and interstate commercial carrier to communicate in furtherance of the activities of the WorldVentures Enterprise.

177.    The WorldVentures Enterprise advertises, markets, and sells products and services throughout the United States. The operation of the enterprise continued over several years, including activities in every state, and has affected and damaged, and continues to affect and damage, commercial activity.

178.    To further the goals of the WorldVentures Enterprise, which were to (1) earn money through fraudulent means, (2) entice individuals to become WorldVentures representatives, (3) entice individuals to purchase products from WorldVentures; (4) entice individuals to recruit others to become WorldVentures representatives and profit off those recruits' purchases of WorldVentures products, and (5) reap large profits for themselves based on false representations, WorldVentures and the remaining defendants engaged in various forms of illegal activity, including (a) mail fraud, (b) wire fraud, and (c) conspiracy.

179.    The pattern of racketeering activity alleged is distinct from the WorldVentures Enterprise. Each act of racketeering activity is distinct from the WorldVentures Enterprise in that each is a separate offense committed by an entity or individual while the WorldVentures Enterprise is an association of entities and individuals. The WorldVentures Enterprise has an ongoing structure and/or organization supported by personnel and/or associates with continuing functions

or duties.

180.    The racketeering acts set out above and below, and others, all had the same pattern and similar purpose of defrauding Plaintiff and the class for the benefit of the WorldVentures Enterprise and its members. Each racketeering act was related, had a similar purpose, involved the same or similar participants and methods of commission and had similar results affecting Plaintiff and the class. The racketeering acts of mail and wire fraud were also related to each other in that they were part of the WorldVentures Enterprise's goal to fraudulently induce Plaintiff and the class to join the illegal scheme, purchase products, and recruit others to join the scheme.

181.    WorldVentures' and other Defendants' wrongful conduct has been and remains part of WorldVentures Enterprise's ongoing way of doing business and constitutes a continuing threat to the property of Plaintiff and the class. Without the repeated acts of mail and wire fraud, the WorldVentures Enterprise's fraudulent scheme would not have succeeded.

182.    Revenue gained from the pattern of racketeering activity, which constitutes a significant portion of the total income of WorldVentures and the Individual Defendants, was reinvested in the operations of the WorldVentures Enterprise for the following purposes: (a) to expand the operations of the WorldVentures Enterprise through additional false and misleading advertising and promotional materials aimed at recruiting new representatives; (b) to facilitate the execution of the illegal scheme; and (c) to convince current representatives to recruit new representatives, and purchase WorldVentures products.

183.    Yiru and the class were injured by the reinvestment of the racketeering income into the WorldVentures Enterprise because they invested billions of dollars of their own money through their purchasing of products, promotional materials, and WorldVentures products, all of which were packaged and shipped at inflated charges.

184.    In connection with promoting and executing their illegal scheme, members of the WorldVentures Enterprise knowingly and recklessly placed and caused to be placed in the United States mail or by interstate commercial carrier, or took or received therefrom, matters or things to be sent to or delivered by the United States mail or by interstate commercial carrier comprising,

among other things product, invoices, letters, promotional materials, brochures, products and checks to Plaintiff and the class and received communications between and among themselves through the United States mail, in all fifty states and the District of Columbia. It was reasonably foreseeable that these mailings or receipts would take place in furtherance of the fraudulent scheme.

185.    In connection with promoting and executing their illegal scheme, members of the WorldVentures Enterprise engaged in wire fraud, in violation of 18 U.S.C. § 1343, by among other things, knowingly and recklessly transmitting or causing to be transmitted with wire communications, in interstate and foreign trade, materials promoting the illegal WorldVentures Pyramid on internet web sites, radio, satellite radio, television, email, facsimile, telephone, and text messages, including promotional materials, registration information, product information, and invoices. WorldVentures and the Directors maintain websites on the internet where the enterprise was perpetrated.

186.    WorldVentures' representatives can and do buy products and are given inducements to continue working as representatives within the WorldVentures Pyramid. WorldVentures maintains various websites hosting promotional videos featuring the Individual Defendants promoting the unlawful scheme and other marketing materials featuring the Individual Defendants promoting the illegal scheme. WorldVentures sent and received these interstate wire communications to and from all fifty states and the District of Columbia.

187.    Each Defendant has promoted the WorldVentures Pyramid and WorldVentures Enterprise. Each use of the mail or wire by Defendants and the Individual Defendants done in furtherance of the WorldVentures Pyramid is an act of racketeering.

188.    The pattern of racketeering activity through which the affairs of the WorldVentures Enterprise were conducted and in which WorldVentures and the Individual Defendants participated consisted of the following:

### **Racketeering Act Number One**

189.    In 2015, plaintiff Yiru received, through private commercial interstate carrier and

the internet portal maintained by WorldVentures, certain application materials, which promoted the WorldVentures Enterprise and contained material false representations regarding the success representatives could achieve through WorldVentures by purchasing travel packages and recruiting others to do the same.

190.    Because of her receipt of these materials, Plaintiff Yiru signed up with WorldVentures purchased WorldVentures travel packages, and recruited others to do the same. The materials and package items were sent to Plaintiff Yiru with the purpose and intent of promoting the WorldVentures Enterprise's illegal scheme, all in violation of 18 U.S.C. § 1341.

### Racketeering Act Number Two

191.    In 2015, Plaintiff Yiru received, through private commercial interstate carrier, and the internet portal maintained by the Defendants, a 2015 Annual Income Disclosure Statement, which promoted the WorldVentures Enterprise and the WorldVentures pyramid through the sales and marketing plan, and which contained material false representations regarding the success that representatives could achieve through WorldVentures by purchasing travel packages and recruiting others to do the same.

192.    Because of her receipt of the representations, Plaintiff Yiru signed up with WorldVentures, purchased WorldVentures travel package, and recruited others to do the same. The Income Disclosure Statement with the purpose and intent of promoting the WorldVentures Enterprise's illegal scheme, all in violation of 18 U.S.C. § 1341.

### Racketeering Act Number Three

193.    In 2015 through 2016, Plaintiff Yiru ordered, through interstate wire transmissions over the internet travel packages, which were promoted by the WorldVentures Enterprise as the means by which representatives such as Yiru could "pay for their position" and get greater retail profits. WorldVentures hosted these websites. Yiru paid WorldVentures for these services using an electronic transfer of funds. WorldVentures shipped Yiru these products through private commercial interstate carrier. WorldVentures coordinated through interstate wires on at least a monthly basis following the order the collection and accruing of the rewards associated with those

purchases. Because of the promised "rewards," "profits," and opportunity to advance up the WorldVentures Pyramid, Plaintiff Yiru purchased WorldVentures travel packages, paid for those WorldVentures travel packages, and received those products, using instrumentalities of interstate commerce. Defendants' actions violated 18 U.S.C. §§ 1341 and 1343.

### Racketeering Act Number Four

194.    Throughout April of 2009 and continuing to present date, WorldVentures distributed information by interstate wire transmissions over the internet, such as www.WorldVentures.com, worldventuresfoundation.org. Yiru reviewed the website. The WorldVentures websites promoted the fraudulent scheme through videos of Directors containing material false representations regarding the business opportunity available to representatives, and the wealth that a distributor could get by agreeing to become an WorldVentures distributor. Because of the representations on WorldVentures' websites, Yiru became an WorldVentures distributor and maintained his position as an WorldVentures distributor and continued to order WorldVentures' products and recruit others to do the same. This violated 18 U.S.C. § 1343.

### Racketeering Act Number Five

195.    Throughout 2016 and continuing to present date, the those acting on behalf of WorldVentures distributed information by interstate wire transmissions over the internet promoting WorldVentures as described in this Complaint. These videos promoted the fraudulent pyramid scheme and contained material false representations regarding the wealth that a recruit or WorldVentures distributor could achieve if that recruit became an WorldVentures distributor and if a distributor purchased WorldVentures products.  This violated 18 U.S.C. § 1343.

### Racketeering Act Number Six

188.    Throughout 2016 and continuing to present date, the those acting on behalf of WorldVentures distributed information by interstate wire transmissions over the internet in WorldVentures back office database, including its SQL database to other countries, to upper level managers in other countries, and in-house counsel for WorldVentures that evidence sales receipts almost exclusively from recruiting, and none from the sale of any product or service to customers.

These videos promoted the fraudulent pyramid scheme and contained material false representations regarding the wealth that a recruit or WorldVentures distributor could achieve if that recruit became an WorldVentures distributor and if a distributor purchased WorldVentures products.  This violated 18 U.S.C. § 1343.

189.    WorldVentures' and the Directors' representations and omissions were the proximate cause of Yiru and the class joining the fraudulent scheme and purchasing the products.

190.    To the extent proof of reliance is legally required, in engaging in the aforementioned wire and mail fraud, WorldVentures and the Directors knew that Yiru and the class would reasonably rely on their representations and omissions which would cause the Plaintiff and the class joining the fraudulent pyramid scheme and purchasing the products.

191.    Defendants and the Directors knew that the misrepresentations and omissions described above in promoting and executing the fraudulent scheme were material because they caused Yiru and the class to join and participate in the illegal scheme.

192.    Had Yiru and the class known that WorldVentures and the Directors were promoting an illegal scheme, they would not have joined the WorldVentures Pyramid scheme.

193.    WorldVentures' and the Directors' acts of mail and wire fraud were a proximate cause of the injuries that Yiru and the class suffered. Because of WorldVentures' and the Directors' pattern of unlawful conduct, Yiru and the class lost millions of dollars, if not billions of dollars.

194.    Under 18 U.S.C. § 1964, Yiru and the class are entitled to treble their damages, plus interest, costs and attorney's fees.

<u>**COUNT V**</u>

(**RICO 18 U.S.C. § 1962(c)**)

(On behalf of the Class and the Subclass against all Defendants, including DOES 1-100)

195.    Plaintiff realleges all allegations as if fully set forth herein, and incorporates previous allegations by reference.

196.    WorldVentures, its promoters, the Directors, and the Individual Defendants are associated with the WorldVentures Enterprise. In violation of 18 U.S.C. § 1962(c), WorldVentures

and the Individual Defendants conducted and/or participated in the conduct of the affairs of the WorldVentures Enterprise, including participation in activities in furtherance of the WorldVentures Defendants' fraudulent scheme, through the pattern of racketeering activity earlier alleged.

197.    As a direct and proximate result of WorldVentures' and the promoters', Directors' Individual Defendants' violation of 18 U.S.C. § 1962(c), Yiru and the class were induced to, and did, become representatives in the WorldVentures Pyramid scheme and purchased billions of dollars of the WorldVentures products/services and recruited others to do the same. Yiru and the class were injured by WorldVentures' and the promoters, Directors, and Individual Defendants' unlawful conduct. The funds used to buy WorldVentures products constitute property of Yiru and the class within the meaning of 18 U.S.C. § 1964(c).

198.    WorldVentures knew of and agreed to the overall objective of the RICO offense because it knew the bonuses it toted were not possible, it knew the commission were not achievable, it knew that as much as 96% of distributors failed, and that income was derived not from customers, but from recruitments.

199.    Each of the Individual Defendants had a written and/or oral agreement with WorldVentures to commit each of the above predicate acts, in that there was an actual agreement between WorldVentures and each of the Individual Defendants that defined how each of the Individual Defendants would be making money from the scheme, that such money would be based on the number of persons recruited into the scheme, and that salaries and bonuses would be tied to how many people were recruited into the network, as opposed to legitimately branching out into retail.

200.    Under 18 U.S.C. § 1964(c), Yiru and the class are entitled to treble their damages, plus interest, costs and attorney's fees.

## COUNT VI

### (RICO 18 U.S.C. § 1962(d))

(On behalf of the Class and the Subclass against all Defendants, including DOES 1-100)

201.    Plaintiff realleges all allegations as if fully set forth herein, and incorporates previous allegations by reference.

195.    Each of the Defendants was separate and distinct from the enterprise and they each carried out functions independently, attempting to create an air of propriety and success. WorldVentures and the Individual Defendants agreed to work together in a symbiotic relationship to carry on the illegal scheme. Under that agreement, WorldVentures, WorldVentures Holdings, WorldVentures Foundation, the Individual Defendants, and others conspired to violate 18 U.S.C. § 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

196.    As a direct and proximate result of WorldVentures' and the Individual Defendants' violation of 18 U.S.C. § 1962(d), Yiru and the class were injured by WorldVentures', the Individual Defendants' and the promoters' unlawful conduct. The funds used to buy WorldVentures products constitute property of Yiru and the class under 18 U.S.C. § 1964(c).

197.    Under 18 U.S.C. § 1964(c), Yiru and the class are entitled to treble their damages, plus interest, costs and attorney's fees

## COUNT VII

### (DECLARATORY RELIEF 28 U.S.C. §§ 2201 *et seq.*)

(On behalf of the Class and the Subclass against all Defendants, including DOES 1-100)

198.    Plaintiff incorporates herein by reference the paragraphs above as if they were set forth fully herein.

199.    This is a Count for declaratory relief brought pursuant to 28 U.S.C. §§ 2201 and 2202.

200.    28 U.S.C. §§ 2201 *et seq.* authorizes relief for any person who desires a declaration of rights or duties with respect to one another. In cases of actual controversy relating to the legal rights and duties of respective parties, such a person may seek a judicial declaration of his or her rights and duties relative to an instrument or contract, or alleged contract, including a determination of any question of construction or validity arising under the instrument or contract, or alleged contract.

201.    On October 10, 2019, the Hon. Carlos G. Lopez (ret.) issued a Final Award (the "Final Award") in arbitration case number 01-18-0004-3400, finding that the Representative Agreement, the Policies and Procedures Manual, and the Compensation Guide were illusory, and thus, entirely unenforceable.

202.    On September 21, 2020, this Court *sua sponte* determined that there was an "ambiguity" in the Final Award, and remanded proceedings to Judge Lopez on a limited basis. ECF No. 172.

203.    On October 26, 2020, Judge Lopez issued an Amended Final Award in the arbitration proceeding (the "Amended Final Award"). No party disputes the Amended Final Award, and Plaintiff is moving to confirm the Amended Final Award.

204.    The Amended Final Award clarified (1) that typically arbitration agreements are standalone from policies manuals, whereas WorldVentures did implement such separate agreement here, (2) that the Representative Agreement, the Policies and Procedures Manual, and the Compensation Guide comprised the entirety of the ("Agreement"), and (3) that the Final Award meant to apply the finding only that the "arbitration provision" in the entire Agreement was illusory, and other findings.

205.    Plaintiff's Demand in the arbitration action requested only one Count for Declaratory relief.

206.    Even though the Arbitrator clarified his ruling was not made as to other provisions of the Agreement, the illusory ruling is subject to collateral estoppel because each and every provision of the Agreement must be necessarily bound up in such a determination that one provision is illusory, and WorldVentures is collaterally estopped and precluded from arguing that the choice of law provision is enforceable based on the illusory finding related to the arbitration provision.

207.    Alternatively, the Final Award and Amended Final Award are subject to "law of the case doctrine," because a finding that one provision is illusory cannot be divorced from the same necessary finding that the balance of the Agreement's provisions are too, illusory.

208.    Even if the Defendants are not estopped or precluded based on law of the case or estoppel, Plaintiff seeks a declaratory judgment that the Agreement (which would include each and every provision, the choice of law provision, the so-called confidentiality provision) are unenforceable because the Agreement is illusory.

209.    Judge Lopez's ruling is at minimum, persuasive as to such a determination.

210.    The entire Agreement is illusory because the unilateral amendment clauses are impermissible under law.

211.    The effect of a finding that an agreement is illusory under law, is that the entire contract is unenforceable.

212.    If the entire contract is unenforceable, the "choice of law" provision is unenforceable and the "confidentiality" provision is unenforceable.

213.    The Individual Defendants are not parties to the Agreement.

214.    The Individuals Defendants may not assert estoppel based on the terms of the purported Agreement, their conduct, the claims at issue in this case, and the operation of WorldVentures' business in practice.

215.    The choice of law provision is a narrow one under 5th Circuit Authority, and thus does not reasonably include the Counts at issue in this dispute that are claims sounding in tort.

216.    A review of the choice of law provision of legitimate companies in Texas reflects as a matter of custom, practice, and performance, that the choice of law provision here is narrow.

217.    A review of the Restatement 2nd analysis adopted by the Fifth Circuit independently prohibits a dispute like this from being reviewed on the merits.

218.    An actual controversy exists between Plaintiff and Defendants as to their rights and duties to each other.  Specifically, the Defendants are now contending that one provision of the Agreement is not "illusory" even though another provision was found to be illusory, that the choice of law provision is broad even though it is indisputably narrow, and that apparently, the Individual Defendants can assert the choice of law. Plaintiffs contend that the choice of law provision is narrow, that illusory to one clause means illusory to all, and that the Individual Defendants have no basis to assert choice of law, as to a contract which does not refer to them.  Independently, an

analysis of the Restatement factors precludes the "enforcement" of any choice of law provision. Accordingly, a declaration is necessary and proper at this time.

219.    Plaintiff requests declaratory relief and a determination that the entire Agreement is illusory.

### PRAYER FOR RELIEF

The named Plaintiff and the Plaintiff class and subclass request the following relief:

a.    Certification of the class and subclasses;

b.    A jury trial and judgment against Defendants;

c.    Rescission of the agreements upon which the scheme is based, and recovery of all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme;

d.    Damages for the financial losses incurred by Plaintiff and by the class and subclasses because of the WorldVentures Defendants' conduct and for injury to their business and property;

e.    Restitution and disgorgement of monies;

f.    A judicial declaration that the entire Agreement is illusory, and thus unenforceable;

g.    Temporary and permanent injunctive relief enjoining WorldVentures from paying its Representatives recruiting rewards that are unrelated to retail sales to ultimate users and from further unfair, unlawful, fraudulent and/or deceptive acts;

h.    The cost of suit including reasonable attorneys' fees under California Code of Civil Procedure § 1021.5, Civil Code §1689.2, and otherwise by law;

i.    Trebling of damages;

j.    Punitive damages;

k.    For damages in an amount yet to be ascertained as allowed by law; and

l.    For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

Dated: November 9, 2020                    Respectfully submitted,


*/s/ Blake J. Lindemann*                    */s/ Rachel E. Montes*
BLAKE J. LINDEMANN                          RACHEL E. MONTES
California Bar No. 255747                    Rachel@MontesLawGroup.com
E-mail:  blake@lawbl.com                    Texas Bar No. 45005925
**LINDEMANN LAW FIRM, APC**                  **MONTES LAW GROUP, PC**
(*pro hac vice*)                             1121 Kinwest Parkway, Ste. 100
433 N. Camden Drive, 4th Floor               Irving, TX 75063
Beverly Hills, CA 90210                      Telephone No: 214-522-9401
Telephone No: 310-279-5269                   Facsimile No: 214-522-9428
Facsimile No: 310-300-0267


                                            ATTORNEYS FOR PLAINTIFF SHI YIRU
                                            AND THOSE SIMILARLY SITUATED

## DEMAND FOR JURY TRIAL

Plaintiff Melody Yiru, on behalf of herself and those similarly situated, hereby requests a

jury trial on all matters so triable.

Dated: November 9, 2020                            Respectfully submitted,


*/s/ Blake J. Lindemann*                            */s/ Rachel E. Montes*
BLAKE J. LINDEMANN                                 RACHEL E. MONTES
California Bar No. 255747                           Rachel@MontesLawGroup.com
E-mail:  blake@lawbl.com                            Texas Bar No. 45005925
**LINDEMANN LAW FIRM, APC**                         **MONTES LAW GROUP, PC**
(**pro hac vice**)                                  1121 Kinwest Parkway, Ste. 100
433 N. Camden Drive, 4th Floor                      Irving, TX 75063
Beverly Hills, CA 90210                             Telephone No: 214-522-9401
Telephone No: 310-279-5269                          Facsimile No: 214-522-9428
Facsimile No: 310-300-0267

                                                    ATTORNEYS FOR PLAINTIFF SHI YIRU
                                                    AND THOSE SIMILARLY SITUATED

**DEMAND FOR JURY TRIAL AND CERTIFICATE OF SERVICE**

## <u>CERTIFICATE OF SERVICE</u>

On November 9, 2020, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I will serve the parties individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

*/s/ Blake J. Lindemann*
Blake J. Lindemann