Phillip Lamberson – State Bar No. 00794134
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile:   (214) 745-5390
plamberson@winstead.com

**COUNSEL FOR SEACRET DIRECT, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| § | | **Chapter 11** |
| **SPHERATURE INVESTMENTS LLC,** § | | |
| *et al.,* § | | **Case No. 20-42492** |
| § | | |
| **DEBTORS.**[1] § | | **Jointly Administered** |

**LIMITED OBJECTION OF SEACRET DIRECT, LLC TO MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING:  (A) BID PROCEDURES; (B) STALKING HORSE BIDDER AND BID PROTECTIONS; AND (C) FORM AND MANNER OF NOTICES; (II) SCHEDULING AN AUCTION AND SALE HEARING; (III) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF**

Seacret Direct, LLC ("Seacret") files this *Limited Objection to Motion for Entry of an Order (I) Authorizing and Approving: (A) Bid Procedures; (B) Stalking Horse Bidder and Bid Protections; and (C) Form and Manner of Notices; (II) Scheduling an Auction and Sale*

---

[1]  The "**Debtors**" in the above-captioned jointly administered chapter 11 bankruptcy cases ("**Cases**") are: Spherature Investments LLC ("**Spherature**") EIN#5471; Rovia, LLC ("**Rovia**") EIN#7705; WorldVentures Marketing Holdings, LLC ("**WV Marketing Holdings**") EIN#3846; WorldVentures Marketplace, LLC ("**WV Marketplace**") EIN#6264; WorldVentures Marketing, LLC ("**WV Marketing**") EIN#3255; WorldVentures Services, LLC ("**WV Services**") EIN#2220.

---

**LIMITED OBJECTION OF SEACRET DIRECT, LLC MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING:  (A) BID PROCEDURES; (B) STALKING HORSE BIDDER AND BID PROTECTIONS; AND (C) FORM AND MANNER OF NOTICES; (II) SCHEDULING AN AUCTION AND SALE HEARING; (III) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF   Page 1 of 8**

*Hearing; (III) Approving the Sale of Substantially All of the Assets of the Debtors, Free and Clear of All Liens, Claims, Encumbrances and Interests; (IV) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (V) Granting Related Relief* (the "Objection") to the *Motion for Entry of an Order (I) Authorizing and Approving: (A) Bid Procedures; (B) Stalking Horse Bidder and Bid Protections; and (C) Form and Manner of Notices; (II) Scheduling an Auction and Sale Hearing; (III) Approving the Sale of Substantially All of the Assets of the Debtors, Free and Clear of All Liens, Claims, Encumbrances and Interests; (IV) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (V) Granting Related Relief* [Dkt # 92] (the "Bid Procedures"), filed by the Debtors and Debtors-in-Possession on January 21, 2021.

## I. FACTUAL BACKGROUND

1. On December 21, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases, and the Debtors remain in control of their assets and estate as debtors-in-possession.

2. On January 22, 2021, an Official Committee of Unsecured Creditors was appointed in these cases.

3. Before the Petition Date, Seacret and WV Marketing entered into a Limited Solicitation Agreement (the "Limited Solicitation Agreement").[2] As noted in WV Marketing's Schedule G, the purpose of the Limited Solicitation Agreement with Seacret was "to assist in

---

[2] Before the Limited Solicitation Agreement, Seacret and WV Marketing entered a Co-Marketing Agreement; however, this agreement was largely replaced by the Limited Solicitation Agreement.

---

**LIMITED OBJECTION OF SEACRET DIRECT, LLC MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING: (A) BID PROCEDURES; (B) STALKING HORSE BIDDER AND BID PROTECTIONS; AND (C) FORM AND MANNER OF NOTICES; (II) SCHEDULING AN AUCTION AND SALE HEARING; (III) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF**

protecting and maintaining [the Debtors'] sales force." [Case 20-42494; Dkt # 22]. However, Seacret files this Objection purely as a potential bidder in connection with the Bid Procedures, and not as a creditor or contract counterparty.[3]

## II.  LIMITED OBJECTION

### A.  The Stalking Horse Protections of the Bid Procedures Should Not be Approved.

4. The Bid Procedures provide for a break up fee to WV Holdings Co, LLC (the "Stalking Horse") in the amount of $500,000 as well as $500,000 in expense reimbursement. Thus, the entire break fee that other bidders must pay to the Stalking Horse under the proposed Bid Procedures is $1 million (the "Break Fee").

5. The Court will remember a time when break fees were an aberration and rarely granted in bankruptcy cases. It is really only the last 15 to 20 years that break fees became a standard 363 sale protection. But even based on modern practice, break fees are only justified where they encourage subsequent bidders to bid for the debtor's assets. In the *Asarco* case, the Fifth Circuit elaborated on the justification for break fees in bankruptcy cases: "In the context of bankruptcy auction sales, break-up fees are sometimes authorized . . . because they provide an incentive for an initial bidder to serve as a so-called `stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders. The break-up fee compensates the stalking horse for the risk it shoulders in being the first bidder." *In re Asarco, LLC*, 650 F.3d 593, 602 n.9 (5th Cir. 2011) (internal citations omitted). Further, break fees that relate to

---

[3] Seacret reserves all rights related to the Limited Solicitation Agreement, the Co-Marketing Agreement or otherwise, including the right to compel arbitration or demand a jury trial related to any disputes. This Objection is not intended to be, and should not be interpreted as, an informal proof of claim or any other demand for payment, and it is not a request for relief beyond the Bid Procedures. This Objection is not a consent to or an acceptance of jurisdiction or venue by Seacret in connection with this bankruptcy case.

---

**LIMITED OBJECTION OF SEACRET DIRECT, LLC MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING: (A) BID PROCEDURES; (B) STALKING HORSE BIDDER AND BID PROTECTIONS; AND (C) FORM AND MANNER OF NOTICES; (II) SCHEDULING AN AUCTION AND SALE HEARING; (III) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF**   Page 3 of 8

expenses already incurred by the bidder at the time presented to the Court (as here) must also meet the standards for allowance of an administrative claim under § 503(b). *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3rd Cir. 1999) ("We therefore conclude that the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."). *See also Asarco*, 650 F.3d at 602 (adopting the *Calpine* standard for expenses already incurred).

6. At least in the case of Seacret, the Break Fee is unnecessary and simply an additional cost that transfers value away from the Debtors' estates (and their creditors) to the Stalking Horse. In November 2020, Seacret and the Debtors entered into a letter of intent for Seacret to purchase certain Debtors' assets. Beginning in November 2020 and continuing through January 2021, Seacret did in fact negotiate an asset purchase agreement with the Debtors consistent with the terms of the letter of intent, and this asset purchase agreement was substantially agreed between Seacret and the Debtors.

7. Thus, the Stalking Horse had no part in Seacret's interest in the Debtors' assets, and the Stalking Horse's due diligence, negotiation of an APA and other participation in the sales process is irrelevant to Seacret's participation. The Stalking Horse is in no way the "initial bidder" or "first bidder" for the Debtors' assets, as required by *Asarco*. In fact, it appears that Seacret was an interested buyer pursuing the purchase of the Debtors' assets well before the

**LIMITED OBJECTION OF SEACRET DIRECT, LLC MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING:  (A) BID PROCEDURES; (B) STALKING HORSE BIDDER AND BID PROTECTIONS; AND (C) FORM AND MANNER OF NOTICES; (II) SCHEDULING AN AUCTION AND SALE HEARING; (III) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF                             Page 4 of 8**

Stalking Horse, and Seacret believes other potential bidders for the Debtor's assets were likewise involved before or at the same time as the Stalking Horse and the Break Fee is not relevant to their participation either.

8.  Further, the Break Fee is excessive relative to the offer that the Stalking Horse is actually making. The Bid Procedures emphasize that the Stalking Horse is paying $10 million in upfront cash. However, the Debtors' combined schedules show that they held approximately $8.7 million in cash and an additional $2.25 million in cash deposits and pre-paid expenses as of the Petition Date -- roughly $11 million in cash and equivalents. The Stalking Horse's letter of intent (the "Stalking Horse LOI") attached to the Bid Procedures indicates that the Stalking Horse will be purchasing this cash and all cash equivalent assets [Dkt. # 92-5, page 2 of 8]. Further, even if one takes into account the use of cash over the course of this bankruptcy case up through the date of the sale, the Debtors' most recent cash collateral budget shows that they will still have $3,579,637 in cash on the week ending April 4, 2021 (the anticipated week of closing) [Dkt. # 136, page 15 of 15], in addition to the scheduled $2.25 million in deposits and pre-paids. Thus, the *actual net cash* that the Stalking Horse is paying is at most $4.2 million, making the Break Fee roughly 24% of the upfront cash to be paid. All other consideration to be paid under the Stalking Horse LOI is entirely speculative and subject to a to-be-determined APA with the Stalking Horse.[4] Thus, the $1 million Break Fee is wildly excessive.

---

[4] For example, the Stalking Horse LOI provides an "Earn Out" calculated as a 1% royalty for each month that minimum monthly revenue is $6 million related to "historical" product lines. [Dkt. # 92-5, page 2 of 8]. The cash collateral budget shows that the Debtors will not once satisfy this $6 million monthly threshold during the bankruptcy case [Dkt. # 97, page 11 of 11], and there is no indication that the Stalking Horse will do so either once it acquires the assets.

---

**LIMITED OBJECTION OF SEACRET DIRECT, LLC MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING:  (A) BID PROCEDURES; (B) STALKING HORSE BIDDER AND BID PROTECTIONS; AND (C) FORM AND MANNER OF NOTICES; (II) SCHEDULING AN AUCTION AND SALE HEARING; (III) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF                           Page 5 of 8**

9. The Bid Procedures also require an initial minimum overbid of $250,000 with subsequent minimum overbids of $500,000. Seacret submits that these overbids are too large relative to the size of the offers being made, and that an overbid of $100,000 to $200,000 is more than adequate.

10. Finally, the Stalking Horse offer is highly conditional. The Stalking Horse LOI has two and half pages of closing conditions [Dkt. # 92-5, pages 3-5 of 8], many of which are completely out of the Debtors' control. The clear ability to satisfy all closing conditions to the Stalking Horse sale is necessary because the only possible justification for the extraordinary bid protections is the Debtors' uninhibited ability to sell to the Stalking Horse. Further, the Stalking Horse LOI provides that the Stalking Horse will receive the $1 million Break Fee if a Termination Event occurs, which includes failure to satisfy any closing condition. This would include vague one-sided closing conditions like "immediate termination" of the "Interim Agreement"[5] and entry of a consulting agreement with Wayne Nugent "in form and substance satisfactory to the [Stalking Horse] and its counsel in its sole discretion" as well as various other conditions solely under the control of the Stalking Horse. The Court cannot approve Bid Procedures that put the Debtors in the position where they do not have a closable sale, but also owe the failed buyer $1 million in Break Fees.

---

[5] Seacret's letter of intent uses the term "Interim Agreement" to define the Limited Solicitation Agreement. Thus, it is very likely that Seacret's letter of intent was shopped to the Stalking Horse to encourage it to make an offer. In fact, portions of the Stalking Horse LOI bear a strong resemblance to the Seacret letter of intent and purchase agreement. In this sense, the Break Fee is turned completely on its head – Seacret's offer predated and encouraged the Stalking Horse offer, but the Stalking Horse is being gifted a Break Fee.

---

**LIMITED OBJECTION OF SEACRET DIRECT, LLC MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING: (A) BID PROCEDURES; (B) STALKING HORSE BIDDER AND BID PROTECTIONS; AND (C) FORM AND MANNER OF NOTICES; (II) SCHEDULING AN AUCTION AND SALE HEARING; (III) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF**  **Page 6 of 8**

### B. The Stalking Horse Should be Held to the Same Standards as Other Bidders.

11. In addition to very liberal Break Fee and overbid protections, the Staking Horse is being treated entirely differently -- and more favorably -- than other bidders under the Bid Procedures. The Bid Procedures require Qualified Bidders to fully disclose the identity of the entity that will be bidding or participating in the bid. [Dkt. # 92-2, page 4 of 12]. However, the Stalking Horse is a newly-created acquisition entity that refuses to disclose the true identity of the buyer or its related parties.

12. Likewise, the Bid Procedures require that Qualified Bidders make a good faith deposit of 10% of their cash purchase price, which must be at least $10 million (but in reality, will probably be $11 million or more due to the Break Fee). Thus, Qualified Bidders must post at least a $1 million (or more likely $1.1 million) deposit. But the Stalking Horse posts only a $150,000 good faith deposit, and it has apparently not even done that yet.

### C. The To-Be-Filed APA and Reservation of Rights

13. At the time this Objection is filed, the Debtors have not filed the Asset Purchase Agreement (the "APA") with the Stalking Horse even though it was required to be filed by February 9 pursuant to the Bid Procedures. Seacret reserves all rights to supplement or amend this Objection, including to incorporate terms from the APA and related documents once filed, and to file additional objections or reservations of rights.

### III. PRAYER

Seacret respectfully requests that this Court grant this Objection and deny the Bid Procedures, or only allow the Bid Procedures consistent with this Objection. Seacret also

---

**LIMITED OBJECTION OF SEACRET DIRECT, LLC MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING: (A) BID PROCEDURES; (B) STALKING HORSE BIDDER AND BID PROTECTIONS; AND (C) FORM AND MANNER OF NOTICES; (II) SCHEDULING AN AUCTION AND SALE HEARING; (III) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF**       Page 7 of 8

requests such other and further relief in connection with the Bid Procedures to which it may show itself to be justly entitled.

**DATED: February 22, 2021.**

Respectfully submitted,

By: */s/ Phillip Lamberson*
Phillip Lamberson
State Bar No. 00794134
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
plamberson@winstead.com

**COUNSEL FOR SEACRET DIRECT, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2021, notice of this document will be electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District.

*/s/ Phillip Lamberson*
One of Counsel

---

**LIMITED OBJECTION OF SEACRET DIRECT, LLC MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING: (A) BID PROCEDURES; (B) STALKING HORSE BIDDER AND BID PROTECTIONS; AND (C) FORM AND MANNER OF NOTICES; (II) SCHEDULING AN AUCTION AND SALE HEARING; (III) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (IV) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF **Page 8 of 8**
4839-3881-9292v.1 65392-1