**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| In Re: | Lead Case No.: 20-42492 |
| SPHERATURE INVESTMENTS LLC, et al., | |
| | Chapter 11 |
| Debtors.[1] | |
| _____ / | |
| VIVA VOYAGE, LLC, | |
| | Adv. Case No.: _____ |
| Plaintiff, | |
| v. | |
| SPHERATURE INVESTMENTS LLC, ROVIA, LLC, WORLDVENTURES MARKETING, LLC, WORLDVENTURES HOLDINGS, LLC, | |
| Defendants. | |
| _____ / | |

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

Plaintiff, Viva Voyage, LLC ("Viva Voyage" or "Plaintiff"), sues Defendants, Spherature Investments, LLC ("Spherature"), Rovia, LLC ("Rovia"), WorldVentures Marketing, LLC ("WorldVentures Marketing"), and WorldVentures Holdings, LLC ("WorldVentures Holdings"), (collectively "Defendants"), and allege as follows:

---

[1] The "Debtors" in the above-captioned jointly administered chapter 11 bankruptcy cases ("Cases") are: Spherature Investments LLC ("Spherature") EIN#5471; Rovia, LLC ("Rovia") EIN#7705; WorldVentures Marketing Holdings, LLC ("WV Marketing Holdings") EIN#3846; WorldVentures Marketplace, LLC ("WV Marketplace") EIN#6264; WorldVentures Marketing, LLC ("WV Marketing") EIN#3255; WorldVentures Services, LLC ("WV Services") EIN#2220.

## INTRODUCTION

1. Plaintiff is a seller of travel that prides itself on the highest level of customer service. The company mission is to become the best seller of vacations by redefining the way that they are sold. Viva Voyage was designed to work harder than other travel agencies to make sure that its customers are purchasing the right vacation to match their needs and to provide vacation solutions for its customers with the highest possible value for their vacation dollar.

2. Defendant WorldVentures Holdings is the parent company of dozens of affiliated WorldVentures companies. What all of the affiliated subsidiary companies have in common is that they are multilevel marketing direct sales companies that market and sell lifestyle membership products and services through their network of representatives.

3. One such affiliated company is WorldVentures Marketing which provides leisure travel services. With a multi-level marketing model, WorldVentures Marketing sells DreamTrips Memberships through a series of part-time and full-time individuals who receive a commission for each membership that is sold.

4. By purchasing a DreamTrips Membership, an individual has the ability to purchase a variety of vacations at a discounted rate. As part of the DreamTrips Membership, an individual can partake in a variety of individual or group trips that are only available to DreamTrips members.

5. When a member inevitably books a trip, it is often done through WorldVentures Marketing's wholly owned subsidiary Rovia.

6. Rovia entered into a three-year contract with Plaintiff for Viva Voyage to procure cruise inventory as a licensed travel agent in markets selected by Rovia, to create cruise ship centered trips available to members of organizations or clubs, including DreamTrips, to procure and package cruise inventory to fulfill the cruise needs of Rovia's customers, and to procure travel

excursions for Rovia's customers during their trips amongst other related services. The contract between Viva Voyage and Rovia contains a Master Services Agreement ("MSA") and Statement of Work ("SOW").

7. Plaintiff has brought this lawsuit in connection with a number of business torts by Defendants, including defalcations of money that should be held in trust but were utilized for other purposes. By not holding the money in trust, Rovia violated a number of state and federal Seller of Travel and trust accounting laws.

8. In addition to being illegal, this conduct greatly endangers the public.

## PARTIES, JURISDICTION, AND VENUE

9. Viva Voyage, LLC is a Nevada Limited Liability Company. The three members of Viva Voyage are Geoffrey Silvers, Scott Silvers, and Walter Silvers. Although the company is a Nevada Limited Liability Company, very little of the company's operations occur in Nevada, and the company's principal place of business is in Palm Beach County, Florida.

10. Geoffrey Silvers is a citizen of Florida and resides in Palm Beach County, Florida.

11. Scott Silvers is a citizen of Florida and resides in Palm Beach County, Florida.

12. Walter Silvers is a citizen of Florida and resides in Palm Beach County, Florida.

13. Rovia, LLC is a Limited Liability Company whose sole member is WorldVentures Marketing, LLC.

14. WorldVentures Marketing, LLC is a Limited Liability Company whose sole member is WorldVentures Holdings, LLC.

15. Spherature, LLC is a Limited Liability Company which is the successor entity to WorldVentures Marketing.

16. WorldVentures Holdings, LLC is a Limited Liability Company with a variety of individual members.

17. This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. § 1409.

18. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## BACKGROUND AND GENERAL ALLEGATIONS

19. Rovia entered into a three year contract with Plaintiff for Viva Voyage to procure cruise inventory as a licensed travel agent in markets selected by Rovia, to create cruise ship centered trips available to members of organizations or clubs, including DreamTrips (which is owned by WorldVentures Marketing), to procure and package cruise inventory to fulfill the cruise needs of Rovia's customers, and to procure travel excursions for Rovia's customers during their trips amongst other related services.

20. Since the inception of the Contract, Viva Voyage has upheld and complied with each and every one of its material terms.

21. Prior to executing the Contract with Viva Voyage, Rovia was selling a high volume of cruise packages where the vast majority of the packages that they sold were at a loss. To place this in perspective, this means that each cruise package sold by Rovia, the sole source of income for the company, placed the company further into debt.

22. After Viva Voyage took control of Rovia's cruise ship bookings, nearly every cruise booked by Viva Voyage on behalf of Rovia customers has been profitable.

23. Despite this, Rovia has continuously and systematically violated the terms of the Contract as well as interfered with Viva Voyage's business.

24. However, it was Rovia's recalcitrant attitude toward holding its clients' funds in a trust account which necessitated the filing of an initial action and seeking injunctive relief from the Court in order to protect the public from Rovia's behavior.

25. Since Rovia sells trips to individuals residing in all 50 states, it is required to comply with the Seller of Travel laws for each state (referred to herein as the "Seller of Travel laws").

26. Once a Rovia customer in certain states pays the company for a trip, Rovia is required to maintain that money in a trust account under a variety of Seller of Travel Laws. From there, the money is to be transmitted from the trust account to pay for the trip. The purpose of these laws is to protect the public from fraudulent and negligent behavior.

27. In the instance of a trip booked by Viva Voyage, the money should go from the Rovia trust account directly to Viva Voyage. From there, Viva Voyage would directly pay the company that is offering the trip.

28. Despite this, Viva Voyage has been routinely notified by Rovia representatives that instead of Rovia setting aside client funds that have been paid for a trip, that Rovia utilizes the funds from new customers to pay for the operating expenses of its parent company, WorldVentures Holdings, or to pay for the trips of earlier customers.

29. This conduct violates a number of state and federal Seller of Travel and trust laws.

30. Viva Voyage was first notified on this conduct by Maria Kozova, the former Chief Financial Officer for Rovia. Viva Voyage learned of this conduct when Viva Voyage reached out to her to determine the reason that payments for trips were being delayed by Rovia and because Rovia employees were telling Viva Voyage that Rovia did not have any money to pay Viva Voyage.

31. Viva Voyage had reached out to Ms. Kozova since Rovia was habitually late in paying Viva Voyage – in fact, its first payment under the Contract in the amount of approximately $50,000 was not timely paid and Rovia ignored numerous requests from Viva Voyage about this issue – and Viva Voyage could not understand how Rovia did not have money to pay Viva Voyage given that all of the trips it booked were paid for by a customer in advance.

32. Due to this conduct, there have been times when Viva Voyage has been forced to advance its own funds, sometimes in excess of $100,000, to meet a deadline to pay for a customer's trip because Rovia had used customer funds for unauthorized purposes and was unable to cover the amount owed for the trip when it came due.

33. Although it is widely known amongst the employees at Rovia that the company engages in this illegal conduct, Fuqua, a former Senior Vice President for Travel Products at Rovia, acknowledged to Viva on numerous occasions that Rovia engages in this activity, that it is illegal under numerous state and federal regulations for Rovia to engage in this activity, and that Rovia will cease from continuing to engage in the conduct.

34. However, despite these assurances from Fuqua, Rovia continued to use client funds for unauthorized purposes.

35. Viva Voyage demanded on a number of occasions that Rovia make Viva Voyage the merchant of record for trips that it books.  By doing so, Viva Voyage could ensure that the proper trust accounting protocols are abided by.  However, Rovia refused to do so.

36. The reason for the refusal was simple, it would mean the end of Rovia utilizing client funds to support its cashflow needs for other companies under the WorldVentures family of companies.

LAW OFFICES
BECKER
1 EAST BROWARD BLVD., SUITE 1800 • FT. LAUDERDALE, FL  33301
TELEPHONE (954) 987-7550

37. The individuals engaging in this illegal conduct were Rovia, WorldVentures Marketing, and WorldVentures Holdings, Wayne Nugent, and Jerre Fuqua.

38. Nugent, who sits on the board of all three companies, and is one of two owners of the parent WorldVentures Holdings, is the individual who directed Rovia, through Fuqua, to engage in this improper conduct of transferring the money to WorldVentures Marketing or WorldVentures Holdings instead of having the money remain in a trust account.

39. At the express direction of Nugent; Fuqua, knowing that the conduct violates Seller of Travel laws, refused to comply with the Seller of Travel laws and personally engaged in the torts in his individual capacity by transferring the money coming into Rovia to other WorldVentures companies instead of into a trust account as mandated by the Seller of Travel laws. Both Nugent and Fuqua personally benefit from this practice financially since this activity helped keep the various WorldVentures companies afloat, and thus, both Fuqua and Nugent continued to derive income from the respective entities.

40. In addition to the conduct described above being illegal, it also violates Section 10.2.2 of the MSA.

41. For this reason, prior to the Petition for Bankruptcy, Viva Voyage sought for the Court to appoint an individual to oversee Rovia's financial accounts.

## FINANCIAL BREACHES BY ROVIA

**Margin Incentives Withheld by Rovia**

42. Rovia has also failed to uphold its financial obligations under the Contract.

43. Despite numerous requests by Viva Voyage to Rovia for an accounting and payment of the 2019 margin incentive, Fuqua, on behalf of Rovia, has only provided a one-page superficial spreadsheet without any supporting documentation.

44. A final accounting with supporting documentation was requested by Geoff Silvers and Scott Silvers on behalf of Viva Voyage during an in-person meeting with Fuqua in Dallas, Texas in late 2019. At that time, Rovia promised that supporting documentation and a full accounting would be provided on an expedited basis.

45. Despite this representation, and additional representations made to George Lopez from Viva Voyage, Rovia has not provided a final accounting for the 2019 margin incentive or payment of the incentive despite the fact that it was due on January 31, 2020 under the terms of the Contract.

46. Viva once again requested that Rovia provide a final 2019 accounting as well as payment of the 2019 incentive in May, 2020. In response, Rovia took the position for the first time that Viva Voyage did not qualify for the margin incentive because Viva Voyage did not meet both the revenue and margin requirements delineated in the SOW.

47. However, this position ignores that the revenue incentive as well as the margin incentive are separate incentives, and that the margin incentive can be added to the revenue incentive - even if the revenue incentive is 0 - in accordance with Section 5(c)(2) of the SOW.

48. By Viva Voyage's estimates, Rovia owes Viva Voyage between $80,000 and $100,000 for the 2019 margin incentive.

**Commission Withheld by Rovia**

49. Viva Voyage books all trips for Rovia customers on the Virtuoso platform. Virtuoso is the platform that Viva Voyage subscribes to in order to book travel for customers at a discounted rate.

50. In addition to booking trips for Rovia customers through the Virtuoso platform, Viva Voyage books trips for its own customers through the platform.

51. However, since Rovia is set up to receive all commissions from the Virtuoso platform, it is receiving commissions that it is not entitled to receive under the MSA for Viva Voyage's customers that are booked through the platform.

52. Despite a demand to do so, Rovia has failed to provide an accounting of these commissions or to provide the commission money to Viva Voyage.

53. It is believed that Rovia owes Viva Voyage substantial commissions for Viva Voyage customers not covered by the MSA that were booked through the Virtuoso platform.

**Revelex Fees under the Statement of Work**

54. Rovia has also breached the Contract by failing to pay the required monthly payment for Revelex under the terms of the agreement.

55. In accordance with Section 5(a) to the Statement of Work, Rovia shall pay Viva Voyage:

> "$7,000 plus any actual additional Revelex costs incurred including but not limited to bookings, users or exceeding included page views as listed in pricing on Rovia's current Revelex contract that are incurred automatically or are required to support increased Rovia cruise volume."

56. However, Rovia has only paid $7,000 for the past 20 months and has failed to pay Viva Voyage the associated Revelex fees for each month. The Revelex fees are approximately $7,000 each month making the amount due and owing to Viva Voyage for this breach approximately $140,000.

**Breach of Exclusivity**

57. Rovia has also breached the exclusivity provisions of the MSA.

58. Section 15.5 of the MSA provides: "<u>Exclusive</u>. This engagement of Service Provider for cruise Product and related Services shall be exclusive; Rovia may not engage other travel agencies for the same or similar services and/or the provision of cruise Product."

59. Despite this provision, at the onset of the Contract, instead of exclusively utilizing the services of Viva Voyage for its cruise related needs, Rovia was utilizing the services of a competing company, International Cruises and Excursions ("ICE").

60. By utilizing the services of ICE, which were advertised on the Rovia website, it created confusion amongst the consumer public and Viva Voyage lost bookings as a direct result of the confusion.

**Tortious Interference with an Advantageous Business Relationship**

61. Rovia has also interfered with an advantageous business relationship for Viva Voyage with Allianz Travel Insurance ("Allianz").

62. In 2019, Geoffrey Silvers, on behalf of Viva Voyage, was negotiating with Allianz to obtain approval to provide a highly profitable insurance policy that not all travel companies are approved to sell.

63. The negotiations were progressing favorably and the parties were close to reaching a deal.

64. However, when Rovia's former employee Mac Donald learned of the opportunity, he reached out directly to Allianz to attempt to make a deal for Rovia that would not include Viva Voyage. When Mac Donald did so, the calls he made to Allianz on behalf of his employer Rovia were placed from his home in Broward County, Florida.

65. Of course this ignored that Rovia would have benefitted from the Allianz program had Viva Voyage been approved to sell the insurance.

66. By Mac Donald reaching out directly to Allianz, he soured the deal that was near materialization, and as a result, Allianz refused to continue the negotiations with Viva Voyage.

67. All conditions precedent to this lawsuit have been met or waived.

68. Viva Voyage has retained the undersigned law firm to prosecute the instant lawsuit and has agreed to pay reasonable attorney's fees and costs which Defendants should be responsible for pursuant to controlling law.

**Rovia's Impersonation of Viva Voyage**

69. Since June, 2020, in an effort to gain information about refunds Viva Voyage has received, as well as to obtain information about cruise bookings, Rovia has impersonated Viva Voyage by calling a number of cruise lines and misinforming the cruise company that the individual calling is from Viva Voyage when in actuality the individual is an employee of Rovia.

70. These ongoing calls have been made to – at least - Royal Caribbean Cruise Lines and Norwegian Cruise Lines.  In each instance, an individual named Christine called Norwegian Cruise Lines and Carnival Cruise Lines to obtain information concerning cruise bookings and refunds.  Christine identified herself as an employee of Viva Voyage in order to obtain the information.  Christine misidentified herself due to the fact that Royal Caribbean Cruise Lines and Norwegian Cruise Lines would not have provided the information she sought as the information would only be disseminated to an individual employed by Viva Voyage.  In all of these instances, which have occurred since June, 2020 and continue through the present, Christine called Norwegian or Royal Caribbean at their Miami, Florida headquarters and provided the false information in order to obtain information concerning cruise bookings and refunds.  Incredibly, Rovia has such a cavalier attitude toward this behavior that emails from counsel in this case have indicated the Rovia will continue to verify refunds that Viva Voyage has received from cruise

lines. This is despite the fact that the cruise lines would not provide the information without Rovia falsely stating that they are calling on behalf of Viva Voyage.

**Improper Termination of Contract**

71. In March, 2020, Fuqua on behalf of Rovia, reached out to Viva Voyage concerning the Contract.

72. According to Fuqua, Rovia was having financial trouble due to COVID-19 and that they needed to make some "difficult decisions". Fuqua went on to state that the company could no longer pay for the contract with Viva Voyage. As a result, he requested that Viva Voyage be a "team player" and accept a 91% discount on the price that it is paid on a monthly basis under the Contract.

73. During the call, Fuqua stated that Rovia was requesting that all of their partners modify their agreements due to Rovia's financial situation. According to Fuqua, this was the only way that Rovia could remain a growing concerning. During the call, which was attended by numerous Rovia employees, there was no mention of a breach by Viva Voyage to any of the agreements between Rovia and Viva Voyage. In fact, at no time previous to this call was a breach of an agreement ever raised.

74. In a letter confirming the conversation, Rovia once again requested the 91% discount and made no mention of any purported breaches by Viva Voyage.

75. Viva Voyage declined Rovia's request.

76. Knowing that Viva Voyage had a long-term valid contract with Rovia in place, Fuqua attempted to create purported breaches to the Contract in order to obtain leverage so that Viva Voyage would accede to his unreasonable demands.

77. To this end, Fuqua and Rovia concocted a list of fabricated breaches by Viva Voyage to the Contract which were contained in a letter.

78. Although the letter indicated that Viva Voyage had 30 days to cure all of the purported defaults pursuant to Section 7.1.1 of the Master Services Agreement, Rovia failed to provide Viva Voyage with the 30 days required by Section 7.1.1.

79. Curing the alleged defaults was made impossible due to the fact that Rovia shut off Viva Voyage's email access on May 26, 2020, Rovia locked Viva Voyage out of the Rovia systems on May 26, 2020, Rovia has ignored all communications from Viva Voyage since May 26, 2020, Rovia removed Viva Voyage's access to Virtuoso on or about May 27, 2020, and Rovia deleted Viva Voyage as a branch of Virtuoso, amongst other conduct.

80. These actions made it impossible for Viva Voyage to cure any of the purported defaults.

81. As a consequence of this conduct, Rovia failed to provide Viva Voyage with the cure period delineated in Section 7.1.1 of the Master Services Agreement and anticipatorily breached the contract due to the conduct described

## COUNT I – FOR WILLFUL INJURY  (11 U.S.C. § 523(a)(6)

82. Plaintiff re-alleges and incorporates paragraphs 1 through 81 as set forth above.

83. Defendants made representations and engaged in conduct as described above.

84. Defendants' actions described above constituted a willful and malicious injury to Viva Voyage because Defendants intended to injure Viva Voyage or the injury to Viva Voyage was substantially certain due to Defendants actions.

85. As a direct and proximate result of Defendants' these actions, Viva Voyage has suffered financial damages as delineated above.

## COUNT II – FOR MONEY OBTAINED BY FALSE PRETENSES, FALSE REPRESENTATIONS, OR ACTUAL FRAUD (11 U.S.C. § 523(a)(2)(A))

86. Plaintiff re-alleges and incorporates paragraphs 1 through 70 as set forth above.

87. Defendants made representations as described above.

88. At the time, Defendants knew that the representations made to Viva Voyage were false.

89. Defendants made the representations with the purpose of deceiving Viva Voyage in order to abscond with assets belonging to Viva Voyage.

90. Viva Voyage relied on the false representations by Defendants, and as a direct and proximate result of Defendants' fraudulent actions, Viva Voyage has suffered financial damages as delineated above.

## COUNT III – FOR FRAUD OR DEFALCATION WHILE ACTING IN A FIDUCIARY CAPACITY (11 U.S.C. § 523(a)(4))

91. Plaintiff re-alleges and incorporates paragraphs 1 through 70 as set forth above.

92. As set forth herein, Defendants misappropriated a substantial amount of money from Viva Voyage while acting in a fiduciary capacity.

93. Defendants breached their fiduciary duties by diverting funds to themselves.

94. As a result of Defendants' breach of fiduciary duty, Viva Voyage has incurred substantial damages.

## COUNT IV – EMBEZZLEMENT (11 U.S.C. § 523(a)(4))

95. Plaintiff re-alleges and incorporates paragraphs 1 through 70 as set forth above.

96. As set forth herein, Defendants misappropriated and diverted assets.

97. Defendants misappropriated these assets with fraudulent intent (specifically to cause financial harm to Viva Voyage) and for Defendants' use and benefit.

LAW OFFICES
BECKER
1 EAST BROWARD BLVD., SUITE 1800 • FT. LAUDERDALE, FL  33301
TELEPHONE (954) 987-7550

## **COUNT V – LARCENY (11 U.S.C. § 523(a)(4))**

98. Plaintiff re-alleges and incorporates paragraphs 1 through 70 as set forth above.

99. Defendants have stolen property belonging to Viva Voyage to the detriment of viva Voyage.

100. Defendants' actions as described herein constitute "larceny" within the meaning of 11 U.S.C. § 523(a)(4).

101. Defendants' larceny has caused injury and damage to Viva Voyage.

**WHEREFORE**, Plaintiffs request the entry of judgment against Defendants for:

(a) A determination that the aforementioned debt is non-dischargeable under 11 U.S.C. § 1328(a)(2), 11 U.S.C. § 523(a)(6); 11 U.S.C. § 523(a)(2)(A), and 11 U.S.C. § 523(a)(4);

(b) An award of costs and reasonable attorneys' fees; and

(c) For such further relief as the Court deems appropriate.

Dated: March 30, 2021

    Respectfully submitted
    BECKER
    *Attorneys for Plaintiff*
    1 East Broward Blvd., Suite 1800
    Fort Lauderdale, FL  33301
    Telephone:  (954) 987-7550
    Facsimile:  (954) 985-4176
    Eberege@beckerlawyers.com
    Cgellman@beckerlawyers.com

By: _____
    EVAN B. BERGER
    Florida Bar No.  71479