Marcus A. Helt, Esq. (Texas Bar #24052187)
Jack Haake, Esq. *(Admitted Pro Hac Vice)*
MCDERMOTT WILL & EMERY LLP
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201
Tel: (214) 210-2821 / Fax: (972) 528-5765
Email: mhelt@mwe.com
Email: jhaake@mwe.com

*PROPOSED COUNSEL FOR THE DEBTORS AND DEBTORS-IN-POSSESSION*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| **SPHERATURE INVESTMENTS LLC, *et al.*** | § | **Case No.: 20-42492** |
| | § | |
| **Debtors.**[1] | § | **Jointly Administered** |
| | § | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER (A) APPROVING BINDING TERM SHEET, (B) APPROVING EXPENSE REIMBURSEMENT AND BREAKUP FEE TO THE PLAN SPONSOR AND (C) GRANTING CERTAIN RELATED RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Spherature Investments LLC ("Spherature"), together with the related parties identified herein, as debtors and debtors-in-possession (collectively, the "Debtors"), files this motion (this "Motion") for entry of an order, substantially in the form attached as **Exhibit B** (the "Order"), approving (a) the Debtors' entry into the Binding Term Sheet (as defined below), (b) payment to the Plan Sponsor (as defined below) of the Expense Reimbursement (as defined below) and the Breakup Fee (as defined below), each in accordance with the terms and conditions of the Binding

[1] The "Debtors" in the above-captioned jointly administered chapter 11 bankruptcy cases ("Cases") are: Spherature Investments LLC EIN#5471; Rovia, LLC EIN#7705; WorldVentures Marketing Holdings, LLC EIN#3846; WorldVentures Marketplace, LLC EIN#6264; WorldVentures Marketing, LLC EIN#3255; WorldVentures Services, LLC EIN#2220.

Term Sheet and (c) granting certain related relief. In support of this Motion, the Debtors respectfully represent as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

2. The statutory bases for relief requested herein are sections 105(a), 363(b), 503(b), 507 (a)(2), 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure.

**INTRODUCTION**

3. On December 21, 2020 (the "Petition Date"), the Debtors filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code, initiating the above-captioned cases (collectively, the "Cases" or the "Chapter 11 Cases") and creating the bankruptcy estates for each Debtor (individually, an "Estate" and, collectively, the "Estates"), in the United States Bankruptcy Court for the Eastern District of Texas (the "Bankruptcy Court").

4. A full description of the Debtors' business operations and reasons for commencing the Cases are set forth in the declaration submitted by the Debtors' proposed Chief Restructuring Offer, Erik Toth (the "First Day Declaration").[2] The contents of the First Day Declaration are incorporated by reference, as if set forth herein verbatim, pursuant to Federal Rule of Civil Procedure 10(c).

---

[2] The First Day Declaration is filed at Docket No. 20 in Spherature Investments LLC, pending before the Bankruptcy Court.

5. The Debtors remain in possession of their property and are managing their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. On January 22, 2021, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") [Docket Nos. 93 and 116].

**MARKETING PROCESS AND BINDING TERM SHEET**

7. Since initiating the Cases, the Debtors and their professionals have been focused on marketing the Debtors' assets and locating a plan sponsor or purchaser for substantially all of the Debtors' assets. The Debtors extensive marketing process included, without limitation, the following:

a) Establishing a data room with relevant documents about the Debtors' assets, the Debtors' financial status, and the Debtors' operations;

b) Preparing a confidential information presentation;

c) Approaching strategic and financial buyers with industry and/or "special-situations" experience; and

d) Holding numerous discussions with interested parties.

8. As a result of these efforts, the Debtors discussed in detail a possible transaction with a number of interested parties. Mindful of maximizing value of the Estates, preserving going-concern value, saving jobs, and administering the Estates as quickly and cost-effectively as possible, especially considering the stress the protracted prepetition sale process has put on the Debtors' relationships with its employees, vendors, and customers, the Debtors engaged with Vernoa International Holdings, Inc. and one or more subsidiaries or affiliates (the "Plan Sponsor") to come to terms of on a sale of substantially all of the Debtors' assets under section 1123 of the

Bankruptcy Code (the "Transaction") pursuant to the terms of a binding term sheet (the "Binding Term Sheet"), which is attached as **Exhibit C**.

9. The Debtors believe that the proposal from the Plan Sponsor maximizes the value of the Debtors' assets for the benefit of the Estates and their creditors and is the highest and best offer received by the Debtors through their marketing process. Through the Plan Sponsor's proposal, the Debtors anticipate being able to provide a meaningful recovery to the Debtors' allowed unsecured claims. The Debtors also submit that the proposal has the greatest likelihood of closing, given that there is no diligence condition. Given that the proposal from the Plan Sponsor represents the best value and has the lowest manifest execution risk, and after lengthy negotiations, the Debtors and the Plan Sponsor signed the Binding Term Sheet, which sets forth the terms for the Debtors' restructuring pursuant to a chapter 11 plan (the "Plan") on May 28, 2021.

10. Key terms of the Binding Term Sheet are as follows:[3]

- The Plan Sponsor will provide the sum of (i) "Cure" costs required under § 365 and (ii) up to $82,500,000, as more fully set forth in the Binding Term Sheet, which generally includes (a) $5 million in cash, (b) $5.5 mm in assumed secured debt, (c) $16.0 mm in earn-out/royalty payments, (d) up to $45 mm in aggregate unpaid pre-petition sales commissions, and (e) up to $11 mm in assumed deferred revenue.

- The Plan Sponsor will deposit $250,000.00 (the "Deposit") with Wilmington Trust, National Association, as escrow agent. The Debtors will retain the Deposit in the event the Plan Sponsor terminates the Binding Term Sheet, as more fully set forth in the Binding Term Sheet.

- The Plan Sponsor will acquire substantially all of the Debtors' assets other than Excluded Assets, which such Excluded Assets

[3] The following is a summary of the Binding Term Sheet and is qualified in its entirety by reference to the Binding Term Sheet. If there is an inconsistency between the Binding Term Sheet and its description herein, the terms of the Binding Term Sheet shall govern. Unless otherwise defined in this summary or this Motion, capitalized terms shall have the meanings assigned to such terms in the Binding Term Sheet.

include (a) all utility deposits, (b) all Causes of Action (defined in the Binding Term Sheet) of the Debtors, and (c) all rights to receive payments under the Limited Solicitation Agreement between the Debtors and Seacret Direct LLC.

- The Closing Date is the first date practicable following entry of an order by the Bankruptcy Court approving the Transaction.
- On or before June 11, 2021, the Debtors will provide a schedule of executory contracts and unexpired leases, including proposed cure amounts to the Plan Sponsor and file a motion to approve procedures for the assumption, assumption and assignment, and rejection for such contracts and leases.
- The Plan Sponsor will be entitled to a $350,000 breakup fee (the "Breakup Fee") and a $150,000 expense reimbursement (the "Expense Reimbursement") for out-of-pocket reasonable and documented expenses, subject to proof of same to the Bankruptcy Court.
- The Debtors seek authority to pay the Breakup Fee and Expense Reimbursement as an administrative expense of all the Debtors' bankruptcy estates pursuant to §§ 507 or 503 of the Bankruptcy Code.
- The Binding Term Sheet is governed by the laws of the state of New York.
- Notwithstanding anything to the contrary in the Binding Term Sheet, nothing in the Binding Term Sheet requires the Debtors, the board of directors, board of managers, or similar governing body of the Debtors, to take any action or to refrain from taking any action if taking of failing to take such action would be inconsistent with applicable law or their fiduciary obligations under applicable law.

11. As consideration for the Plan Sponsor's agreements under the Binding Term Sheet, the Debtors agreed to seek approval from the Bankruptcy Court of the Binding Term Sheet, including payment of the Breakup Fee and reimbursement of the Expense Reimbursement, should the Debtors fail to conclude the Transaction. The Debtors believe that approval of the Expense Reimbursement and Breakup Fee are reasonable and necessary conditions to ensure the best possible recovery for all of the Debtors' stakeholders.

## RELIEF REQUESTED

12. By this Motion, the Debtors seek approval of the Binding Term Sheet on the terms set forth herein and in the Binding Term Sheet. As described above, the Debtors, after extensive efforts to explore value maximizing transactions and restructuring alternatives and, after discussions with its professionals, determined in the exercise of their sound business judgment that approval of the Binding Term Sheet was the most effective way to maximize the value of the Estates. Approval of the Expense Reimbursement and the Breakup Fee should be granted by this Court as reasonable and necessary to the Binding Term Sheet under the circumstances.

## BASIS FOR RELIEF REQUESTED

### A. The Binding Term Sheet Should be Approved

13. Under section 363(b)(l) of the Bankruptcy Code, the Court may authorize a debtor in possession to "use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l). A debtor in possession's decision to use, sell or lease assets outside the ordinary course of business must be based upon its sound business judgment. *See Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp.* (*In re Chateaugay Corp.*), 973 F.2d 141, 143 (2d Cir. 1992) (holding that a section 363(b) application must find a "good business reason" to grant application); *see also In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (same). The "business-judgment" test is met when the debtor demonstrates any rational business purpose for the proposed use of property. *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

14. Once the debtor articulates a valid business justification, the business-judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Thus, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns Manville Corp.*), 60 B.R. 612, 616 (Bank. S.D.N.Y. 1986).

15. A debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" *In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr. D. Del. 2001) (quoting *In re Logical Software*, 66 B.R. 683, 686 (Bankr. D. Mass. 1986)); *Integrated Resources*, 147 B.R. at 656 ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest or gross negligence.").

16. Here, entering into the Binding Term Sheet represents a sound exercise of the Debtors' business judgment and should be approved. The Binding Term Sheet was the result of arms-length, good-faith negotiations among the Plan Support Group and the Debtors, each of which was represented by experienced professionals and advisors. The Binding Term Sheet and the restructuring proposal contemplated therein preserve the Debtors' core businesses along with the jobs of the Debtors' employees, provide the Debtors with the ability to pay their secured and unsecured creditors, and provide a meaningful recovery for their creditors in various forms of consideration. Based on the foregoing, the Debtors submit that entry into the Binding Term Sheet was a valid exercise of their business judgment, which should be approved by the Court.

**B. <u>The Expense Reimbursement and the Breakup Fee Should be Approved</u>**

17. Similarly to the standard used to authorize entry into the Binding Term Sheet, courts will generally defer to a debtor's judgment and approve the payment of expense

reimbursements and breakup fees pursuant to section 363(b) of the Bankruptcy Code as long as there is a "legitimate business justification." *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996); *Accord Lionel Corp.*, 722 F.2d at 1071 (applying the "business judgment rule," which requires that a sound business purpose for the transaction exist).

18. Courts have acknowledged that the approval of breakup fees and expenses in connection with substantial sales in bankruptcy is warranted to compensate an unsuccessful acquirer whose initial offer served as the basis and catalyst for higher or better offers. *See Asarco, Inc. v. Elliot Mgmt*. (*In re Asarco, LLC*), 650 F.3d 593, 597-98, 601-03 & n.9 (5th Cir. 2011); *In re JW Res., Inc*., 536 B.R. 193, 195-96 (Bankr. E.D. Ky. 2015); *In re Hupp Industries, Inc*., 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992). As listed in *Hupp Indus.*, courts consider various factors in determining whether to authorize breakup fees, such as:

- whether the fee requested correlates with a maximization of value to the debtor's estate;
- whether the transaction in the negotiated agreement is an arms-length transaction between the debtor's estate and the negotiating acquirer;
- whether the principal secured creditors are supportive of the concession;
- whether the subject breakup fee constitutes a fair and reasonable percentage of the proposed purchase price;
- the existence of available safeguards beneficial to the debtor's estate; and
- whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the breakup fee.

*In re Hupp Indus*., 140 B.R. at 194-96; *see also In re JW Res*., 536 B.R. at 195 (citing with approval *Hupp Industries'* multi-factor test).

19. To warrant court approval of such breakup fees and expenses, the Fifth Circuit in *Asarco* required a showing that the requested fees and expenses must be supported by a sound business justification. *In re Asarco*, 650 F.3d at 602-03 (favoring business judgment standard governing use of assets outside of the ordinary course of business, rather than the standard for administrative expenses, in assessing propriety of fees and expenses incurred by bidders). Bankruptcy courts in Texas have likewise found that breakup fees and expense reimbursements are proper and necessary tools to ensure lively bidding, protect the auction process, and avoid potential litigation. *See e.g. In re Texas Rangers Baseball Partners,* 431 B.R. 706, 715 (Bankr. N.D. Tex. 2010).

20. Here, the Breakup Fee and Expense Reimbursement if they are paid will satisfy the foregoing tests because they will be or were: (a) actual and necessary costs and expenses of preserving the Estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code; (b) commensurate to the real and substantial benefit conferred on the Estates by the Plan Sponsor; (c) reasonable and appropriate, especially in light of the size and nature of the proposed Transaction, the consideration to be paid to the Estates, and the commitments that have been made and the efforts that have been and will be expended by the Plan Sponsor; (d) necessary to induce the Plan Sponsor to continue to pursue the Transaction and to continue to be bound by the Binding Term Sheet; and (e) subject to all parties in interests' rights to object and be heard with respect to approval of such payments. Indeed, the Breakup Fee and Expense Reimbursement will enable the Debtors to secure an adequate floor price for the sale of their assets, thereby ensuring a satisfactory threshold or minimum value for their assets – a clear benefit to the Estates. Moreover, the Plan Sponsor expressed an unwillingness to agree to act as Plan Sponsor without being granted the Breakup Fee and Expense Reimbursement. Without the Breakup Fee and Expense

Reimbursement, the Debtors might lose the opportunity to obtain the significant offer for their assets and would certainly lose the downside protection that will be afforded by the existence of Plan Sponsor.

21. Moreover, the negotiations leading to the execution of the Binding Term Sheet were extensive and intense among the Debtors and the Plan Sponsor, with each party arguing diligently for its own interests. As a result, the Debtors submit that approval of the Breakup Fee is consistent with the Debtors' fiduciary duties to maximize the value of their assets for all stakeholders. In addition, approval of the Breakup Fee and Expense Reimbursement will not hamper the Debtors from receiving and considering alternative proposals; to the contrary, the agreement struck between the Debtors and the Plan Sponsor allows the Debtors to negotiate an alternate transaction with another plan sponsor with the qualifications and commitment to support the Debtors' goal of maximizing value of their assets for all stakeholders, thereby allowing the Debtors to comply with their fiduciary duties.

22. The Breakup Fee represents a reasonable price to pay for the Debtors' freedom to engage in an alternate transaction while having the security, particularly in this economic environment, of progressing toward consummation of a chapter 11 plan on terms beneficial to all stakeholders. In addition, the Breakup Fee is reasonable and proportional to the size of the investment being made by the Plan Sponsor. Finally, the Debtor believes that the payment of the Breakup Fee is warranted under the circumstances.

23. Additionally, the Plan Sponsor has already invested considerable resources into negotiating and working in coordination with the Debtors to design a transaction that maximizes value for the Debtors and their stakeholders. This undertaking alone provides sufficient justification for payment of the Expense Reimbursement. Based on the foregoing, the Debtors

believe the Break-Up Fee and the Expense Reimbursement fall within the range of reasonableness for transactions of this type and should be approved.

24. In light of the foregoing, the Debtors submit that (a) they have demonstrated a sound business justification for authorizing the payment of the Expense Reimbursement and the Breakup Fee and (b) each should is reasonable under the circumstances and should be approved.

**NOTICE**

25. The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee; (b) to each of the Debtors' secured lenders; (c) counsel to the agents of the Debtors' secured lenders; (d) the Committee; (e) the Internal Revenue Service; (f) all parties in interest who have formally appeared and requested notice; and (g) and all parties who have requested special notice from the Debtors. The Debtors respectfully submit that no further notice of this Application is required.

26. The pleadings in these Cases and supporting papers are available on the Bankruptcy Court's website at https://ecf.txeb.uscourts.gov/ and on the Debtors' proposed Claims and Noticing Agent's website at https://cases.stretto.com/Spherature. You can also request any pleading you need from the Debtors' proposed counsel at: McDermott Will & Emery LLP, c/o Jack Haake, Esq., 2501 North Harwood Street, Suite 1900, Dallas, Texas 75201 (jhaake@mwe.com).

**NO PRIOR REQUEST**

27. No prior motion for the relief requested herein has been made to this or to any other court.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that this Court enter the Order, substantially in the form attached as **Exhibit B**, approving (a) the Debtors entry into the Binding Term Sheet, (b) payment to the Plan Sponsor of an Expense Reimbursement and a Breakup Fee, each in accordance with the terms and conditions of this Motion and the Binding Term Sheet, and (c) granting such other and further relief as this Court may deem just and proper.

Respectfully Submitted,

Dated: June 2, 2021

*/s/ Marcus A. Helt*

Marcus A. Helt, Esq. (Texas Bar #24052187)
Jack G. Haake, Esq. (Admitted *Pro Hac Vice*)
**MCDERMOTT WILL & EMERY LLP**
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201
Tel: (214) 210-2821
Fax: (972) 528-5765
Email: mhelt@mwe.com
Email: jhaake@mwe.com

*PROPOSED COUNSEL FOR THE DEBTORS AND DEBTORS-IN-POSSESSION*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed and served via the Court's CM/ECF filing and noticing system this 2nd day of June 2021, to all parties registered to receive electronic notices in this case.

*/s/ Marcus A. Helt*
Marcus A. Helt