THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THE DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

Marcus A. Helt (Texas Bar #24052187)
Jack Haake *(Admitted Pro Hac Vice)*
MCDERMOTT WILL & EMERY LLP
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201
Tel:     (214) 210-2821 / Fax: (972) 528-5765
Email:   mhelt@mwe.com
Email:   jhaake@mwe.com

***COUNSEL TO THE DEBTORS***
***AND DEBTORS-IN-POSSESSION***

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **SPHERATURE INVESTMENTS LLC,** | § | **Case No.: 20-42492** |
| *et al.* | § | |
| | § | |
| **Debtors.**[1] | § | **Jointly Administered** |
| | § | |

### DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT CHAPTER 11 PLAN OF SPHERATURE INVESTMENTS LLC AND ITS DEBTOR AFFILIATES

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF SPHERATURE INVESTMENTS LLC AND ITS DEBTOR AFFILIATES.[2] NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED HEREIN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.

---

[1]  The "Debtors" in the above-captioned jointly administered chapter 11 bankruptcy cases (the "Cases") are: Spherature Investments LLC EIN#5471; Rovia, LLC EIN#7705; WorldVentures Marketing Holdings, LLC EIN#3846; WorldVentures Marketplace, LLC EIN#6264; WorldVentures Marketing, LLC EIN#3255; WorldVentures Services, LLC EIN#2220. The above-captioned Debtors' mailing address is 8105 Rasor Blvd, Ste. 109, Plano, TX 75024.

[2]  Capitalized terms not defined herein shall have the meanings ascribed to them in the *First Amended Joint Chapter 11 Plan for Spherature Investments LLC and Its Debtor Affiliates* (as may be amended, supplemented or modified from time to time, the "Plan"), dated September 6, 2021, and attached hereto as **Exhibit A**.

FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT OR THIRD-PARTY ADVISORS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

DM_US 180458543-6.114823.0011

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS, AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, AND THE PLAN EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

DM_US 180458543-6.114823.0011

# TABLE OF CONTENTS

Page

EXHIBIT ................................................................................................................. v
ARTICLE I.
    INTRODUCTION............................................................................................ **6**
    A.    The Plan.................................................................................................6
    B.    The Plan Structure................................................................................9
    C.    The Sale Transaction..........................................................................12
ARTICLE II.
    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
    STATEMENT ................................................................................................ **14**
    A.    What is Chapter 11?............................................................................14
    B.    Why are the Debtors sending me this Disclosure Statement?...................15
    C.    Am I entitled to vote on the Plan?.......................................................15
            1.    Summary of Classification...........................................................16
    D.    What will I receive from the Debtors if the Plan is Consummated?..........16
    E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim or
         an Allowed Priority Tax Claim? ..........................................................17
    F.    What will I receive if I am a Sales Representative?................................17
    G.    What will I receive if I am a Sales Representative and I opt-out of the Sales
         Representatives Commission Claims Payment Plan? ..............................18
    H.    What will I receive for my Virtual Currency? .......................................18
    I.    Who is allowed to be in the Convenience Claims Class and what will be its
         treatment?..........................................................................................18
    J.    What does a General Unsecured Creditor receive?................................19
    K.    How does the Plan treat prepayments for future travel, training, events,
         representative business-system fees, or membership-enrollment fees?..................19
    L.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when
         the Plan goes effective, and what is meant by "Confirmation," "Plan Effective
         Date," and "Consummation?"..............................................................19
    M.    What are the sources of cash and other consideration required to fund the Plan?...19
    N.    What will happen if the Plan is not confirmed? .....................................20
    O.    Who Supports the Plan? ......................................................................20
    P.    Will there be releases and exculpation granted to parties in interest as part of the
         Plan?..................................................................................................20
    Q.    What is the deadline to vote on the Plan? .............................................20
    R.    How do I vote for or against the Plan?..................................................20
    S.    Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the
         Confirmation Hearing set to occur? .....................................................21
    T.    What is the purpose of the Confirmation Hearing?................................21
    U.    What is the effect of the Plan on the Debtors' ongoing business?...........21
    V.    Who do I contact if I have additional questions with respect to this Disclosure
         Statement or the Plan?.........................................................................21
    W.    Do the Debtors recommend voting in favor of the Plan?........................22

i

**ARTICLE III.**
    **BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11**
    **CASES** ................................................................................................. **22**
    A.    Corporate History ...........................................................................22
          1.    Formation and Business ......................................................22
          2.    Employees ............................................................................23
          3.    Management .........................................................................24
    B.    Prepetition Capital Structure .........................................................24
          1.    Secured Notes Payable ........................................................24
          2.    2020 Payroll Protection Program Loans .............................26
          3.    Related Party Payables ........................................................26
**ARTICLE IV.**
    **EVENTS LEADING UP TO THE CHAPTER 11 CASES** ........................................ **27**
    A.    Lack of Internal Controls and Exploitation by Bad Actors ............27
    B.    Adverse Market Conditions ............................................................28
    C.    Negotiations with Seacret ...............................................................28
    D.    Pursuit of Strategic Alternatives ....................................................29
**ARTICLE V.**
    **ADMINISTRATION OF THE CHAPTER 11 CASES** .......................................... **29**
    A.    First Day Pleadings and Other Case Matters .................................29
          1.    Administrative Motions .......................................................29
          2.    Operational Relief ...............................................................29
          3.    Cash Collateral ....................................................................30
          4.    Automatic Stay .....................................................................30
    B.    Employment and Compensation of Advisors ................................30
    C.    Appointment of Official Committee ...............................................31
    D.    Summary of Claims Process, Bar Date and Claims Filed ...............31
    E.    Exclusivity ......................................................................................31
    F.    Postpetition Marketing, Bidding, and Auction Process ..................32
    G.    Litigation ........................................................................................32
**ARTICLE VI.**
    **SUMMARY OF THE PLAN** .......................................................................... **32**
    A.    General Settlement of Claims and Interests ...................................33
    B.    Proposed Creditor Recoveries ........................................................33
    C.    The Sale Transaction ......................................................................36
    D.    Effectuating the Sale Transaction ..................................................37
    E.    The Liquidating Trustee ..................................................................38
    F.    The Liquidating Trust .....................................................................39
    G.    Corporate Action .............................................................................40
    H.    Executory Contracts ........................................................................41
    I.    Recoveries to Certain Holders of Claims and Interests ..................42
    J.    *De Minimis* Distributions ...............................................................42
    K.    Dispute of the MCA Claim .............................................................42
    L.    Purchaser Sales Representative Claim Payment Plan .....................43
    M.    Retention of Rights to Pursue Causes of Action and Effectuate Setoffs,
        Recoupment, Etc. ...........................................................................44

DM_US 180458543-6.114823.0011

    N.     Release, Injunction, and Related Provisions .............................................................45
          1.     Release of Liens ...............................................................................45
          2.     Releases by the Debtors ....................................................................46
          3.     Releases by Holders of Claims and Interests ...............................47
          4.     Exculpation .......................................................................................49
          5.     Injunction .........................................................................................50

**ARTICLE VII.**
**VOTING AND CONFIRMATION** .................................................................. **50**
    A.     Classes Entitled to Vote on the Plan ............................................................50
    B.     Votes Required for Acceptance by a Class ..................................................51
    C.     Certain Factors to Be Considered Prior to Voting .....................................51
    D.     Classes Not Entitled to Vote on the Plan .....................................................52
    E.     Solicitation Procedures.................................................................................52
          1.     Notice and Claims Agent .................................................................52
          2.     Solicitation Package........................................................................53
          3.     Distribution of the Solicitation Package and Plan Supplement .................53
    F.     Voting Procedures ........................................................................................54
          1.     Voting Deadline ...............................................................................54
          2.     Voting Instructions...........................................................................54
          3.     Ballots Not Counted.........................................................................55
    G.     Confirmation Objection Deadline ................................................................55
    H.     Confirmation Hearing ..................................................................................56
    I.     Confirmation Standards.................................................................................56
          1.     Best Interests of Creditors Test—Liquidation Analysis ............................57
          2.     Financial Feasibility........................................................................59
    J.     Acceptance by Impaired Classes..................................................................59
    K.     Confirmation Without Acceptance by All Impaired Classes .....................60
          1.     No Unfair Discrimination .................................................................61
          2.     Fair and Equitable Test ....................................................................61

**ARTICLE VIII.**
**SECTION 363 SALE** ..................................................................................... **62**
    A.     Debtors Will Seek Sale of Substantially All of the Debtors Assets If the Plan Is Not Confirmed...................................................................................................62
    B.     Form and Manner of the Auction and Related Notices is Adequate........................62
    C.     Approval of the Sale Transaction is Appropriate and in the Best Interests of the Debtors' Estates...............................................................................63
    D.     The Sale Transaction(s) Has Been Proposed in Good Faith and Without Collusion, and Each Successful Bidder Will Be a "Good Faith Purchaser." ...........................63
    E.     The Sale Transaction(s) Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code......................................................................64
    F.     Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Approved. ............................................................................65

**ARTICLE IX.**
**CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING** .............. **67**
    A.     Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims Under the Plan.............................................................................67

DM_US 180458543-6.114823.0011

1.    Actual Amounts of Allowed Claims May Differ from Estimated Amounts
      of Allowed Claims, Thereby Adversely Affecting the Recovery of Some
      Holders of Allowed Claims. ....................................................................................67
2.    The Debtors May Not Be Able to Satisfy the Conditions Precedent to
      Consummation of the Plan. ....................................................................................67
3.    The Debtors Cannot State with Certainty What Recovery Will Be
      Available to Holders of Allowed Claims in the Voting Classes. ............................67
4.    The Debtors Cannot Guaranty Recoveries or the Timing of Such
      Recoveries. .............................................................................................................68
5.    Certain Tax Implications of the Debtors' Bankruptcy ............................................68
B.    Certain Bankruptcy Law Considerations ............................................................................68
1.    Parties in Interest May Object to the Plan's Classification of Claims. ...................68
2.    Failure to Satisfy Vote Requirements. ....................................................................68
3.    The Debtors May Not Be Able to Secure Confirmation of the Plan. ......................69
4.    Failure to Consummate the Plan. .............................................................................69
5.    Nonconsensual Confirmation. .................................................................................70
6.    Risk of Non-Occurrence of the Plan Effective Date. ..............................................70
7.    Compliance with the Cash Collateral Order. ..........................................................70
8.    Contingencies May Affect Votes of Impaired Classes to Accept or Reject
      the Plan. ..................................................................................................................70
9.    The Debtors May Lack Sufficient Liquidity to Satisfy Certain Priority and
      Administrative Claims in Full in Cash. ...................................................................70
10.   Releases, Injunctions, and Exculpations Provisions May Not Be
      Approved. ................................................................................................................70
11.   The Closing Conditions of the Sale Transaction May Not Be Satisfied. ................71
C.    Disclosure Statement Disclaimer ........................................................................................71
1.    The Financial Information Contained in this Disclosure Statement Has Not
      Been Audited. ..........................................................................................................71
2.    Information Contained in this Disclosure Statement Is for Soliciting
      Votes. ......................................................................................................................71
3.    This Disclosure Statement Was Not Approved by the United States
      Securities and Exchange Commission. ....................................................................71
4.    This Disclosure Statement May Contain Forward Looking Statements. ..................71
5.    No Admissions Made. ..............................................................................................72
6.    Failure to Identify Litigation Claims or Projected Objections. ...............................72
7.    No Waiver of Right to Object or Right to Recover Transfers and Assets. ...............72
8.    Information Was Provided by the Debtors and Was Relied Upon by the
      Debtors' Advisors. ..................................................................................................72
9.    Potential Exists for Inaccuracies, and the Debtors Have No Duty to
      Update. ....................................................................................................................72
10.   No Representations Outside this Disclosure Statement Are Authorized. .................72
D.    Liquidation Under Chapter 7 ...............................................................................................73
ARTICLE X.
      MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES .. 73
A.    Federal Income Tax Consequences to Claimants ................................................................74
B.    Tax Withholding .................................................................................................................74

C.      **Disclaimers**...........................................................................................................74
**ARTICLE XI.**
    **RECOMMENDATION OF THE DEBTORS............................................................ 75**

v

# ARTICLE I.
## INTRODUCTION[3]

The Debtors submit this disclosure statement (this "<u>Disclosure Statement</u>") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes to accept or reject the Plan.[4]  A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference.  The Plan constitutes a joint chapter 11 plan for the Debtors.

**THE PLAN, IF CONSUMMATED, WILL EFFECTUATE THE TERMS OF THE SALE TRANSACTION.**

**EACH OF THE DEBTORS' BOARDS OF DIRECTORS OR SOLE MEMBER HAS APPROVED THE PLAN AND BELIEVES THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES.  AS SUCH, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ACCEPT THE PLAN BY RETURNING THEIR BALLOTS (EACH, A "<u>BALLOT</u>") SO AS TO BE <u>ACTUALLY</u> <u>RECEIVED</u> BY THE NOTICE AND CLAIMS AGENT (AS DEFINED HEREIN) NO LATER THAN <u>OCTOBER 8, 2021, AT 4:00 P.M. (PREVAILING CENTRAL TIME)</u>.  ASSUMING THE REQUISITE ACCEPTANCES TO THE PLAN ARE OBTAINED, THE DEBTORS WILL SEEK THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN AT THE CONFIRMATION HEARING ON <u>OCTOBER 12, 2021 AT 10:00 A.M., PREVAILING CENTRAL TIME</u>.**

**THE DEBTORS BELIEVE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO HOLDERS OF CLAIMS.  ACCORDINGLY, THE DEBTORS BELIEVE THAT THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

A.    The Plan

As more fully described below, the Debtors filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code on the Petition Date.  The purpose of a chapter 11 bankruptcy case is to resolve the affairs of a debtor and distribute the proceeds of the debtor's estate pursuant to a confirmed chapter 11 plan.  To that end, the Debtors filed the Plan, the terms of which are more fully described herein.  The Plan contemplates a transfer of the Acquired Assets to the

---

[3]    If the Plan is not confirmed or the Plan Effective Date does not occur, the Debtors reserve all of their rights regarding the Disclosure Statement and the Plan and any statement set forth in the Disclosure Statement and the Plan, as applicable.  Furthermore, if the Plan is not confirmed or the Plan Effective Date does not occur, nothing in the Disclosure Statement or the Plan shall be deemed an admission by the Debtors, and the Debtors reserve all such rights regarding the Disclosure Statement and the Plan and any statement set forth in the Disclosure Statement and the Plan, including, without limitation, all rights with respect to the consummation of the Sale Transaction contemplated herein.

[4]    The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

Purchaser, whose bid for the Acquired Assets will be selected as the highest or otherwise best bid at the Debtors' Auction, as defined in the Topping Bid Procedures, if any is held. The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and to distribute all property of the Debtors' Estates that is or becomes available for Distribution, in each Case, generally in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Debtors' Estates, and therefore the Debtors seek to confirm the Plan.

Generally speaking, the Plan:

    (a)    provides for consummation of the Sale Transaction;

    (b)    deems the Debtors consolidated for voting, Confirmation, and Distributions;

    (c)    provides for 100 percent recoveries for Holders of Allowed Administrative Claims, Priority Tax Claims, Professional Fee Claims, and Priority Non-Tax Claims, unless otherwise agreed by the Holder of such Claims;

    (d)    provides that the Debtors dispute Class 2 Claims of MCA, as collateral agent to the Secured Parties and Holders of Class 2 Claims will receive no Distribution unless and until their Class 2 Claims are Allowed by Final Order of the Bankruptcy Court;

    (e)    provides for the issuance by the Purchaser of the Purchaser Note to the Liquidating Trustee with payments paid under the Purchaser Note into a segregated account owned and controlled by the Liquidating Trustee and subject to the jurisdiction and administration of the Bankruptcy Court;

    (f)    provides that on the later of the Effective Date, or the date of the Final Order allowing a Class 2 Claim, as full and final satisfaction, settlement, and release of, and in exchange for such Class 2 Claims, Holders of Allowed Class 2 Claims will be paid as follows: at the Debtors' (or Liquidating Trustee's) and Purchaser's sole and absolute discretion, (i) negotiation of the Purchaser Note, (ii) delivery of the Collateral securing such Allowed Class 2 Claims that is not an Acquired Asset, or (iii) payment of such Allowed Secured Claim in full in Cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code from the Sales Transaction Proceeds;

    (g)    provides that if any part of MCA's alleged Class 2 Claim is allowed by the Bankruptcy Court, the Liquidating Trustee may, as full and final satisfaction, release, and discharge of such Allowed Class 2 Claim, (i) assign the Purchaser Note to MCA, (ii) continue to make payments to the Holders of Allowed Class 2 Claims, or (iii) issue a note to MCA for the amount of its Allowed Class 2 Claim with a security interest in the Purchaser Note;

    (h)    provides to each Holder of an Allowed Other Secured Claim, at the Debtors' option, (a) payment in full in Cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code, (b) surrender of the

DM_US 180458543-6.114823.0011

Collateral securing such Allowed Secured Claim, or (c) issuance of a restructured note with a present value equal to the value of each holder's Class 3 Collateral with interest accruing at a rate of 3% per annum. Interest will be paid on the first Business Day of the first year after the Effective Date. The balance of the Class 3 Claims will be paid in full no later than the tenth (10th) year after the Effective Date;

(i)     provides that each Holder of an Allowed Convenience Claim will receive Cash in an amount equal to its Pro Rata Share of the Convenience Class Pool, which is $800,000.00 in the aggregate, payable from the Cash Component or, if the Cash Component is insufficient, the Liquidating Trust Assets, as soon as practicable after the Effective Date.  Each Holder will receive its payment in Cash on the later of (a) the Effective Date, (b) thirty (30) days after the Convenience Claim becomes Allowed, and (c) when sufficient Liquidating Trust Proceeds exist;

(j)     provides for the creation of a Liquidating Trust and for each Holder of an Allowed Class 5 Claim to be satisfied by a Pro Rata Share of Distributions from proceeds of Tier I Proceeds (proceeds from the Seacret Royalty and the Sale Transaction minus Opt-Out Sales Representatives Proceeds) and Tier II Proceeds (proceeds from the Causes of Action and Opt-Out-Sales Representative Proceeds);

(k)     provides that Sales Representatives will be segregated into two categories based on whether they decide to work for or with the Purchaser (Non-Opt-Out Sales Representatives who are treated in Class 6 (Class Representatives Claims)) and whether they decide to not work for or with the Purchaser (Opt-Out Class Representatives who are treated in Class 5 (General Unsecured Claims)).

(l)     provides that each Non-Opt-Out Sales Representative will (a) be paid pursuant to the Sales Representative Claim Payment Plan, the Future Compensation Plan, and the Purchaser Sales Representative Agreement, and (b) receive his/her/its Pro Rata Share of Tier II Proceeds, as full and final satisfaction, settlement, and release of, and in exchange for, his/her/its Claim against the Estates;

(m)     provides that each Opt-Out Sales Representative will be classified as a Class 5 Claim and receive a Pro Rata Share of Distributions from Tier I and Tier II proceeds;

(n)     provides that the Virtual Currency will be assumed by the Purchaser on the Effective Date subject to the cap identified in Assumed Virtual Currency and Holders of Class 7 Claims may use the Virtual Currency pursuant to the Virtual Currency Payment Schedule, which allows Holders of "Rovia Bucks" "Travel Dollars" and "Dream Trip Points" on a $1:1 basis in the ordinary course of the Purchaser's business and pursuant to standard published

8

booking policies and practices for a post-Effective Date travel-product purchase;

(o)   provides that the Assumed Deferred Revenue Liability Claims will be satisfied or paid by the Purchaser in the ordinary course of its business; provided, however, the Purchaser's Assumed Deferred Revenue Liability shall not exceed $11,000,000 in Cash and services. If Allowed Claims for Deferred Revenue Liability exceed $11,000,000 all such Allowed Claims shall receive their Pro Rata share of $11,000,000. The satisfaction or payment of the Allowed Class 8 Claims will be the Purchaser's sole responsibility pursuant to the Plan;

(p)   provides for the Debtors to retain the Employee Retention Tax Credit up to $950,000 to be used to pay the costs and expenses necessary to Wind Down the Non-Acquired Entities and for the Purchaser to recoup such amounts by reducing each Royalty Earn Out Payment otherwise due by 2.0% until such Retained Employee Retention Tax Credit has been recouped; and

(q)   designates a Liquidating Trustee to, among other things, (i) wind down the Debtors' businesses and affairs; (ii) pay and reconcile Claims as provided therein; (iii) administer the Plan in an effective and efficient manner; and (iv) make Distributions.

The Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Plan classifies Holders of Claims and Interests according to the type of the Holder's Claim or Interest, as more fully described below. As governed by the Voting Procedures, Holders of Claims in Class 2 (Secured Claim of MCA as collateral agent on behalf of the Secured Parties), Class 3 (Other Secured Claims), Class 4 (Convenience Claims); Class 5 (General Unsecured Claims), Class 6 (Sales Representatives Claims), and Class 7 (Virtual Currency Claims) are entitled to vote to accept or reject the Plan.

B.   The Plan Structure

The Plan proposes to fund creditor recoveries from Cash, the Sale Transaction Proceeds, Excluded Assets, the Debtors' rights under the Sale Transaction Documentation, the debt issued (or assumed) by the Purchaser or any of its subsidiaries, payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Purchaser pursuant to §§ 365 or 1123 of the Bankruptcy Code, and all Causes of Action not previously settled, released, or exculpated under the Plan that are not otherwise Excluded Assets, Unless otherwise agreed in writing by the Debtors and the Purchaser, Distributions required by this Plan on account of Allowed Claims that are Assumed Liabilities shall be the sole responsibility of the Purchaser to the extent such Claim is Allowed against the Debtors.

The Plan provides that on the Effective Date: (a) all Liquidating Trust Assets (and all proceeds thereof) and all liabilities of each of the Debtors shall be deemed merged or treated as

9

though they were merged into and with the assets and liabilities of each other, (b) no distributions shall be made under this Plan on account of Intercompany Claims among the Debtors, and all such Claims shall be eliminated and extinguished, (c) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any Claim against any Debtor and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors, (d) each and every Claim filed or to be filed in any of the Chapter 11 Cases shall be treated filed against the consolidated Debtors and shall be treated as one Claim against and obligation of the consolidated Debtors, and (e) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors. Such substantive consolidation shall not (other than for purposes relating to this Plan) affect the legal and corporate structures of the Debtors. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any Claim or Interest or the ability of the Debtors or the Liquidating Trustee, as applicable, to seek to have any Claim or Interest subordinated in accordance with any contractual rights or equitable principles.

Pursuant to the Plan, the Debtors or the Liquidating Trustee will pay or provide for payments of Claims as follows:

- Priority Claims will be paid in full on the later of (i) the Plan Effective Date, (ii) when sufficient Liquidating Trust Proceeds exist to pay such Claims in full in Cash, and (iii) in the case of Priority Tax Claims, treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

- Class 2 MCA Claims are disputed by the Debtors on numerous grounds.  For Class 2 MCA Claims to receive any amounts on account of their Claims, the dispute must be resolved.  Assuming that the dispute is resolved in favor of Class 2, each Holder of an MCA Claim will receive, at the Debtors' (or Liquidating Trustee's) and Purchaser's sole and absolute discretion, (i) issuance of the Purchaser Note, (ii) delivery of the Collateral securing such Allowed Class 2 Claims, or (iii) payment of such Allowed Secured Claim of MCA in full in Cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code.  The Purchaser will issue the Purchaser Note to the Liquidating Trustee and the Purchaser will make payments pursuant to the terms of the Purchaser Note to a segregated account owned and controlled by the Liquidating Trustee and subject to the jurisdiction and administration of the Bankruptcy Court.  The amount, validity, extent, value, and priority of the Allowed Class 2 Claim under § 506(b) of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Liquidating Trustee and MCA. Any Deficiency Claim or other General Unsecured Claim of a holder of a Class 2 Claim shall be treated in Class 5.  MCA's Class 5 Claim is also disputed.

- Class 3 Other Secured Claims will be paid, at the Debtors' option, by (a) payment of such Allowed Secured Claim in full in Cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code, (b) surrender of the Collateral

DM_US 180458543-6.114823.0011

securing such Allowed Secured Claim, or (c) issuance of a restructured note with a present value equal to the value of each holder's Class 3 Collateral with interest accruing at a rate of 3% per annum. Interest will be payable on the first Business Day of the first year after the Effective Date. The balance of the Class 3 Claim will be paid in full no later than the tenth (10th) year after the Effective Date.  The amount, validity, extent, value, and priority of the Allowed Secured Class 3 Claim under § 506 of the Bankruptcy Code, or otherwise, will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Liquidating Trustee and holder of a Class 3 Claim. Any Deficiency Claim or other General Unsecured Claim of the holder of the Class 3 Claim shall be treated in Class 5.

- Class 4 Convenience Class Claims will receive Cash in an amount equal to its Pro Rata Share of the Convenience Class Pool, which is $800,000.00 in the aggregate, payable from the Cash Component or, if the Cash Component is insufficient, the Liquidating Trust Assets, as soon as practicable after the Effective Date.  Each Holder will receive its payment in Cash on the later of (a) the Effective Date, (b) thirty (30) days after the Convenience Claim becomes Allowed, and (c) when sufficient Liquidating Trust Proceeds exist.

- Class 5 General Unsecured Claims will receive their Pro Rata Share of Distributions from Tier I and Tier II Proceeds.

- Class 6 Sales Representative Claims will receive (a) payment pursuant to the Sales Representative Claim Payment Plan, the Future Compensation Plan and, the Purchaser Sales Representative Agreement, and (b) his/her/its Pro Rata Share of Tier II Proceeds, as full and final satisfaction, settlement, and release of, and in exchange for, his/her/its Claim against the Estates. Those Sale Representatives who select the "opt-out" box on the Ballot and choose to discontinue working with the Debtors and Purchaser will be classified in Class 5 (General Unsecured Claims) and paid accordingly.

- Class 7 Virtual Currency Claims will be assumed by the Purchaser on the Effective Date subject to the cap identified in  Assumed Virtual Currency and Holders of Class 7 Claims may use the Virtual Currency pursuant to the Virtual Currency Payment Schedule, which allows Holders of "Rovia Bucks" "Travel Dollars" and "Dream Trip Points" on a $1:1 basis in the ordinary course of the Purchaser's business and pursuant to standard published booking policies and practices for a post-Effective Date travel-product purchase.

- Class 8 Assumed Deferred Revenue Liability Claim will be satisfied or paid by the Purchaser in the ordinary course of its business; provided, however, the Purchaser's Assumed Deferred Revenue Liability shall not exceed $11,000,000 in Cash and services.  If Allowed Claims for Deferred Revenue Liability exceed $11,000,000 all such Allowed Claims shall receive their Pro Rata share of $11,000,000.  The satisfaction or payment of the Allowed Class 8 Claims will be the Purchaser's sole responsibility pursuant to the Plan.

11

- Existing Interests in the Debtors will be cancelled without any distribution to the Holders of such Interests.

The Debtors believe that the Plan is in the best interest of the Estates and urge Holders of Claims in Class 3 (Other Secured Claims); Class 4 (Convenience Claims); Class 5 (General Unsecured Claims), Class 6 (Sales Representative Claims), and Class 7 (Virtual Currency Claims) to vote to accept the Plan.

C.     The Sale Transaction

The Plan contemplates the sale of substantially all of the assets of the Debtors (the "Sale Transaction"), excluding the Excluded Assets, in accordance with the terms and conditions set forth in the Plan.

Excluded Assets  means, notwithstanding anything in this Plan to the contrary, (a) Sale Proceeds, (b) all privileged and legal documents, files, and work papers, (c) Retained Utility Deposit, (d) defenses or counterclaims (other than defenses or counterclaims for (i) setoff or offset, or a right to payment of an Acquired Asset, whether or not arising under an assumed and assigned contract or lease or (ii) contractual rights under Assumed/Assigned Contracts and Leases) to Claims against the Debtors, (e) Causes of Action of the non-Debtor Affiliates against the Debtors, either directly or through the acquisition of the equity of such non-Debtor Affiliates, (f) all insurance rights and proceeds, except those from property and casualty insurance policies and proceeds (to the extent an Assumed/Assigned Executory Contract or Acquired Assets), (g) the Seacret Royalty, and (h) except for Acquired Claims, all Causes of Action, both owned by or asserted against the Debtors, including Causes of Action (i) asserted in or related to the Seacret Litigation, including Causes of Action against any current or potential defendant in the Seacret Litigation; (ii) asserted in or related to the Head Litigation, including Causes of Action against any current or potential defendant in such adversary proceeding; (iii) against or related to Seacret or arising under or relating to any contract or agreement with Seacret (including the Limited Solicitation Agreement) regardless of whether such contracts are Assumed/Assigned Contracts and Leases; (iv) against or related to Tom Montgomery, MCA, the lenders represented by MCA, any entity owned, controlled, or related to Montgomery Capital Partners, Montgomery Coscia Greilich LLP, and Baker Tilly US, LLP; (v) against any current or former directors, officers, members, managers, insiders, related person, or individual, and Affiliate of the Debtors or the D&O Policies and proceeds thereof; (vi) Avoidance Actions, and (vii) against any affiliated, related, predecessor, or successor person or entity of any person or entity described in subparagraphs (a)-(h). The Excluded Assets shall vest in the Liquidating Trustee on the Effective Date.

Generally, the Sale Transaction contemplates that:

(a)     The Debtors will, among other things, transfer the Acquired Assets held by the Debtors to the Purchaser free and clear of all Liens, Claims, Interests, charges, and other encumbrances (except for Liens in the Acquired Assets to secure the Purchaser Note and the Excluded Assets) pursuant to sections 363, 365, and/or and 1123 of the Bankruptcy Code, the Plan and the Confirmation Order;

(b)    The Confirmation Order will contain a finding that if the Seacret Trademark License has not been revoked, the Seacret Trademark License is revoked as of the Effective Date, and Seacret shall have no future right to use the corporate name, trademarks, and tradenames of Debtors.  Further, as of the Effective Date, all goodwill associated with the corporate name, trademarks, and tradenames of Debtors included in (i) the Excluded Assets inure to the benefit of the Liquidating Trust and the Liquidating Trustee and (ii) the Acquired Assets inure to the benefit of Purchaser.

(c)    The Confirmation Order will contain a finding that nothing in the Plan, including the revocation of the Seacret Trademark License constitutes a termination of or assumption and assignment of the Limited Solicitation Agreement by the Debtors and all rights of the Debtors to recover the Seacret Royalty and/or any claims against Seacret pursuant to the Limited Solicitation Agreement are hereby unaffected by the Plan and preserved for the benefit of the Liquidating Trust and the beneficiaries thereof;

(d)    The Confirmation Order will contain a finding that the Purchaser is a good-faith purchaser and entitled to the protections and benefits set forth in § 363(m) of the Bankruptcy Code  and further provide that the Acquired Assets sold by the Debtors are transferred, conveyed, and assigned to the Purchaser free and clear of all Liens, Claims, encumbrances and interests (other than Assumed Liabilities) as more fully set forth in the Plan;

(e)    Prior to the closing of the Sale Transaction, the Debtors will transfer, or caused to be transferred, the equity of the Acquired Entities so that each is owned directly by a Debtor as a first-tier subsidiary (which first-tier subsidiary itself will have no subsidiaries) as follows:  The Debtors shall transfer, or caused to be transferred, the equity ownership interest in (i) Rovia Corp Services to Rovia LLC, (ii) WorldVentures Marketing Pty Ltd to WorldVentures Marketing Holdings, LLC; (iii) WorldVentures Canada, Inc. to WorldVentures Marketing Holdings, LLC; (iv) WorldVentures Services Malaysia Sdn to WorldVentures Marketing Holdings, LLC; and (v) WorldVentures Events (Malaysia) Sdn. Bhd. 15 Company No. 1178688D to WorldVentures Marketing Holdings, LLC.;

(f)    The Purchaser will pay the Cash Component;

(g)    The Purchaser will issue a promissory note to the Liquidating Trustee in the principal amount of $5,500,000, plus interest at the rate of 6% simple interest per annum. The Purchaser Note will be fully amortized over thirty-six (36) months. Payments under the Purchaser Note will (a) begin on the last day of the first full calendar month after the Effective Date and (b) be paid into a segregated account controlled by the Liquidating Trustee and owned by the Liquidating Trust. No Distributions will be made from this segregated account without Order of the Bankruptcy Court;

13

(h) The Purchaser will pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the Debtors and assigned to the Purchaser pursuant to the Sale Transaction Documentation and the Plan;

(i) The Purchaser will make Royalty Earn Out Payments of up to $16,000,000.00, payable in monthly payments equal to a Tiered Percentage of gross monthly sales of Purchaser Products and Services as follows:

(i) 5% of Gross Sales equal to or in excess of $12,000,000.00; or

(ii) 4% of Gross Sales equal to or in excess of $10,000,000.00 but are less than $12,000,000.00; or

(iii) 3% of Gross Sales equal to or in excess of $9,000,000.00 but are less than $10,000,000.00; or

(iv) 2% of Gross Sales equal to or in excess of $8,000,000.00 but are less than $9,000,000.00; or

(v) 1% of Gross Sales equal to or in excess of $5,999,999, but are less than $8,000,000.00.

The Royalty Earn Out Payments will start on the first calendar month on or after 90th day after the Effective Date and continuing every thirty (30) days thereafter until the $16,000,000.00 is paid to the Liquidating Trustee;

(j) To resolve Claims in the aggregate up to $45,000,000.00 by paying or satisfying (a) Sales Representatives Commission Claims by the payment of up to $22,250,000 on account of Sales Representative Commission Claims and (b) Virtual Currency Claims by the honoring of up to $7,000,000 of such Claims held by active travel club members in good standing pursuant to the conditions set forth in the Plan; and

(k) The Purchaser will pay Assumed Deferred Revenue Liability in an amount up to $11,000,000.00.

## ARTICLE II.
## QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT

A.  What is Chapter 11?

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors

and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. The Plan contemplates a sale of the Debtors' assets to the Purchaser, and this Disclosure Statement is being submitted to provide information about this transaction and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold (if any). Each category of Holders of Claims or Interests in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

DM_US 180458543-6.114823.0011

1.    *Summary of Classification*

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Allowed Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Secured Claim of MCA as collateral agent on Behalf of the Secured Parties | Impaired | Entitled to Vote |
| Class 3 | Other Secured Claims | Impaired | Entitled to Vote |
| Class 4 | Convenience Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6(a) and 6(b) | (a) Non-Opt-Out Sales Representatives Commission Claims and (b) Opt-Out Sales Representatives Commission Claims | Impaired | Entitled to Vote |
| Class 7 | Virtual Currency Claims | Impaired | Entitled to Vote |
| Class 8 | Assumed Deferred Revenue Liability Claims | Impaired | Entitled to Vote |
| Class 9 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Subordinated Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Interests in the Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

D.    What will I receive from the Debtors if the Plan is Consummated?

The following table provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan.  Any estimates of Claims in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

DM_US 180458543-6.114823.0011

| Class | Claim/Interest | Estimated Allowed Amount | Anticipated Recovery |
|---|---|---|---|
| 1 | Allowed Priority Non-Tax Claims | $0.00 | 100% |
| 2 | MCA Claim[5] | Unknown | 100% |
| 3 | Other Secured Claims [6] | $36,954.32 | 100% |
| 4 | Convenience Claims | $5,879,038.00 | 13% |
| 5 | General Unsecured Claims | $29,565,563.00 | Unknown |
| 6 | Sales Representative Claims | $37,612,017.00 | 65% |
| 7 | Virtual Currency Claims | $3,540,000.00 | 100% |
| 8 | Assumed Deferred Revenue Liability Claims | $3,000,000.00 | 100% |
| 9 | Intercompany Interests | N/A | $0 |
| 10 | Subordinated Unsecured Claims | Unknown | $0 |
| 11 | Interests in the Debtors | N/A | $0 |

E.     **What will I receive from the Debtors if I hold an Allowed Administrative Claim or an Allowed Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  Administrative Claims and Priority Tax Claims will be satisfied as set forth in Article II of the Plan.

F.     **What will I receive if I am a Sales Representative?**

Under the Plan, each Sales Representative has the opportunity to receive payments under the "Sales Representatives Commission Claims Payment Plan."  Sales Representatives who receive payments under the Sales Representatives Commission Claims Payment Plan will also receive a Pro Rata Share of the Tier II Proceeds held by the Liquidating Trust.

To receive payment, each Sales Representative will be required to enter into a "Purchaser Sales Representatives Agreement" with the Purchaser.  The Purchaser will continue to operate the

---

[5]  To the extent any amounts continue to be owed, such deficiency will be treated in Class 5 as a General Unsecured Claim unless the Holders of the MCA Claim elect treatment under 11 U.S.C. §1111(b).

[6]  The projected amount of Allowed Other Secured Claims set forth herein assumes that the value of the collateral securing such obligations is sufficient in amount to satisfy such Allowed Other Secured Claims in full.

DM_US 180458543-6.114823.0011

business and provide opportunities for Sales Representatives to earn commissions pursuant to the Purchaser Sales Representatives Agreement. Additionally, the Purchaser will satisfy or pay up to 65% of each qualifying Sales Representative's Sales Representative Commission Claim up to a cap of $22,250,000 such payments.

If the amount owed to the Sales Representatives is more than the cap, then each Sales Representative will receive a Pro Rata Share of the Purchaser Paid Sales Representatives Commission. Purchaser Paid Sales Representatives Commissions will be paid in twenty-four (24) monthly payments at the rate of five (5%) percent of the Purchaser's monthly Gross Sales, starting the 1st day of the month that is at least thirty (30) days after the Effective Date and continue for the next twenty-three days.

To be a qualifying Sales Representative, each Sales Representative must (i) have entered into the Purchaser Sales Representative Agreement, and (ii) remain a Sales Representative in good standing with "active status" and not be more than three (3) months (cumulative) delinquent in monthly payments. Sales Representatives may opt out of this treatment by selecting to opt-out of the Sales Representatives Commissions Payment Plan on his/her Ballot.

A Purchaser Sales Representative does not include the Debtors, the Acquired Entities, or the Non-Acquired Entities', officers, directors (at any time), insiders, and affiliates, and the insiders and affiliates of each of the foregoing (other than the Employees, as defined in the Plan), a list of which the Debtors will provide to the Purchaser.

On the Effective Date, all Sales Representative Agreements will be rejected. All Sales Representatives that do not exercise the Sales Representative Opt-Out right waive any rejection damage Claim against the Debtors and the Liquidating Trustee.

G.   What will I receive if I am a Sales Representative and I opt-out of the Sales Representatives Commission Claims Payment Plan?

A Sales Representative that opts out of the Sales Representatives Commission Claims Payment Plan will be classified as a General Unsecured Claim and receive the same treatment as Class 5 of the Plan.

H.   What will I receive for my Virtual Currency?

The Purchaser will honor up to $7,000,000 in Virtual Currency Claims for Allowed Claims of active travel club members who are in good standing at the time that the Virtual Currency Claim is used. Virtual Currency means "DreamTrips Points," "Rovia Bucks," and "Travel Dollars." Under the Plan, the Purchaser will honor, and each qualifying Holder of a Virtual Currency Claim may use such Claim on a $1:1 (unless a lesser ratio is required because Virtual Currency Claims exceed $7,000,000) in the ordinary course of the Purchaser's business as points applied towards travel and pursuant to standard published booking policies and practices for a post-Effective Date travel-product purchase.

I.   Who is allowed to be in the Convenience Claims Class and what will be its treatment?

18

All Claims that are under $1,000 will be put into the Convenience Class Pool. Each Holder of an Allowed Convenience Claim shall receive Cash in an amount equal to its Pro Rata Share of the Convenience Class Pool, which is $800,000 in the aggregate. If Claims in the Convenience Class do not exceed $800,000, then they will be paid in full from the Convenience Class Pool.

Holders of Claims that exceed $1,000 may elect to participate in the Convenience Class on their Ballot. For Example, if the anticipated General Unsecured Claim recovery was 10%, a Holder of a General Unsecured Claim in the amount of $3,000 may elect to irrevocably reduce his Claim to $1,000 to participate in the Convenience Claims Class.

J.     What does a General Unsecured Creditor receive?

A Holder of a General Unsecured Claim will receive a Pro Rata Share of Distributions from proceeds from Liquidating Trust Assets. Liquidating Trust Assets will be divided into two (2) Tiers of Proceeds, which are divided based on the source of recovery and who may benefit from the sources of recovery.

Tier I Proceeds will be the Sale Transaction Proceeds. Tier II Proceeds will be the recoveries on Retained Causes of Action plus the up to 65% Distribution that would have otherwise been paid by the Purchaser to a Sale Representative who elected to be an Opt-Out Sales Representative, but who nevertheless did serve as a Sales Representative for or with the Purchaser within six (6) months of the Effective Date.

K.     How does the Plan treat prepayments for future travel, training, events, representative business-system fees, or membership-enrollment fees?

The Purchaser will continue to operate the business and will satisfy prepayments for future travel, training, events, representative business-system fees, or membership-enrollment in the ordinary course of business. For example, if a member made a payment for a future event, the Purchaser will honor the payment for the future event, which will be satisfied when the event is held. The Purchaser has only assumed up to $11,000,000 in Cash and services. If Allowed Claims for Allowed Claims for Deferred Revenue Liability exceed $11,000,000, all such Allowed Claims will receive their Pro Rata Share of $11,000,000.

L.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Plan Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Plan Effective Date"—or as soon as practicable thereafter or when sufficient Liquidating Trust Proceeds exist to pay such Claims, as specified in the Plan. "Consummation" means the occurrence of the Plan Effective Date.

M.     What are the sources of cash and other consideration required to fund the Plan?

The Plan will be funded by the following sources of cash and consideration: (i) Cash (solely to the extent it is not an Acquired Asset), (ii) the Sale Transaction Proceeds, (iii) Excluded Assets, (iv) the Debtors' rights under the Sale Transaction Documentation, (v) the debt issued (or assumed) by the Purchaser or any of its subsidiaries, (vi) payments made directly by the Purchaser on account of any Purchaser  Paid/Satisfied Liabilities under the Sale Transaction Documentation, (vii) payments of Cure Costs made by the Purchaser pursuant to §§ 365 or 1123 of the Bankruptcy Code, and (viii) all Causes of Action (other than Acquired Claims) not previously settled, released, or exculpated under the Plan that are not otherwise Excluded Assets. Except as otherwise provided herein, Distributions required by this Plan on account of Allowed Claims that relate to Purchaser Paid/Satisfied Liabilities shall be the sole responsibility of the Purchaser.

N.     What will happen if the Plan is not confirmed?

If the Plan is not confirmed, the Debtors reserve the right to request that the Bankruptcy Court approve the Sale Transaction as a §363 sale.

O.     Who Supports the Plan?

The Plan is supported by the Debtors and the Purchaser.

P.     Will there be releases and exculpation granted to parties in interest as part of the Plan?

Yes, the Plan provides for releases and exculpation of the Debtors and other parties in interest as set forth in Article IX of the Plan, including, collectively and individually,  (a) the Independent Directors; (b) the Employees; (c) Erik Toth, as Chief Restructuring Officer, and Larx Advisors Inc.; (d) the Purchaser; (e) the Committee; (f) Committee Parties; and (g) the Professionals retained by the Debtors, Purchaser, and the Committee in the Chapter 11 Cases, and their respective employees, agents, attorneys, accountants, consultants, representatives, and other professionals, each in his/her capacity as such. For the avoidance of doubt, **NO** Cause of Action of the Debtors is released against (a) MCA, and the Secured Parties represented by MCA, (b) Seacret Direct, LLC and any officer, director, and agent of Seacret Direct, LLC, (c) Kenneth E. Head, and (d) the Debtors' pre-petition and post-petition Officers, and/or Directors (other than the Employees and the Independent Directors).

Q.     What is the deadline to vote on the Plan?

The Voting Deadline is **October 8, 2021, at 4:00 p.m., prevailing Central Time**.

R.     How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, you must submit your ballot in accordance with the instructions provided in the Voting Procedures, a summary[7] of which are included in **Article VII.F.2** of this Disclosure Statement.  **BALLOTS SENT BY EMAIL OR FACSIMILE TRANSMISSION ARE NOT ALLOWED AND WILL**

---

[7] To the extent there are inconsistencies between the summary and the Voting Procedures, the latter shall govern.

DM_US 180458543-6.114823.0011

**NOT BE COUNTED.**    If you have questions about voting, please send inquiries to spheratureinquiries@stretto.com.

S.    Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur?

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.  The Debtors will also be seeking final approve of this Disclosure Statement at the Confirmation Hearing.

The Debtors have requested that the Bankruptcy Court schedule the "Confirmation Hearing" for **October 12, 2021 at 10:00 a.m.**, **prevailing Central Time**.  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed with the Bankruptcy Court and served so as to be *actually received* by the appropriate notice parties by **October 11, 2021 at 4:00 p.m. (prevailing Central Time)**.

T.    What is the purpose of the Confirmation Hearing?

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under the chapter 11 plan, any person acquiring property under the chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of the chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

U.    What is the effect of the Plan on the Debtors' ongoing business?

Upon consummation of the Plan and the Sale Transaction, it is anticipated that substantially all of the Debtors' assets will be transferred to the Purchaser, except for the Excluded Assets.

V.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent, Bankruptcy Management Solutions, Inc. d/b/a Stretto:

*By Hand Delivery or Overnight Mail at:*

Spherature Claims Processing
c/o Stretto
Re:  Spherature Investments LLC, et al.
410 Exchange, Suite 100
Irvine, CA 92602

21

*By electronic mail at:*
TeamSpherature@stretto.com

*By telephone at:*
(800) 205-7196 (U.S. and Canada)
(949) 527-2232 (International)

Copies of the Plan, this Disclosure Statement and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Notice and Claims Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Notice and Claims Agent at https://cases.stretto.com/spherature (free of charge) or the Bankruptcy Court's website at https://ecf.txeb.uscourts.gov (for a fee).

W.    Do the Debtors recommend voting in favor of the Plan?

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a sale of substantially all of the Debtors' assets to the Purchaser, is in the best interest of all Holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.

# ARTICLE III.
## BUSINESS DESCRIPTION AND BACKGROUND TO THE CHAPTER 11 CASES

A.    Corporate History

1.    *Formation and Business*

Spherature Investments, LLC d/b/a WorldVenures Holding, LLC ("WorldVentures", and together with its affiliates, the "Company") organized on October 5, 2005 solely for the purpose of providing access to unique travel and lifestyle experiences through a membership based direct sales business and later acquired a wholly-owned travel product and fulfilment company. Each of the Debtors is a limited liability company organized under the laws of the State of Nevada. WorldVentures retains ownership in the following affiliated Debtor parties to these Cases: (a) Rovia, LLC (wholly-owned subsidiary of WorldVentures); (b) WorldVentures Marketing, LLC (wholly-owned subsidiary of WorldVentures); (c) WorldVentures Services, LLC (wholly-owned subsidiary of WorldVentures Marketing Holdings, LLC); (d) WorldVentures Marketing Holdings, LLC (wholly-owned subsidiary of WorldVentures); and (e) WorldVentures Marketplace, LLC (wholly-owned subsidiary of WorldVentures Marketing Holdings, LLC).  WorldVentures acts as a consolidated management entity for the Debtors and their subsidiaries and affiliates, providing oversight, direction, and governance support, and may provide forms of financial assistance.

WorldVentures provides its travel products and services to individual and group leisure and corporate travelers in the United States and abroad. The Debtors (wholly) own ninety-four (94) legal entities operating as branches, offices, and subsidiaries across the world and these entities are collectively managed as WorldVentures. The Company markets its products and services through a network of Independent Sales Representatives that market and sell travel memberships and associate travel packages across multiple subscription levels.

22

WorldVentures' primary revenue stream, in order of significance to the Debtors, is as follows: membership sales, travel sales, representative business system sales, and other marketing and promotions sales.  The Debtors' primary markets, in order of significance to the Debtors, are the Americas, Asia, Europe, and Africa.  WorldVentures' revenue is derived solely from its Sales Representatives and the membership and travel related sales they generate.  The Debtors' primary revenue streams are described in more detail below:

- <u>Membership Sales</u>. The sale of memberships allows the purchasers to access exclusive travel opportunities at discounted rates compared to retail costs. Memberships are offered to purchasers in four tiers, each with increasing levels of access to travel amenities and benefits.  Membership dues are billed to the purchaser monthly generally through recurring transactions.

- <u>Travel Sales</u>. Travel products and services are offered on a stand-alone and package basis primarily through the merchant and agent business models. Under the merchant model, the Debtors facilitate the booking of hotel rooms, airline seats and destination services from travel suppliers and act as the merchant of record for such bookings.  The majority of the Debtors' merchant travel transactions relate to the sales of packaged vacations.  Under the agent model, the Debtors act as the agent in the transaction, passing reservations booked by the purchaser to the relevant travel provider.  The Debtors receive commissions or ticketing fees from the travel supplier and/or purchaser.  For certain agency, airline, hotel and car transactions, the Debtors may also receive fees from global distribution system partners that control the computer systems through which these reservations are booked.

- <u>Representative Business System Sales</u>. In accordance with the Representative Agreements (as defined below), each Sales Representative is required to pay a one-time enrolment fee and a recurring monthly fee for their own replicated website, which provides access to online training tools, presentations, important product documents, and other assets that help the Sales Representatives manage their WorldVentures business.

- <u>Other Marketing and Promotions Sales</u>. The Debtors provide Sales Representatives with access to purchase sales aides and other promotional and marketing materials to facilitate the growth of the Sales Representatives' business.  Sales Representatives are also provided with opportunities to participate in training conventions for an up-front attendance fee.

2.    *Employees*

As of the Petition Date, the Debtors employed 85 employees (the "<u>Employees</u>"). Additionally, the Debtors contract with approximately 60,000+ Independent Sales Representatives whose commissions are calculated based on the current published commissions plan, and terms of their subcontract agreement are outlined in their Independent Sales Representative Contracts.

DM_US 180458543-6.114823.0011

Individuals that wish to become Independent Sales Representatives enter into a 1-year auto renewable agreement (the "Representative Agreements") and pay an initial fee and make monthly payments (s) (the "RBS Fees") in exchange for full access to the WorldVentures Representative Business System ("RBS") platform. Sales Representatives are under no obligation to purchase any products or services of the Debtors.

The Sales Representatives receive commissions on membership sales to end-use customers. No commissions are paid for recruiting new Sales Representatives and there is no compensation derived from a Sales Rep's personal purchase. Commissions are paid weekly and monthly based upon performance. Performance, and therefore commissions, is measured on a tiered basis with caps on weekly and monthly compensation.

Representative Agreements contain certain terms and conditions that govern the relationship. In particular, each Sales Representative agrees to non-solicit and non-compete provisions during and for a period of 1 year following the termination of their agreement with the Debtors. The relationship is also governed by a Policies and Procedures ("Policies") agreement. The purpose of these Policies is to define the relationship between the Debtors and the Sales Representatives, to set standards of permissible business conduct and practices, to protect the business relationships, goodwill, trade secrets, confidential information, including the Debtors' business methods and strategies, and to protect and support Sales Representatives via the ethical and compliant building of their business.

The Debtors' "going concern assets" are predominately the Sales Representatives themselves as the primary source of revenue to the enterprise; however there is a cache of inventories that is made up of promotional merchandise, training materials, apparel, and other merchandise offered to customers at convention events or through online purchasing. Property and equipment consist of leasehold improvements, computer, and video equipment, furniture, fixtures, software, and other equipment at the Debtors' facilities. The Debtors' assets also include merchant reserves, cash deposits and accounts receivable.

    3.    *Management*

WorldVentures is governed by its officers and three managers comprising the board (the "Board"): Wayne T. Nugent, James Calandra, and Russell Nelms. James Calandra and Russell Nelms were added as independent Board members on December 3, 2020 to advise on the filing of these Cases and the related restructuring of the Debtors' assets and liabilities. The Debtors' day-to-day management is led by a complement of corporate officers and supported by an organization of general and administrative staff. Additionally, Erik Toth, the Chief Restructuring Officer appointed on or around November 17, 2020 has been overseeing the Debtors' restructuring efforts and operations.

B.    Prepetition Capital Structure

    1.    *Secured Notes Payable*

On November 3, 2017, the Debtors entered into that certain Security Agreement (the "Initial Security Agreement") which provided for multiple secured notes (the "Notes") issued by various individuals and entities (the "Secured Parties") as listed below. The Debtors also entered into that

certain Note and Warrant Purchase Agreement as of November 3, 2017, which provided for the right to purchase membership interest units exercisable at $0.012 per unit. The Notes then totaled $3,100,000 with an original maturity of November 3, 2018. The Debtors subsequently repaid $100,000 of principal and the remaining balance was extended to November 3, 2019.

On October 30, 2019 the Debtors executed that certain First Amendment to the Security Agreement (the "Amended Initial Security Agreement") in which they amended the maturity to November 30, 2020 (the "Maturity").

On December 31, 2019, the Debtors entered into an Amended and Restated Security Agreement (the "Restated Security Agreement") by and between Montgomery Capital Advisers, LLC, a Texas limited liability company, as collateral agent on behalf of the Secured Parties. The Security Agreement extended the maturity date to November 30, 2020 and expanded the total principal balance of the Notes to $5,500,101. In conjunction with the Restated Security Agreement, the Debtors executed a certain Amended and Restated Note and Warrant Purchase Agreement and Warrant Agreement with each of the Secured Parties. These certain agreements, dated December 31, 2019, provided for the right to purchase membership interest units exercisable at $0.02199598 per unit. The Notes bear an annual interest rate of 16% payable quarterly. No principal payments are made until maturity, when the full principal balance plus all accrued interest is due.

The Secured Parties and the associated outstanding principal balance and Warrant Units are listed in the table below:

| Investor | Principal | % | Warrant Units |
|---|---|---|---|
| Montgomery Capital Partners II, LP | $    1,239,629 | 22.5% | 563,571 |
| Jae W. Chung | 1,068,145 | 19.4% | 485,609 |
| Bowling Capital Partners, Ltd. | 505,000 | 9.2% | 229,587 |
| Montgomery Capital Partners, LLC | 435,766 | 7.9% | 198,112 |
| Montgomery Capital Advisers, LLC | 167,383 | 3.0% | 76,097 |
| B. Terrell Limited Partnership | 223,177 | 4.1% | 101,463 |
| STRATA Trust Co, Custodian FBO TAM IRA | 200,000 | 3.6% | 90,926 |
| Steven A. Hall Irrevocable Trust | 250,000 | 4.5% | 113,657 |
| Maribess Miller | 100,000 | 1.8% | 45,463 |
| TWL Group, LP | 200,000 | 3.6% | 90,926 |
| Boog-Scott Family LP | 200,000 | 3.6% | 90,926 |
| Massoud Bayat AR Sole/Sep Prop Trust | 100,000 | 1.8% | 45,463 |

| | | | |
|---|---|---|---|
| Reza Bayat & Khatereh Tabandeh Trust, Rev | 100,000 | 1.8% | 45,463 |
| MA Ceres LLC | 100,000 | 1.8% | 45,463 |
| Type A Management LLC | 250,000 | 4.5% | 113,657 |
| Mulkey Holdings LLC | 250,000 | 4.5% | 113,657 |
| TBF Loose Holdings LLC | 111,000 | 2.0% | 50,464 |
| **TOTAL:** | **$    5,500,101** | **100.0%** | **2,500,503** |

The Debtors' obligation to repay the loans from the Secured Parties was evidenced by seventeen (17) separate promissory notes.  The Notes were secured (a) on a parity basis with each other, (b) by a lien on and security interest on all of the Debtors' assets pursuant to the Restated Security Agreement; and (c) a lien on the federal income tax refund for 2016 of Wayne Nugent and Susan Nugent, residents of the State of Texas.

The Debtors believe that they have certain claims and causes of action against Montgomery Capital Advisers, LLC and the Secured Parties arising from their actions prior to the initiation of these Bankruptcy Cases.

2.    *2020 Payroll Protection Program Loans*

On or about March 27, 2020, Congress enacted, and the President signed, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), and § 1102 of the CARES Act established the Paycheck Protection Program (the "PPP") as a convertible loan program under § 7(a) of the Small Business Act (15 U.S.C. § 363(a)).  The travel and leisure industry in which the Debtors operate was particularly hard hit by the global pandemic as geographical regions went into various stages of lockdown and implemented travel restrictions.  As a result, the Debtors applied for relief with the SBA under the PPP.  The Debtors received $6,526,604 in funding under the PPP across five (5) separate legal entities as provided in the table below.  The Debtors believe that they have complied with all the provisions and requirements for loan forgiveness.  The Debtors submitted a request for loan forgiveness and the PPP loans were forgiven in May 2021.

3.    *Related Party Payables*

Incorporated in the Accounts Payable and Representative Commissions, current liability accounts are payables to majority owner Mr. Wayne Nugent.  As of November 20, 2020, these payables totaled $5,177,625.85.  This amount can be divided as follows: (i) $1,773,430.78 in compensation for revenue generation; (ii) $88,789.10 for reimbursement for travel, meals, entertainment, and other incidentals associated with normal course of business activity; and (iii) $3,315,405.97 related to the unpaid commissions earned by Mr. Nugent attributable to the Representative Commissions compensation plan then in place.

26

## ARTICLE IV.
## EVENTS LEADING UP TO THE CHAPTER 11 CASES

A.    Lack of Internal Controls and Exploitation by Bad Actors

The Debtors' operating model is based on an international sales force of independently contracted representatives that actively solicit program memberships that provide access to discounted travel and leisure experiences that range from group travel, individual travel, corporate events, and concierge services.  The representatives receive compensation in the form of commissions based on the level of sales of memberships they achieved on a weekly and monthly basis.  A majority of travel sales are transacted via credit card on the Debtors' online travel platform operated under the affiliate Rovia, LLC and available at www.dreamtrips.com.  Membership transactions are achieved when a person signs up to be a customer through the Debtors' online membership platform operated under the affiliate WorldVentures Marketing, LLC and available at www.worldventures.biz.  Individuals have the opportunity to sign up to be a Sales Representative through this same platform.  Members pay an initial sign-up fee and a recurring membership charged to the member's credit card.  Each Sales Representative pays an initial sign-up fee and a recurring business system fee is charged to the Sales Representative's credit card.

Starting in 2015 and continuing until December 2016, revenue grew 32.9% from $612 million to $813 million as the business expanded into new international markets.  During this period of rapid growth, business leadership did not implement proper systems and controls to monitor profitability and cash flow.  A flawed commission structure was exploited by bad actors; in addition, around the same timeframe, overzealous Sales Representatives in new markets began to aggressively market products in markets where the Debtors were not authorized to conduct business.  This behavior was most prevalent within the Asian markets and the aggressive nature resulted in a higher commissionable rate than any other region.  As a result, gross profit dropped from 30.2% in 2015 to 11.9% in 2016.  During that same period operating expenses increased only 27% from $124.4 million to $158.3 million; however, net income dropped from a profit of $47.6 million to a loss of $66.4 million.

In an effort to absorb losses, the business began to accumulate past due trade payables and commissions.  To compound the liquidity issues, on or about April 2017 to May 2018, the Debtors were exposed to additional questionable activity in which stolen credit cards were used to book memberships and travel packages for non-members; this abuse resulted in approximately a 30% cancellation rate of trips.  Revenue declined from $533 million in 2017 to $341 million in 2018.  Without adequate fraud and abuse management systems in place to provide monitoring, the Debtors experienced investigations by regulatory bodies in multiple markets resulting in fines and penalties.  Moreover, individual Sales Representatives were investigated by regulatory bodies, which further exacerbated the negative impact on the brand's reputation as penalties, fines, and damaging press were levied upon the system.  In response to the dramatic impact to liquidity, the Debtors continued to withhold commission payments and accumulated over $42 million of unpaid commission liability.

In 2018, as revenue declined to $341 million the Debtors took further actions to adjust pricing, yielding an 11% improvement in gross profit from 26% in 2017 to 37% in 2018, and reduced operating expenses by $53 million in an attempt to preserve liquidity and recover from

27

the devastating incident. The Debtors returned to profitability in 2018 and ended the year with $17 million in net income. By 2019, revenues seemed to stabilize at $335 million and operating expenses were cut by another $14 million. In an effort to increase revenue, earned commissions were permitted to deviate programmatically from the published contractual structure without the desired benefit, causing gross profit margin to drop from 37% to 29% and net income margin was down to only 2%. By March 2020, the situation deteriorated to the point where the then Chief Executive Officer resigned, and the Debtors were left to regroup and bring in a new leadership. The Debtors hired Mr. Michael Poates as Chief Operating Officer to lead a reorganization and restructuring of the business.

B.     Adverse Market Conditions

The COVID-19 global pandemic decimated the travel and leisure industry and the ensuing lockdowns, travel restrictions, and economic downturn created a compounding effect that had a material adverse financial impact on the Debtors. Many factors, including the steep decline in the travel and leisure market, which has impaired the ability of Sales Representatives to sell travel products and memberships, have resulted in the failure of the Debtors to attract and retain members and customers as originally forecasted.

C.     Negotiations with Seacret

Before the Petition Date, and as a result of discussions among the Debtors and MCA as the collateral agent, on behalf of the Secured Parties, the parties agreed that the Debtors would conduct negotiations with another direct sales business, Seacret Direct, LLC ("Seacret"), regarding a possible acquisition or merger of the two. On July 22, 2020, the Debtors and Seacret executed a Co-Marketing Agreement where the Debtors' Sales Representatives were permitted to purchase and sell Seacret's products with no reciprocity provided to the Debtor. This relationship appeared to be mutually aligned and beneficial, and therefore on November 10, 2020, the Debtors and Seacret executed a non-binding Letter of Intent ("LOI") agreement to outline the proposed transaction considerations in an effort to consummate a definitive asset purchase agreement by an undefined day in November 2020.

Subsequently, on November 11, 2020, the Debtors' Chief Legal Officer and Chief Operating Officer, among others, executed a Limited Solicitation Agreement (the "Solicitation Agreement") with Seacret. This agreement, among other provisions outlined in the LOI, gave exclusive right to Seacret to "solicit any WVM (WorldVentures Marketing, LLC, an Affiliate of the Debtor) Sales Representatives and enlist only such WVM Sales Representatives to join Seacret's downline organization and otherwise be associated with Seacret, as independent contractors, in order to sell current and future Seacret products and services and directly receive a commission or other form of compensation from Seacret for such sales." Furthermore, the Solicitation Agreement states that WorldVentures "waives, and agrees not to enforce, any non-competition provisions or similar restrictions that might exist in any agreement between WVM and the WVM Sales Representatives."

28

D.     Pursuit of Strategic Alternatives

Since the second quarter of 2020, the Debtors have pursued strategic alternatives to bolster their liquidity and position their business for a possible sale, absent the existence of any alternative to recapitalizing the Debtors.  As the deterioration of sales and the acceleration of migration of Sales Representatives to Seacret continued, the Debtors hired Erik Toth ("Toth") and Larx Advisors, Inc. ("Larx") to serve as Chief Restructuring Officer ("CRO") to the Debtors to review, develop, and implement strategic alternatives including the possibility to seek the protections of bankruptcy.

As discussions and negotiations with Seacret stalled, and an agreement on the terms and conditions of a purchase agreement seemed too distant, the Debtors in conjunction with Larx developed and distributed solicitation documents to a pool of over two hundred potentially interested parties.  The marketing process also included MCA.  Collaborative discussions with the MCA resulted in a two-week extension to the Maturity date of the Notes.

The Debtors filed these Cases to effectuate a sale of their assets and/or equity interests.  The filing of these Cases and the confirmation of the Plan are the Debtors' best option to preserve and maximize the value of their assets and business and create the greatest return to the Debtors' creditors.

## ARTICLE V.
## ADMINISTRATION OF THE CHAPTER 11 CASES

A.     First Day Pleadings and Other Case Matters

On the Petition Date, or shortly thereafter, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of first day motions and applications (collectively, the "First Day Pleadings") with the Bankruptcy Court.  On December 30, 2020, and January 4, 25, and 28 the Bankruptcy Court entered orders granting interim and final relief, respectively, to, among other things:  (a) prevent interruptions to the Debtors' businesses; (b) allow the Debtors to retain certain advisors necessary to assist the Debtors with the administration of the Chapter 11 Cases; and (d) allow the Debtors to have access to postpetition cash collateral (each, a "First Day Order").

1.     *Administrative Motions*

To facilitate a smooth and efficient administration of the Chapter 11 Cases, the Debtors filed First Day Pleadings seeking orders designating these cases a complex chapter 11 bankruptcy case, authorizing the joint administration of the Debtors' Chapter 11 Cases, and establishing certain notice, case management and administrative procedures.

2.     *Operational Relief*

The Debtors filed certain motions and applications requesting various types of "first day" and "second day" relief.  The relief granted enabled the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including, among other things, orders authorizing the Debtors:

- to continue using their existing cash management system, honor certain prepetition obligations related thereto, maintain existing business forms, and continue to perform intercompany transactions;

- to pay certain prepetition taxes and fees;

- to fulfill and honor certain customer obligations the Debtors deemed appropriate in the ordinary course of business and continue, renew, replace, implement new, and/or terminate any customer practices and incur customer obligations as the Debtors deem appropriate;

- to pay their obligations under insurance policies entered into prepetition, continue paying brokerage fees, honor the terms of their premium financing agreement and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business;

- to pay employees' wage Claims and related obligations in the ordinary course of business and continue certain employee benefit programs; and

- to establish procedures for utilities to request adequate assurance, pursuant to which the utilities were prohibited from discontinuing service except in certain circumstances.

3.    *Cash Collateral*

The Debtors filed a motion seeking authority for the Debtors to utilize the cash collateral of their secured lender constituents during the Chapter 11 Cases in accordance with the terms of the Cash Collateral Order.  The Bankruptcy Court has entered seven interim cash collateral orders, which are found at Docket Nos. 18, 97, 136, 241, 308, 356, and 382.  The Debtors have a continued hearing on cash collateral scheduled for October 5, 2021.

4.    *Automatic Stay*

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined all collection efforts and actions against the Debtors' and their Estates, the enforcement of Liens, Claims, encumbrances, and interests against property of the Debtors, and both the commencement and the continuation of prepetition litigation against the Debtors.  With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay remains in effect until the Plan Effective Date of the Plan.

B.    Employment and Compensation of Advisors

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed the following applications requesting that the Bankruptcy Court authorize the Debtors to retain and employ certain advisors:  (a) on the Petition Date, the Debtors filed an application to retain Stretto, as Notice and Claims Agent to the Debtors; (b) on January 20, 2021, the Debtors filed an application to retain Foley & Lardner LLP as counsel to the Debtors; (c) on June 1, 2021, the Debtors filed an

application to retain McDermott Will & Emery LLC and replace Foley & Lardner LLP as bankruptcy counsel to the Debtors with Foley & Lardner LLP remaining as litigation counsel in certain adversary proceedings. The Bankruptcy Court has also entered an order approving procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases.

C.    Appointment of Official Committee

On January 22, 2021, the United States Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 93], notifying parties in interest that the United States Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases. The Committee is currently composed of the following members: FSP Legacy Tennyson Center, LLC and David Watson. The Committee has retained Pachulski Stand Ziehl & Jones, LLP as its legal counsel and B. Riley Advisory Services as its financial advisor.

Since the formation of the Committee, the Debtors have consulted with the Committee concerning the administration of the Chapter 11 Cases, and the Committee has been an active participant in these Chapter 11 Cases. The Debtors have kept the Committee informed of, and have conferred with the Committee on, matters relating to the Debtors' business operations and have sought the concurrence of the Committee to the extent that its constituency would be affected by proposed actions or transactions outside of the ordinary course of the Debtors' businesses. The Committee has participated actively with the Debtors' management and professional advisors in reviewing the Debtors' business plans and operations.

D.    Summary of Claims Process, Bar Date and Claims Filed

On January 22, 2021, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs. Interested parties may review the Schedules and SOFAs and amendments thereto by visiting the Debtors' Case Information Website (located at https://cases.stretto.com/Spherature/court-docket/).

On December 31, 2020, the Bankruptcy Court entered the *Notice of Chapter 11 Bankruptcy Case* [Docket No. 58] that was served by Stretto, the Debtors' claims' and noticing agent, pursuant to the *Notice of Appointment of Stretto as Claims, Noticing, and Balloting Agent* (the "Notice of Commencement") [Docket No. 151]. Pursuant to the Notice of Commencement, the last date for certain persons and entities to file Proofs of Claim in the Debtors' Chapter 11 Cases was **April 20, 2021** (the "Bar Date"); and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases was **June 21, 2021.** The Bankruptcy Court has also established **August 20, 2021** as the deadline by which Sales Representatives and Dreamtrip members file proofs of claim [Docket No. 368].

E.    Exclusivity

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code, during which only the debtor may file a chapter 11 plan. If the debtor files a chapter 11 plan within such 120-day period, section 1121(c)(3) of the Bankruptcy Code extends the exclusivity period by an additional 60 days to permit the debtor to seek acceptances of such plan. Section 1121(d) of the

31

Bankruptcy Code also permits the Bankruptcy Court to extend these exclusivity periods "for cause." The Debtors were granted an extension of exclusivity through September 17, 2021 to file a plan and through November 16, 2021 to solicit a plan.

F.     Postpetition Marketing, Bidding, and Auction Process

Since the Petition Date, the Debtors have continued to negotiate with potential purchasers. On June 2, 2021, the Debtors filed a motion seeking the approval of certain bid protections for the Purchaser. The Bankruptcy Court approved the bid protections [Docket No. 329]. As part of the Debtors' motion to conditionally approve the Disclosure Statement, the Debtors also sought approval of the Topping Bid Procedures. The Topping Bid Procedures, among other things, established (a) dates and deadlines for the submission of bids and the auction of substantially all assets of the Debtors, and (b) requirements for bids to be "Qualified Bids" that will be considered at the Auction, if any Qualified Bids are received. Pursuant to the Disclosure Statement Order [Docket No. ●], the final bid deadline for the Assets is **September 24, 2021 at 11:59 p.m. (prevailing Central Time)**. If the Debtors receive any other Qualified Bids, the Debtors will hold an auction for all or substantially all of their assets on **September 27, 2021, at 10:00 a.m. (prevailing Central Time)** or such other time as determined by the Debtors.

G.     Litigation

Since the Petition Date, the Debtors have initiated two adversary proceedings: (1) *Spherature Investments, LLC, et al. v. Kenneth E. Head* (Adversary Proceeding 21-04058); and *Spherature Investments, LLC, et al. v. Seacret Direct LLC* (Adversary Proceeding 21-04059). The Debtors initiated these adversary proceedings for claims that the Debtors and their Estates have relating to actions taken against their businesses. Viva Voyage also initiated *Viva Voyage, LLC v. Spherature Investments, LLC, et al.* (Adversary Proceeding 21-42492). On August 2, 2021, *Melody Yiru initiated Melody Yiru, on behalf of herself and those similarly situated v. Spherature Investments, LLC* (Adversary Proceeding 21-04099).

**ARTICLE VI.**
**SUMMARY OF THE PLAN**

**THIS ARTICLE VI IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS THERETO. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL SUCH TERMS AND PROVISIONS, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ATTACHMENTS) WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES**

**BETWEEN THIS <u>ARTICLE VI</u> AND THE PLAN (INCLUDING ATTACHMENTS), THE LATTER SHALL GOVERN.**

The Plan provides for the sale of all or substantially all of the Debtors' assets through the Sale Transaction. The key terms of the Plan are as follows:

A.    General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

B.    Proposed Creditor Recoveries

The Plan proposes to fund creditor recoveries from Cash, the Sale Transaction Proceeds, Excluded Assets, the Debtors' rights under the Sale Transaction Documentation, the debt issued (or assumed) by the Purchaser or any of its subsidiaries, payments made directly by the Purchaser on account of any Assumed Liabilities under the Sale Transaction Documentation, payments of Cure Costs made by the Purchaser pursuant to §§ 365 or 1123 of the Bankruptcy Code, and all Causes of Action not previously settled, released, or exculpated under the Plan that are not otherwise Excluded Assets, shall be used to fund Distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided herein. Unless otherwise agreed in writing by the Debtors and the Purchaser, Distributions required by this Plan on account of Allowed Claims that are Assumed Liabilities shall be the sole responsibility of the Purchaser to the extent such Claim is Allowed against the Debtors.

Following an extensive series of negotiations between the Debtors and the Purchaser, on May 18, 2021, the Debtors and the Purchaser each executed the Binding Term Sheet, which contemplates the Sale Transaction. Although the Debtors will continue to market their assets on a postpetition basis and will hold the Auction to the extent Qualified Bids for the Debtors' assets are submitted in accordance with the bidding procedures, the Binding Term Sheet or Asset Purchase Agreement, represents a floor bid for the sale of the Debtors' assets. The Debtors intend to consummate the Sale Transaction with the bidder that provides the highest or otherwise best offer as contemplated under the Disclosure Statement Order, the Topping Bid Procedures, the Sale Transaction Documentation and the Plan.

DM_US 180458543-6.114823.0011

Pursuant to the Plan, the Debtors or the Liquidating Trustee shall pay or provide for payments of Claims as follows:

- Priority Claims will be paid in full on the Plan Effective Date (or, in the case of Priority Tax Claims, treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code).

- Class 2 Claim(s) are disputed. Holders of Class 2 Claims will receive no Distribution until their Class 2 Claims are Allowed by Final Order of the Bankruptcy Court. On the later of the Effective Date, or the date of the Final Order allowing a Class 2 Claim, as full and final satisfaction, settlement, and release of, and in exchange for such Class 2 Claims, Holders of Allowed Class 2 Claims will be paid as follows: at the Liquidating Trustee's sole and absolute discretion, (i) negotiation of the Purchaser Note, (ii) delivery of the Collateral securing such Allowed Class 2 Claims that is not an Acquired Asset, or (iii) payment of such Allowed Secured Claim in full in Cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code from the Sales Transaction Proceeds. Until Class 2 Claims are Allowed by Order of the Bankruptcy Court, all payments to Holders of such Class 2 Claims will be paid into a segregated account owned by the Liquidating Trust and controlled by the Liquidating Trustee and subject to the jurisdiction and administration of the Bankruptcy Court. The amount, validity, extent, value, and priority of the Allowed Class 2 Claim under § 506(b) of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Liquidating Trustee and MCA. Any Deficiency Claim or other General Unsecured Claim of a holder of a Class 2 Claim shall be treated in Class 5. MCA's Class 5 Claim is also disputed. If any part of MCA's alleged Class 2 Claim is allowed by the Bankruptcy Court, the Liquidating Trustee may, as full and final satisfaction, release, and discharge of such Allowed Class 2 Claim, (i) assign the Purchaser Note to MCA, (ii) continue to make payments to the Holders of Allowed Class 2 Claims, or (iii) issue a note to MCA for the amount of its Allowed Class 2 Claim with a security interest in the Purchaser Note.

- As full and final satisfaction, settlement, and release of, and in exchange for, Class 3 Claims, Holders of Allowed Class 3 Claims shall be designated as Class 3A, Class 3B *et seq.* and shall be paid, at the Debtors' or Liquidating Trustee's option, by (a) payment of such Allowed Secured Claim in full in Cash, including interest, if applicable, as required under § 506(b) of the Bankruptcy Code from the Sale Transaction Proceeds (other than Cure Costs), (b) surrender of the Collateral securing such Allowed Secured Claim if the Collateral is not an Acquired Asset, or (c) issuance of a restructured note with a present value equal to the value of each holder's Class 3 Collateral with interest accruing at a rate of 3% per annum. Interest will be payable on the first Business Day of the first year after the Effective Date. The balance of the Class 3 Claim will be paid in full no later than the tenth (10th) year after the Effective Date. The amount, validity, extent, value, and priority of the Allowed Secured Class 3 Claim under § 506 of the Bankruptcy Code, or otherwise, will be determined by the Bankruptcy Court after the Effective Date or

34

pursuant to an agreement between the Liquidating Trustee and holder of a Class 3 Claim. Any Deficiency Claim or other General Unsecured Claim of the holder of the Class 3 Claim shall be treated in Class 5.

- Holders of Class 4 Convenience Claims will receive Cash in an amount equal to its Pro Rata Share of the Convenience Class Pool on the later of (a) the Effective Date, (b) thirty (30) days after the Convenience Claim becomes Allowed, and (c) when sufficient Liquidating Trust Proceeds exists to fund the Convenience Class Pool.

- Holders of Class 5 General Unsecured Claims will receive a Pro Rata Share of Distributions from Liquidating Trust Assets from Tier I and Tier II Proceeds, as applicable.

- Holders of Class 6 Sales Representative Claims are segregated into Non-Opt-Out Sales Representatives (Class 6(a)) and Opt-Out Sales Representatives (Class 6(b)). Each Allowed Claim on account of commissions held by a Non-Opt-Out Sales Representative shall be released, settled, and satisfied (a) pursuant to and in accordance with the Sales Representatives Commission Claims Payment Plan, the Future Compensation Plan and, the Purchaser Sales Representative Agreement, and (b) receive his/her/its Pro Rata Share of Tier II Proceeds, as full and final satisfaction, settlement, and release of, and in exchange for, his/her/its Claim against the Estates.

- Holders of Class 6 Sales Representative Claims who are Opt-Out Sales Representatives will receive a Pro Rata Share of the Tier I Proceeds and the Tier II Proceeds.

- Holders of Class 7 Virtual Currency Claims that are active travel club members in good standing will have their Virtual Currency Claims honored on a $1:1 basis (unless a lesser ratio is required because Virtual Currency Claims exceed $7,000,000) in the ordinary course of the Purchaser's business as points applied towards travel pursuant to standard published booking policies and practices for a post-Effective Date travel-product purchase.

- Holders of Class 8 Assumed Deferred Revenue Liability Claims will be satisfied or paid by the Purchaser in the ordinary course of its business; *provided, however*, the Purchaser's Assumed Deferred Revenue Liability shall not exceed $11,000,000 in Cash and services. If Allowed Claims for Deferred Revenue Liability exceed $11,000,000, all such Allowed Claims shall receive their Pro Rata share of $11,000,000.

- Existing Interests in the Debtors will be cancelled without any distribution to the Holders of such Interests.

The Debtors believe that the Plan is in the best interest of the Estates and urge Holders of Claims in Class 2 (MCA Claim), Class 3 (Other Secured Claims), Class 4 (Convenience Class Claims); Class 5 (General Unsecured Claims), Class 6 (Sales Representative Claims), Class 7

(Virtual Currency Claims); and Class 8 (Assumed Deferred Revenue Liability) to vote to accept the Plan.

C.      The Sale Transaction

The Plan contemplates the sale of substantially all of the assets of the Debtors (the "Sale Transaction"). Generally, the Sale Transaction contemplates that:

(a)      the Debtors shall, among other things, transfer the Acquired Assets and all Transferred Causes of Action held by the Debtors to the Purchaser free and clear of all Liens, Claims, Interests, charges, and other encumbrances (other than the Assumed Liabilities) pursuant to sections 363, 365, and/or and 1123 of the Bankruptcy Code, the Plan and the Confirmation Order;

(b)      The Purchase Price for the Acquired Assets will be the sum of (i) Cure Costs and (ii) up to $82,500,000 of other consideration, which consists of:

(i)      The "Cash Component";

(ii)     The Purchaser Note in the principal amount of $5,500,000.00, payments from which the Debtors will escrow in a segregated account, pending resolution of MCA's Claim, which is disputed by the Debtors. The Purchaser will issue the promissory note to the Liquidating Trust and make payments under the note to a segregated account owned and controlled by the Liquidating Trustee. Any Allowed Class 2 Claim will be paid from the proceeds in this segregated account. The Liquidating Trustee will make no Distributions from that segregated account without further Order of the Bankruptcy Court. The amount, validity, extent, value, and priority of the Allowed Class 2 Claim under § 506(b) of the Bankruptcy Code will be determined by the Bankruptcy Court after the Effective Date or pursuant to an agreement between the Liquidating Trustee and MCA. Any Deficiency Claim or other General Unsecured Claim of a holder of a Class 2 Claim shall be treated in Class 5. MCA's Class 5 Claim is also disputed, and may be subject to disallowance, subordination or recharacterization. If any part of MCA's alleged Class 2 Claim is allowed by the Bankruptcy Court, the Liquidating Trustee may, as full and final satisfaction, release, and discharge of such Allowed Class 2 Claim, (i) assign the Purchaser Note to MCA, (ii) continue to make payments to the Holders of Allowed Class 2 Claims, or (iii) issue a note to MCA for the amount of its Allowed Class 2 Claim with a security interest in the Purchaser Note. If the Allowed amount of the Class 2 Claim is less than the payments received from the Purchaser Note, the Liquidating Trustee may use this difference to pay the costs of administering the Liquidating Trust or to make distributions on account of other Claims under the Plan;

(iii)    Up to $16,000,000 in the Royalty Earn Out;

36

(iv) To resolve claims in the aggregate up to $45,000,000.00 by paying or satisfying (a) Sales Representatives Commission Claims by the payment of up to $22,250,000 on account of Sales Representative Commission Claims and (b) Virtual Currency Claims by the honoring of up to $7,000,000 of such Claims held by active travel club members in good standing pursuant to the conditions set forth in the Plan; and

(v) The assumption of no more than $11,000,000.00 in Assumed Deferred Revenue Liability.

(c) the Purchaser shall pay all Cure Costs that are required to be paid (if any) pursuant to and in accordance with sections 365 or 1123 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases that are assumed by the Debtors and assigned to the Purchaser pursuant to the Sale Transaction Documentation and the Plan.

The Acquired Assets also include Acquired Claims (including certain Avoidance Actions) held by the Debtors as of the Plan Effective Date. Acquired Claims DO NOT include the following, which are Excluded Assets, (a) Causes of Action of the non-Debtor Affiliates against the Debtors, either directly or through the acquisition of the Intercompany Interests or (b) Causes of Action, both owned by or against the Debtors and/or the Debtors' Affiliates, including Causes of Action (i) asserted in or related to the Seacret Litigation, including Causes of Action against any current or potential defendant in the Seacret Litigation; (ii) asserted in or related to the Head Litigation, including Causes of Action against any current or potential defendant in such adversary proceeding; (iii) against or related to Seacret or arising under or relating to any contract or agreement with Seacret (including the Limited Solicitation Agreement) regardless of whether such contracts are Assumed/Assigned Contracts and Leases; (iv) against or related to Tom Montgomery, MCA, the lenders represented by MCA, Montgomery Capital Partners, Montgomery Capital Partners, LLC, Montgomery Capital Partners II, LP, Montgomery Capital Partners III, LP, Montgomery Coscia Greilich LLP, Baker Tilly US, LLP, and any entity owned, controlled, or related to any of the aforementioned individuals and entities or their predecessors; (v) against any current or former directors, officers, members, managers, insiders (whether statutory or non-statutory insiders), affiliates, related person, or individual, and Affiliates of the Debtors or the D&O Policies, including damage to goodwill or reputation; (vi) Avoidance Actions; and (vii) against any affiliated, related, predecessor, or successor person or entity of any person or entity described in subparagraphs (i)-(vii).

D.    Effectuating the Sale Transaction

Upon the entry of the Confirmation Order, the Debtors, the Liquidating Trustee, and the Purchaser are authorized, without further order of the Bankruptcy Court, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Sale Transaction under or in connection with the Plan and the Sale Transaction Documentation, including: (1) the execution and delivery of all appropriate agreements or other documents of merger, consolidation, sale, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law; (2) the execution and delivery of

appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) the transfer pursuant to a stock asset purchase agreement of the Acquired Equity; (6) the issuance of any debt issued or assumed by the Purchaser, as set forth in the Plan; and (7) subject to the occurrence of the Effective Date, the consummation of the transactions contemplated by the Sale Transaction Documentation.

The Confirmation Order shall, and shall be deemed to, pursuant to §§ 105, 363, 365 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Sale Transaction.

Without limiting the foregoing, prior to the closing of the Sale Transaction, the Debtors shall transfer, or caused to be transferred, the Acquired Equity so that it is owned directly by a Debtor as a first-tier subsidiary (which first-tier subsidiary itself will have no subsidiaries) as follows: The Debtors shall transfer, or caused to be transferred, the equity ownership interest in (i) Rovia Corp Services to Rovia LLC, (ii) WorldVentures Marketing Pty Ltd to WorldVentures Marketing Holdings, LLC; (iii) WorldVentures Canada, Inc. to WorldVentures Marketing Holdings, LLC; (iv) WorldVentures Services Malaysia Sdn to WorldVentures Marketing Holdings, LLC; and (v) WorldVentures Events (Malaysia) Sdn. Bhd. 15 Company No. 1178688D to WorldVentures Marketing Holdings, LLC.

To further implement the Sale Transaction, no later than twenty one (21) days prior to the Effective Date, the Debtors shall deliver to the Purchaser a list of (i) all registered and unregistered intellectual property, domain names, websites, and Uniform Resource Locators and (ii) all licenses relating to the operation of the Business in the United States and in the locations where the Acquired Entities engage in business operations.

The Liquidating Trustee and the Purchaser shall execute such additional post-Effective Date documents that are reasonable, necessary, or appropriate to consummate, evidence, or further and fully implement the Plan, the Sale Transaction, and the transfer of the Acquired Assets to the Purchaser.

E.    The Liquidating Trustee

On and after the Effective Date, the Liquidating Trustee shall act in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) necessary to implement the Plan and Effectuate the Sale Transaction for all Trust Beneficiaries. On the Effective Date, the authority, power, and incumbency of the persons acting as directors, managers and officers of the Debtors shall be deemed to have resigned, and a representative of the Liquidating Trustee (which may be the Liquidating Trustee) shall be appointed as the sole director, manager and officer of the Debtors, and shall succeed to the powers of the Debtors' managers, directors, and officers. From and after

the Effective Date, the Liquidating Trustee shall be the sole representative of, and shall act for, the Debtors as further described in Article VII of the Plan. The Liquidating Trustee shall use commercially reasonable efforts to operate in a manner consistent with the Wind Down and the Liquidating Trust Agreement. The Liquidating Trustee shall have the authority to execute all documents and take all actions necessary or appropriate to effectuate the Sale Transactions.

Following the Effective Date, in addition to the responsibilities set forth in Article VII.A of the Plan, the Liquidating Trustee shall administer the Estates for the purpose of effectuating the Claims-reconciliation and settlement process of all Claims, and making Distributions to the Holders of such Claims in accordance with the terms of the Liquidating Trust Agreement. For the avoidance of doubt, all Distributions made by the Liquidating Trustee are made for the benefit of the Trust Beneficiaries and not the Debtors.

The Liquidating Trustee shall retain and have all the rights, powers, and duties necessary to carry out his/her/its responsibilities under this Plan and as otherwise provided in the Confirmation Order. The Liquidating Trustee shall be the exclusive trustee over the Excluded Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to § 1123(b)(3)(B) of the Bankruptcy Code.

Except as set forth elsewhere in the Plan, the Liquidating Trustee's powers shall include all powers and authority to implement the Plan and the Liquidating Trust Agreement, and handle all matters of the Debtors, including the Wind Down, and to administer and distribute proceeds of the Liquidating Trust Assets, including: (1) liquidating, receiving, holding, investing, supervising, and protecting the Liquidating Trust Assets; (2) taking all steps to execute all instruments and documents necessary to effectuate the Distributions to be made under the Plan and the Liquidating Trust Agreement; (3) making Distributions to Holders of Allowed Claims; (4) establishing and maintaining bank accounts in the name of the Debtors and/or the Liquidating Trust; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan and the Liquidating Trust to the extent necessary; (6) paying reasonable fees, expenses, debts, charges, and liabilities of the Debtors and the Liquidating Trust on and after the Effective Date; (7) administering and paying taxes of the Debtors and the Liquidating Trust on and after the Effective Date, including filing tax returns; (8) representing the interests of the Debtors, the Estates, or the Liquidating Trust before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, the Liquidating Trust or the Confirmation Order, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan, the Liquidating Trust and the Confirmation Order.

The Liquidating Trustee's post-Plan Effective Date compensation shall be set forth in the Plan Supplement and paid from the Liquidating Trust Assets.

F.    The Liquidating Trust

On the Effective Date, the Liquidating Trust will be formed to implement the Wind Down, including the liquidation of the Liquidating Trust Assets for the benefit of the Trust Beneficiaries. The Liquidating Trust will have no objective to continue or engage in the conduct of a trade or

business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Upon transfer of the Liquidating Trust Assets to the Liquidating Trust, as more fully set forth in the Liquidating Trust Agreement, the Debtors will have no reversionary or further interest in or with respect to the Liquidating Trust Assets. For all federal income-tax purposes, the Trust Beneficiaries will be treated as grantors and owners thereof, and it is intended that the Liquidating Trust be classified as a liquidating trust under § 301.7701-4 of the Treasury Regulations. Accordingly, for federal income-tax purposes, it is intended that the Liquidating Trust Beneficiaries be treated as if they had received an interest in the Liquidating Trust's assets and then contributed such interests to the Liquidating Trust. The Liquidating Trust will, in a reasonably expeditious but orderly manner, (a) liquidate and convert the Liquidating Trust Assets to Cash, and (b) make timely distributions to the Trust Beneficiaries pursuant to the Plan and the Confirmation Order, and not unduly prolong its duration. The Liquidating Trust will not be deemed a successor in interest to the Debtors. Upon the termination of the Liquidating Trust, any excess funds shall be paid to Holders of Allowed Claims in the order of priority outlined in this Plan and the Liquidating Trust Agreement.

The Liquidating Trustee shall be the trustee of the Liquidating Trust and shall continue to have all of the rights and powers granted to the Debtors and the Liquidating Trustee as set forth in this Plan and applicable non-bankruptcy law, and the Liquidating Trustee shall also have the rights, powers, and obligations set forth in the Liquidating Trust Agreement. On and after the Effective Date, all references to the Debtors in this Plan shall be deemed references to the Debtors or the Liquidating Trust/Liquidating Trustee, as applicable, and all references to the Liquidating Trustee shall be deemed references to the Liquidating Trustee, both in his role as Liquidating Trustee and the Liquidating Trustee and officer in charge of the Wind Down, as applicable.

G.    Corporate Action

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan and the Sale Transaction Documentation (including any action to be undertaken by the Debtors or the Liquidating Trustee, as applicable) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, the Liquidating Trustee, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, including the consummation of the Sale Transaction, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates, in the best interests of the Estates and in good faith.

The Liquidating Trustee, will be authorized to execute, deliver, File, or record such contracts, instruments, and other agreements or documents and take such other actions as they may deem necessary or appropriate to implement the provisions of Article IV.G of the Plan and the Sale Transaction.

The authorizations and approvals contemplated by Article IV.G of the Plan will be effective on the Effective Date, notwithstanding any requirements under applicable nonbankruptcy law.

40

H.   Executory Contracts

On the Effective Date, and as part of the Sale Transaction, the Debtors will assume and sell/assign the Assumed/Assigned Contracts and Leases to the Purchaser pursuant to the Sale Transaction Documentation, the Plan, the Confirmation Order, and the Plan Supplement. Except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease (other than any Executory Contract or Unexpired Lease previously rejected, assumed, or assumed and sold/assigned), any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations  or independent contractor obligations arise (including all Sales Representatives Agreements), will be deemed automatically rejected (including the Sales Representative Agreements) on the Effective Date pursuant to §§ 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as an Assumed/Assigned Contract and Lease, or is specifically scheduled, prior to or on the Effective Date, to be assumed or assumed and sold/assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and sold/assigned to the Purchaser or another third party, as applicable, in connection with the Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (5) is a D&O Policy; or (6) is the Sale Transaction Documentation or the Purchaser Documentation. Purchaser shall assume no liability or obligation of any kind or nature in connection with any Executory Contract or Unexpired Lease that is rejected or not expressly assumed and sold/assigned to Purchaser other than as set forth in the Plan. Purchaser shall pay to the applicable non-debtor counterparties to the Assumed/Assigned Executory Contracts and Unexpired Leases all Cure Costs required for the assumption and assignment of Assumed/Assigned Executory Contracts and Unexpired Leases to the Purchaser. Any objections to the proposed rejection, assumption, or assumption and sale/assignment of an Executory Contract or Unexpired Lease or to Cure Costs under this Plan must be (1) in writing, (2) Filed with the Bankruptcy Court, and (3) served by electronic mail on the Debtors, the Purchaser, the Committee, and the U.S. Trustee by the Confirmation Objection Deadline. Each such objection must specifically describe the grounds for the objection and, to the extent applicable, include the proposed Cure Costs and provide supporting documentation therefor, and include any other evidence that supports such objection. Any objections to a proposed rejection of an Executory Contract or Unexpired Lease as part of a motion – and not this Plan – must be Filed with the Bankruptcy Court and served on the Debtors or, after the Effective Date, the Liquidating Trustee, as applicable, by the earlier of (1) the objection deadline described in the motion and (2) fourteen (14) days after service of the motion proposing the rejection of such Executory Contract or Unexpired Lease.  All Sales Representatives that do not exercise the Sales Representative Opt-Out right waive any rejection damage Claim against the Debtors and the Liquidating Trust.

41

I.      Recoveries to Certain Holders of Claims and Interests

The estimated recoveries to Holders of Claims and Interests are described in **Article II.D** of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

J.      *De Minimis* Distributions

No Cash payment of less than $250.00, in the Liquidating Trustee's reasonable discretion, shall be made to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest, *provided*, *however*, that this provision shall not apply to Convenience Class Claims or Sales Representatives Commission Claims.  With respect to Convenience Class and Sales Representatives Commissions Claims there shall be no Cash payments of less than $20.00.

K.      Dispute of the MCA Claim

The Debtors dispute the MCA Claim and, in addition to filing an objection to the claim, intend to pursue affirmative claims against (i) Montgomery Capital Advisors LLC, separately, and as agent for the Secured Lenders, (ii) the Secured Lenders; and (iii) various affiliates and insiders of Montgomery Capital, including Tom Montgomery (collectively, the "Targets").  The claims include, but are not limited to:

- avoidance of fraudulent transfers under Bankruptcy Code §§ 544(b), 548, and 550, and applicable state statutes;

- aiding and abetting breaches of fiduciary duty by the Debtors' former officers and directors;

- claims for recharacterization of the alleged loans made by the Secured Lenders as equity; and

- claims to subordinate the claims, if any, of the Holders of Class 2 Claims to the Claims of the Debtors' general unsecured creditors.

These claims arise out of the Targets' improper conduct, which ultimately contributed to the Debtors' slide into bankruptcy.  Such improper conduct includes, for example, using their influence with and control over the Debtors for their own personal gain despite knowledge of the Debtors' financial difficulties; designing a fraudulent scheme to convince the Debtors' sales representatives to convert their commission claims to equity; charging and obtaining usurious interest payments from the Debtors using a sham consulting agreement and/or management services agreement; requiring the Debtors to sign a release of all claims against the Targets on the eve of the Debtors' bankruptcy filing for no or inadequate consideration; and advising the Debtors to enter into transactions that were of little to no benefit to the Debtors.  In connection with and in support of these claims, the Debtors believe that they will be able to establish that, at all relevant times, Tom Montgomery was a quasi or de facto officer and director of the Debtors.

L.    Purchaser Sales Representative Claim Payment Plan

Under the "*Sales Representatives Claim Payment Plan*" each Purchaser Sales Representative's Pro Rata Share of the Assumed Sales Representative Commissions, payable in twenty-four (24) monthly payments equal to five (5%) percent of the Purchaser's Gross (monthly) Sales, starting the 1st day of the month that is at least thirty (30) days after the Effective and continuing for the next twenty-three (23) months. The last monthly payment shall be in the amount necessary to pay each Purchaser Sales Representative's Pro Rata Share of the Assumed Sales Representative Commissions in full; *provided*, *however*, the Purchaser Sales Representative will ONLY receive his/her/its Pro Rata Share of the Assumed Sales Representative Commissions IF the Purchaser Sales Representative:

> (a) releases 65% of its/his/her Claims against the Estates and their respective affiliates, subsidiaries, and related parties;

> (b) retains a Claim, subject to allowance/disallowance/recharacterization/subordination, etc., for the remaining 35% against the Tier II Proceeds;

> (c) agrees to the Future Compensation Plan by not affirmatively "opting out" on the Ballot from being bound to a Purchaser Sales Representatives Agreement - i.e., a Purchaser Sales Representative must be a Non-Opt-Out Sales Representative;

> (d) is engaged as a Purchaser Sales Representative pursuant to an executed Purchaser Sales Representative Agreement producing revenue from third-party sales, and is not in violation of the Purchaser Sales Representatives Agreement; and

> (e) is and remains an active member in good standing with "active status"  and is not more than three (3) months (cumulative) delinquent in monthly payments.

If a Purchaser Sales Representative fails to meet any these requirements as of the date upon which a payment on account of the Sales Representatives Commissions is due and payable, (a) the Purchaser shall have no liability to the Purchaser Sales Representative with respect to such payment, and (b) the Liquidating Trust shall have no liability to the Purchaser Sales Representatives, save for its interest, if any in the Tier II Proceeds.

Within fourteen (14) calendar days prior to the First Payment Date, the Liquidating Trustee shall deliver to the Purchaser (in Excel format) a schedule setting forth (a) the Allowed amount of each Purchaser Sales Representative's Sales Representatives Commissions, (b) the Pro Rata Share of each Purchaser Sales Representative (and the Liquidating Trust with respect to any Opt Out Sales Representative Proceeds), (c) the proposed amount payable to each Purchaser Sales Representative (and, if applicable, the Liquidating Trust on account of the Opt Out Sales Representative Proceeds) on the date of the Purchaser's applicable scheduled payment, and (d)

43

such other information as is reasonably requested by Purchaser. In making payments under the Sales Representatives Commission Claims Payment Plan, the Purchaser is entitled to rely on the amounts, information, and calculations provided by the Liquidating Trustee without independent investigation, analysis, or verification and shall not be liable to any Person or Entity (including, without limitation, the Sales Representatives or the Liquidating Trust) arising from such payments. If the Allowed amount changes because of the resolution of an objection or because of a Final Order, the Liquidating Trustee shall provide notice of such change to the Purchaser as soon as reasonably practicable.

If the Purchaser Sales Representative meets each requirement above at all relevant times, an example of how this *Sales Representatives Commission Claims Payment Plan* works is as follows: Assume that (a) the Purchaser Sales Representative asserts a $10,000.00 Sales Representatives Commission Claim against the Estates, (b) the Effective Date is September 1, 2021, and (c) Purchaser's monthly Gross Sales are $7,500,000.00. That Purchaser Sales Representative will withdraw/release that Claim; in exchange, the Purchaser will pay that Purchaser Sales Representative $6,500.00 on account of its Claim against the Estates. That $6,500.00 will be paid as follows: $250.00 on October 1, 2021, and $250.00 on the 1st day of each month thereafter for 22 months, totaling $5,750.00. The 23rd payment will be $750.00, for a total distribution of $6,500.00; *provided*, *however*, in no circumstance shall a Purchaser Sales Representative receive from the Purchaser more than 65% of his/her/its Allowed Sales Representatives Commission Claim, and no more than 35% of such Allowed Claim from the Liquidating Trust Tier II Proceeds; *provided further* that in no event will the aggregate amount of Purchaser Paid Sales Representatives Commissions exceed $22,250,000.

For the avoidance of doubt, the Purchaser's obligation to pay the Opt-Out Sales Representative Proceeds depends upon the Opt-Out Sales Representative's satisfaction of the terms and conditions of the Sales Representatives Commission Claims Payment Plan. In addition, the Opt-Out Sales Representatives Proceeds are included when determining the $22,250,000 cap on Purchaser Paid Sales Representatives Commissions.

In the Sales Representatives Commission Claims Payment Plan, the Purchaser shall not be required to make any payments on account of a Sales Representatives Commission Claim until such Claims is Allowed or the agreement of the Debtors (prior to or on the Effective Date) or the Liquidating Trustee (after the Effective Date), on the one hand, and the Holder of such Sales Representative Commission Claim, on the other hand. The Liquidating Trustee shall use his reasonable efforts to reconcile Sales Representative Commission Claims (including by filing any objections thereto) within 60 days after the Effective Date.

M.    Retention of Rights to Pursue Causes of Action and Effectuate Setoffs, Recoupment, Etc.

Except as otherwise ordered by the Bankruptcy Court or as specifically and explicitly provided in the Plan, all Causes of Action shall be preserved by the Debtors and the Liquidating Trustee, as applicable, under this Plan. A list of preserved claims is attached hereto as **Exhibit C**.

No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Avoidance Action or Cause of Action against it as any indication that the Liquidation Trust will not pursue any and all available Causes of Action against

44

it. The Liquidation Trust expressly reserves all rights to prosecute any and all Avoidance Action and Causes of Action against any Entity that constitutes property of the Estate, except as otherwise provided in this Plan. THE FAILURE TO LIST, DISCLOSE, DESCRIBE, IDENTIFY, OR REFER TO A RIGHT, CLAIM, CAUSE OF ACTION, DEFENSE, OR COUNTERCLAIM, OR POTENTIAL RIGHT, CLAIM, CAUSE OF ACTION, DEFENSE, OR COUNTERCLAIM, IN THE PLAN, THE SCHEDULES, OR ANY OTHER DOCUMENT FILED WITH THE BANKRUPTCY COURT SHALL IN NO MANNER WAIVE, ELIMINATE, MODIFY, RELEASE, OR ALTER ANY RIGHT OF THE LIQUIDATION TRUST TO COMMENCE, PROSECUTE, DEFEND AGAINST, SETTLE, AND REALIZE UPON ANY RIGHTS, CLAIMS, CAUSES OF ACTION, DEFENSES, OR COUNTERCLAIMS THAT THE DEBTORS HAVE OR MAY HAVE AS OF THE EFFECTIVE DATE.

N.    Release, Injunction, and Related Provisions

The Plan contains certain releases, as described in **Article II.P** of this Disclosure Statement entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"

Article IX of the Plan provides for releases of all Claims and Causes of Action against the Debtors by the following are "Releasing Parties", collectively, and in each case, in their respective capacities as such: (a) the Purchaser; (b) all holders of Claims and Interests that are presumed to accept the Plan *and* who do not affirmatively opt-out of the releases in the Plan on the Ballot; (c) all holders of Claims and Interests who vote to accept the Plan; (d) all holders of Claims or Interests that (i) abstain from voting on the Plan *and* who do not opt-out of the releases in the Plan on the Ballot, (ii) vote to reject the Plan *and* who do not opt-out of the releases in the Plan on the Ballot, or (iii) are deemed to reject the Plan *and* who do not opt-out of the releases in the Plan on the Ballot; (e) the Committee, the members thereof and their respective professionals (solely in their capacity as such); (f) the Debtors (except that the Debtors are NOT releasing any Claims or Causes of Action against any Party other than the Released Parties).

**Importantly, all holders of Claims and Interests that do not affirmatively opt-out of the releases in the Plan on the Ballot will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release of all Claims and Causes of Action against the Debtors and the Released Parties.**

The release, exculpation, and injunction provisions that are contained in Article IX of the Plan are copied in pertinent part below.

1.    *Release of Liens*

ON THE EFFECTIVE DATE, ALL MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS AGAINST ANY PROPERTY OF THE ESTATES SHALL BE FULLY RELEASED, SETTLED, COMPROMISED, AND DISCHARGED, AND ALL OF THE RIGHT, TITLE, AND INTEREST OF ANY HOLDER OF SUCH MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS SHALL REVERT EITHER (I) TO THE DEBTORS (WITH RESPECT TO EXCLUDED ASSETS) AND THEIR SUCCESSORS AND ASSIGNS, OR (II) THE PURCHASER (WITH RESPECT TO ACQUIRED ASSETS), IN EACH CASE, WITHOUT

45

ANY FURTHER APPROVAL OR ORDER OF THE BANKRUPTCY COURT AND WITHOUT ANY ACTION OR FILING BEING REQUIRED TO BE MADE BY THE DEBTORS OR THE PURCHASER. IN ADDITION, THE HOLDER OF SUCH MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS SHALL EXECUTE AND DELIVER ALL DOCUMENTS REASONABLY REQUESTED BY THE DEBTORS OR LIQUIDATING TRUSTEE (WITH RESPECT TO EXCLUDED ASSETS) OR THE PURCHASER (WITH RESPECT TO ACQUIRED ASSETS) TO EVIDENCE THE RELEASE OF SUCH MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, AND OTHER SECURITY INTERESTS AND SHALL AUTHORIZE THE DEBTORS OR THE PURCHASER, AS APPLICABLE, TO FILE UCC-3 TERMINATION STATEMENTS OR OTHER RELEASES WITH RESPECT TO SUCH MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS.

2.   *Releases by the Debtors*

PURSUANT TO § 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS AND THEIR ESTATES FROM ANY AND ALL CAUSES OF ACTION, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT THE DEBTORS OR THEIR ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' CAPITAL STRUCTURE, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A DEBTOR AND ANOTHER DEBTOR, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE BINDING TERM SHEET, THE DISCLOSURE STATEMENT, THE PLAN, THE SALE TRANSACTION, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE BINDING TERM SHEET, THE DISCLOSURE STATEMENT, OR THE PLAN, THE SALE TRANSACTION, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND THE IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, EXCEPT FOR ANY CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. NOTWITHSTANDING THE INCLUSION OF ANY RELEASED PARTIES AS A POTENTIAL PARTY TO ANY CAUSES OF ACTION, SUCH PARTIES SHALL REMAIN RELEASED PARTIES.

46

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR ANY OTHER PROVISION OF THE PLAN, THE RELEASES CONTAINED IN THE PLAN DO NOT (1) RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE SALE TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, OR (2) AFFECT THE RIGHTS OF HOLDERS OF ALLOWED CLAIMS AND INTERESTS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN.  FURTHER, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PLAN, THE RELEASE, DISCHARGE, INJUNCTION, EXCULPATION, AND OTHER PROVISIONS WITH SIMILAR EFFECT IN THE PLAN SHALL **EXCLUDE** (AND NOTHING HEREIN SHALL RELEASE, WAIVE OR DISCHARGE): (A) ANY CLAIM, CAUSE OF ACTION, OR OBLIGATION UNDER THE PLAN, ANY DOCUMENT, AGREEMENT, OR TRANSACTION ENTERED INTO PURSUANT TO THE PLAN; (B) ANY CLAIM OR CAUSE OF ACTION OF THE DEBTORS AGAINST (1) MONTGOMERY CAPITAL ADVISERS, LLC, AND THE SECURED PARTIES REPRESENTED BY MONTGOMERY CAPITAL ADVISERS, LLC, (2) SEACRET  DIRECT, LLC AND ANY OFFICER, DIRECTOR, AND AGENT OF SEACRET DIRECT, LLC, AND (3) KENNETH E. HEAD.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES HEREIN, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND SHALL FURTHER CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE RELEASES HEREIN ARE: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2)  A  GOOD-FAITH  SETTLEMENT  AND COMPROMISE OF THE CLAIMS RELEASED BY THE RELEASES HEREIN; (3) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES, AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE CONSIDERATION AND REASONABLY-EQUIVALENT VALUE; (5) GIVEN AND MADE AFTER REASONABLE INVESTIGATION BY THE DEBTORS AND AFTER NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO THE ASSERTION OF ANY CLAIM RELEASED BY THE RELEASES HEREIN AGAINST ANY RELEASED PARTY.

3.    *Releases by Holders of Claims and Interests*

AS OF THE EFFECTIVE DATE, EXCEPT AS OTHERWISE PROVIDED HEREIN, EACH HOLDER OF A CLAIM AND HOLDER OF AN INTEREST IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR AND EACH RELEASED PARTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS BETWEEN OR AMONG A DEBTOR AND ANOTHER DEBTOR, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING

47

OF THE BINDING TERM SHEET, THE DISCLOSURE STATEMENT, THE PLAN, PLAN SUPPLEMENT, THE SALE TRANSACTION, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE BINDING TERM SHEET, THE DISCLOSURE STATEMENT, OR THE PLAN, THE SALE TRANSACTION, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND THE IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, EXCEPT FOR ANY CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. THE BALLOT WILL CONTAIN AN OPT-OUT PROVISION, AND ANY HOLDER OF A CLAIM OR INTEREST THAT DESIGNATES ITSELF AS OPTING-OUT SHALL NOT BE A RELEASING PARTY.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING OR ANY OTHER PROVISION OF THE PLAN, THE RELEASES CONTAINED IN THE PLAN DO NOT (1) RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR (2) AFFECT THE RIGHTS OF HOLDERS OF ALLOWED CLAIMS AND INTERESTS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN.  FURTHER, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PLAN, THE RELEASE, DISCHARGE, INJUNCTION, EXCULPATION, AND OTHER PROVISIONS WITH SIMILAR EFFECT IN THE PLAN SHALL EXCLUDE (AND NOTHING HEREIN SHALL RELEASE, WAIVE OR DISCHARGE): (A) ANY CLAIM, CAUSE OF ACTION AND/OR OBLIGATION OF THE DEBTORS ARISING UNDER THE BINDING TERM SHEET, OR (B) ANY DOCUMENT, AGREEMENT, OR TRANSACTION ENTERED INTO PURSUANT THERETO, INCLUDING THIS PLAN, THE SALE TRANSACTION, THE PURCHASE DOCUMENTATION, OR THE SALE TRANSACTION DOCUMENTATION.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES OF HOLDERS OF CLAIMS AND INTERESTS, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND SHALL FURTHER CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE RELEASES HEREIN ARE:   (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE HOLDERS OF CLAIMS AND INTERESTS; (3) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES, AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE CONSIDERATION AND REASONABLY-EQUIVALENT VALUE; (5) GIVEN AND MADE AFTER NOTICE AND OPPORTUNITY

48

FOR HEARING; AND (6) A BAR TO ANY HOLDER OF A CLAIM OR INTEREST FROM ASSERTING ANY CLAIM RELEASED BY THE RELEASE HEREIN AGAINST ANY OF THE RELEASED PARTIES.

4.   *Exculpation*

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS RELEASED AND EXCULPATED FROM ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE BINDING TERM SHEET AND RELATED PREPETITION TRANSACTIONS, THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE SALE TRANSACTION, OR ANY OTHER TRANSACTION IMPLEMENTED BY THE PLAN, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN, THE SALE TRANSACTION, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY ON THE ADVICE OF COUNSEL (AND PURCHASER MAY RELY UPON INFORMATION RECEIVED FROM THE DEBTORS OR THE LIQUIDATING TRUSTEE IN CONNECTION WITH THE SALES REPRESENTATIVES COMMISSION CLAIMS PAYMENT PLAN) WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN AND THE SALE TRANSACTION. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF VOTES AND DISTRIBUTION OF CONSIDERATION PURSUANT TO THE PLAN; THEREFORE, THEY ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NOTHING IN THE FOREGOING "EXCULPATION" SHALL EXCULPATE ANY PERSON OR ENTITY FROM ANY LIABILITY RESULTING FROM ANY ACT OR OMISSION CONSTITUTING FRAUD, WILLFUL MISCONDUCT, GROSS NEGLIGENCE, AND CRIMINAL CONDUCT, AS DETERMINED BY A FINAL ORDER OR, WITH RESPECT TO THE SALE TRANSACTION, FROM BREACH OF CONTRACT.

DM_US 180458543-6.114823.0011

5.    *Injunction*

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR DISTRIBUTIONS REQUIRED TO BE PAID OR DELIVERED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, SETTLED, SATISFIED, OR DISCHARGED PURSUANT TO THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

For more detail, see Article IX of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

## ARTICLE VII.
## VOTING AND CONFIRMATION

On September [●], 2021, the Bankruptcy Court entered an order approving the adequacy of this Disclosure Statement and the solicitation procedures and deadlines contemplated herein.

A.    Classes Entitled to Vote on the Plan

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "Voting Classes"):

50

| Class | Claim | Status |
|-------|-------|--------|
| Class 2 | MCA Claim | Impaired |
| Class 3 | Other Secured Claims | Impaired |
| Class 4 | Convenience Claims | Impaired |
| Class 5 | General Unsecured Claims | Impaired |
| Class 6 | Sales Representatives Claims | Impaired |
| Class 7 | Virtual Currency Claims | Impaired |
| Class 8 | Assumed Deferred Liability Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined herein) or a Ballot. If your Claim is included in the Voting Classes, you should read your Ballot and carefully follow the instructions set forth therein. Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or the Notice and Claims Agent on behalf of the Debtors, otherwise provide to you.

B.     Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Each Class of Claims entitled to vote on the Plan will have accepted the Plan if: (a) the Holders of at least two-thirds in dollar amount of the Claims actually voting in each Class vote to accept the Plan; and (b) the Holders of more than one-half in number of the Claims actually voting in each Class vote to accept the Plan.

C.     Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan, including that:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

DM_US 180458543-6.114823.0011

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of Holders within the Voting Classes or necessarily require a re-solicitation of the votes of Holders of Claims in such Voting Classes.

For a further discussion of risk factors, please refer to **Article IX** hereof, entitled "Certain Risk Factors to be Considered Before Voting."

D.    Classes Not Entitled to Vote on the Plan

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan, in which case they are conclusively presumed to accept the proposed plan, or if they will receive no property under the plan, in which case they are deemed to reject the proposed plan.  Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Allowed Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 9 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 11 | Interests in the Debtors | Impaired | Not Entitled to Vote (Deemed to Reject) |

E.    Solicitation Procedures

1.    *Notice and Claims Agent*

The Debtors retained Stretto, which is the trade name of the Management Solutions, Inc. ("Stretto") to act, among other things, as the notice and claims agent (the "Notice and Claims Agent") in connection with the solicitation of votes to accept or reject the Plan.

52

2.    *Solicitation Package*

Pursuant to the Disclosure Statement Order, Holders of Claims who are entitled to vote to accept or reject the Plan as of **September 8, 2021** (the "Voting Record Date"), will receive appropriate solicitation materials (the "Solicitation Package"), which will include, the following:

- the appropriate Ballot(s) and applicable voting instructions;

- the Solicitation Letter; and

- the Combined Hearing Notice.

This Disclosure Statement and the Plan are being provided free of charge through the Debtors' Notice and Claims Agent at https://cases.stretto.com/Spherature.

3.    *Distribution of the Solicitation Package and Plan Supplement*

The Debtors will cause the Notice and Claims Agent to distribute the Solicitation Packages to Holders of Claims in the Voting Classes on or before **September 12, 2021**.

The Solicitation Package (except for the Ballots) may also be obtained:  (a) from Stretto by (i) by visiting https://cases.stretto.com/Spherature; (ii) by writing to Team Spherature, c/o Stretto., Re: Spherature Investments LLC, et al., 410 Exchange, Suite 100, Irvine, CA 92602; or (b) for a fee via PACER at https://ecf.txeb.uscourts.gov/.

At least 7 days prior to the Voting Deadline, the Debtors intend to file the Plan Supplement. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available at https://cases.stretto.com/Spherature.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement (a) for no charge from Stretto by (i) by calling the Debtors' restructuring hotline at (855) 205-7196 (U.S. and Canada) or (949) 537-2232 (International); (ii)  by visiting the Debtors' restructuring website at:  https://cases.stretto.com/Spherature;  or (iii) by writing to Team Spherature, c/o Stretto., Re: Spherature Investments LLC, et al., 410 Exchange, Suite 100, Irvine, CA 92602 or by electronic mail to spheratureinquiries@stretto.com; or (b) for a fee via PACER at https://ecf.txeb.uscourts.gov/.

As described above, certain Holders of Claims may not be entitled to vote because they are Unimpaired or are otherwise deemed to accept the Plan under section 1126(f) of the Bankruptcy Code.  In addition, certain Holders of Claims and Interests and Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote.  Such Holders will receive only notice of the Confirmation Hearing and a non-voting status notice.  The Debtors are only distributing a Solicitation Package, to be used for voting to accept or reject the Plan, to the Holders of Claims entitled to vote to accept or reject the Plan as of the Voting Record Date.

DM_US 180458543-6.114823.0011

F.    Voting Procedures

If, as of the Voting Record Date, you are a Holder of a Claim in Class 2, 3, 4, 5, 6, 7, or 8—the Voting Classes—you may vote to accept or reject the Plan in accordance with the Solicitation Procedures, described above, by completing the applicable Ballot(s) and returning the Ballot(s) in the envelope.  You may also vote via electronic, online transmission through a customized electronic Ballot (each an "E-Ballot") by utilizing the electronic ballot platform on Stretto's case-designated website.  Holders of Claims in the Voting Classes may cast an E-Ballot and electronically sign and submit such E-Ballot via Stretto's electronic ballot platform, provided that such E-Ballots are uploaded to Stretto's electronic ballot platform on or before the Voting Deadline.  The Ballot you receive will have a unique identifier that you will use as a password using the link provided below in the "Ballots" section.  If you have any questions regarding this process, you may reach out to Stretto for assistance by emailing spheratureinquiries@stretto.com.

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package.  Except as otherwise set forth herein, the Voting Record Date, the Solicitation Procedures and Voting Procedures shall apply to all of the Debtors' creditors and other parties in interest.

1.    *Voting Deadline*

The Voting Deadline is **October 8, 2021, at 4:00 p.m., prevailing Central Time**.  To be counted as a vote to accept or reject the Plan, a Ballot must be properly executed, completed, and delivered, whether by first class mail, overnight delivery, or personal delivery, so that the Ballot is **actually received** by the Notice and Claims Agent no later than the Voting Deadline.

2.    *Voting Instructions*

As described above, the Debtors have retained Stretto to serve as the Notice and Claims Agent for purposes of the Plan.  Stretto is available to answer questions, provide additional copies of materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

| BALLOTS |
|---|
| To be counted, all Ballots must be **actually received** by Stretto by the Voting Deadline, which is **October 8, 2021, at 4:00 p.m., prevailing Central Time**, at the following address: |

| **If by First Class Mail, Hand Delivery or Overnight Mail Ballots must be sent to:** | **If by Electronic Ballot:** |
|---|---|
| **Spherature Ballot Processing c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602** | **To submit your Ballot via the Voting Agent's E-Ballot portal, visit https://balloting.stretto.com/.** |

54

> If you have any questions on the procedure for voting on the Plan, please call the
> Debtors' restructuring hotline maintained by Stretto:
> (855) 205-7196 (U.S. and Canada) or (949) 537-2232 (International).
> Alternatively, you mail email to spheratureinquiries@stretto.com.

More detailed instructions regarding the procedures for voting on the Plan are contained in the Ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must either be submitted through the online E-Ballot portal maintained by Stretto or returned in hard copy and be properly executed, completed, and delivered according to their applicable voting instructions so that the Ballot is **actually received** by Stretto no later than the Voting Deadline at the return address set forth above and in the applicable Ballot. Any Ballot that is properly executed by the Holder of a Claim entitled to vote, but does not indicate an acceptance or rejection of the applicable Plan or indicates both acceptance and rejection of the plan shall be deemed to be an acceptance of the Plan. Any Ballot that is not sent to Stretto will not be counted. For all of the applicable procedures you should review the Voting Procedures set forth in the Disclosure Statement Order.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim in a Voting Class held by such Holder. By signing and returning a Ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked. It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

3. *Ballots Not Counted*

No Ballot will be counted if, among other things: (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (ii) it was transmitted by means other than as specifically set forth on the Ballot(s); (iii) it was cast by a Holder that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed, and for which the applicable claims bar date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection or dispute pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to any party other than the Notice and Claims Agent; (vii) it is unsigned (if returned by mail) or improperly submitted through the E-Ballot portal maintained by the Notice and Claims Agent; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

G. Confirmation Objection Deadline

Parties must object to Confirmation of the Plan by **October 11, 2021, at 4:00 p.m., prevailing Central Time** (the "Confirmation Objection Deadline"). All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors, the Committee, and the United

States Trustee so that they are **actually** **received** on or before the Confirmation Objection Deadline.

H.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  The Bankruptcy Court has scheduled the Confirmation Hearing for **October 12, 2021, at 10:00 a.m., prevailing Central Time**.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and solicitation procedures.  Any objection to the Plan and the Disclosure Statement must (1) be in writing; (2) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (3) state the name, address, phone number, and e-mail address of the objecting party; (4) state the amount and nature of the Claim or Interest of such objecting party, if any; (5) state with particularity the basis and nature of any objection to the Plan and/or Disclosure Statement, and, if practicable, a proposed modification to the Plan and/or Disclosure Statement that would resolve such objection; and (6) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the Debtors' undersigned counsel, the Committee, and the U.S.  Trustee on or before the Confirmation Objection Deadline.  Unless an objection to the Plan and/or Disclosure Statement is timely served and filed, it may not be considered by the Bankruptcy Court.

I.    Confirmation Standards

At the Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code, and the Disclosure Statement satisfies the requirements of section 1125 of the Bankruptcy Code.  The Debtors believe that the Plan and the Disclosure Statement satisfy or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (1) made before the confirmation of the Plan is reasonable; or (2) is subject to

the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

• With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Plan Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  With respect to each Class of Interests, each Holder of an Impaired Interest will have accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Plan Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

• Each Class of Claims that is entitled to vote on the Plan will have either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.

• Except with respect to Professional Fee Claims, or as otherwise set forth herein, subject to the provisions of §§ 327, 330(a), and 331 of the Bankruptcy Code, and except to the extent that a holder of an Allowed Administrative Claim and, as applicable, the Debtors or the Liquidating Trustee, agree to less-favorable treatment or such holder has been paid by any applicable Debtor prior to the Effective Date, the Debtors or the Liquidating Trustee shall pay each holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash, which payment shall be made (x) in the ordinary course of business; or (y) on the later of (i) the Effective Date and (ii) the date on which such Administrative Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter) with a Cash Distribution; *provided*, *however*, that any Allowed Administrative Claim that has been expressly assumed by the Purchaser under the Plan or the Sale Transaction Documentation shall not be an obligation of the Debtors, the Estates, or the Liquidating Trust

• At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

• Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial restructuring of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or restructuring.

• The Debtors have paid or the Plan provides for the payment of the required fees pursuant to 28 U.S.C. § 1930.

    1.    *Best Interests of Creditors Test—Liquidation Analysis*

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each

Holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such Holder with a recovery that has a value at least equal to the value of the recovery that each such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code beginning on what would have been the Plan Effective Date. Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Plan Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under chapter 7 beginning on the Plan Effective Date.

The Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. After accounting for administrative expenses, unsecured creditors (including any secured creditors' deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will be liquidated through the Sale Transaction and the Plan effects a liquidation of the Debtors' remaining assets through the Liquidating Trust. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to holders of First Lien Secured Claims and Allowed General Unsecured Claims than would a chapter 7 liquidation. Liquidating the Debtors' Estates under the Plan likely provides holders of the Secured Claim of MCA as Collateral Agent on Behalf of the Secured Parties and Allowed General Unsecured Claims with a larger, more timely recovery primarily due to the expectation of materially lower realized sale proceeds in chapter 7.

A chapter 7 liquidation beginning on what would have been the Plan Effective Date would provide less recovery for creditors than the Plan. The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee would not have the technical expertise or knowledge of the Debtors' business that the Debtors had when they proposed to sell their assets pursuant to the Plan. Moreover, the distributable proceeds under a chapter 7 liquidation would be lower because of the chapter 7 trustee's fees and expenses.

Sale proceeds in chapter 7 would likely be significantly lower particularly in light of the time delay associated with the chapter 7 trustee's learning curve for these assets. In addition to the expected material reduction in sale proceeds, recoveries would be further reduced (in comparison

58

with those provided for under the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' technical assets, and these specific Chapter 11 Cases, in order to complete the administration of the Debtors' Estates. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

In a chapter 7 liquidation, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case. Moreover, the conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries relative to those available under the Plan.

Attached hereto as **Exhibit B** is a Liquidation Analysis prepared by the Debtors and their professionals for use in projecting recoveries and distributions under the Plan. The Liquidation Analysis, the figures reported therein, and the methodology used to create the Liquidation Analysis are subject to the "Disclaimer" provided in this Disclosure Statement.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in materially reduced sale proceeds, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

2.   *Financial Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation or the need for further financial restructuring, unless the plan contemplates such liquidation or restructuring. The Plan provides for the sale of the Debtors' businesses. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

J.   Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan either: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—(A) cures any such default that occurred before or after the commencement of the case under title 11, other than a default of a kind specified in section

59

365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan. Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or to reject a plan. Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of creditors or interests.

Claims in Class 1 are Unimpaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan. Holders of Claims in Class 2 are disputed and not entitled to vote, and Claims and Interests in Classes 9, 10, and 11 will receive no distribution under the Plan and are, therefore, deemed to have rejected the Plan.

Claims in Classes 3 through 7 are Impaired under the Plan, and as a result, the Holders of Claims in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed <u>without</u> application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described directly below. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

K.     Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan; *provided* that the plan is accepted by at least one impaired class (without regard to the votes of insiders). Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

1.   *No Unfair Discrimination*

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent but that such treatment be "fair." In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.,* classes of the same legal character). The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

2.   *Fair and Equitable Test*

The fair and equitable test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class. As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement because there is no Class receiving more than 100 percent of the amount of the Allowed Claims in such Class, and no Class that is junior to a dissenting Class that will receive or retain any property on account of the Claims or Interests in such junior Class.

(a)   *Secured Claims*

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the Plan Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

(b)   *Unsecured Claims*

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that the plan provides either: (i) that each holder of a claim of such class receives or retains on account of such claim property of a value, as of the Plan Effective Date of the plan, equal to the allowed amount of such claim; or (ii) no holder of any claim or any interest that is junior to the claims of such class will receive or retain any property under the plan on account of such junior claim or junior interest.

61

(c)   *Interests*

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that the plan provides that either:  (i) each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the Plan Effective Date of the plan, equal to the greater of:  (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (ii) that no holder of any interest that is junior to the interests of such class will receive or retain any property under the plan on account of such junior interest.

# ARTICLE VIII.
## SECTION 363 SALE

A.   Debtors Will Seek Sale of Substantially All of the Debtors Assets If the Plan Is Not Confirmed

If the Debtors are unable to confirm the Plan, the Debtors will treat this Disclosure Statement as a motion seeking entry of an order approving the sale and assignment of substantially all of the Debtors assets free and clear of liens, claims, interests, and encumbrances, as set forth in the Plan, and authorizing the assumption and assignment of certain executory contracts and unexpired leases associated with the assets to the Purchaser pursuant to § 363 of the Bankruptcy Code.  If the Debtors seek approval of the sale, the Debtors will request that the Confirmation Hearing be utilized as the sale hearing (the "Sale Hearing").  The Court is authorized pursuant to sections 105(a), 363(b), 364, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006, 9007, 9014, and Local Rule 9013-1 to grant this relief.

Pursuant to the Topping Bid Procedures, parties may submit a bid for the purchase and sale of substantially all of the Debtors' assets (the "Assets").  Any assets not sold pursuant to the M&A Process will be retained by the Debtors and be available to sell to another bidder or subject to a different chapter 11 plan, which will be proposed and solicited by the Debtors.

For various reasons, if the Plan is not confirmed, the expedited sale of the Assets is the best possible way to maximize value for all stakeholders.  The Debtors have been marketing the Assets since the beginning of these cases and potential bidders have sufficient information to evaluate the Assets and submit a bid pursuant to the Topping Bid Procedures that the Debtors had approved by the Court through the Disclosure Statement Order.

B.   Form and Manner of the Auction and Related Notices is Adequate

Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c)(1), such notice must include the time and place of the applicable auction and Sale Hearing and the deadline for filing any objections to the relief requested herein. The Debtors submit that notice of this information through this Disclosure Statement as provided for herein and in the Disclosure Statement Order, constitutes good and adequate notice of the auction(s), the Sale Hearing(s) and the proceedings with respect thereto in compliance with, and in satisfaction of, the applicable requirements of Bankruptcy Rules 2002, 6004, and 6006.

DM_US 180458543-6.114823.0011

Moreover, adequate and reasonable notice of the Sale Transaction will have been provided through the service of this Disclosure Statement more than twenty-one (21) days prior to the Sale Hearing.

C.    Approval of the Sale Transaction is Appropriate and in the Best Interests of the Debtors' Estates

Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate "some articulated business justification," as established by the Second Circuit in *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983), which decision has been adopted in this circuit. *In re ASARCO, L.L.C.*, 650 F.3d 593, 603 (5th Cir. 2011) (upholding order entered under the business judgment standard); *see also Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"). Once the Debtors articulate a valid business justification, "[t]he business judgment rule . . . 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a Debtor's management decisions.").

The Debtors have a sound business justification for selling the Assets pursuant to a competitive-bidding process consistent with the Topping Bid Procedures. Based on an analysis of the Debtors' ongoing and future business prospects, the Debtors concluded that a sale of the Assets pursuant to a competitive-bidding process would likely be the best way to maximize recoveries for creditors in connection with the Debtors' restructuring efforts in these Chapter 11 Cases.

The Debtors submit that a Successful Bid resulting from the Bid Procedures will constitute the highest and/or best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to sell the Assets pursuant to a competitive-bidding process as provided for in the Bid Procedures is a valid and sound exercise of the Debtors' business judgment. The Debtors believe that they have proposed a fair process for obtaining the highest and/or best offer and sale of the Assets for the benefit of the Debtors' estates and their creditors. The fairness and reasonableness of the consideration to be received by the Debtors will be demonstrated by a "market check" through the process outlined in the Bid Procedures.

D.    The Sale Transaction(s) Has Been Proposed in Good Faith and Without Collusion, and Each Successful Bidder Will Be a "Good Faith Purchaser."

Pursuant to section 363(m)[8] of the Bankruptcy Code, a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *O'Dwyer v. O'Dwyer (In re O'Dwyer)*, 611 Fed. App'x 195, 200 (5th Cir. 2015); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D.N.J. May 11, 2007); *see also In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders).

In other words, a party would have to show fraud or collusion between the successful bidder and the debtor-in-possession or trustee or other bidders to demonstrate a lack of good faith. An appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

The Debtors submit that the Purchaser will be a "good faith" purchaser within the meaning of section 363(m) and the terms of the purchase agreement with the Purchaser will be negotiated at arm's-length and in good faith without any collusion or fraud. The Topping Bid Procedures are designed to produce a fair, transparent, and competitive bidding process. All parties in interest will have an opportunity to evaluate and object, if necessary, to any particular party's conduct or the satisfaction of the requirements of section 363(m) of the Bankruptcy Code. Accordingly, the Debtors will be prepared to show, at the Sale Hearing to approve any Sale Transaction that the Purchaser is entitled to the full protections of section 363(m) and will seek a finding that any Successful Bidder is a good faith purchaser and is entitled to the full protections of the Bankruptcy Code.

E.   The Sale Transaction(s) Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.

Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges, and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). As section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f). *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec.

---

[8] Section 363(m) provides that:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied."). The Debtors believe that they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

The Court may also authorize the sale of a debtor's assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) did not apply. *See In re Ditech Holding Corp.*, 606 B.R. 544, 591 (Bankr. S.D.N.Y. 2019) ("[P]lan sales can be free and clear of claims without invoking section 363(f)."); *In re Trans World Airlines. Inc.*, No. 01–0056, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("[B]ankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of section 363(f)."); *see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

F.     Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Approved.

Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports the assumption or rejection. *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 524–25 & n.5 (5th Cir. 2004); *In re Gucci*, 193 B.R. 411 (S.D.N.Y. 1996); *In re Pisces Energy, LLC*, No. 09- 36591H5-11, 2009 WL 7227880, *6 (Bankr. S.D. Tex. Dec. 21, 2009). Under the business judgment test, a court should approve a debtor's proposed assumption of executory contracts if such assumption will benefit the estate. *In re Pisces Energy*, 2009 WL 7227880, at *6; *In re Gunter Hotel Assocs.*, 96 B.R. 696, 698 (Bankr. W.D. Tex. 1998); *In re Food City, Inc.*, 94 B.R. 91, 93–94 (Bankr. W.D. Tex. 1988). Any more exacting scrutiny would slow the administration of a debtor's estates, increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially. *See Richmond Leasing v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. Section 365(f) of the Bankruptcy Code specifically provides that contract provisions seeking to prohibit or limit assignment are unenforceable. *See* 11 U.S.C. § 365(f)(1); *see also In re Amidee Capital Grp., Inc.*, No. 10-20041, 2010 WL 5141276, at *6 (Bankr. S.D. Tex. Oct. 7, 2010) (treating such prohibitions or limitations as null and void under section 365(f)); *In re Office Prods. of Am., Inc.*, 140 B.R. 407 (Bankr. W.D. Tex. 1992) (provisions that work as a restriction on assignment of leases should be struck down); *In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he code generally favors free assignability as a means to maximize the value of the debtor's estate").

Section 365(f) provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *In re PRK Enters.*, 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999) (internal quotations omitted); *see also Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988); *In re Natco Indus.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that the debtor will thrive). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re PRK Enters.*, 235 B.R. at 603 ("The financial evidence presented by [assignee] demonstrates the likelihood that it has the financial capacity to perform its future obligations under the lease agreements and that its principal officers are serious in their commitment to rehabilitate this corporation."); *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it strong likelihood of succeeding).

The terms of the Topping Bid Procedures ensure that the Purchaser will have to demonstrate financial resources that are sufficient to perform under any desired 365 contracts it seeks to have assumed and assigned by the Debtors. Moreover, if necessary, the Debtors will adduce facts at the Sale Hearing or any other applicable hearing on any objection demonstrating the financial wherewithal of the Purchaser and their willingness and ability to perform under the desired 365 contracts to be assigned to them. The Sale Hearing therefore will provide this Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Purchaser to provide adequate assurance of future performance with respect to the desired 365 contracts to be assumed and assigned.

The Debtors respectfully submit that the proposed Topping Bid Procedures are appropriate and reasonably tailored to provide adequate assurance notice in the form of the assumption and assignment notice, including the proposed Cure Amounts, as defined in the Topping Bid Procedures, to be communicated pursuant thereto. The counterparties will then be given an opportunity to object to such Cure Amounts. If a contract objection is timely filed, such objection will be heard at the Sale Hearing or at a later hearing, in accordance with the Court's schedule.

Furthermore, to the extent that any monetary defaults exist under any desired 365 contracts, the Purchaser will cure any such defaults prior to or as part of the Debtors assuming and assigning the desired 365 contracts. Accordingly, the Debtors submit that implementation of the proposed assumption and assignment procedures is appropriate in these Chapter 11 Cases. The Debtors submit that this Court therefore should authorize the Debtors to assume and assign the desired 365 contracts as may be identified by the Purchaser in the Plan Supplement. In addition, to facilitate the assumption and assignment of the desired 365 contracts, the Debtors further request that the Court find that all anti-assignment provisions in the desired 365 contracts, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, are unenforceable under section 365(f) of the Bankruptcy Code.

DM_US 180458543-6.114823.0011

## ARTICLE IX.
## CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING

Holders of Claims entitled to vote should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.   Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims Under the Plan.

1.   *Actual Amounts of Allowed Claims May Differ from Estimated Amounts of Allowed Claims, Thereby Adversely Affecting the Recovery of Some Holders of Allowed Claims.*

The estimate of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan.

2.   *The Debtors May Not Be Able to Satisfy the Conditions Precedent to Consummation of the Plan.*

To the extent that the Debtors are unable to satisfy the conditions precedent to Consummation of the Plan, the Debtors may be unable to consummate the Plan and parties may terminate their support, financial or otherwise, for the Plan prior to the Confirmation or Consummation of the Plan. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

3.   *The Debtors Cannot State with Certainty What Recovery Will Be Available to Holders of Allowed Claims in the Voting Classes.*

The Debtors cannot know with certainty, at this time, the number or amount of Claims in the Voting Classes that will ultimately be Allowed and how the amount of Allowed Claims will compare to the estimates provided herein. For example, a number of Proofs of Claim may allege Claims in an unliquidated amount that will require future resolution, making the amount of any Allowed Claim based on such Proof of Claim entirely speculative as of the date of this Disclosure Statement. In addition, the Debtors are continuing to review the Proofs of Claim filed in their Chapter 11 Cases. As such, the estimated amount of Claims may materially change due to the Debtors' ongoing review. Accordingly, because certain Claims under the Plan will be paid on a pro rata basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Classes.

4.   *The Debtors Cannot Guaranty Recoveries or the Timing of Such Recoveries.*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims, including Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims, it is possible that the actual amount of such Allowed Claims is materially higher than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guaranty the timing of any recovery on an Allowed Claim.

5.   *Certain Tax Implications of the Debtors' Bankruptcy*

Holders of Allowed Claims should carefully review **Article X** of this Disclosure Statement, "Material United States Federal Income Tax Consequences," in regard to the tax implications of the Plan and the Chapter 11 Cases.

B.   Certain Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes:

1.   *Parties in Interest May Object to the Plan's Classification of Claims.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Furthermore, certain parties in interest, including the Debtors, reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim when such Claim is or may be subject to an objection or is not yet Allowed. Any Holder of a Claim that is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

2.   *Failure to Satisfy Vote Requirements.*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

3.    *The Debtors May Not Be Able to Secure Confirmation of the Plan.*

The Debtors will need to satisfy section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by a bankruptcy court that:  (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial restructuring unless such liquidation or restructuring is contemplated by the plan; and (iii) the value of distributions to non-accepting Holders of Claims and Interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. According to the Plan, there are various documents that must be in form and substance acceptable to the Debtors and/or the Purchaser.  If agreement cannot be reached on these documents, Confirmation of the Plan may not occur.  Further, if the requisite acceptances are not received, the Debtors may seek to accomplish an alternative restructuring and obtain acceptances to an alternative plan of reorganization for the Debtors, or otherwise, that may not have the support of the Holders of Allowed Claims and Allowed Interests and/or may be required to liquidate these Estates under chapter 7 or 11 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the Debtors' proposed procedures for the solicitation of Ballots from Holders of Allowed Claims, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.  If the Plan is not Confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such a less favorable treatment may include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4.    *Failure to Consummate the Plan.*

As of the date of this Disclosure Statement, there can be no assurance that the conditions to Consummation of the Plan will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the Restructuring Transactions completed.

5.    *Nonconsensual Confirmation.*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes.  The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.   In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

6.    *Risk of Non-Occurrence of the Plan Effective Date.*

Although the Debtors believe that the Plan Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether such an Plan Effective Date will, in fact, occur.

7.    *Compliance with the Cash Collateral Order.*

The Debtors cash collateral, as defined in 11 U.S.C. § 363 is only authorized through October 11, 2021.  There can be no assurance that MCA will extend cash collateral consensually and the Court may not authorize further use of Cash Collateral, which may result in the inability of the Debtors to consummate the Plan.

8.    *Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims and Allowed Interests to be subordinated to other Allowed Claims and Allowed Interests.   The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

9.    *The Debtors May Lack Sufficient Liquidity to Satisfy Certain Priority and Administrative Claims in Full in Cash.*

It is possible that Allowed Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, Professional Compensation Claims and the costs of the wind down may exceed the funding available with respect to such Claims, in which case the Plan will not become effective.

10.    *Releases, Injunctions, and Exculpations Provisions May Not Be Approved.*

DM_US 180458543-6.114823.0011

Article IX of the Plan provides for certain releases, injunctions, and exculpations.  However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

11.    *The Closing Conditions of the Sale Transaction May Not Be Satisfied.*

It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction, which would prevent the Debtors from consummating the Plan.  If this occurs, the Chapter 11 Cases may be converted to cases under chapter 7 or dismissed.

C.    Disclosure Statement Disclaimer

1.    *The Financial Information Contained in this Disclosure Statement Has Not Been Audited.*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained in this Disclosure Statement and attached hereto is without inaccuracies.

2.    *Information Contained in this Disclosure Statement Is for Soliciting Votes.*

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.    *This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.*

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

4.    *This Disclosure Statement May Contain Forward Looking Statements.*

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology.  All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

5.   *No Admissions Made.*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims, or any other parties in interest.

6.   *Failure to Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Plan Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

7.   *No Waiver of Right to Object or Right to Recover Transfers and Assets.*

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates are specifically or generally identified in this Disclosure Statement.

8.   *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

9.   *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.   *No Representations Outside this Disclosure Statement Are Authorized.*

DM_US 180458543-6.114823.0011

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors.

D.    Liquidation Under Chapter 7.

If no chapter 11 plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation could have on the recoveries of Holders of Claims and the Debtors' liquidation analysis is set forth in **Article VII.I.1** of this Disclosure Statement entitled "Best Interests of Creditors Test—Liquidation Analysis."

**ARTICLE X.**
**MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

The following discussion is a summary of certain United States ("U.S.") federal income tax consequences of the consummation of the Plan to the Debtors, the Purchaser, and to certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims or Interests in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax exempt organizations, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims or Interests, or the Purchaser Stock or any other consideration to be received under the Plan, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes

73

that Holders of Claims hold only Claims in a single Class and holds Claims or Interests as "capital assets" (within the meaning of section 1221 of the IRC). This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan). This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

A.     Federal Income Tax Consequences to Claimants

        In general, a Holder of a Claim should recognize gain or loss equal to the amount realized under the Plan in respect to its Claim less the amount of such holder's basis in its Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss, or ordinary income or loss, depending upon the nature of the Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a discount. If the Holder realizes a capital loss, its deduction of the loss may be subject to limitations under the Tax Code. The holder's aggregate tax basis for any Distribution received under the Plan generally will equal the amount realized. The amount realized by a holder generally will equal the sum of the Distribution the holder received less the amount (if any) allocable to Claims for interest.

B.     Tax Withholding

        For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

C.     **Disclaimers**

        **PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS. THE DEBTORS MAKE THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THAT THEY MAY WISH TO CONSIDER. THE DEBTORS CANNOT, AND DO NOT, REPRESENT THAT THE TAX CONSEQUENCES MENTIONED ABOVE ARE COMPLETELY ACCURATE BECAUSE, AMONG OTHER THINGS, THE TAX LAW EMBODIES MANY COMPLICATED RULES THAT MAKE**

DM_US 180458543-6.114823.0011

IT DIFFICULT TO STATE ACCURATELY WHAT THE TAX IMPLICATIONS OF ANY ACTION MIGHT BE.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, THE DEBTORS INFORM ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT THAT ANY U.S. TAX INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING THE EXHIBITS HERETO) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (A) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE, OR (B) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

## ARTICLE XI.
## RECOMMENDATION OF THE DEBTORS

**In the opinion of the Debtors, the Plan is extremely preferable to any potential alternatives described in this Disclosure Statement because the Plan provides for a larger distribution to the Holders of Allowed Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.** In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan. **Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.**

Respectfully Submitted,

Dated: September 6, 2021

/s/ Marcus A. Helt

Marcus A. Helt, Esq. (Texas Bar #24052187)
Jack G. Haake, Esq. (Admitted *Pro Hac Vice*)
**MCDERMOTT WILL & EMERY LLP**
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201
Tel:   (214) 210-2821
Fax:   (972) 528-5765
Email: mhelt@mwe.com
Email: jhaake@mwe.com

***COUNSEL TO THE DEBTORS***
***AND DEBTORS-IN-POSSESSION***