Page 1

1          IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE EASTERN DISTRICT OF TEXAS
2                    SHERMAN DIVISION

3    IN RE:                    )
     SPHERATURE INVESTMENTS    )   Chapter 11
4    LLC, et al.               )
                               )   CASE NO. 20-42492
5    ------------------------- )
                               )
6    SPHERATURE INVESTMENTS    )
     LLC, et al. d/b/a WORLD   )
7    VENTURES HOLDINGS, LLC,   )
          Plaintiff,           )
8                              )
     VS.                       )   Adversary No. 21-04058
9                              )
     KENNETH E. HEAD,          )
10        Defendant.           )

11

12

13

14      ---------------------------------------------

15       ORAL, VIDEOTAPED AND VIDEOCONFERENCED

16                   DEPOSITION OF

17                  MICHAEL POATES

18          AS CORPORATE REPRESENTATIVE

19                  March 10, 2021

20                    VOLUME 1

21     (Reported remotely in Denton County, Texas)

22      ---------------------------------------------

23

24

25

Michael Poates - As Corporate Representative Vol 1
March 10, 2021                                    2 to 5

## Page 2

1        ORAL, VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION OF

2   MICHAEL POATES AS CORPORATE REPRESENTATIVE, produced as

3   a witness at the instance of the Defendant, was taken in

4   the above-styled and numbered cause on March 10, 2021,

5   from 12:57 p.m. to 2:04 p.m., before Jamie K. Israelow,

6   Certified Shorthand Reporter in and for the State of

7   Texas, Registered Merit Reporter and Certified Realtime

8   Reporter, reported by machine shorthand, with the

9   witness appearing remotely at the offices of Foley &

10  Lardner, LLP, located at 2021 McKinney Avenue, Suite

11  1600, in the City of Dallas, County of Dallas and State

12  of Texas, Regarding the COVID-19 Disaster status, and

13  the provisions stated on the record or attached hereto;

14  that the deposition shall be read and signed before any

15  notary public.

16

17

18

19

20

21

22

23

24

25

## Page 3

1                   REMOTE APPEARANCES

2

3   FOR THE PLAINTIFF:

4       Mr. Robert Slovak
        Mr. Steven C. Lockhart

5       Mr. Brandon C. Marx
        FOLEY & LARDNER, LLP

6       2021 McKinney Avenue, Suite 1600
        Dallas, Texas  75201

7       214.999.4334
        214.999.4668

8       214.999.4754
        rslovak@foley.com

9       slockhart@foley.com
        bmarx@foley.com

10

11  FOR THE DEFENDANT:

12      Mr. Todd A. Hoodenpyle
        SINGER & LEVICK, P.C.

13      16200 Addison Road, Suite 140
        Addison, Texas  75001

14      972.380.5533
        hoodenpyle@singerlevick.com

15

16

17  ALSO PRESENT:

18      Mr. Eric Haynes
        Ms. Beth Levine

19      Mr. Kenneth E. "Eddie" Head
        Mr. Bill Hartley, Videographer

20

21

22

23

24

25

## Page 4

1                          INDEX

                                                    PAGE
2   Appearances                                        3

3   Stipulations                                       5

4   MICHAEL POATES AS CORPORATE REPRESENTATIVE
        EXAMINATION BY MR. HOODENPYLE                  5

5

6
    Corrections and Signature                         52
7   Reporter's Certificate                            54

8

9
    (Exhibits provided electronically to the reporter
10    and only the exhibits referred to are attached)

11                        EXHIBITS
12  NO.        DESCRIPTION                           PAGE

13  Exhibit 6   E-mail chain, top e-mail dated         38
                January 8, 2021, to John Kelly and
14              others from Eddie Head

    Exhibit 7   E-mail chain, top e-mail dated         41
15              January 8, 2021, to Boaz Yadin and
                John Kelly from Izhak Ben Shabat

16  Exhibit 23  E-mail chain, top e-mail dated         13
                10/7/2020, to Eddie Head from
17              Izhak Ben Shabat

    Exhibit 25  E-mail chain, top e-mail dated         21
18              10/20/2020, to Eddie Head and
                others from John Kelly

19  Exhibit 36  E-mail chain, top e-mail dated         34
                11/16/2020, to Wayne Nugent and
20              others from Eddie Head

    Exhibit 53  Conference call invite, dated          24
21              October 23, 2020

    Exhibit 55  Plaintiffs' Objections and              8
22              Responses to Defendant's Corporate
                Representative Topics

23

24

25

## Page 5

1                  P R O C E E D I N G S

2            (On the record at 12:57 p.m.)

3            (Reporter's Note:  Due to the quality of a

4   Zoom videoconference and transmission of

5   data, audio distortion and audio freezes

6   make it more challenging to prepare a

7   transcript as opposed to one prepared

8   during in-person proceedings.)

9            (Witness presents government-issued

10           identification and identity verified.)

11           THE VIDEOGRAPHER:  Today is March 10th,

12  year 2021.  We're going on the record, 12:57 p.m.

13           THE REPORTER:  Same agreement under the

14  Federal Rules and swearing in remotely?

15           MR. HOODENPYLE:  Yes.

16           MR. SLOVAK:  Yes, ma'am.

17                     EXAMINATION

18  BY MR. HOODENPYLE:

19      Q.    Would you state your full name?

20      A.    Michael D. Poates.

21      Q.    How are you currently employed?

22      A.    Chief operating officer, Spherature.

23      Q.    And we're continuing a corporate representative

24  deposition.  You were present in the room when

25  Mr. Davies was testifying as a corporate representative

Page 6

1  for the debtors, correct?
2      A.   Yes.
3      Q.   And just some of the same understanding that I
4  had with him I'd ask to have with you; that when I'm
5  referring to WorldVentures, I'm referring to the
6  debtors.
7           Can we have that agreement?
8      A.   Yes.
9      Q.   And if I refer to the letter of in- -- the LOI
10 or the letter of intent, I'm referring to, I believe
11 it's the November 10th, 2020 letter of intent that
12 Mr. Nugent sent to Mr. Benshabat.
13          Can we have that agreement?
14     A.   Yes.
15     Q.   And then the LSA, I refer to the LSA, you
16 understand we're referring to the Limited Solicitation
17 Agreement, I believe it's dated November 11th, 2020?
18     A.   Yes.
19     Q.   And I understand that people also call it the
20 interim agreement.  So if we call it the interim
21 agreement, we're talking about the Limited Solicitation
22 Agreement?
23     A.   Understood.
24     Q.   How long have you been in the position of COO?
25     A.   Specifically to the WorldVentures entity?

Page 7

1      Q.   Yes.
2      A.   I'm just about to my one year anniversary.  I
3  think I'm a few days off from making it one full year.
4      Q.   So March of -- sometime in March of 2020?
5      A.   Correct.
6      Q.   And how were you employed prior to that?
7      A.   Consulting.
8      Q.   Individual consulting?
9      A.   Correct.
10     Q.   Did you consult for WorldVentures?
11     A.   No, I did not.
12     Q.   Okay.  And how long did you have your own
13 consulting business?
14     A.   Six years.
15     Q.   Okay.  Did you have any prior involvement with
16 WorldVentures before March 2020?
17     A.   No, I did not.
18     Q.   And who hired you at WorldVentures?
19     A.   Wayne Nugent.
20     Q.   Has Eddie Head ever reported to you?
21     A.   Technically for 24 hours, the very first day
22 that I was hired, I was hired as a CEO, and then we
23 converted that hire to COO and he reported directly to
24 Wayne from that point forward.
25     Q.   When did you convert from the CEO to COO?

Page 8

1      A.   Within 24 hours.
2      Q.   Okay.  So after you converted over to COO,
3  Eddie Head was then reporting to Wayne Nugent?
4      A.   That's correct.
5      Q.   Did that ever change?
6      A.   No.
7      Q.   You understand that you've been designated to
8  testify about certain subjects as a corporate
9  representative on behalf of WorldVentures?
10     A.   I do.
11     Q.   And we pulled up Exhibit Number 55 a while ago.
12 We can pull it up again for you, if you need to see it.
13          Have you seen Exhibit 55, with the
14 objections and responses that your attorney served
15 designating the subjects that you would testify on?
16     A.   I have reviewed it.  I'd like it pulled up on
17 the screen, please.
18     Q.   And you reviewed the topics before, correct?
19     A.   Correct.
20     Q.   All right.  Well, I'm showing you Exhibit
21 Number 55.
22          (Counsel displays document.)
23     Q.   (By Mr. Hoodenpyle)  Have you seen this exhibit
24 before?
25          MR. SLOVAK:  I've got a copy of it here.

Page 9

1  We can make it easier.
2          MR. HOODENPYLE:  Yeah.  I'm not going to
3  spend any time on it.  I assume he's seen it and know
4  what topics he's designated on.
5          MR. SLOVAK:  Yes.
6      Q.   (By Mr. Hoodenpyle)  All right.  You've seen
7  the topics you're designated on, correct?
8      A.   Yes, sir.
9      Q.   So did Wayne Nugent, does he report to you?
10     A.   No.
11     Q.   Did you report to Wayne Nugent?
12     A.   Correct.
13     Q.   You reported to Wayne Nugent?  Sorry.  I didn't
14 hear you.
15     A.   Yes, sir.
16     Q.   So 24 hours after you were hired, both you and
17 Mr. Head were reporting to Mr. Nugent; is that safe --
18 is that fair to say?
19     A.   Yes.
20     Q.   Okay.  So about the time you were hired was
21 about the time the COVID-19 pandemic hit and that had a
22 pretty big impact on WorldVentures' business; is that
23 true?
24     A.   Yes, it is.
25     Q.   What was the reason why Mr. Nugent brought you

Page 10

1  on?

2      A.   To develop the company, steer through the
3  crisis of the pandemic.

4      Q.   At some point, you learned that WorldVentures
5  and Seacret were having some communications in 2020; is
6  that right?

7      A.   Correct.

8      Q.   When did you first learn that?

9      A.   I believe it was September.

10     Q.   Okay.  So you had no involvement with the
11 Co-Marketing Agreement?

12     A.   Yes.  I was a reviewer of that agreement.

13     Q.   Okay.  You were not involved in negotiating the
14 agreement, the Co-Marketing Agreement?

15     A.   Generally, no.

16     Q.   All right.  What input did you have on the
17 Co-Marketing Agreement during the negotiation?

18     A.   I was a broad CC as red line copies to the
19 organization.

20     Q.   Well, you heard Mr. Davies' testimony that,
21 basically, a team of people that had eyes on it,
22 including Wayne Nugent, Eddie Head, Mr. Davies, you,
23 inside counsel and outside counsel.

24          Do you recall that?

25     A.   Yes.  I do not recall the outside counsel that

Page 11

1  participated on our end.

2      Q.   Okay.  But was there outside counsel that did
3  participate?

4      A.   It's my understanding that we did have outside
5  counsel on -- on the other side of the turn, but on our
6  turn, it was just Eric Haynes, to my knowledge.

7      Q.   Did you learn a couple of months after the
8  Co-Marketing Agreement was signed that Izhak Benshabat
9  and Seacret wanted out of the Co-Marketing Agreement?

10     A.   Yes.

11     Q.   What's your understanding of why Mr. Benshabat
12 and Seacret wanted out of the Co-Marketing Agreement?

13     A.   I believe they wanted out of the agreement
14 because they found out the company was insolvent.

15     Q.   And what's your answer based on?

16     A.   Personal discussion with Izhak Benshabat.

17     Q.   Okay.  When was that discussion?

18     A.   I believe it was the 8th of October.

19     Q.   Are you the one that told Mr. Shabat that
20 WorldVentures was virtually insolvent?

21     A.   Correct, yes, I was.

22     Q.   Why did you tell him that?

23     A.   It was my job as -- as the senior officer.  I
24 felt that I had an obligation to inform him.  I was not
25 aware if there were any underlying discussions that were

Page 12

1  going on with him at that point except for the
2  Co-Marketing Agreement.  I was actively looking for
3  investors to support a work-out plan, a POR, through our
4  363, our anticipated bankruptcy, and thought that based
5  on the indisputable ^ ck opportunity in the Co-Marketing
6  Agreement, that he offered an excellent opportunity as
7  an investor into the platform, and we had a discussion
8  relative to that.  The business and the insolvency came
9  up in that discussion.

10     Q.   When did you start considering filing a
11 bankruptcy and pursuing a 363 sale?  When is the first
12 time that you had thought about that?

13     A.   Immediately.

14     Q.   In March?

15     A.   In my -- in my head, yes, sir.

16     Q.   What did you do to prepare for your deposition
17 today?

18     A.   Reviewed the filings.

19     Q.   Did you have any discussions with anyone?

20     A.   Yes, sir.

21     Q.   Who?

22     A.   Counsel.

23     Q.   Anyone else?

24     A.   Wayne Nugent.

25     Q.   Anyone else?

Page 13

1      A.   Not that I can recall.

2      Q.   When did you discuss with Wayne Nugent?

3      A.   Last night.  He --

4      Q.   Go ahead.

5      A.   Yesterday.  Yesterday evening.

6      Q.   Okay.  And what did you and Mr. Nugent discuss?

7      A.   Mr. Nugent was on the speakerphone talking to
8  the room generally providing additional information and
9  purview into the discussions he had relative to the
10 negotiations of the LOI, the interim solicitation
11 agreement, and additionally, his hope for a successful
12 Asset Purchase Agreement.  I did not have any discussion
13 personally with Wayne except for thanking him for his
14 time.

15     Q.   Who else was on -- who else was on the call?

16     A.   Simon Davies, Eric Haynes, Rob Slovak -- excuse
17 me, and Wayne, of course.  I'm sorry.

18          And I believe Wayne's counsel.

19          (Counsel displays document.)

20     Q.   (By Mr. Hoodenpyle)  I'm showing you what's
21 marked as Exhibit 23.  And this is an e-mail string
22 between Izhak Benshabat, Eddie Head, Wayne Nugent and
23 Michael Poates.  I'll go down to the first e-mail, an
24 e-mail on October 6th from Mr. Benshabat to Wayne and
25 Eddie, it looks like.

**Page 14**

1   And in the second paragraph, he says: We
2   knew the company was in a financial challenge, but we
3   also understand now, it's on the verge of BK or
4   liquidation.
5   And you're the person that told him that?
6   MR. SLOVAK:  Objection.
7   A.   Correct.
8   Q.   (By Mr. Hoodenpyle)  What else did you and
9   Mr. Benshabat discuss in that call on or about
10  October 6th?
11  MR. SLOVAK:  Objection, form.
12  Q.   (By Mr. Hoodenpyle)  Can you answer?
13  A.   I'm asking if he had a desire to potentially
14  invest in the WorldVentures platform.  We discussed
15  that.  We discussed the opportunities that I think are
16  the upside of that investment.  That was generally the
17  discussion.
18  Q.   You had discussed with Mr. Benshabat before his
19  October 6th e-mail that the company was on the verge of
20  insolvency?
21  MR. SLOVAK:  Objection, form.
22  A.   Could you restate that?  I'm sorry.
23  Q.   (By Mr. Hoodenpyle)  You had discussed with
24  Mr. Benshabat that the company was on the verge of
25  insolvency before his October 6th e-mail?

**Page 15**

1   A.   Yes.  Let me take that back.  That's not the
2   case.  So before that e-mail, no.  My discussion with
3   him was on the date, if I recall correctly, so no.  That
4   would not have happened.
5   Q.   On the -- in the October 8th conversation, you
6   did confirm to him that the company was on the verge of
7   bankruptcy?
8   A.   Correct.
9   Q.   All right.  Did he tell you what the source of
10  his information was before your call as to the company
11  being on the verge of bankruptcy?
12  A.   No.
13  Q.   Do you know if Eric Haynes had had any
14  discussions with Mr. Benshabat before your October 8th
15  conversation about the company being on the verge of
16  insolvency?
17  A.   No.
18  Q.   All right.  And then shortly after that call,
19  the WorldVentures and Seacret began negotiating a letter
20  of intent or the LOI, right?
21  A.   Correct.
22  Q.   And the LOI was signed on November 10th.
23  What led to the -- what were the
24  circumstances leading to the negotiation of the letter
25  of intent?

**Page 16**

1   A.   It's my understanding that we had a
2   Co-Marketing Agreement in existence.  I believe that we
3   started to see quite a few of our members and reps
4   beginning to move to Seacret and leave our organization
5   in a critical time, and I believe that this agreement
6   was negotiated to help support that conveyance and to
7   help support the continued relationship providing the
8   reps with consumable products and holding, as you've
9   noted, as an interim document, to help us proceed to an
10  Asset Purchase Agreement.
11  Q.   Your testimony that before the letter of intent
12  was negotiated, WorldVentures' sales reps were leaving
13  to go to Seacret?
14  A.   My testimony is that before that negotiation
15  was executed, it's my belief -- it's my belief -- it was
16  our belief as a company that there was some level of
17  solicitation already occurring, and that agreement, I
18  think, was materialized to solve for the initial
19  solicitation that was occurring in an agreement that
20  didn't allow for that.
21  That second agreement by execution helped
22  support the continued solicitation of the team.
23  Q.   What's your -- your testimony that you believe
24  that there was solicitation going on already, what's
25  that based on?

**Page 17**

1   A.   It's based on my knowledge, understanding of
2   e-mails that I've reviewed, text messages that I've
3   reviewed in discovery process for this matter.  It's my
4   understanding, based on discussions that I've had with a
5   number of folks in our senior leadership team, and it
6   was a gut instinct.
7   Q.   Well, I haven't seen any e-mails before the
8   letter of intent talking about WorldVentures' sales
9   representatives going over to Seacret.  It's your
10  testimony that there was such an e-mail before the
11  letter of intent was negotiated that says that
12  WorldVentures or sales representatives were moving over
13  to Seacret?
14  A.   I didn't say that anybody had moved.  I told
15  you that I had a concern that that -- that folks would
16  move in that agreement, but that agreement opened up a
17  possibility that we would convey leadership, feel
18  leadership and members.  And there was no governance in
19  that agreement for that.  The -- the interim agreement
20  was designed, it's my understanding, to provide some
21  level of governance as far as who could be recruited and
22  who could be solicited and who could not.
23  Q.   Okay.  So -- well, you're talking about the
24  LSA.  I want to talk about the LOI right now, even
25  though they were at the same time.  But your testimony

Michael Poates - Ag Corporate Representative Vol 1
March 10, 2021                                          18 to 21

1  is what it is. I heard you testify that people were --
2  were being solicited and, now, it was just a concern.
3  You had a concern that people were being solicited. You
4  don't have any facts that anybody was actually solicited
5  before the letter of intent was negotiated and signed;
6  is that true?
7      A.   I had a concern that it could occur.
8      Q.   You didn't answer my question.
9           MR. HOODENPYLE:  Nonresponsive.
10     Q.   (By Mr. Hoodenpyle)  Do you have any facts to
11 support that there was actual solicitation going on
12 before the letter of intent was signed?
13     A.   Not at this time.
14     Q.   Who initiated the discussion of the letter of
15 intent?
16     A.   Eddie Head.
17     Q.   And what's the basis of your answer?
18     A.   We had a number of senior leadership meetings.
19 It was scheduled as a standing meeting. The letter of
20 intent, the Co-Marketing Agreement were vigorously
21 discussed in those meetings. That's how I came to
22 understand the existence.
23     Q.   So who raised those leadership meetings? Eddie
24 Head?
25     A.   Yes.

1      Q.   Okay. So he wasn't hiding it from everybody;
2  he was openly discussing it at leadership meetings; is
3  that right?
4      A.   Yes.
5      Q.   The debtors have alleged that Mr. Head was
6  solely responsible for negotiating the LOI and the LSA.
7           Is that your testimony today, that
8  Mr. Head was solely responsible for negotiating the
9  letter of intent?
10          MR. SLOVAK:  Objection, form.
11     Q.   (By Mr. Hoodenpyle)  On behalf of
12 WorldVentures?
13          MR. SLOVAK:  Objection.
14     A.   So my testimony is that while I felt that he
15 participated in the LOI and that he was very public
16 about that, I believe that the solicitation agreement,
17 he was solely responsible for. That's my testimony.
18          MR. HOODENPYLE:  Objection, nonresponsive.
19     Q.   (By Mr. Hoodenpyle)  My question, Mr. Poates,
20 was: Is it your testimony that Mr. Head was solely
21 responsible for negotiating the letter of intent on
22 behalf of WorldVentures?
23     A.   No. He was not --
24     Q.   Is it your -- is it your testimony today that
25 Eddie Head was solely responsible for negotiating the

1  Limited Solicitation Agreement?
2      A.   I believe so, yes.
3      Q.   What's your testimony based on that you believe
4  Eddie Head was solely responsible for negotiating the
5  solicitation agreement?
6      A.   Recovered direct communications with Eddie
7  Head.
8      Q.   Recovered direct communications between Eddie
9  Head and Izhak?
10          MR. SLOVAK:  Were you finished with your
11 answer?
12          THE WITNESS:  No.
13          MR. SLOVAK:  Finish your answer.
14     A.   Well, will you please ask the question prior so
15 that I can finish the answer that I was providing.
16     Q.   (By Mr. Hoodenpyle)  What recovered direct
17 communications are you referring to?
18     A.   Text communications.
19     Q.   And the basis for your belief that Eddie Head
20 is solely responsible on behalf of WorldVentures in
21 negotiating the LSA are these text messages?
22     A.   Yes.
23     Q.   All right. Have you reviewed a lot of -- have
24 you reviewed e-mails showing all the parties that
25 negotiated the LSA?

1      A.   Yes.
2      Q.   Okay. Well, let's go back to the LOI for a
3  second.
4           Who was involved in negotiating the LOI on
5  behalf of Seacret?
6      A.   I recall John Kelly. I recall Izhak. That's
7  all who I can recall at this point in time.
8      Q.   Okay. And who was involved in negotiating the
9  letter of intent on behalf of WorldVentures?
10     A.   Eddie Head, Wayne Nugent. Purview was provided
11 into that document and reviewed by our internal legal
12 team, Eric Haynes and subordinates. I, at times, was
13 copied as CC or as a reviewer.
14     Q.   Did outside counsel for WorldVentures review
15 and comment on the letter of intent?
16     A.   I don't recall.
17          (Counsel displays document.)
18     Q.   (By Mr. Hoodenpyle)  I'm showing you what's
19 been marked as Exhibit Number 25, and this is an e-mail
20 string that WorldVentures produced in this case, and
21 it's an e-mail string dated October 20th, starting at
22 the bottom e-mail whereby it looks like it starts at the
23 bottom of what is WV22534. It's an e-mail from Eddie
24 Head, copying -- or to Wayne Nugent and Izhak Benshabat
25 and copying boaz@secreatspa and Marvin Ruth. And this

Michael Poates - Corporate Representative Vol 1
March 10, 2021                                    22 to 25

Page 22

1 is about a priority call to kick off the business
2 relationship.  And is this one of the beginning e-mails
3 to discuss the letter of intent?
4       A.   I wasn't a party to that e-mail, so I can't --
5 it's hard --
6       Q.   You're testifying today -- you're testifying
7 today as a corporate representative, are you not?  And
8 you've been designated to talk about the negotiation of
9 the letter of intent.
10           Was this an e-mail that was kicking off
11 the conversation about the letter of intent?
12      A.   I can't validate that e-mail.  I was not a
13 party to that e-mail.
14      Q.   Well, you were the one designated to do it,
15 Mr. Poates, so --
16      A.   I understand.
17      Q.   You don't have to have personal knowledge as a
18 corporate representative.
19      A.   I understand.
20      Q.   It's validated by the Bates stamp that your
21 lawyers produced it from your -- your records.
22      A.   I will say that it looks to me that a
23 negotiation was going on relative to that agreement, and
24 it looks to me in the upper left-hand box, the folks
25 that were negotiating that agreement are noted.  I

Page 23

1 didn't receive a copy of that document and it's hard for
2 me to attest on a document that I have not received
3 personally or reviewed.
4           So in this particular document, while I
5 have looked it over, you're asking me to testify that
6 this was the absolute beginning of this relationship.  I
7 cannot do that.  I do not know what other communications
8 may lie outside of this document and could have occurred
9 possibly prior to the issuance of this document.  So,
10 therefore, I can tell you that the document looks
11 legitimate, but I do not know if that's the actual
12 document that was an inception document or the event --
13 horizon of the event.
14      Q.   Okay.  Well, you have an obligation as a
15 corporate representative to familiar yourself --
16 familiarize yourself with the facts.
17           So when did the negotiations for the
18 letter of intent begin?
19           MR. SLOVAK:  Objection, form.
20      A.   I don't have that knowledge.
21      Q.   (By Mr. Hoodenpyle)  You're the person
22 designated to testify to that.
23           What did you do to figure that out?
24      A.   There are a lot of facts and a lot of things in
25 my head.

Page 24

1       Q.   Okay.
2       A.   That's just a piece of information I just can
3 recall at the moment.
4       Q.   Who is the person with the most knowledge as
5 the corporate representative that could answer that,
6 Mr. Poates, since you don't know?
7            MR. SLOVAK:  Objection, form.
8       A.   I think it would have been Eddie Head.
9       Q.   (By Mr. Hoodenpyle)  Okay.  Well, he'll
10 certainly testify to it, but he's not at WorldVentures.
11           Who is the WorldVentures' representative
12 that can testify to it?
13           MR. SLOVAK:  Objection, form.
14      A.   I just don't know.
15      Q.   (By Mr. Hoodenpyle)  I'm going to share my
16 screen and show you Exhibit Number 53.
17           (Counsel displays document.)
18      Q.   (By Mr. Hoodenpyle)  This is Seacret
19 Number 5350.  This is some kind of a challenger.  The
20 organizer is Ray Balestri.  This is about the time that
21 the letter of intent of negotiations would have began
22 around October 20th or 23rd.
23           Would you agree with that?
24      A.   Yes.
25      Q.   Why do you disagree with my time frame as to

Page 25

1 when the letter of intent negotiations began?
2       A.   It's my understanding you were asking:  Was
3 that the initiating letter that began the negotiations?
4       Q.   I've asked you a different question now,
5 Mr. Poates.  I don't have but 30 minutes left of my
6 time, so I'd appreciate if you'd answer my question.
7            My question was:  Why do you dispute that
8 that time frame is not the time frame that the letter of
9 intent negotiations began?
10      A.   Because you're asking me to give you
11 information in absolutes based on an e-mail, right?
12           I do not know at this point in time if
13 there were other communications in other forms, formats
14 on other platforms that occurred prior to these
15 communications and e-mail.  So it looks reasonable from
16 a time frame because that's generally when I was made
17 aware that the negotiations were beginning.  However,
18 you can again see that I'm not copied.  It doesn't look
19 like, on this document hereto.
20      Q.   Okay.  Looking at Exhibit 53, the organizer of
21 this meeting was Ray Balestri and he's actually an
22 attorney, outside counsel for WorldVentures, correct?
23      A.   He is outside counsel.  I wouldn't say that he
24 is currently outside counsel for WorldVentures.
25      Q.   At the time that calendar was -- entry was

Page 26

1  made, he was outside counsel for WorldVentures; isn't
2  that true?
3      A.   That's correct.
4      Q.   So about the same time that the LOI was
5  negotiated, the parties were negotiating the Limited
6  Solicitation Agreement; is that correct?
7      A.   That's my understanding, correct.
8      Q.   All right.  So that the LOI was a proposal that
9  Mr. Nugent sent to Mr. Benshabat about a proposal for
10 Seacret to purchase the assets of WorldVentures'
11 business; is that true?
12     A.   Correct.
13     Q.   Okay.  Did -- did WorldVentures issue any LOIs
14 to anyone else at that time?
15     A.   Could you provide a little more clarity?
16 Specific -- LOI specific to the acquisition --
17 acquisition of the company?
18          Is that what you're asking for?
19     Q.   Mr. Poates, I'm asking whether or not at that
20 time, that time frame, and I'll just give you a little
21 bit of a broader time frame, so you don't have to
22 concern yourself too much with the dates, but let's just
23 say, from October 6th, the date that Mr. Benshabat said
24 that he's worried about a bankruptcy filing, until
25 November 10th, the date that the LOI was signed, did

Page 27

1  WorldVentures provide an LOI to any other entity?
2          MR. SLOVAK:  Objection, form.
3      A.   Not to my knowledge.
4      Q.   (By Mr. Hoodenpyle)  Did WorldVentures -- did
5  WorldVentures provide an LOI to any entity before the
6  date that you filed for bankruptcy on December 21st
7  other than Seacret?
8      A.   Not to my knowledge.
9      Q.   Sir, contemporaneously, WorldVentures and
10 Seacret were negotiating two agreements, one for a
11 potential purchase by Seacret, and then an interim
12 agreement that would allow WorldVentures' sales
13 representatives to start moving over to Seacret under
14 the interim agreement; is that right?
15     A.   That's not entirely correct, no.
16     Q.   Okay.  What's incorrect about that?
17     A.   So there was -- the discussion was that the
18 reps would be able to work at Seacret and sell the
19 consumable product line to generate revenue during a
20 period of time where travel had been curtailed by the
21 pandemic.  I would not say that that agreement allowed
22 them to just move over and leave the -- and leave us for
23 that agreement.  That was not the heart and spirit of
24 that agreement.  That's not my understanding.
25     Q.   Okay.

Page 28

1      A.   It gave them an opportunity to benefit the
2  folks who had been suffering with the pandemic, right,
3  that were not able to sell travel because the travel
4  market had been devastated, and so this consumable
5  product line offered that capacity to many of our reps.
6  And so our reps were allowed to go and sell the Seacret
7  product.  That's the -- that's the gist of the agreement
8  as far as I understand it.
9      Q.   Well, the next step in this series of
10 agreements was to enter into an asset purchase
11 agreement, right?
12     A.   Correct.
13     Q.   Okay.  So the sales reps were eventually all
14 going to move over under Seacret, right?
15          MR. SLOVAK:  Objection, form.
16     Q.   (By Mr. Hoodenpyle)  There's a point
17 negotiating an Asset Purchase Agreement where
18 the sale -- WorldVentures sales representatives were
19 then going to move over to Seacret where they could be
20 able to both sell Seacret's products and the travel
21 product, correct?
22     A.   No.
23     Q.   What's incorrect about what I just said?
24     A.   What's incorrect about it is, the APA that was
25 being negotiated in any form never had any discussion

Page 29

1  relative to purchase of the Rovia asset.  Rovia asset
2  was set up as a reversion annuity or reverse back into
3  the estate.  There were different timelines discussed
4  back in the agreement and that's the first part of my
5  answer.
6          The second part of my answer was, just
7  because in good faith, you begin the discussion of an
8  Asset Purchase Agreement, by no means does that preclude
9  that that agreement will occur and that it's a done
10 deal.  And the spirit of the agreement was, the
11 solicitation agreement was marked as an interim
12 agreement allowing the brand enough time to put this
13 business into bankruptcy where it belongs.  And then
14 through Section 363, and with the approval of Honorable
15 Judge Rose, we would proceed with an approved asset
16 purchase agreement likely if -- as a stock force for the
17 company.  So that's generally where we were at with that
18 transaction.
19     Q.   Okay.  Well, under -- under your first point,
20 Rovia, they don't -- they don't own the database, right?
21 They don't own the sales representatives.  They do the
22 fulfillment, correct?
23     A.   Correct.
24     Q.   Okay.  So under the interim agreement, Seacret
25 had the right to sign up its sales representatives and

Page 30

1  move them over to Seacret's database; isn't that true?
2             MR. SLOVAK:  Objection, form.
3      A.  They had the right to -- they had untethered
4  access to the database to -- so that they could recruit
5  the -- the reps who wanted to participate in selling a
6  consumable product line.  That -- that is the agreement
7  in my eyes.  The agreement wasn't a forced migration of
8  our reps to the Seacret platform by no means.
9      Q.  (By Mr. Hoodenpyle)  Okay.  Well, nobody said
10  it was, Mr. Poates.  So if you could just answer my
11  question:  Rovia was a fulfilment platform.  It doesn't
12  own the downline, correct?
13      A.  Yes.
14      Q.  Okay.  And the downline, the interim agreement
15  provided the downline to move over from WorldVentures.
16  In fact, WorldVentures provided their downline database
17  information to Seacret, as Mr. Davies testified earlier,
18  the CPO provided that, correct?
19      A.  You're not correct.  The CPO participated in
20  providing the actual signatory for the conveyance of
21  that intellectual property that came from Wayne W.
22  Nugent.  He provided the approval for the conveyance of
23  that information.
24      Q.  Okay.  Well, Mr. Nugent provided the approval
25  and the CPO actually did the work to do it, right?

Page 31

1      A.  Correct.
2      Q.  Okay.  So let's see.  So Section 1.5 of the
3  interim agreement has a provision that Seacret could not
4  solicit WorldVentures' employees; is that true?
5      A.  Correct.
6      Q.  And who was involved in negotiating the LSA on
7  behalf of Seacret?
8      A.  Izhak, their attorney, John Kelly, at that --
9  and internally -- yes.  So from Seacret's side, the
10  folks that I am aware of that I can speak to right now
11  would be John Kelly and Izhak.
12      Q.  Okay.  And who was involved in negotiating
13  Limited Solicitation Agreement on behalf of
14  WorldVentures?
15      A.  Eddie Head, Wayne Nugent, with purview from our
16  legal department, Eric Haynes and team, with myself on a
17  number of the communications as a CC, not all the
18  communications, as demonstrated earlier.
19      Q.  Okay.  So -- but you had a hand in the
20  negotiation or seen the document, correct?
21      A.  I had a hand in seeing the documents.
22      Q.  Okay.  And who was the internal legal that was
23  involved in the negotiation of the LSA?  Eric Haynes?
24      A.  Eric Haynes.  And I think there were some
25  reviews by Steven Rains, who is a subordinate of Eric's.

Page 32

1      Q.  Okay.  Who was outside counsel for
2  WorldVentures that was involved in the negotiation of
3  the LSA?
4      A.  I don't recall.  I don't recall outside counsel
5  entering in until negotiations began on the APA.
6      Q.  Was Ray Balestri involved in negotiating the
7  LSA on behalf of WorldVentures?
8      A.  Ray was involved -- it's my understanding, Ray
9  was involved on the negotiation of the Asset Purchase
10  Agreement.  And to what extent he was involved on the
11  LSA, I just don't have -- I can't answer that.
12      Q.  When were the first discussions between
13  WorldVentures and Seacret about moving WorldVentures'
14  employees over to Seacret?
15      A.  I don't know the event horizon date.  Those
16  discussions, I believe, occurred between -- in the
17  negotiations between the LSA and the APA, in between.
18      Q.  In between the negotiations of the LSA and the
19  APA?
20      A.  In between the negotiations of the APA after
21  execution of the LSA.
22      Q.  Okay.  Was Simon Davies involved in negotiating
23  the LSA?
24      A.  Yes.  I do think he had some purview into it
25  from the financial perspective and model perspective.

Page 33

1      Q.  Who was it that proposed the idea of moving
2  Seacret's employees over to -- let me start over.
3            Who was it that first proposed the idea of
4  moving WorldVentures' employees over to Seacret?
5      A.  Eddie Head.
6      Q.  And what's your answer based on?
7      A.  Direct conversation.
8      Q.  All right.  Anything else?
9      A.  E-mail strings.
10      Q.  So you were on these e-mail strings?
11      A.  Correct.
12      Q.  Did you have an issue with moving -- with the
13  idea of moving WorldVentures' employees over to Seacret?
14      A.  I wanted to make sure that it was reviewed by
15  legal, but generally, no, I did not have that -- I do
16  not have an issue.  I had --
17      Q.  All right.  Well, you knew it would be reviewed
18  by legal, too, because they were involved in the
19  process, right?
20      A.  Correct.
21      Q.  Did anyone else at WorldVentures voice
22  opposition to having employees move over to Seacret?
23      A.  I think there was a general concern.
24      Q.  My question was:  Did anyone else, if there's a
25  specific person that voiced an issue with employees of

Page 34

1  WorldVentures moving over to Seacret?

2      A.  Not that I recall.

3      Q.  I'll share my screen with you and show you

4  Exhibit Number 16 -- or Exhibit 36.

5          (Counsel displays document.)

6      Q.  (By Mr. Hoodenpyle)  I'll start with the last

7  e-mail at the top of the page, November 26, 2020 e-mail,

8  which you were copied on, correct?

9      A.  Correct.

10     Q.  And if we go down -- go down to the original

11 e-mail -- I can't tell who -- Wayne Nugent sent an

12 e-mail, we don't know who it's sent to, but really

13 telling everybody, he didn't want to miss this

14 opportunity.  And the opportunity he's talking about is

15 the opportunity with Seacret to do a deal, to sell the

16 assets to Seacret; is that correct?

17         MR. SLOVAK:  Objection, form.

18     A.  I don't know what -- I don't know what context

19 that e-mail was sent, so I can't answer yes or no.

20     Q.  (By Mr. Hoodenpyle)  Well, the subject is:  Who

21 owns this?  Let's decide --

22     A.  Who owns?  The people that were involved with

23 it versus --

24     Q.  Okay.  If you'd let me finish my question.

25     A.  I was trying to answer the first one.

Page 35

1      Q.  I didn't ask you a question.  I just read the

2  subject of the e-mail.

3          If we go up to the next e-mail, we've got

4  a November 16th, 2020, at 9:54 a.m., Mr. Nugent sent

5  another e-mail and you're copied on that one; is that

6  correct?

7      A.  Yes.

8      Q.  And he's talking about working in the spirit of

9  collaboration versus competition.

10         Do you know what he's referring to there

11 after looking at the e-mail?

12     A.  No.  I really -- frankly, it's -- I don't

13 understand.  I don't understand the meaning.  I mean,

14 it's a lot of sentences.  There's a lot of phrases.  But

15 I don't understand what the overall message is, that's

16 trying to be communicated in this e-mail.

17     Q.  Okay.  Let me find the specific line.

18         Mr. Nugent, in this e-mail string here,

19 talks about the only alternative in front of us.  And by

20 "the only alternative in front of us," he's referring to

21 the option with the deal with Seacret; isn't that true?

22         MR. SLOVAK:  Objection, form.

23     A.  I don't think that is true.  We had

24 bankruptcy -- an opportunity in bankruptcy as well.  I

25 think that there was another opportunity.  So he's

Page 36

1  referring to one of the opportunities that was well

2  communicated to him.

3      Q.  (By Mr. Hoodenpyle)  If you go to the end of

4  the first page, Mr. Nugent, is a message to Paul

5  Jenkins.

6          Who is Paul Jenkins?

7      A.  Head of IT.

8      Q.  Okay.  And he tells Mr. Jenkins at the end:

9  That's why we must make considerate cuts.

10         So at that time, WorldVentures knew that

11 they needed to cut back on employees, right, because the

12 outlook was bad?

13         MR. SLOVAK:  Objection, form.

14     A.  We needed to cut back on employees at that time

15 to meet the means test to get into bankruptcy court,

16 just from an SG&A perspective.  That was by -- the

17 force behind that.

18     Q.  (By Mr. Hoodenpyle)  That's one of the reasons

19 why everyone was okay with the employees of

20 WorldVentures moving over to Seacret, correct?

21     A.  I don't know -- I don't know why.  I can't

22 speak to why everybody was okay with everybody moving

23 over to Seacret.

24     Q.  (By Mr. Hoodenpyle)  Okay.  Well, you

25

Page 37

1  understood that World- -- that was one of the reasons

2  why WorldVentures agreed to waive Section 1.5 of the

3  interim agreement; isn't that true?

4      A.  To allow those who would like to go to Seacret,

5  to go to Seacret.  But the question was:  Was everybody

6  okay?  It's difficult for me to answer, because I didn't

7  have the purview of everybody's thinking.

8          MR. HOODENPYLE:  Objection, nonresponsive.

9      Q.  (By Mr. Hoodenpyle)  If you'd just answer my

10 question, Mr. Poates.

11         That's why WorldVentures agreed to waive

12 Section 1.5 of the interim agreement is because of the

13 issues with the WARN Act?

14         MR. SLOVAK:  Objection.

15     A.  That's not true.

16     Q.  (By Mr. Hoodenpyle)  You just said it was.  You

17 said that one of the reasons why people were moving --

18 you were letting go of employees is because of -- you

19 need to meet the means test for bankruptcy and the WARN

20 Act issues.  So that's one of the reasons why

21 WorldVentures waived Section 1.5; isn't that true?

22         MR. SLOVAK:  Objection.

23     A.  So the WARN Act, it never came out of my mouth.

24 It was strictly for the bankruptcy.

25     Q.  (By Mr. Hoodenpyle)  Okay.

Michael Poates - Corporate Representative Vol 1
March 10, 2021                                    38 to 41

Page 38

1    A.   We had three workforce reductions prior that we
2    had not triggered the WARN Act.  This particular WFR
3    would, but by no means did that influence our decision.
4        Q.   Okay.  So your decision through relief to waive
5    Section 1.5 of the interim agreement, that was not as a
6    result of needing to -- an issue with the WARN Act or
7    with meeting the means test?
8        MR. SLOVAK:  Objection, form.
9        Q.   (By Mr. Hoodenpyle)  Is that your testimony?
10       A.   Yes, the -- the result of a request by Eddie
11   Head for specific individuals that he identified that he
12   wanted to travel with him to Seacret.  That's the
13   reason.
14       MR. HOODENPYLE:  Objection, nonresponsive.
15       Q.   (By Mr. Hoodenpyle)  Mr. Poates, I'm showing
16   you what's marked as Exhibit Number 6.  If we go down,
17   we can see a November 17, 2020 e-mail from Eddie Head
18   copying -- or to you and to Mr. Nugent.
19       And the subject is "Employee list review."
20   What is this e-mail?
21       A.   This is a requested list that Eddie sent the
22   company to Wayne, my direct report.
23       Q.   Okay.
24       A.   And saying that these are the individuals that
25   would go to Seacret, Tier One, with -- my understanding

Page 39

1    would be the folks for sure.
2        Tier Two would be the folks that were
3    hoped.  And I believe, if you move down that document,
4    there would be a Tier Three, and those would be folks
5    that may or may not.
6        Q.   Okay.  So on this first e-mail under Tier One,
7    Eddie Head is not listed there, is he, under Tier One?
8        A.   No.
9        Q.   Correct?
10       A.   No.
11       Q.   All right.  And then when you received this,
12   you responded to Mr. Head's e-mail:  Thank you.
13       Do you see that?
14       A.   Yes.
15       Q.   And then later, Eddie Head responds back to
16   you:  Michael, are you working with Eric to get a one
17   pager drafted on this?
18       What was your understanding of what that
19   meant?
20       A.   At this time, I -- I'm reading the e-mail
21   verbatim.  It looks like he's asking if I can get our
22   legal team to draft a one-page document.  And it's my
23   understanding that that document was for some level of
24   relief so these employees could go to work for Seacret.
25       Q.   Right.  Mr. Head was asking you to draft a

Page 40

1    little one-page relief or have legal counsel do it; is
2    that correct?  Is that correct?
3        A.   Yes, sir.
4        Q.   Okay.  Thank you.
5        And then you respond a little while later
6    also on November 17th, you said:  Eddie:  We are keeping
7    it simple - we are noticing their counsel that the
8    recruitment is approved - plus adding you and Justin.
9        So what did you mean you were "keeping it
10   simple"?  Does that mean you were just doing a one-page
11   release?
12       A.   I think what it looks to be from -- concerning
13   that I sent the e-mail.
14       Q.   Okay.  And then you were -- you were the one
15   that added --
16       A.   Hold on a second.
17       MR. SLOVAK:  Were you finished with your
18   answer?
19       A.   No.  I was just getting into it.
20       Keeping it simple, from my perspective
21   was, I wasn't going to -- we were just going to
22   communicate directly with counsel from Seacret, our
23   counsel, and send over a notice that the parties would
24   approve.
25       Q.   (By Mr. Hoodenpyle)  Okay.  I couldn't tell you

Page 41

1    were talking still.
2        All right.  So the next thing you do is,
3    you said you added Eddie Head and Justin Call to the
4    list of employees that would be approved to be under the
5    waiver provision, correct?
6        A.   Correct.
7        Q.   And Eddie Head was then eventually listed in
8    the Tier One with you and were people definitely going
9    over to Seacret; isn't that correct?
10       A.   Correct.
11       Q.   All right.  And let me show you -- I'll show
12   you -- I'll show you what is marked as Defendant's
13   Exhibit Number 7.
14       (Counsel displays document.)
15       Q.   (By Mr. Hoodenpyle)  And the main e-mail is
16   Eric Haynes, November 18th, 2020 e-mail, to Izhak
17   Benshabat and John Kelly, copying you and Mr. Nugent.
18       Do you see that?
19       A.   Yes.
20       Q.   And this is the waiver of Section 1.5 of the
21   Limited Solicitation Agreement by WorldVentures,
22   correct?
23       MR. SLOVAK:  Objection, form.
24       A.   Correct.
25       Q.   (By Mr. Hoodenpyle)  And Mr. Haynes is the

Seacret Direct, LLC Exhibit
Page 11 of 61

Page 42

1 legal counsel for WorldVentures who said to:  All, I'm
2 sending this e-mail pursuant to Section 1.5 of the
3 Limited Solicitation Agreement.  WV hereby waives
4 Section 1.5, but only with respect to the following
5 current and former employees.
6          And the first person listed under there is
7 Eddie Head.  Do you see that?
8  A.  Yes.
9  Q.  And this waiver was never retracted, was it?
10      MR. SLOVAK:  Objection.
11  A.  No.
12  Q.  (By Mr. Hoodenpyle)  Who authorized Mr. Haynes
13 to send that e-mail, the November 18th e-mail?
14  A.  I did.
15  Q.  After the -- let me go back to the employees.
16      So the plan was, these employees would
17 slowly move over to Seacret, leading up to a bankruptcy
18 filing, because you wanted to satisfy the means test,
19 correct?
20      MR. SLOVAK:  Objection, form.
21  A.  So the decision to allow these employees to
22 leave and to waive Section 1.5, we made the decision to
23 do so knowing that we still had active employment
24 agreements with many of those individuals and existing
25 NDAs with most, if not all, of those individuals.  And

Page 43

1 when we made this decision, we made this decision
2 knowing that we were sending those individuals into a
3 business that was not competing with ours.
4      MR. HOODENPYLE:  Objection, nonresponsive.
5  Q.  (By Mr. Hoodenpyle)  Mr. Poates, when you
6 sent -- when you authorized Mr. Haynes to send this
7 waiver e-mail, including waiving the right for Seacret
8 to enforce this nonsolicitation provision as to Eddie
9 Head, you knew that Eddie Head had an employment
10 agreement?
11  A.  Right.
12  Q.  But you thought prohibited him from working for
13 someone else, correct?
14      MR. SLOVAK:  Objection, form.
15  Q.  (By Mr. Hoodenpyle)  Correct?
16  A.  We knew that we had an employment agreement
17 with Eddie Head for Spherature, WorldVentures Holdings.
18 We knew that this agreement, this Limited Solicitation
19 Agreement was formed with WorldVentures marketing.  We
20 waived the agreement of 1.5 on the inbound agreement for
21 the solicitation agreement, but we did not waive any of
22 our rights with respect to the employment agreements
23 that were executed with this -- specific members of that
24 group that requested to travel to Seacret.
25      MR. HOODENPYLE:  Object as nonresponsive.

Page 44

1  Q.  (By Mr. Hoodenpyle)  Mr. Poates, my question
2 was:  When you authorized Eric Haynes to send this
3 November 18th waiver e-mail, you knew that Eddie Head
4 has an employment agreement with noncompete language
5 that you thought was enforceable and you knew that he
6 was going to go to work for Seacret; isn't that true?
7      MR. SLOVAK:  Objection, form.
8  A.  With the understanding that Seacret was not a
9 competitor, I absolutely did.
10      MR. HOODENPYLE:  Objection, nonresponsive.
11  Q.  (By Mr. Hoodenpyle)  Mr. Poates, my question
12 was:  When you authorized Mr. Haynes to send the
13 November 18th waiver e-mail, you knew that Eddie Head
14 has an employment agreement that you thought was
15 enforceable noncompete language and you knew he was
16 going to go work for Seacret; isn't that true?
17      MR. SLOVAK:  Objection, form.
18  A.  I believe I've already answered the question.
19  Q.  (By Mr. Hoodenpyle)  Please answer my question.
20      MR. SLOVAK:  Objection, form.
21  A.  Again, he had noncompete provisions in his
22 employment agreement.  I believed that based on the
23 agreement that was executed and based on the fact that
24 the company that the agreement was executed with was not
25 a competitor in the travel space against our company,

Page 45

1 under that -- in that situation, I felt that there was
2 not a risk to our brand.  If I -- if it would have been
3 a travel company or a direct competitor of this brand, I
4 would have not approved that waiver of Section 1.5.
5      MR. HOODENPYLE:  Objection, nonresponsive.
6  Q.  (By Mr. Hoodenpyle)  Mr. Poates, again, my
7 question is:  On November 18th, when you authorized Eric
8 Haynes to send this waiver e-mail, you knew that Eddie
9 Head had an employment agreement that you thought
10 included an enforceable noncompete agreement and
11 permitted him to go work at Seacret; isn't that true?
12      MR. SLOVAK:  Objection, form.  Asked and
13 answered five times now.
14  Q.  (By Mr. Hoodenpyle) Appreciate an answer.  It's
15 a yes or no, Mr. Poates.
16  A.  I don't think I can answer this question
17 truthfully with a yes or no.  I think I've already
18 answered it.
19  Q.  It's a yes or no.  You'll get another chance
20 when the judge has -- yes or no?
21  A.  I understand.
22      MR. SLOVAK:  Objection, form.
23  Q.  (By Mr. Hoodenpyle)  Again, my question, I'll
24 wait for an answer:  When you authorized Eric Haynes on
25 November 18th to send this waiver e-mail, you knew that

Seacret Direct, LLC Exhibit 1
Page 12 of 61

Page 46

1  Eddie Head had an employment agreement that you thought
2  included an enforceable noncompete agreement and you
3  allowed them to solicit Eddie Head for Seacret -- to
4  solicit him for employment; isn't that true?
5           MR. SLOVAK:  Objection, form.
6       A.   Not -- not in the way you have presented that
7  question.  That question is not true.  That answer is
8  not true.
9       Q.   (By Mr. Hoodenpyle)  Okay.  You did authorize
10 Eric Haynes to send Seacret an e-mail waiving Section
11 1.5 as to Eddie Head.  We see that, correct?  That's
12 true?
13      A.   Yes.  I answered that.
14      Q.   And you knew as of that date that Eddie Head
15 would be going to work at Seacret, didn't you?
16      A.   I did not know if he had taken a job at Seacret
17 or not, so no, that is not true.
18      Q.   Okay.  Well, whether you knew he was going
19 there or not, you knew he was authorized to go work at
20 Seacret, of course; isn't that true?
21           MR. SLOVAK:  Object to the form.
22      A.   Just another way of asking the question you
23 asked before.
24      Q.   (By Mr. Hoodenpyle)  I appreciate you not
25 arguing with me and just answer my questions.  Okay?

Page 47

1       A.   I'm trying to provide a truthful answer,
2  Counselor.
3       Q.   No.  You're just avoiding my question, so
4  please answer my question.
5       A.   You asked a question for a yes or no.  And I
6  told you that I could not provide a yes/no answer to
7  that question.
8       Q.   Mr. Poates, you can answer it.  You just refuse
9  to which -- that will be quite evident.
10           So, again, when Mr. -- you knew -- whether
11 you knew Mr. Head was going to work there or not, you
12 knew pursuant to this waiver letter that Mr. Head was
13 authorized by WorldVentures to go work for Seacret;
14 isn't that true?
15           MR. SLOVAK:  Objection, form.
16      A.   Under the circumstances, when we -- when that
17 authorization was issued, we did not know that Seacret
18 had intentions of becoming a direct competitor of our
19 brand and soliciting reps and members, so no, that is
20 not true.
21           MR. HOODENPYLE:  Objection.
22      A.   And you're asking for a yes/no answer.  I can't
23 provide it on this question.
24           MR. HOODENPYLE:  Okay.  I'm going to
25 object as nonresponsive.  We'll let the judge worry

Page 48

1  about Mr. Poates.
2       Q.   (By Mr. Hoodenpyle)  So soon after that, the
3  parties began negotiating an Asset Purchase Agreement;
4  is that true?
5       A.   Yes.
6       Q.   Okay.  And through that Asset Purchase
7  Agreement, Seacret has stated their intentions that
8  they're going to start offering a travel product; isn't
9  that true?
10           MR. SLOVAK:  Objection.
11      A.   Not to my knowledge.
12      Q.   (By Mr. Hoodenpyle)  And they were going to do
13 travel regardless of what WorldVentures did, and that
14 they were going to give Rovia a right of first refusal;
15 isn't that true?
16           MR. SLOVAK:  Objection.
17      Q.   (By Mr. Hoodenpyle)  Or a better -- an offer to
18 beat anyone else's offer on fulfillment; isn't that
19 true?
20           MR. SLOVAK:  Objection.
21      A.   You're asking me to speak to what Seacret's
22 intent was.
23      Q.   (By Mr. Hoodenpyle)  No.  I'm asking about the
24 APA.  Have you reviewed the APA?
25      A.   Yes, I have.  And then you're asking me --

Page 49

1       Q.   Were you involved in the negotiations over the
2  APA?
3       A.   Yes.
4       Q.   Okay.  So you do know what the parties have
5  been negotiating and part of the negotiation was that,
6  Seacret was going to buy the assets of WorldVentures and
7  that they were going to offer Rovia an opportunity to do
8  fulfillment.  If they got other offers, they would give
9  Rovia an opportunity to beat that offer; isn't that
10 true?
11           MR. SLOVAK:  Objection.
12      A.   I just don't recall that part of the agreement.
13      Q.   (By Mr. Hoodenpyle)  Had Seacret assumed that
14 Rovia fulfilled any travel in the last -- since December
15 1st?
16      A.   Could you provide a little more detail to that
17 question?  Is that a general -- have they attempted to
18 initiate a travel relationship or has there been a
19 specific member or entity within the Seacret
20 organization that has wanted to use the travel benefit?
21      Q.   Has Seacret attempted to have Rovia fulfill
22 travel for WorldVentures selling their travel
23 memberships?
24           MR. SLOVAK:  Objection, form.
25      A.   Seacret has solicited the company to execute an

Page 50

1  MSA for travel.  We have chosen not to.
2      Q.  (By Mr. Hoodenpyle)  Well, Seacret's also
3  offered to fulfill its obligations and allow
4  WorldVentures' sales representatives to continue to sell
5  and have Rovia fulfill it and the debtors have denied
6  that; isn't that true?
7          MR. SLOVAK:  Objection, form.
8          So, Todd, we' now at three hours and 20
9  minutes, so I've given you some latitude.
10         MR. HOODENPYLE:  Well, under the
11 circumstances, I think it's warranted.
12         MR. SLOVAK:  Okay.  You can take that up,
13 but I think -- you know, I'll give you a couple more
14 questions here, but --
15         MR. HOODENPYLE:  Well, we've got --
16         MR. SLOVAK:  We haven't represented any,
17 so --
18         MR. HOODENPYLE:  That's fine.  We can --
19 we can -- we'll come back.  And a lot of this, he's
20 involved in anyway, so we'll take a break and come back.
21     What do you want to do?
22         MR. SLOVAK:  An hour, is that -- but
23 you're passing him as a corporate representative now,
24 correct?
25         MR. HOODENPYLE:  I'm reserving my

Page 51

1  questions.  I mean, I'm limited under the court order to
2  three hours, so I'm reserving my questions for discovery
3  and everything else and subject to getting any relief
4  for not getting responses to questions, so I mean, it's
5  not technically a pass of the witness.  I just don't
6  have any more time.
7          MR. SLOVAK:  Okay.  So -- but for purposes
8  of the corporate representative deposition, we are now
9  concluding that deposition to resume in an hour for
10 Michael Poates' testimony as an individual subject to
11 whatever reservations that you tried to articulate,
12 right?
13         MR. HOODENPYLE:  Well, yeah.  However
14 inartfully I did it, Rob.  Thank you.  Yeah.
15         MR. SLOVAK:  Don't worry about it.
16         MS. LEVINE:  Can I just ask a question
17 about ordering the transcript?  How do I do that?
18         THE REPORTER:  Are we off the record?
19         MR. HOODENPYLE:  Yeah.  We can go off the
20 record for that.
21         THE VIDEOGRAPHER:  Off the record,
22 2:04 p.m.
23         (Off the record at 2:04 p.m.)
24              - - - - -
25

Page 52

1  CHANGES AND SIGNATURE
2  WITNESS NAME: MICHAEL POATES AS CORPORATE REPRESENTATIVE
3  DATE OF DEPOSITION:  MARCH 10, 2021
4
       Please indicate changes on this sheet of paper,
5  giving the change, page number, line number and reason
   for the change.  Please sign each page of changes.
6
   PAGE/LINE      CORRECTION      REASON FOR CHANGE
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 53

1      I, MICHAEL POATES AS CORPORATE REPRESENTATIVE, have
   read the foregoing deposition and hereby affix my
2  signature that same is true and correct, except as noted
   on the previous page(s), and that I am signing under
3  penalty of perjury.
4
5
6          _____
           MICHAEL POATES AS CORPORATE
7          REPRESENTATIVE, VOLUME 1
8
9
10
11
12
13
14
15 _____ No changes made _____ Amendment Sheet(s) attached
16
17 IN RE:
18 SPHERATURE INVESTMENTS LLC, et al.
19 ---------------------------------
20 SPHERATURE INVESTMENTS LLC, et al. d/b/a
21 WORLD VENTURES HOLDINGS, LLC,
22 VS.
23 KENNETH E. HEAD
24
25 JOB NO. 2-375341

Michael Poates - As Corporate Representative Vol 1
March 10, 2021

54 to 57

Page 54

```
1          IN THE UNITED STATES BANKRUPTCY COURT
2           FOR THE EASTERN DISTRICT OF TEXAS
3                    SHERMAN DIVISION
4
5    IN RE:                        )
     SPHERATURE INVESTMENTS        )  Chapter 11
6    LLC, et al.                   )
                                   )  CASE NO. 20-42492
7    --------------------------    )
                                   )
8    SPHERATURE INVESTMENTS        )
     LLC, et al. d/b/a WORLD       )
9    VENTURES HOLDINGS, LLC,       )
          Plaintiff,               )
10                                 )
     VS.                           )  Adversary No. 21-04058
11                                 )
     KENNETH E. HEAD,              )
12        Defendant.               )
13      REPORTER'S CERTIFICATION OF THE ORAL, VIDEOTAPED
14          AND VIDEOCONFERENCED DEPOSITION OF
15                  MICHAEL POATES
16             AS CORPORATE REPRESENTATIVE
17                  March 10, 2021
18      I, Jamie K. Israelow, a Certified Shorthand
19   Reporter duly commissioned and qualified in and for the
20   State of Texas, Registered Merit Reporter and Certified
21   Realtime Reporter, do hereby certify to the following:
22      That the witness, MICHAEL POATES AS CORPORATE
23   REPRESENTATIVE, was duly sworn by the officer and that
24   the transcript of the oral deposition is a true record
25   of the testimony given by the witness:
```

Page 55

```
1      That the original transcript was delivered to Mr.
2  Todd A. Hoodenpyle.
3      That a copy of the certificate was served on all
4  parties and/or the witness shown herein on
5  _____.
6      I further certify that pursuant to FRCP Rule
7  30(f)(1) that the signature of the deponent:
8      _X_ was requested by the deponent or a party before
9  the completion of the deposition and that signature is
10 to be before any notary public and returned within 30
11 days from date of receipt of the transcript.  If
12 returned, the attached Changes and Signature Page
13 contains any changes and the reasons therefor;
14      ___ was not requested by the deponent or a party
15 before the completion of the deposition.
16      I further certify that I am neither attorney or
17 counsel for, nor related to or employed by any of the
18 parties to the action in which this deposition is taken,
19 and further that I am not a relative or employee of any
20 attorney or counsel employed by the parties hereto, or
21 financially interested in the action.
22
23
24
25
```

Page 56

```
1      CERTIFIED TO BY ME on this _____ day of
2  _____, 2021.
3
4
5
```
*Jamie K. Israelow*
```
   Jamie K. Israelow, CSR, RMR, CRR
6  Texas CSR 3801
   Expiration Date:  4/30/2021
7  US Legal Support-Dallas
   CRCB Registration No. 343
8  8144 Walnut Hill Lane, Suite 350
   Dallas, Texas  75231
9  214.741.6001
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 57

```
1  COUNTY OF DALLAS  )
2  STATE OF TEXAS    )
3      I hereby certify that the witness was notified
4  on _____ that the witness has 30 days (or
5  _____ days per agreement of counsel) after being
6  notified by the officer that the transcript is available
7  for review by the witness and if there any changes in
8  the form or substance to be made, then the witness shall
9  sign a statement reciting such changes and the reasons
10 given by the witness for making them;
11      That the witness's signature was/was not
12 returned as of _____.
13      Subscribed and sworn to on this, the _____
14 day of _____, 2021.
15
16
17
18      _____
        Jamie K. Israelow, CSR, RMR, CRR
19      Texas CSR 3801
        Expiration Date:  4/30/2021
20      US Legal Support-Dallas
        CRCB Registration No. 343
21      8144 Walnut Hill Lane, Suite 350
        Dallas, Texas  75231
22      214.741.6001
23
24 Charge for transcript and exhibits $ _____
   To be paid by the Defendant / Mr. Todd A. Hoodenpyle
25 JOB NO. 2-375341
```

**1**

**1.5**
 31:2 37:2,
 12,21 38:5
 41:20 42:2,
 4,22 43:20
 45:4 46:11
**10th**
 5:11 6:11
 15:22 26:25
**11th**
 6:17
**12:57**
 5:2,12
**16**
 34:4
**16th**
 35:4
**17**
 38:17
**17th**
 40:6
**18th**
 41:16 42:13
 44:3,13
 45:7,25
**1st**
 49:15

**2**

**20**
 50:8
**2020**
 6:11,17 7:4,
 16 10:5 34:7
 35:4 38:17
 41:16
**2021**
 5:12
**20th**
 21:21 24:22
**21st**
 27:6

**23**
 13:21
**23rd**
 24:22
**24**
 7:21 8:1
 9:16
**25**
 21:19
**26**
 34:7
**2:04**
 51:22,23

**3**

**30**
 25:5
**36**
 34:4
**363**
 12:4,11
 29:14

**5**

**53**
 24:16 25:20
**5350**
 24:19
**55**
 8:11,13,21

**6**

**6**
 38:16
**6th**
 13:24 14:10,
 19,25 26:23

**7**

**7**
 41:13

**8**

**8th**
 11:18 15:5,
 14

**9**

**9:54**
 35:4

**A**

**a.m.**
 35:4
**absolute**
 23:6
**absolutely**
 44:9
**absolutes**
 25:11
**access**
 30:4
**acquisition**
 26:16,17
**Act**
 37:13,20,23
 38:2,6
**active**
 42:23
**actively**
 12:2
**actual**
 18:11 23:11
 30:20
**added**
 40:15 41:3
**adding**
 40:8
**additional**
 13:8
**additionally**
 13:11
**agree**
 24:23

**agreed**
 37:2,11
**agreement**
 5:13 6:7,13,
 17,20,21,22
 10:11,12,14,
 17 11:8,9,
 12,13 12:2,6
 13:11,12
 16:2,5,10,
 17,19,21
 17:16,19
 18:20 19:16
 20:1,5
 22:23,25
 26:6 27:12,
 14,21,23,24
 28:7,11,17
 29:4,8,9,10,
 11,12,16,24
 30:6,7,14
 31:3,13
 32:10 37:3,
 12 38:5
 41:21 42:3
 43:10,16,18,
 19,20,21
 44:4,14,22,
 23,24 45:9,
 10 46:1,2
 48:3,7 49:12
**agreements**
 27:10 28:10
 42:24 43:22
**ahead**
 13:4
**alleged**
 19:5
**allowed**
 27:21 28:6
 46:3
**allowing**
 29:12
**alternative**
 35:19,20
**anniversary**
 7:2

annuity
29:2
anticipated
12:4
APA
28:24 32:5,
17,19,20
48:24 49:2
approval
29:14 30:22,
24
approve
40:24
approved
29:15 40:8
41:4 45:4
arguing
46:25
articulate
51:11
asset
13:12 16:10
28:10,17
29:1,8,15
32:9 48:3,6
assets
26:10 34:16
49:6
assume
9:3
assumed
49:13
attempted
49:17,21
attest
23:2
attorney
8:14 25:22
31:8
audio
5:5
authorization
47:17
authorize
46:9
authorized
42:12 43:6

44:2,12
45:7,24
46:19 47:13
avoiding
47:3
aware
11:25 25:17
31:10

_____

**B**

back
15:1 21:2
29:2,4
36:11,14
39:15 42:15
50:19,20
bad
36:12
Balestri
24:20 25:21
32:6
bankruptcy
12:4,11
15:7,11
26:24 27:6
29:13 35:24
36:15 37:19,
24 42:17
based
11:15 12:4
16:25 17:1,4
20:3 25:11
33:6 44:22,
23
basically
10:21
basis
18:17 20:19
Bates
22:20
beat
48:18 49:9
began
15:19 24:21
25:1,3,9
32:5 48:3

begin
23:18 29:7
beginning
16:4 22:2
23:6 25:17
behalf
8:9 19:11,22
20:20 21:5,9
31:7,13 32:7
belief
16:15,16
20:19
believed
44:22
belongs
29:13
benefit
28:1 49:20
Benshabat
6:12 11:8,
11,16 13:22,
24 14:9,18,
24 15:14
21:24 26:9,
23 41:17
big
9:22
bit
26:21
BK
14:3
boaz@
secreatspa
21:25
bottom
21:22,23
box
22:24
brand
29:12 45:2,3
47:19
break
50:20
broad
10:18
broader
26:21

brought
9:25
business
7:13 9:22
12:8 22:1
26:11 29:13
43:3
buy
49:6

_____

**C**

calendar
25:25
call
6:19,20
13:15 14:9
15:10,18
22:1 41:3
capacity
28:5
case
15:2 21:20
CEO
7:22,25
challenge
14:2
challenger
24:19
challenging
5:6
chance
45:19
change
8:5
Chief
5:22
chosen
50:1
circumstances
15:24 47:16
50:11
ck
12:5
clarity
26:15

Co-marketing
10:11,14,17
11:8,9,12
12:2,5 16:2
18:20
collaboration
35:9
comment
21:15
communicate
40:22
communicated
35:16 36:2
communications
10:5 20:6,8,
17,18 23:7
25:13,15
31:17,18
company
10:2 11:14
14:2,19,24
15:6,10,15
16:16 26:17
29:17 38:22
44:24,25
45:3 49:25
competing
43:3
competition
35:9
competitor
44:9,25 45:3
47:18
concern
17:15 18:2,
3,7 26:22
33:23
concluding
51:9
confirm
15:6
considerate
36:9
consult
7:10

consulting
7:7,8,13
consumable
16:8 27:19
28:4 30:6
contemporaneo
usly
27:9
context
34:18
continue
50:4
continued
16:7,22
continuing
5:23
conversation
15:5,15
22:11 33:7
convert
7:25
converted
7:23 8:2
convey
17:17
conveyance
16:6 30:20,
22
COO
6:24 7:23,25
8:2
copied
21:13 25:18
34:8 35:5
copies
10:18
copy
8:25 23:1
copying
21:24,25
38:18 41:17
corporate
5:23,25 8:8
22:7,18
23:15 24:5
50:23 51:8

correct
6:1 7:5,9
8:4,18,19
9:7,12 10:7
11:21 14:7
15:8,21
25:22 26:3,
6,7,12 27:15
28:12,21
29:22,23
30:12,18,19
31:1,5,20
33:11,20
34:8,9,16
35:6 36:20
39:9 40:2
41:5,6,9,10,
22,24 42:19
43:13,15
46:11 50:24
correctly
15:3
counsel
8:22 10:23,
25 11:2,5
12:22 13:18,
19 21:14,17
24:17 25:22,
23,24 26:1
32:1,4 34:5
40:1,7,22,23
41:14 42:1
Counselor
47:2
couple
11:7 50:13
court
36:15 51:1
COVID-19
9:21
CPO
30:18,19,25
crisis
10:3
critical
16:5
current
42:5

curtailed
27:20
cut
36:11,14
cuts
36:9

---

D

data
5:5
database
29:20 30:1,
4,16
date
15:3 26:23,
25 27:6
32:15 46:14
dated
6:17 21:21
dates
26:22
Davies
5:25 10:22
13:16 30:17
32:22
Davies'
10:20
day
7:21
days
7:3
deal
29:10 34:15
35:21
debtors
6:1,6 19:5
50:5
December
27:6 49:14
decide
34:21
decision
38:3,4
42:21,22
43:1

**Defendant's**
41:12

**demonstrated**
31:18

**denied**
50:5

**department**
31:16

**deposition**
5:24  12:16
51:8,9

**designated**
8:7  9:4,7
22:8,14
23:22

**designating**
8:15

**designed**
17:20

**desire**
14:13

**detail**
49:16

**devastated**
28:4

**develop**
10:2

**difficult**
37:6

**direct**
20:6,8,16
33:7  38:22
45:3  47:18

**directly**
7:23  40:22

**disagree**
24:25

**discovery**
17:3  51:2

**discuss**
13:2,6  14:9
22:3

**discussed**
14:14,15,18,
23  18:21
29:3

**discussing**
19:2

**discussion**
11:16,17
12:7,9  13:12
14:17  15:2
18:14  27:17
28:25  29:7

**discussions**
11:25  12:19
13:9  15:14
17:4  32:12,
16

**displays**
8:22  13:19
21:17  24:17
34:5  41:14

**dispute**
25:7

**distortion**
5:5

**document**
8:22  13:19
16:9  21:11,
17  23:1,2,4,
8,9,10,12
24:17  25:19
31:20  34:5
39:3,22,23
41:14

**documents**
31:21

**downline**
30:12,14,15,
16

**draft**
39:22,25

**drafted**
39:17

**Due**
5:3

---

### E

**e-mail**
13:21,23,24
14:19,25

15:2  17:10
21:19,21,22,
23  22:4,10,
12,13  25:11,
15  33:9,10
34:7,11,12,
19  35:2,3,5,
11,16,18
38:17,20
39:6,12,20
40:13  41:15,
16  42:2,13
43:7  44:3,13
45:8,25
46:10

**e-mails**
17:2,7  20:24
22:2

**earlier**
30:17  31:18

**easier**
9:1

**Eddie**
7:20  8:3
10:22  13:22,
25  18:16,23
19:25  20:4,
6,8,19
21:10,23
24:8  31:15
33:5  38:10,
17,21  39:7,
15  40:6
41:3,7  42:7
43:8,9,17
44:3,13  45:8
46:1,3,11,14

**else's**
48:18

**employed**
5:21  7:6

**Employee**
38:19

**employees**
31:4  32:14
33:2,4,13,
22,25  36:11,
14,19  37:18

39:24  41:4
42:5,15,16,
21

**employment**
42:23  43:9,
16,22  44:4,
14,22  45:9
46:1,4

**end**
11:1  36:3,8

**enforce**
43:8

**enforceable**
44:5,15
45:10  46:2

**enter**
28:10

**entering**
32:5

**entity**
6:25  27:1,5
49:19

**entry**
25:25

**Eric**
11:6  13:16
15:13  21:12
31:16,23,24
39:16  41:16
44:2  45:7,24
46:10

**Eric's**
31:25

**estate**
29:3

**evening**
13:5

**event**
23:12,13
32:15

**eventually**
28:13  41:7

**everybody's**
37:7

**evident**
47:9

EXAMINATION
  5:17
excellent
  12:6
excuse
  13:16
execute
  49:25
executed
  16:15 43:23
  44:23,24
execution
  16:21 32:21
exhibit
  8:11,13,20,
  23 13:21
  21:19 24:16
  25:20 34:4
  38:16 41:13
existence
  16:2 18:22
existing
  42:24
extent
  32:10
eyes
  10:21 30:7

_____

        F

_____

fact
  30:16 44:23
facts
  18:4,10
  23:16,24
fair
  9:18
faith
  29:7
familiar
  23:15
familiarize
  23:16
Federal
  5:14
feel

17:17
felt
  11:24 19:14
  45:1
figure
  23:23
filed
  27:6
filing
  12:10 26:24
  42:18
filings
  12:18
financial
  14:2 32:25
find
  35:17
fine
  50:18
finish
  20:13,15
  34:24
finished
  20:10 40:17
folks
  17:5,15
  22:24 28:2
  31:10 39:1,
  2,4
force
  29:16 36:17
forced
  30:7
form
  14:11,21
  19:10 23:19
  24:7,13 27:2
  28:15,25
  30:2 34:17
  35:22 36:13,
  21 37:22
  38:8 41:23
  42:20 43:14
  44:7,17,20
  45:12,22
  46:5,21
  47:15 49:24

50:7
formats
  25:13
formed
  43:19
forms
  25:13
forward
  7:24
found
  11:14
frame
  24:25 25:8,
  16 26:20,21
frankly
  35:12
freezes
  5:5
front
  35:19,20
fulfill
  49:21 50:3,5
fulfilled
  49:14
fulfillment
  29:22 48:18
  49:8
fulfilment
  30:11
full
  5:19 7:3

_____

        G

_____

gave
  28:1
general
  33:23 49:17
generally
  10:15 13:8
  14:16 25:16
  29:17 33:15
generate
  27:19
gist
  28:7

give
  25:10 26:20
  48:14 49:8
  50:13
good
  29:7
governance
  17:18,21
government-
issued
  5:9
group
  43:24
gut
  17:6

_____

        H

_____

hand
  31:19,21
happened
  15:4
hard
  22:5 23:1
Haynes
  11:6 13:16
  15:13 21:12
  31:16,23,24
  41:16,25
  42:12 43:6
  44:2,12
  45:8,24
  46:10
he'll
  24:9
head
  7:20 8:3
  9:17 10:22
  12:15 13:22
  18:16,24
  19:5,8,20,25
  20:4,7,9,19
  21:10,24
  23:25 24:8
  31:15 33:5
  36:7 38:11,
  17 39:7,15,

25 41:3,7
42:7 43:9,17
44:3,13 45:9
46:1,3,11,14
47:11,12

**Head's**
39:12

**hear**
9:14

**heard**
10:20 18:1

**heart**
27:23

**helped**
16:21

**hereto**
25:19

**hiding**
19:1

**hire**
7:23

**hired**
7:18,22
9:16,20

**hit**
9:21

**Hold**
40:16

**holding**
16:8

**Holdings**
43:17

**Honorable**
29:14

**Hoodenpyle**
5:15,18 8:23
9:2,6 13:20
14:8,12,23
18:9,10
19:11,18,19
20:16 21:18
23:21 24:9,
15,18 27:4
28:16 30:9
34:6,20
36:3,18,25
37:8,9,16,25

38:9,14,15
40:25 41:15,
25 42:12
43:4,5,15,25
44:1,10,11,
19 45:5,6,
14,23 46:9,
24 47:21,24
48:2,12,17,
23 49:13
50:2,10,15,
18,25 51:13,
19

**hope**
13:11

**hoped**
39:3

**horizon**
23:13 32:15

**hour**
50:22 51:9

**hours**
7:21 8:1
9:16 50:8
51:2

—————————

**I**

—————————

**idea**
33:1,3,13

**identificatio
n**
5:10

**identified**
38:11

**identity**
5:10

**Immediately**
12:13

**impact**
9:22

**in-**
6:9

**in-person**
5:8

**inartfully**
51:14

**inbound**
43:20

**inception**
23:12

**included**
45:10 46:2

**including**
10:22 43:7

**incorrect**
27:16 28:23,
24

**indisputable**
12:5

**individual**
7:8 51:10

**individuals**
38:11,24
42:24,25
43:2

**influence**
38:3

**inform**
11:24

**information**
13:8 15:10
24:2 25:11
30:17,23

**initial**
16:18

**initiate**
49:18

**initiated**
18:14

**initiating**
25:3

**input**
10:16

**inside**
10:23

**insolvency**
12:8 14:20,
25 15:16

**insolvent**
11:14,20

**instinct**
17:6

**intellectual**
30:21

**intent**
6:10,11
15:20,25
16:11 17:8,
11 18:5,12,
15,20 19:9,
21 21:9,15
22:3,9,11
23:18 24:21
25:1,9 48:22

**intentions**
47:18 48:7

**interim**
6:20 13:10
16:9 17:19
27:11,14
29:11,24
30:14 31:3
37:3,12 38:5

**internal**
21:11 31:22

**internally**
31:9

**invest**
14:14

**investment**
14:16

**investor**
12:7

**investors**
12:3

**involved**
10:13 21:4,8
31:6,12,23
32:2,6,8,9,
10,22 33:18
34:22 49:1
50:20

**involvement**
7:15 10:10

**issuance**
23:9

**issue**
26:13 33:12,
16,25 38:6

**issued**
47:17
**issues**
37:13,20
**Izhak**
11:8,16
13:22 20:9
21:6,24
31:8,11
41:16

---

### J

**Jenkins**
36:5,6,8
**job**
11:23 46:16
**John**
21:6 31:8,11
41:17
**judge**
29:15 45:20
47:25
**Justin**
40:8 41:3

---

### K

**keeping**
40:6,9,20
**Kelly**
21:6 31:8,11
41:17
**kick**
22:1
**kicking**
22:10
**kind**
24:19
**knew**
14:2 33:17
36:10 43:9,
16,18 44:3,
5,13,15
45:8,25
46:14,18,19
47:10,11,12

**knowing**
42:23 43:2
**knowledge**
11:6 17:1
22:17 23:20
24:4 27:3,8
48:11

---

### L

**language**
44:4,15
**latitude**
50:9
**lawyers**
22:21
**leadership**
17:5,17,18
18:18,23
19:2
**leading**
15:24 42:17
**learn**
10:8 11:7
**learned**
10:4
**leave**
16:4 27:22
42:22
**leaving**
16:12
**led**
15:23
**left**
25:5
**left-hand**
22:24
**legal**
21:11 31:16,
22 33:15,18
39:22 40:1
42:1
**legitimate**
23:11
**letter**
6:9,10,11
15:19,24

16:11 17:8,
11 18:5,12,
14,19 19:9,
21 21:9,15
22:3,9,11
23:18 24:21
25:1,3,8
47:12
**letting**
37:18
**level**
16:16 17:21
39:23
**LEVINE**
51:16
**lie**
23:8
**limited**
6:16,21 20:1
26:5 31:13
41:21 43:3
43:18 51:1
**liquidation**
14:4
**list**
38:19,21
41:4
**listed**
39:7 41:7
42:6
**LOI**
6:9 13:10
15:20,22
17:24 19:6,
15 21:2,4
26:4,8,16,25
27:1,5
**LOIS**
26:13
**long**
6:24 7:12
**looked**
23:5
**lot**
20:23 23:24
35:14 50:19

**LSA**
6:15 17:24
19:6 20:21,
25 31:6,23
32:3,7,11,
17,18,21,23

---

### M

**made**
25:16 26:1
42:22 43:1
**main**
41:15
**make**
5:6 9:1
33:14 36:9
**making**
7:3
**March**
5:11 7:4,16
12:14
**marked**
13:21 21:19
29:11 38:16
41:12
**market**
28:4
**marketing**
43:19
**Marvin**
21:25
**materialized**
16:18
**matter**
17:3
**meaning**
35:13
**means**
29:8 30:8
36:15 37:19
38:3,7 42:18
**meant**
39:19
**meet**
36:15 37:19

Case 20-42492   Doc 555-21   Filed 10/18/21   Entered 10/18/21 15:57:26   Desc
Michael Poates -vs- Corporate Representative Vol 1
Exhibit P   Page 23 of 61
March 10, 2021

8

meeting
  18:19 25:21
  38:7
meetings
  18:18,21,23
  19:2
member
  49:19
members
  16:3 17:18
  43:23 47:19
memberships
  49:23
message
  35:15 36:4
messages
  17:2 20:21
Michael
  5:20 13:23
  39:16 51:10
migration
  30:7
minutes
  25:5 50:9
model
  32:25
moment
  24:3
months
  11:7
mouth
  37:23
move
  16:4 17:16
  27:22 28:14,
  19 30:1,15
  33:22 39:3
  42:17
moved
  17:14
moving
  17:12 27:13
  32:13 33:1,
  4,12,13 34:1
  36:20,23
  37:17

MSA
  50:1

_____

N

_____

NDAS
  42:25
needed
  36:11,14
needing
  38:6
negotiated
  16:6,12
  17:11 18:5
  20:25 26:5
  28:25
negotiating
  10:13 15:19
  19:6,8,21,25
  20:4,21
  21:4,8 22:25
  26:5 27:10
  28:17 31:6,
  12 32:6,22
  48:3 49:5
negotiation
  10:17 15:24
  16:14 22:8,
  23 31:20,23
  32:2,9 49:5
negotiations
  13:10 23:17
  24:21 25:1,
  3,9,17 32:5,
  17,18,20
  49:1
night
  13:3
noncompete
  44:4,15,21
  45:10 46:2
nonresponsive
  18:9 19:18
  37:8 38:14
  43:4,25
  44:10 45:5
  47:25

nonsolicitati
on
  43:8
Note
  5:3
noted
  16:9 22:25
notice
  40:23
noticing
  40:7
November
  6:11,17
  15:22 26:25
  34:7 35:4
  38:17 40:6
  41:16 42:13
  44:3,13
  45:7,25
Nugent
  6:12 7:19
  8:3 9:9,11,
  13,17,25
  10:22 12:24
  13:2,6,7,22
  21:10,24
  26:9 30:22,
  24 31:15
  34:11 35:4,
  18 36:4
  38:18 41:17
number
  8:11,21 17:5
  18:18 21:19
  24:16,19
  31:17 34:4
  38:16 41:13

_____

O

_____

object
  43:25 46:21
  47:25
Objection
  14:6,11,21
  19:10,13,18
  23:19 24:7,

13 27:2
28:15 30:2
34:17 35:22
36:13,21
37:8,14,22
38:8,14
41:23 42:10,
20 43:4,14
44:7,10,17,
20 45:5,12,
22 46:5
47:15,21
48:10,16,20
49:11,24
50:7
objections
  8:14
obligation
  11:24 23:14
obligations
  50:3
occur
  18:7 29:9
occurred
  23:8 25:14
  32:16
occurring
  16:17,19
October
  11:18 13:24
  14:10,19,25
  15:5,14
  21:21 24:22
  26:23
offer
  48:17,18
  49:7,9
offered
  12:6 28:5
  50:3
offering
  48:8
offers
  49:8
officer
  5:22 11:23

one-page
39:22 40:1,
10
opened
17:16
openly
19:2
operating
5:22
opportunities
14:15 36:1
opportunity
12:5,6 28:1
34:14,15
35:24,25
49:7,9
opposed
5:7
opposition
33:22
option
35:21
order
51:1
ordering
51:17
organization
10:19 16:4
49:20
organizer
24:20 25:20
original
34:10
outlook
36:12
owns
34:21,22

_____

**P**

_____

p.m.
5:2,12
51:22,23
pager
39:17
pandemic

9:21 10:3
27:21 28:2
paragraph
14:1
part
29:4,6 49:5,
12
participate
11:3 30:5
participated
11:1 19:15
30:19
parties
20:24 26:5
40:23 48:3
49:4
party
22:4,13
pass
51:5
passing
50:23
Paul
36:4,6
people
6:19 10:21
18:1,3 34:22
37:17 41:8
period
27:20
permitted
45:11
person
14:5 23:21
24:4 33:25
42:6
personal
11:16 22:17
personally
13:13 23:3
perspective
32:25 36:16
40:20
phrases
35:14
piece
24:2

plan
12:3 42:16
platform
12:7 14:14
30:8,11
platforms
25:14
Poates
5:20 13:23
19:19 22:15
24:6 25:5
26:19 30:10
37:10 38:15
43:5 44:1,11
45:6,15 47:8
48:1
Poates'
51:10
point
7:24 10:4
12:1 21:7
25:12 28:16
29:19
POR
12:3
position
6:24
possibility
17:17
possibly
23:9
potential
27:11
potentially
14:13
preclude
29:8
prepare
5:6 12:16
prepared
5:7
present
5:24
presented
46:6
presents
5:9

pretty
9:22
prior
7:6,15 20:14
23:9 25:14
38:1
priority
22:1
proceed
16:9 29:15
proceedings
5:8
process
17:3 33:19
produced
21:20 22:21
product
27:19 28:5,
7,21 30:6
48:8
products
16:8 28:20
prohibited
43:12
property
30:21
proposal
26:8,9
proposed
33:1,3
provide
17:20 26:15
27:1,5 47:1,
6,23 49:16
provided
21:10 30:15,
16,18,22,24
providing
13:8 16:7
20:15 30:20
provision
31:3 41:5
43:8
provisions
44:21
public
19:15

**pull**
 8:12
**pulled**
 8:11,16
**purchase**
 13:12 16:10
 26:10 27:11
 28:10,17
 29:1,8,16
 32:9 48:3,6
**purposes**
 51:7
**pursuant**
 42:2 47:12
**pursuing**
 12:11
**purview**
 13:9 21:10
 31:15 32:24
 37:7
**put**
 29:12

—————————

**Q**

—————————

**quality**
 5:3
**question**
 18:8 19:19
 20:14 25:4,
 6,7 30:11
 33:24 34:24
 35:1 37:5,10
 44:1,11,18,
 19 45:7,16,
 23 46:7,22
 47:3,4,5,7,
 23 49:17
 51:16
**questions**
 46:25 50:14
 51:1,2,4

—————————

**R**

—————————

**Rains**
 31:25

**raised**
 18:23
**Ray**
 24:20 25:21
 32:6,8
**read**
 35:1
**reading**
 39:20
**reason**
 9:25 38:13
**reasonable**
 25:15
**reasons**
 36:18 37:1,
 17,20
**recall**
 10:24,25
 13:1 15:3
 21:6,7,16
 24:3 32:4
 34:2 49:12
**receive**
 23:1
**received**
 23:2 39:11
**record**
 5:2,12
 51:18,20,21,
 23
**records**
 22:21
**recovered**
 20:6,8,16
**recruit**
 30:4
**recruited**
 17:21
**recruitment**
 40:8
**red**
 10:18
**reductions**
 38:1
**refer**
 6:9,15

**referring**
 6:5,10,16
 20:17 35:10,
 20 36:1
**refusal**
 48:14
**refuse**
 47:8
**relationship**
 16:7 22:2
 23:6 49:18
**relative**
 12:8 13:9
 22:23 29:1
**release**
 40:11
**relief**
 38:4 39:24
 40:1 51:3
**remotely**
 5:14
**report**
 9:9,11 38:22
**reported**
 7:20,23 9:13
**REPORTER**
 5:13 51:18
**reporter's**
 5:3
**reporting**
 8:3 9:17
**representativ
e**
 5:23,25 8:9
 22:7,18
 23:15 24:5,
 11 50:23
 51:8
**representativ
es**
 17:9,12
 27:13 28:18
 29:21,25
 50:4
**represented**
 50:16

**reps**
 16:3,8,12
 27:18 28:5,
 6,13 30:5,8
 47:19
**request**
 38:10
**requested**
 38:21 43:24
**reservations**
 51:11
**reserving**
 50:25 51:2
**respect**
 42:4 43:22
**respond**
 40:5
**responded**
 39:12
**responds**
 39:15
**responses**
 8:14 51:4
**responsible**
 19:6,8,17,
 21,25 20:4,
 20
**restate**
 14:22
**result**
 38:6,10
**resume**
 51:9
**retracted**
 42:9
**revenue**
 27:19
**reverse**
 29:2
**reversion**
 29:2
**review**
 21:14 38:19
**reviewed**
 8:16,18
 12:18 17:2,3
 20:23,24

21:11 23:3
33:14,17
48:24

**reviewer**
10:12 21:13

**reviews**
31:25

**rights**
43:22

**risk**
45:2

**Rob**
13:16 51:14

**room**
5:24 13:8

**Rose**
29:15

**Rovia**
29:1,20
30:11 48:14
49:7,9,14,21
50:5

**Rules**
5:14

**Ruth**
21:25

────────────

**S**

────────────

**safe**
9:17

**sale**
12:11 28:18

**sales**
16:12 17:8,
12 27:12
28:13,18
29:21,25
50:4

**satisfy**
42:18

**scheduled**
18:19

**screen**
8:17 24:16
34:3

**Seacret**
10:5 11:9,12
15:19 16:4,
13 17:9,13
21:5 24:18
26:10 27:7,
10,11,13,18
28:6,14,19
29:24 30:8,
17 31:3,7
32:13,14
33:4,13,22
34:1,15,16
35:21 36:20,
24 37:4,5
38:12,25
39:24 40:22
41:9 42:17
43:7,24
44:6,8,16
45:11 46:3,
10,15,16,20
47:13,17
48:7 49:6,
13,19,21,25

**Seacret's**
28:20 30:1
31:9 33:2
48:21 50:2

**Section**
29:14 31:2
37:2,12,21
38:5 41:20
42:2,4,22
45:4 46:10

**sell**
27:18 28:3,
6,20 34:15
50:4

**selling**
30:5 49:22

**send**
40:23 42:13
43:6 44:2,12
45:8,25
46:10

**sending**
42:2 43:2

**senior**
11:23 17:5
18:18

**sentences**
35:14

**September**
10:9

**series**
28:9

**served**
8:14

**set**
29:2

**SG&A**
36:16

**Shabat**
11:19

**share**
24:15 34:3

**shortly**
15:18

**show**
24:16 34:3
41:11,12

**showing**
8:20 13:20
20:24 21:18
38:15

**side**
11:5 31:9

**sign**
29:25

**signatory**
30:20

**signed**
11:8 15:22
18:5,12
26:25

**Simon**
13:16 32:22

**simple**
40:7,10,20

**sir**
9:8,15
12:15,20
27:9 40:3

**situation**
45:1

**Slovak**
5:16 8:25
9:5 13:16
14:6,11,21
19:10,13
20:10,13
23:19 24:7,
13 27:2
28:15 30:2
34:17 35:22
36:13,21
37:14,22
38:8 40:17
41:23 42:10,
20 43:14
44:7,17,20
45:12,22
46:5,21
47:15 48:10,
16,20 49:11,
24 50:7,12,
16,22 51:7,
15

**slowly**
42:17

**solely**
19:6,8,17,
20,25 20:4,
20

**solicit**
31:4 46:3,4

**solicitation**
6:16,21
13:10 16:17,
19,22,24
18:11 19:16
20:1,5 26:6
29:11 31:13
41:21 42:3
43:18,21

**solicited**
17:22 18:2,
3,4 49:25

**soliciting**
47:19

solve
  16:18
source
  15:9
space
  44:25
speak
  31:10 36:23
  48:21
speakerphone
  13:7
specific
  26:16 33:25
  35:17 38:11
  43:23 49:19
Specifically
  6:25
spend
  9:3
Spherature
  5:22 43:17
spirit
  27:23 29:10
  35:8
stamp
  22:20
standing
  18:19
start
  12:10 27:13
  33:2 34:6
  48:8
started
  16:3
starting
  21:21
starts
  21:22
state
  5:19
stated
  48:7
steer
  10:2
step
  28:9

Steven
  31:25
stock
  29:16
strictly
  37:24
string
  13:21 21:20,
  21 35:18
strings
  33:9,10
subject
  34:20 35:2
  38:19 51:3,
  10
subjects
  8:8,15
subordinate
  31:25
subordinates
  21:12
successful
  13:11
suffering
  28:2
support
  12:3 16:6,7,
  22 18:11
swearing
  5:14

_____

_____
          T

talk
  17:24 22:8
talking
  6:21 13:7
  17:8,23
  34:14 35:8
  41:1
talks
  35:19
team
  10:21 16:22
  17:5 21:12
  31:16 39:22

technically
  7:21 51:5
telling
  34:13
tells
  36:8
test
  36:15 37:19
  38:7 42:18
testified
  30:17
testify
  8:8,15 18:1
  23:5,22
  24:10,12
testifying
  5:25 22:6
testimony
  10:20 16:11,
  14,23 17:10,
  25 19:7,14,
  17,20,24
  20:3 38:9
  51:10
text
  17:2 20:18,
  21
thanking
  13:13
thing
  41:2
things
  23:24
thinking
  37:7
thought
  12:4,12
  43:12 44:5,
  14 45:9 46:1
Tier
  38:25 39:2,
  4,6,7 41:8
time
  9:3,20,21
  12:12 13:14
  16:5 17:25
  18:13 21:7

24:20,25
  25:6,8,12,
  16,25 26:4,
  14,20,21
  27:20 29:12
  36:10,14
  39:20 51:6
timelines
  29:3
times
  21:12 45:13
today
  5:11 12:17
  19:7,24
  22:6,7
Todd
  50:8
told
  11:19 14:5
  17:14 47:6
top
  34:7
topics
  8:18 9:4,7
transaction
  29:18
transcript
  5:7 51:17
transmission
  5:4
travel
  27:20 28:3,
  20 38:12
  43:24 44:25
  45:3 48:8,13
  49:14,18,20,
  22 50:1
triggered
  38:2
true
  9:23 18:6
  26:2,11 30:1
  31:4 35:21,
  23 37:3,15,
  21 44:6,16
  45:11 46:4,
  7,8,12,17,20

47:14,20
48:4,9,15,19
49:10 50:6
**truthful**
47:1
**truthfully**
45:17
**turn**
11:5,6

**U**

**underlying**
11:25
**understand**
6:16,19 8:7
14:3 18:22
22:16,19
28:8 35:13,
15 45:21
**understanding**
6:3 11:4,11
16:1 17:1,4,
20 25:2 26:7
27:24 32:8
38:25 39:18,
23 44:8
**understood**
6:23 37:1
**untethered**
30:3
**upper**
22:24
**upside**
14:16

**V**

**validate**
22:12
**validated**
22:20
**verbatim**
39:21
**verge**
14:3,19,24
15:6,11,15

**verified**
5:10
**versus**
34:23 35:9
**videoconference**
5:4
**vigorously**
18:20
**virtually**
11:20
**voice**
33:21
**voiced**
33:25

**W**

**wait**
45:24
**waive**
37:2,11 38:4
42:22 43:21
**waived**
37:21 43:20
**waiver**
41:5,20 42:9
43:7 44:3,13
45:4,8,25
47:12
**waives**
42:3
**waiving**
43:7 46:10
**wanted**
11:9,12,13
30:5 33:14
38:12 42:18
49:20
**WARN**
37:13,19,23
38:2,6
**warranted**
50:11
**Wayne**
7:19,24 8:3
9:9,11,13

10:22 12:24
13:2,13,17,
22,24 21:10,
24 30:21
31:15 34:11
38:22
**Wayne's**
13:18
**we'**
50:8
**WFR**
38:2
**work**
27:18 30:25
39:24 44:6,
16 45:11
46:15,19
47:11,13
**work-out**
12:3
**workforce**
38:1
**working**
35:8 39:16
43:12
**World-**
37:1
**Worldventures**
6:5,25 7:10,
16,18 8:9
10:4 11:20
14:14 15:19
17:12 19:12,
22 20:20
21:9,14,20
24:10 25:22,
24 26:1,13
27:1,4,5,9
28:18 30:15,
16 31:14
32:2,7,13
33:21 34:1
36:10,20
37:2,11,21
41:21 42:1
43:17,19
47:13 48:13
49:6,22

**Worldventures'**
9:22 16:12
17:8 24:11
26:10 27:12
31:4 32:13
33:4,13 50:4
**worried**
26:24
**worry**
47:25 51:15
**WV**
42:3
**WV22534**
21:23

**Y**

**year**
5:12 7:2,3
**years**
7:14
**yes/no**
47:6,22
**Yesterday**
13:5

**Z**

**Zoom**
5:4

Page 1

1          IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE EASTERN DISTRICT OF TEXAS
2                    SHERMAN DIVISION

3   IN RE:                        )
    SPHERATURE INVESTMENTS        )   Chapter 11
4   LLC, et al.                   )
                                  )   CASE NO. 20-42492
5   --------------------------    )
                                  )
6   SPHERATURE INVESTMENTS        )
    LLC, et al. d/b/a WORLD       )
7   VENTURES HOLDINGS, LLC,       )
         Plaintiff,               )
8                                 )
    VS.                           )   Adversary No. 21-04058
9                                 )
    KENNETH E. HEAD,              )
10       Defendant.               )

11

12

13

14         ---------------------------------------------

15         ORAL, VIDEOTAPED AND VIDEOCONFERENCED

16                      DEPOSITION OF

17                    MICHAEL POATES

18                    March 10, 2021

19                       VOLUME 1

20      (Reported remotely in Denton County, Texas)

21         ---------------------------------------------

22

23

24

25

## Page 2

```
 1        ORAL, VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION OF
 2   MICHAEL POATES, produced as a witness at the instance of
 3   the Defendant, was taken in the above-styled and
 4   numbered cause on March 10, 2021, from 3:03 p.m. to 4:52
 5   p.m., before Jamie K. Israelow, Certified Shorthand
 6   Reporter in and for the State of Texas, Registered Merit
 7   Reporter and Certified Realtime Reporter, reported by
 8   machine shorthand, with the witness appearing remotely
 9   at the offices of Foley & Lardner, LLP, located at 2021
10   McKinney Avenue, Suite 1600, in the City of Dallas,
11   County of Dallas and State of Texas, Regarding the
12   COVID-19 Disaster status, and the provisions stated on
13   the record or attached hereto; that the deposition shall
14   be read and signed before any notary public.
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                    REMOTE APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4       Mr. Robert Slovak
         Mr. Steven C. Lockhart
 5       Mr. Brandon C. Marx
         FOLEY & LARDNER, LLP
 6       2021 McKinney Avenue, Suite 1600
         Dallas, Texas  75201
 7       214.999.4334
         214.999.4668
 8       214.999.4754
         rslovak@foley.com
 9       slockhart@foley.com
         bmarx@foley.com
10
11   FOR THE DEFENDANT:
12       Mr. Todd A. Hoodenpyle
         SINGER & LEVICK, P.C.
13       16200 Addison Road, Suite 140
         Addison, Texas  75001
14       972.380.5533
         hoodenpyle@singerlevick.com
15
16
17   ALSO PRESENT:
18       Mr. Eric Haynes
         Mr. Robert Feinstein
19       Mr. Kenneth E. "Eddie" Head
         Mr. Bill Hartley, Videographer
20
21
22
23
24
25
```

## Page 4

```
                         INDEX
                                                      PAGE
  Appearances                                          3
  Stipulations                                         5
  MICHAEL POATES
    EXAMINATION BY MR. HOODENPYLE                       5

  Corrections and Signature                           61
  Reporter's Certificate                              63


     (Exhibits provided electronically to the reporter
      and only the exhibits referred to are attached)
                       EXHIBITS
  NO.        DESCRIPTION                              PAGE
  Exhibit 17   E-mail dated 12/31/2020, to            48
               Michael Poates from Eddie Head
  Exhibit 19   Corporate communication titled         51
               Stalking-Horse Bidder
  Exhibit 24   E-mail chain, top e-mail dated          7
               10/7/2020, to Izhak Ben Shabat
               from Eddie Head
  Exhibit 30   E-mail chain, top e-mail dated         40
               10/31/2020, to John Kelly from Ray
               A. Balestri
  Exhibit 41   E-mail chain, top e-mail dated         44
               12/28/2020, to Michael Poates from
               Eddie Head
  Exhibit 45   E-mail dated December 31, 2020, to     47
               Michael Poates from Eddie Head
  Exhibit 48   E-mail chain, top e-mail dated         53
               2/25/2021, to Reuven Cypers from
               Michael Poates
  Exhibit 49   E-mail chain, top e-mail dated         26
               10/21/2020, to Izhak Ben Shabat
               and others from Ray a. Balestri
  Exhibit 50   E-mail chain, top e-mail dated         27
               10/21/2020, to Izhak Ben Shabat
               and others from Ray A. Balestri
```

## Page 5

```
 1                 P R O C E E D I N G S
 2            (On the record at 3:03 p.m.)
 3            (Reporter's Note:  Due to the quality of a
 4   Zoom videoconference and transmission of
 5   data, audio distortion and audio freezes
 6   make it more challenging to prepare a
 7   transcript as opposed to one prepared
 8   during in-person proceedings.)
 9            (Witness presents government-issued
10   identification and identity verified.)
11            (All exhibit were premarked.)
12            THE VIDEOGRAPHER:  Today is March 10th,
13   year 2021.  We're going on the record, 3:03 p.m.
14            THE REPORTER:  Same agreement as before?
15            MR. SLOVAK:  Yes.
16            MR. HOODENPYLE:  Yeah, same agreements.
17                   MICHAEL POATES,
18   having been first duly sworn, testified as follows:
19                     EXAMINATION
20   BY MR. HOODENPYLE:
21       Q.   Would you state your full name, please.
22       A.   Yes, sir.  Michael Dean Poates.
23       Q.   Mr. Poates, you testified earlier today as a
24   corporate representative for the debtors, so I would
25   like to just operate with the same kind of defined terms
```

Page 6

1  that we used earlier today in that deposition; is that

2  okay?

3     A.   Yes, sir.

4     Q.   Just for some added background for this

5  transcript, you're currently the chief operating officer

6  of the debtors; is that correct?

7     A.   Yes, sir.

8     Q.   And you've been in that role since March of

9  2020?

10    A.   Yes, sir.

11    Q.   And do you report to anyone?

12    A.   Wayne Nugent.

13    Q.   Is Mr. Nugent still active in the debtors'

14 business?

15    A.   Yes.  He's still the CEO.

16    Q.   Earlier in the corporate representative

17 deposition, we discussed some conversations that you had

18 with Izhak Ben Shabat in October of last year about the

19 time that he was learning that the company was

20 insolvent.

21         Do you recall that line of questioning?

22    A.   Yes.

23    Q.   And I'm going to pull up an exhibit, just to

24 give a point of reference.

25         (Counsel displays document.)

Page 7

1     Q.   (By Mr. Hoodenpyle)  It's marked Exhibit --

2  Defendant's Exhibit 24, and the first e-mail there at

3  the -- in the middle of the second page is an e-mail

4  that we looked at in the other deposition from Mr. Ben

5  Shabat where he says that he's learned that the debtors

6  are on the verge of bankruptcy.  Do you see that?

7     A.   Yes.

8     Q.   And then Eddie Head responded a little while

9  later to Mr. -- Mr. Ben Shabat.  And then later, it

10 looks like Eddie forwarded your contact information to

11 Mr. Ben Shabat.  Do you see that?

12    A.   Yes, sir.

13    Q.   Is this the first time that you had spoken to

14 Mr. Ben Shabat after that e-mail, or had you spoken to

15 him before?

16         Do you need me to enlarge this?

17    A.   Yeah.  You know what, yeah.  I'm so sorry.

18    Q.   Is that better?

19    A.   Yeah.  Thank you.  I appreciate it.

20    Q.   And if you need me to scroll down, just let me

21 know.

22    A.   Did I have a conversation prior to this

23 discussion?

24    Q.   Yes.

25    A.   Yes.

Page 8

1     Q.   Okay.  When in this conversation was -- that

2  you had with Mr. Ben Shabat before this e-mail string?

3     A.   I think it -- I think it occurred the very --

4  the first week in October.

5     Q.   And what was the purpose of your call?

6     A.   Just to make an introduction and see if he had

7  any interest in investing in WorldVentures.

8     Q.   Is that the first time you've ever spoken to

9  Mr. Ben Shabat?

10    A.   Yes, sir, I believe so.

11    Q.   Okay.  And what did you and Mr. Ben Shabat

12 discuss in that conversation?

13    A.   We discussed the -- the state of the brand and

14 the fact that we were making resolutions to -- or

15 planning to file a bankruptcy and we needed a -- a

16 potential partner that might be interested in coming in

17 with it and helping us work through the bankruptcy and

18 coming out whole.

19    Q.   And what was Mr. Ben Shabat's response?

20    A.   He was very polite, very cordial and, you know,

21 we -- I heard a second person on that call with me,

22 Bo Short.  Bo was the one that made the introduction,

23 and I had heard from Bo that -- the follow-up on the

24 call was that there wasn't -- there wasn't an interest

25 in investing in the company.

Page 9

1     Q.   Okay.  Was there anyone else on that call,

2  other than you, Mr. Nugent -- or I'm sorry.

3         Was there anyone else on that call,

4  besides you, Mr. Ben Shabat and Bo Short?

5     A.   Yeah.  So I -- I thought Muzafer was on that

6  call, and I don't want to -- I'm trying not to butcher

7  that name -- a gentleman by the name of Mutzafer or

8  Muzafer.

9     Q.   Did Muzafer say anything in that conversation?

10    A.   I don't remember.  I'm sorry.

11    Q.   In that conversation, did you tell Mr. Ben

12 Shabat that you were trying to remove Mr. Nugent from

13 the company?

14    A.   No.

15    Q.   Did you ever tell Mr. Ben Shabat that you were

16 trying to remove Mr. Nugent from the company?

17    A.   No.  Could I get a clarification, if you don't

18 mind?  So we talked about the chapter, the bankruptcy

19 and a 363 sale.  And what was discussed was that in a

20 363 sale, there would be a material change of ownership.

21 So that's -- that's how I discussed it, not in terms of

22 removing Wayne from his position, but that there would

23 be a change in ownership.

24         MR. HOODENPYLE:  Objection, nonresponsive.

25    Q.   (By Mr. Hoodenpyle)  Did you ever tell Mr. Ben

Page 10

1 Shabat that you were trying to remove Mr. Nugent from
2 the company?
3    A.   No.
4    Q.   It's your testimony that you've never told
5 Mr. Ben Shabat that you were trying to remove Mr. Nugent
6 from WorldVentures?
7         MR. SLOVAK:   Objection.
8    Q.   (By Mr. Hoodenpyle)   Is that your testimony?
9    A.   Yes, under the -- under the -- that there was
10 a -- it was a likely change of ownership in a bankruptcy
11 scenario so that -- so, yes, the answer would be yes,
12 correct.
13   Q.   You recall giving a declaration in support of
14 the debtors' application for injunctive relief?
15   A.   Yes, sir.
16        (Counsel displays document.)
17   Q.   (By Mr. Hoodenpyle)   I've pulled up the exhibit
18 for you to see there.   And I haven't marked it as an
19 exhibit, but this is from Docket Number 2, it's the
20 declaration, Paragraph 14.
21        Your testimony was that:   Attached as
22 Exhibit A-6 to the application is a true and correct
23 copy of the Limited Solicitation Agreement dated
24 November 11th, 2020, by and between WorldVentures
25 Marketing and Seacret, which was negotiated by Head.

Page 11

1         You see the section I've -- the sentence I
2 just read?
3    A.   Yes, sir, I do.
4    Q.   By your testimony there, was it your intent to
5 lead the court to believe that Eddie Head was solely
6 responsible for negotiating the LSA?
7    A.   I believe that he carried the lion's share of
8 the effort with respect to -- on our side of the -- on
9 our side being the WorldVentures side.   I believe that
10 he carried the lion's share of the negotiations.
11        MR. HOODENPYLE:   I object as
12 nonresponsive.
13   Q.   (By Mr. Hoodenpyle)   My question was,
14 Mr. Poates:   Was it your intent to lead the court to
15 believe that Mr. Head was solely responsible for
16 negotiating the LSA on behalf of WorldVentures?
17   A.   No.
18   Q.   Why didn't you include the other parties who
19 were involved in negotiating the LSA in the declaration
20 there?
21        MR. SLOVAK:   Objection, form.
22   A.   I didn't -- I didn't think that that particular
23 item would have been relevant to the -- as an exhibit,
24 and I didn't style this document.   What I thought was
25 relevant was that a large portion of the group was not

Page 12

1 in favor of the Limited Solicitation Agreement.
2    Q.   (By Mr. Hoodenpyle)   Did you say you didn't
3 style this document?
4    A.   Well, I'm -- what I'm saying is that I
5 didn't -- I didn't write the document, and so I -- so --
6    Q.   But you do understand that your declaration is
7 your testimony subject to penalty of perjury, correct?
8    A.   Yes, sir.
9    Q.   Okay.   So are you saying that what you wrote
10 there was untrue?
11   A.   No.   It was true.
12   Q.   Well, it's not completely true, because
13 Mr. Head's not the only one that negotiated the LSA on
14 behalf of WorldVentures; isn't that true?
15        MR. SLOVAK:   Objection, form.
16   A.   I mean, I believe that -- I believe that Eddie
17 Head was the primary person that negotiated that
18 agreement.   I think the agreement was circulated and not
19 agreed upon by most of the -- if not all of the senior
20 team, so that's -- that's my understanding.
21        MR. HOODENPYLE:   Objection, nonresponsive.
22   Q.   (By Mr. Hoodenpyle)   Your testimony there is
23 not completely true because you didn't list all of the
24 people that were negotiating the LSA on behalf of
25 WorldVentures; isn't that true?

Page 13

1         MR. SLOVAK:   Objection, form.
2    A.   It's true that I did not list all of the
3 people.
4    Q.   (By Mr. Hoodenpyle)   In fact, earlier today,
5 testifying in corporate -- as a corporate
6 representative, you also said:   Wayne Nugent was
7 involved in negotiating the LSA, and that you personally
8 had laid eyes on the LSA and internal and outside
9 counsel -- internal and external counsel had laid eyes
10 on the LSA, and Eric Haynes -- well, Eric Haynes is
11 internal counsel.
12        Isn't that true, all of those people had
13 laid eyes on the LSA as part of the negotiation process?
14        MR. SLOVAK:   Objection, form.
15   A.   Yeah.   I think that -- I think that I was
16 confused and my understanding was that -- I just got
17 confused on what document we were talking about, the
18 Limited Solicitation Agreement.   It's just how I know
19 the document.   And so my -- my understanding is that we
20 did not participate -- that Eddie was the primary person
21 that was participating with the negotiating -- the
22 negotiations of that document.   That document may have
23 been circulated amongst the team, but generally, the
24 leadership team didn't agree with the document and we
25 advised against entering into that document.

Seacret Direct, LLC Exhibit 1
Page 32 of 61

Case 20-42492   Doc 555-21   Filed 10/18/21   Entered 10/18/21 15:57:26   Desc
Exhibit U   Page 33 of 61
Michael Poates Vol 1
March 10, 2021

14 to 17

Page 14

```
1      Q.   (By Mr. Hoodenpyle)  Is there any written
2   documentation that you advised against entering into
3   this LSA?
4      A.   I believe there is.  I think that --
5      Q.   Where --
6      A.   It might not be me per se; it might be our
7   legal counsel that responded after discussion.
8           MR. HOODENPYLE:  Objection, nonresponsive.
9      Q.   (By Mr. Hoodenpyle)  My question, Mr. Poates:
10  Is there anything in writing where you said you do not
11  agree with the LSA?
12     A.   I don't know.
13     Q.   The LSA was actually signed by Mr. Nugent,
14  isn't it?
15     A.   Yes, sir, I believe so.
16     Q.   The fact is that Mr. Nugent made the decision
17  to sign off on the LSA, not Mr. Head; isn't that a fact?
18     A.   I believe that is true, sir, yes.
19     Q.   Did you ever ask Mr. Ben Shabat if you could
20  move over and be employed by Seacret?
21     A.   No.  We did ask -- we did discuss the capacity
22  of maybe buying Rovia, and if we would consider
23  operating Rovia as a go-forward entity, and that was a
24  discussion that did occur.
25           MR. HOODENPYLE:  Object as nonresponsive.
```

Page 15

```
1      Q.   (By Mr. Hoodenpyle)  My question was:  Did you
2   ever ask Mr. Ben Shabat if he could move over and be
3   employed by Seacret?
4      A.   I don't recall asking that.  To my
5   understanding, I did not ask that.
6      Q.   It's your understanding that you didn't ask?
7      A.   Correct.  It's my understanding that we
8   asked -- we tried to do a deal with -- with Rovia to try
9   to get Rovia either bought by Izhak or internally
10  together a group to keep it alive and we discussed that
11  additionally with Wayne Nugent and having Rovia be, you
12  know, the business that it would stay intact and provide
13  travel services potentially for Seacret, and then -- so
14  that's generally what the discussions were.
15           MR. HOODENPYLE:  Object as nonresponsive.
16     Q.   (By Mr. Hoodenpyle)  Did you ever ask Mr. Ben
17  Shabat if he would consider giving back 49 percent of
18  the company for you and the other executives if Mr. Ben
19  Shabat purchased WorldVentures?
20     A.   Yes.
21     Q.   And when did you do that?
22     A.   In my discussion, I think my very first
23  discussion with him.
24     Q.   So that 1st October discussion, you asked that?
25     A.   I believe so, yes.
```

Page 16

```
1      Q.   What was Mr. Ben Shabat's response to that
2   idea?
3      A.   I think he listened politely to all options,
4   and I received a response via Bo Short that he just
5   wasn't interested in acquiring a brand or putting it out
6   to bid.
7      Q.   Did you ever borrow a million dollars to put in
8   this deal anticipating that Seacret would purchase the
9   assets of WorldVentures?
10     A.   I've borrowed money anticipating that I might
11  need funds to -- to do another venture, and certainly,
12  there was a possibility to buy Rovia.  That would have
13  been something that -- that I would have entertained,
14  but it's -- the way it is now in bankruptcy, it's just
15  -- you know, a combined asset is how they're looking at
16  it, so no.
17     Q.   Okay.
18     A.   So no, I have not borrowed a million dollars.
19  I have access to that.  I have not made that.  I have
20  not borrowed a million dollars for the purposes of
21  buying WorldVentures.
22     Q.   Were you opposed to Seacret purchasing the
23  assets of WorldVentures?
24     A.   Absolutely not.
25     Q.   But you were opposed to the -- you say that you
```

Page 17

```
1   were opposed to the LSA?
2      A.   Yes, sir.
3      Q.   Did you ever tell Izhak Ben Shabat that you
4   borrowed $1 million in anticipation of this deal that
5   Seacret was going to buy the assets of WorldVentures?
6      A.   Yeah.  I don't recall that.  I recall saying
7   that -- discussing that -- that the executive team may
8   be interested, including myself, in investing in the
9   Rovia side of the business or investing in the
10  WorldVentures side of the business as a workout strategy
11  for a POR and a reorganization through a bankruptcy
12  process.  That's what I recall.
13     Q.   So you borrowed money to potentially buy part
14  of WorldVentures through a work-out process?
15     A.   No.  I borrowed money, frankly, thinking
16  that -- that there's a lot of ways that WorldVentures
17  may not exit the bankruptcy or exit iterations in its
18  current form, and so I was -- pulled the capital, more
19  or less, to look at restaurant opportunities in the
20  marketplace.
21     Q.   Did you say "restaurant opportunities"?
22     A.   Yes, sir, restaurant.
23     Q.   Mr. Poates, there have been a number of
24  recordings that have been produced in this case.
25           Have you listened to any of them?
```

Page 18

1   A.   No.
2   Q.   So you haven't heard the recording of you
3 telling Mr. -- I believe Mr. Ben Shabat that you
4 borrowed $1 million anticipating in reliance on this
5 transaction of Seacret buying assets?
6       MR. SLOVAK:   Objection, form.
7   A.   I mean, if it's on -- if it's recorded, then,
8 yeah.  I mean, that's how the conversation went.  I've
9 had a lot of discussions with him, yes.
10   Q.   (By Mr. Hoodenpyle)  So you did tell Mr. Ben
11 Shabat that you borrowed a million dollars anticipating
12 this transaction; isn't that right?
13       MR. SLOVAK:   Objection, form.
14   A.   Yes, if it's on -- if it's in -- if it's on a
15 recording.  I just don't recall.  I mean, I've had a lot
16 of conversations.  I'm sorry.
17   Q.   (By Mr. Hoodenpyle)  Earlier in the corporate
18 representative deposition, we talked about the e-mails
19 where you added Eddie Head and Justin Call to the list
20 of employees who would be authorized to go over and work
21 for Seacret.
22       Do you remember that e-mail when that --
23 that line of questioning?
24       MR. SLOVAK:   Objection, form.
25   Q.   (By Mr. Hoodenpyle)  Did you ask Mr. Head to

Page 19

1 stay with WorldVentures until the bankruptcy filing at
2 any point?
3   A.   Yes.  I -- I said that it -- based on the fact
4 that -- that Seacret was the only group that was the APA
5 at the time, I felt it would be helpful to have Eddie
6 stay with the brand up until the time that, you know, it
7 didn't make sense, and so we -- there was a point in
8 time where I don't think that I could answer your
9 question yes.
10   Q.   Well, in the lawsuit, you -- the debtors have
11 claimed that Mr. Head was not doing a good job.  Why
12 would you ask him to stay on through the -- to stay with
13 the brand if he wasn't doing a good job?
14       MR. SLOVAK:   Objection, form.
15   A.   I felt that he was intricately involved with
16 the solicitation agreement and I think I thought it
17 would be useful to have that material knowledge, you
18 know, under -- under the governance of an employment
19 agreement with our company.
20   Q.   (By Mr. Hoodenpyle)  Do you recall a November
21 17 call that you had with Mr. Ben Shabat about moving
22 employees over to Seacret?
23   A.   No, but if he's recorded me, if he's got a
24 recording, I could listen to it.  It would certainly
25 help me with recollection.

Page 20

1   Q.   Did you ever tell Mr. Ben Shabat that you were
2 concerned about the debtors having to pay severances?
3   A.   Yes.
4   Q.   When did you tell him that?
5   A.   I don't recall the exact time and date, but
6 yes, I did say that.
7   Q.   Was that during the November conversations
8 regarding the LSA and waiving provision -- or Section
9 1.5?
10   A.   It may have been, yes.
11   Q.   Did you also tell Mr. Ben Shabat that you were
12 concerned about consequences under the WARN Act?
13   A.   Yes.
14   Q.   Do you recall Mr. Ben Shabat asking you
15 questions along the lines of why the debtors were not
16 paying commissions to their sales representatives?
17       MR. SLOVAK:   Objection, form.
18   A.   Yes.
19   Q.   (By Mr. Hoodenpyle)  And what did you tell
20 them?
21   A.   That the company did not have the cash flow to
22 make those payments.
23   Q.   Is there anything else that you recall telling
24 Mr. Ben Shabat on that subject?
25   A.   Not off the hand, no.

Page 21

1   Q.   You recall telling Mr. Ben Shabat that y'all
2 didn't pay the commissions to the sales representatives
3 because you were concerned that the creditors might put
4 the company into an involuntary bankruptcy?
5       MR. SLOVAK:   Objection, form.
6   A.   I think that that would have been taken out of
7 context.  That context, that wouldn't have made sense.
8 I just don't recall it.  I'm not saying a conversation
9 did or did not happen.  I just don't recall having that
10 conversation and it wouldn't have made -- it wouldn't
11 have made sense in how a bankruptcy operates.
12       THE REPORTER:  I'm sorry?  It wouldn't
13 have made sense?  I didn't catch the last part.
14       THE WITNESS:  In how a bankruptcy
15 operates.
16       MR. HOODENPYLE:  I'm going to object as
17 nonresponsive.
18   Q.   (By Mr. Hoodenpyle)  My question was:  Did you
19 tell Mr. Ben Shabat that you were concerned about paying
20 sale reps commissions or that you were choosing not to
21 pay sale reps commissions because you were concerned
22 about the creditors putting the company into an
23 involuntary bankruptcy?  Did you tell him that?
24       MR. SLOVAK:   Objection, form.
25   A.   I just don't recall.  I'm sorry.

Michael Poates, Vol 1
March 10, 2021

22 to 25

Page 22

1     Q.   (By Mr. Hoodenpyle)  Did you pay yourself a
2  bonus and other executives get paid bonuses near the end
3  of the year last year?
4         MR. SLOVAK:  Objection, form.
5     A.   Yes.
6     Q.   (By Mr. Hoodenpyle)  How much of a bonus were
7  you paid?
8     A.   I don't recall.  It -- they were retention
9  bonuses to keep the senior leadership onboard the asset
10 and work it through a bankruptcy.
11    Q.   Were these bonuses paid before or after the
12 bankruptcy filing?
13    A.   Before.
14    Q.   Were you paid more than six figures?
15    A.   Yes.
16    Q.   And who were the other executives that were
17 paid bonuses?
18    A.   Eric Haynes, Paul Jenkins, Simon Davies.
19    Q.   Did all of you receive six-figure bonuses?
20    A.   Yes.
21    Q.   How much did Mr. Head receive in a bonus late
22 last year?
23    A.   I -- I don't know.
24    Q.   He didn't get anything, did he?
25    A.   He wasn't part of the retention bonus, no, sir.

Page 23

1     Q.   The month that you paid bonuses to yourself and
2  the other -- these other executives, did you pay the
3  sales representatives residual commissions in full?
4         MR. SLOVAK:  Objection, form.
5     A.   I don't -- I don't know the answer to that.  I
6  would have to -- I'd have to drill in and look to see
7  what -- what the others received, but I just don't know
8  off-the-cuff.  I know we paid some portion of
9  commission.  I just don't know what it is.
10    Q.   (By Mr. Hoodenpyle)  The answer is no, you
11 didn't pay the residual commissions in full, isn't it?
12        MR. SLOVAK:  Objection, form.
13    A.   No, we did not pay the residual commissions in
14 full.
15    Q.   (By Mr. Hoodenpyle)  Going back to our
16 conversation or questions about your conversations with
17 Mr. Head, did you ask Mr. Head to stay on with
18 WorldVentures to support communication of the bankruptcy
19 plan?
20    A.   Yes.  That was one of the things that we needed
21 help with in communicating the plan to the field.  We
22 felt that Eddie had a good relationship with the field
23 and had the capacity to communicate it, yes, sir.
24    Q.   Did you discuss with Mr. Head whether he would
25 receive a six-month severance package?

Page 24

1     A.   I just don't remember.  Possibly, but I just
2  don't remember.
3     Q.   Do you recall discussing with Mr. Head that he
4  would not receive a six-month severance package because
5  it wouldn't be necessary because he was moving over to
6  Seacret?
7         MR. SLOVAK:  Objection, form.
8     A.   Yes.  I think I did have something -- a
9  discussion along those lines in that phrase, yes.
10    Q.   (By Mr. Hoodenpyle)  Okay.  And when was that
11 discussion?
12    A.   I don't know.  I'm sorry.
13    Q.   Do you remember if it was in November or
14 December of last year?
15    A.   No.
16    Q.   So tell me what you and Mr. Head said in that
17 conversation.
18    A.   I just don't recall.  It was -- it was a long
19 time ago.
20    Q.   There's not anything you can remember, as you
21 sit here today, other than the fact that it dealt with
22 Mr. Head not receiving a severance package because he
23 was going over to work for Seacret?
24    A.   Inevitably, yes.
25    Q.   Was it before the bankruptcy filing?

Page 25

1     A.   I don't recall.
2     Q.   Did you have a discussion with Mr. Head that
3  his moving to Seacret would benefit the bankruptcy
4  estate because it would do away with the liability?
5     A.   I don't recall having that discussion.
6     Q.   Did Mr. Head stay on and support communication
7  of the plan, or what you were proposing to do?
8         MR. SLOVAK:  Objection, form.
9     A.   So I -- yes.  I think that Eddie did
10 communicate on behalf of the estate, and generally, I
11 don't -- I don't recall any case where he wasn't
12 cooperative with the request.
13    Q.   (By Mr. Hoodenpyle)  Did Mr. Head attempt to
14 support or cooperate in the Asset Purchase Agreement
15 process?
16    A.   Yes, sir.
17    Q.   Let's go back in time a little bit to October.
18        Do you recall in October that Ray
19 Balestri, the attorney for WorldVentures, sent a cease
20 and desist letter to a couple of people to ask them to
21 stop working on the negotiation of the -- the LOI?
22    A.   Yes, sir.
23    Q.   Do you have any personal knowledge of how it
24 came to be that Ray Balestri sent this cease and desist
25 letter to Eddie Head and to Izhak Ben Shabat?

Page 26

```
1              MR. SLOVAK:  Objection.
2      A.   I just have hearsay and I don't have personal
3  knowledge to that.
4      Q.   (By Mr. Hoodenpyle)  You weren't involved in
5  that?
6      A.   The -- it's my recollection that Wayne made the
7  request, Wayne Nugent.
8      Q.   Okay.  Let me show you what I've marked as
9  Exhibit 49.
10             (Counsel displays document.)
11     Q.   (By Mr. Hoodenpyle)  And then this is
12  Exhibit 49.  It's Defendant's Exhibit 49, first e-mail.
13     A.   Do you think -- sir, you could make it just a
14  little bit larger.  I'm sorry.
15     Q.   That's fine.  I will.  Just give me one second.
16     A.   Okay.
17     Q.   Well, actually, Exhibit 49, this is a request
18  from Mr. Balestri.  Well, it doesn't look like you were
19  copied on this.  An e-mail that he sent asking Seacret
20  to stop communicating, and you also said, likewise, we
21  request that all communications cease with Eddie Head.
22             So Mr. Balestri was asking Seacret to stop
23  communicating with WorldVentures and Mr. Head.
24             You're aware of that?
25     A.   Yes, sir.
```

Page 27

```
1              (Counsel displays document.)
2      Q.   (By Mr. Hoodenpyle)  I'll show you what's been
3  marked as Exhibit Number 50.
4              Exhibit 50 is another e-mail.  This one,
5  you are copied on, where Mr. Balestri sends an e-mail --
6  it looks similar to the other one, but you're copied on
7  this one.  Let me make sure you were -- oh, you were
8  copied on the other as well, or maybe the same e-mail.
9              So at some point in time, there was a
10  request of Mr. Head to stop and not be involved in this
11  and he later became involved.
12             Are you aware that Mr. Nugent asked
13  Mr. Head to be involved in the negotiation process
14  again?
15             MR. SLOVAK:  Objection, form.
16     A.   I wasn't directly made aware, but I assumed
17  that that had happened because it was my understanding
18  that the directive for the cease and desist came from
19  Wayne, and then I think that Wayne authorized the
20  continued discussion and the continued engagement of it.
21     Q.   (By Mr. Hoodenpyle)  Say that again.
22     A.   I'm sorry, sir.
23             So that was just my understanding that
24  Wayne authorized it.  After -- I know it's hard to
25  understand the logic, but after the cease and desist
```

Page 28

```
1  letter was issued at Wayne's request, then it's my
2  understanding that Wayne had asked Eddie to reengage on
3  the deal.
4      Q.   Well, Mr. Nugent actually sent an e-mail up to
5  the team confirming at some point that he wanted to make
6  sure we're all working together as a team including
7  Eddie Head.
8              MR. SLOVAK:  Objection, form.
9      A.   You know what?  I believe I saw that e-mail,
10  yes, sir.
11     Q.   (By Mr. Hoodenpyle)  Okay.  Who is Tom
12  Montgomery?
13     A.   Our senior secured lender.
14     Q.   What is the name of the lender?
15     A.   MCA, Montgomery Capital Associates.  I'm sorry
16  for the initials.
17     Q.   When did WorldVentures first do a transaction
18  with MCA?
19             MR. SLOVAK:  I'm going to object for a
20  second.  I mean, what does any of this have to do with
21  the temporary injunction?
22             MR. HOODENPYLE:  Well, forget-- it's
23  follow-up to these questions about Mr. Head being the
24  only person being involved in all of this and driving
25  this, so that's where we're going.
```

Page 29

```
1      Q.   (By Mr. Hoodenpyle)  So when did Montgomery
2  first become a lender to WorldVentures?
3      A.   I don't know.  I'm sorry.
4      Q.   Okay.
5      A.   I can confirm he is and, you know, I can
6  confirm that through my tenure, he's been active as a
7  lender with the business.
8      Q.   Okay.  Are you aware that Mr. Montgomery wanted
9  to be involved in these negotiations with Seacret over
10  the LOI and the LSA?
11     A.   Yes, sir.
12     Q.   And is that one of the reasons why the cease
13  and desist letter went out, is because Mr. Montgomery
14  wanted to be involved?
15             MR. SLOVAK:  Objection.
16     A.   That's not my understanding.
17     Q.   (By Mr. Hoodenpyle)  Okay.  What -- what
18  involvement had Mr. Montgomery had in the negotiations
19  with Seacret?
20     A.   The calls that I -- we're on, I think that Tom,
21  with respect to the APA, was right in the middle of it
22  for quite some time in the negotiations.
23     Q.   Okay.  And can you be a little more specific?
24  What does that mean, that he was right in the middle of
25  it?
```

Page 30

1   A.   I think that he was actively engaged in those
2   negotiations.
3   Q.   Was Mr. Montgomery engaged in the negotiations
4   and discussions on the Limited Solicitation Agreement?
5            MR. SLOVAK:   Objection.
6   A.   I don't know the answer to that.
7   Q.   (By Mr. Hoodenpyle)  Did Mr. Montgomery ever
8   lead any calls updating people on the process of -- the
9   progress of the limited solicitation negotiations?
10  A.   Not to my recollection.  I recall him leading
11  calls solely on the APA.
12  Q.   How many calls had Mr. Montgomery led on the
13  APA?
14  A.   Quite a few.  Just a second, and I'll give you
15  an answer.
16           So I would say at least nine calls maybe
17  that I was on relative to the APA.  And if we could back
18  up, as I was speaking this answer, I -- I just -- I
19  don't -- I recall there was some level of involvement on
20  the solicitation piece, on the solicitation agreement.
21  I just don't know to what extent.  I don't have
22  firsthand knowledge of it.  I don't want to say
23  something I don't know personally.
24  Q.   Okay.  So by some level of involvement, you
25  mean Tom Montgomery had some level of involvement; you

Page 31

1   just don't know to what extent; is that right?
2   A.   Right.  I don't know if he was CC or a direct
3   negotiator.  I just don't know.
4   Q.   Do you recall having a call -- or did you have
5   any calls with Izhak Ben Shabat in December before the
6   bankruptcy filing about Mr. Ben Shabat investing or
7   continuing the conversations for the Asset Purchase
8   Agreement?
9   A.   I believe so, yes.
10  Q.   Do you recall who called who in those
11  communications?
12  A.   No.  I'm sure that I called.  I'm sure that I
13  received calls from him.
14  Q.   Do you recall --
15           THE REPORTER:  I'm sorry.  Wait.  I didn't
16  get the last part of that.
17           THE WITNESS:  And I'm sure I received
18  calls from him as well.
19  Q.   (By Mr. Hoodenpyle)  Do you recall a
20  conversation with Mr. Ben Shabat on December 12th of
21  last year?
22  A.   I just don't recall.  I'm sorry.  I'm not
23  saying it didn't happen; I just don't recall.
24  Q.   Do you recall a conversation with Mr. Ben
25  Shabat on December 12th last year where you discussed

Page 32

1   with him where you wanted the senior folks to get a
2   piece of the business in the deal?
3            MR. SLOVAK:   Objection, form.
4   A.   Yes.  Anybody that we talked to about
5   potentially becoming an investor, helping us with a plan
6   of reorganization, a principal discussion has all been
7   that we would like to set up a profit sharing program
8   for them.
9   Q.   (By Mr. Hoodenpyle)  Okay.  And is that true of
10  post-petition conversations?
11           MR. SLOVAK:   Objection.
12  A.   Really, I believe -- post-petition
13  conversations, I just don't recall.  I believe that
14  those are really centered around the Rovia asset in
15  trying to get a commitment either to -- for its purchase
16  or, you know, for us to potentially segregate it and set
17  up a purchase.  I just don't recall.  I'm not saying it
18  didn't happen.  Really, my goal there was to get him
19  moved as quickly to conversation as the TRO as soon as
20  possible.
21  Q.   (By Mr. Hoodenpyle)  My question about whether
22  you had a conversation with Mr. Ben Shabat on December
23  12th about the senior folks getting a piece of the
24  business, I mean, an ownership piece, not just profits.
25  Did you have a communication with Mr. Ben Shabat on

Page 33

1   December 12th about the senior folks getting a -- an
2   ownership percent?
3            MR. SLOVAK:   Objection, form.
4   A.   Maybe.  I mean, I would lean towards yes.  That
5   was my goal, to get some resolution to the asset.
6   Q.   (By Mr. Hoodenpyle)  Okay.  Do you remember
7   telling Mr. Ben Shabat that you and -- you and Paul
8   Jenkins wanted to have an ownership percentage and Eric,
9   too, maybe, but Eric didn't seem too interested?
10           Does that ring a bell?
11           MR. SLOVAK:   Objection, form.
12  A.   No, it doesn't ring a bell.  I mean, I'm
13  sure -- I've learned that all conversations with -- or
14  most of my conversations were recorded.  So if there's a
15  recording, that might be an instance.
16           MR. HOODENPYLE:  Object as nonresponsive.
17  Q.   (By Mr. Hoodenpyle)  As you sit here today, you
18  don't recall a conversation where you told Mr. Ben
19  Shabat that you and Paul Jenkins wanted some ownership
20  interest and that Eric might be interested in that as
21  well?
22           MR. SLOVAK:   Objection, form.
23  A.   I'd say it's a high likelihood that that
24  conversation occurred, yes, sir.
25  Q.   (By Mr. Hoodenpyle)  Do you recall discussing

Page 34

1  with Mr. Ben Shabat that the company -- that you could
2  buy a company as a shell and then buy the assets from
3  WorldVentures?
4          MR. SLOVAK:  Objection, form.
5     A.   I remember talking about specifically Asset
6  Purchase Agreement and buying the company as, you know,
7  free and clear like the 363 Asset Purchase Agreement.
8  That's what I remember, but not the word "shell."
9  That's the only thing I don't remember.  I don't know
10  where a shell would come up with the -- frankly, in an
11  Asset Purchase Agreement, it's one of the cleanest ways
12  to buy, so I just don't recall the Asset Purchase
13  Agreement part of that conversation.
14     Q.   (By Mr. Hoodenpyle)  I lost your testimony
15  there.
16          What's the cleanest way to buy?
17     A.   A healthy business, a price agreed upon by
18  seller and buyer.
19     Q.   Okay.  Well, I mean, people set up -- get shell
20  companies and go in and buy assets all the time, right,
21  if you're familiar with that process?
22          MR. SLOVAK:  Objection.
23          Again, what does any of this have to do
24  with the temporary injunction?
25          MR. HOODENPYLE:  It's got a lot to do with

Page 35

1  your -- the bad faith enforcement of the noncompete
2  agreement.
3     Q.   (By Mr. Hoodenpyle)  So did you discuss with
4  Mr. Ben Shabat buying the stock of company through a
5  shell company?
6          MR. SLOVAK:  Objection, form.
7     A.   I would -- I just don't recall having that
8  discussion.  I just don't recall specifically that
9  discussion.  I would have had a discussion relative to
10  an Asset Purchase Agreement in the 363.  That's really
11  roughly where I would have had the conversations.  I
12  just don't recall it.  I'm sorry.
13     Q.   (By Mr. Hoodenpyle)  Did you tell Mr. Ben
14  Shabat that you were going to take control of the
15  company in the bankruptcy?
16          MR. SLOVAK:  Objection, form.
17     A.   No.  I told -- I told him that the company
18  would -- CRO would take control of the company and that
19  the company had independent directors and the -- there
20  were two independent directors, Judge Nelms, Jim
21  Colendra, and then you had Wayne Nugent, and that was
22  the board of directors.  And so the ownership and the
23  ownership stock, the moment that you file bankruptcy,
24  obviously, is not any -- any more important than the
25  debt due to the estate.

Page 36

1          MR. HOODENPYLE:  Object as nonresponsive.
2     Q.   (By Mr. Hoodenpyle)  My question, Mr. Poates,
3  is:  Did you tell Mr. Ben Shabat that you would take
4  control of the company through the bankruptcy?
5     A.   Yes.
6     Q.   And you did tell him that.  And you also told
7  them that you would like to keep working with Seacret.
8  That's why you've kept yourself in the position that
9  you're in at WorldVentures; is that right?
10     A.   Absolutely.
11          MR. SLOVAK:  Objection.
12     A.   Yes.
13     Q.   (By Mr. Hoodenpyle)  So to get a position after
14  the -- going through the bankruptcy process, that's why
15  you had hoped to have an ownership interest and to
16  continue working for Seacret after that process,
17  correct?
18          MR. SLOVAK:  Objection.
19     A.   No.
20     Q.   (By Mr. Hoodenpyle)  Okay.  But you told Izhak
21  Ben Shabat there was no way that Wayne Nugent would end
22  up in -- with any equity after this process; is that
23  correct?
24          MR. SLOVAK:  Objection, form.
25     A.   Yes, it was.  I -- Wayne would have to come up

Page 37

1  with a purchase price of the business.  So under that,
2  yes, I said that.
3     Q.   (By Mr. Hoodenpyle)  And then you were using
4  your position with the debtors to try to negotiate a
5  position where you would have equity and Mr. Nugent
6  would not have any equity; isn't that true?
7          MR. SLOVAK:  Objection.
8     A.   No.
9     Q.   (By Mr. Hoodenpyle)  Were there any discussions
10  in December related to moving two employees over to
11  Seacret before the bankruptcy was filed?
12     A.   I don't recall.
13     Q.   The debtors' bankruptcy case was filed on
14  December 21st, 2020; is that correct?
15     A.   Yes, sir.
16     Q.   And did anyone on behalf of the debtors request
17  that Eddie Head resign after the bankruptcy was filed?
18     A.   I don't remember.  I don't know.  There was a
19  lot going on at that time.
20     Q.   Did you ever ask Mr. Head to resign?
21     A.   Yes, I did.
22     Q.   When did you ask Mr. Head to resign?
23     A.   I told Eddie -- I think it was the first week
24  in January, if I'm not mistaken.
25     Q.   Well, we'll look at it in a minute, but

Page 38

1  Mr. Head resigned on December 31st, correct?
2      A.   Yes, sir.
3      Q.   So if you asked him to resign, it would have
4  been before that, right?
5      A.   Yes, sir.
6      Q.   Okay.  So did you call and ask Eddie Head to
7  resign before he tendered his resignation?
8      A.   I told Eddie -- yes, sir.
9      Q.   Okay.  Did you -- what did you tell Eddie?
10     A.   That based on -- that we were going to
11 eliminate the role, and that he wanted to be given a
12 heads-up and asked if I would do that courtesy.  I -- we
13 had that discussion prior, and I said absolutely.  And I
14 provided the -- I provided him that courtesy.  I
15 thought -- yeah, that's what I did.
16     Q.   Okay.  Did you discuss if Mr. Head would
17 provide a two-week notice?
18     A.   Yes, sir.
19     Q.   Okay.  And what else was discussed?
20     A.   I don't recall.
21     Q.   Was that in a conversation, a phone
22 conversation the day before Mr. Head -- or a day or two
23 before Mr. Head resigned?
24     A.   I don't recall.  I'm sorry.
25     Q.   In that conversation, did Mr. Head commit to

Page 39

1  helping with the transaction with Seacret anyway
2  regardless of his resignation?
3      A.   Yes, sir, he did.
4      Q.   So what was discussed about that?
5      A.   I mean, generally, just that.  I don't -- I
6  don't remember a word in point that -- I recall Eddie
7  being graceful and professional and he said that -- that
8  he would continue to help the -- help get a deal done
9  and get the APA pushed to the finish line with respect
10 to the APA becoming potentially soft and bitter for the
11 company.
12          MR. HOODENPYLE:  We've been going about an
13 hour.  We can take a short little break, Rob.
14          MR. SLOVAK:  Whatever you say.  It's your
15 depo.  That's okay with me.
16          MR. HOODENPYLE:  Okay.
17          THE VIDEOGRAPHER:  Off the record.  Going
18 off the record, 3:57.
19          (A recess was taken from
20          3:57 p.m. to 4:13 p.m.)
21          THE VIDEOGRAPHER:  Going back on the
22 record, 4:13 p.m.)
23     Q.   (By Mr. Hoodenpyle)  Mr. Poates, I want to go
24 back to October for a minute.
25          We have gone through a line of questioning

Page 40

1  about Ray Balestri sending a cease and desist to
2  Mr. Head and to Seacret in being involved and looked at
3  e-mails showing Mr. Balestri said:  We just want
4  attorneys to be involved in these discussions.
5          Do you recall that?  I'll pull it up if
6  you want to see it.
7          Do you recall that?
8      A.   Yes, I do recall.
9      Q.   Okay.  And I can pull up the e-mail.  I think
10 that was on October 21st when Mr. Balestri sent that
11 e-mail.
12          Does that sound right?
13     A.   I believe so.
14     Q.   Okay.  I'm going to share my screen.
15          And do you recall on October 31st of last
16 year that you joined in on a conference call that was a
17 Seacret conference call with Seacret and its counsel?
18 You recall that?
19     A.   No, I don't recall.
20     Q.   This is Exhibit -- Defendant's Exhibit 30, and
21 this is an e-mail on October 31st, 2020, from John Kelly
22 to Ray Balestri, and Mr. Kelly says:
23          Ray:  Just a quick note to let you know
24 that Marvin and I were on a call with our clients this
25 morning and Mike Poates joined.  I told Mike that I'd

Page 41

1  prefer to have you, as WV's counsel, present (since he
2  was talking to Seacret and its lawyers), but he said
3  that it wasn't necessary to have WV's lawyers on the
4  call.  He basically shared with us that WVH is
5  considering organization through bankruptcy and that WV
6  would like to change our discussions to contemplate some
7  sort of interim management agreement which would allow
8  WV agents to migrate over to Seacret and keep selling
9  products and services.
10          Does that sound like an accurate
11 representation of your discussion with Mr. Kelly and his
12 clients on October 31st?
13     A.   Yes.
14     Q.   But judging by Mr. Kelly's e-mail, it looks
15 like it was your idea to enter into this interim
16 management agreement.
17          Would you agree with that?
18     A.   No, I wouldn't.
19     Q.   To your knowledge, had there been any
20 discussion about this interim management agreement
21 before you brought it up on the October 31st phone call?
22     A.   I don't recall.
23     Q.   Going back to December, the debtors filed for
24 bankruptcy on December 21st, and at that time, the
25 debtors were involved in -- well, the plan, I guess, was

Page 42

1  to have a prepackaged deal where Seacret would come in
2  and purchase the assets.
3         Wasn't that the original plan?
4     A.   Yes, sir.
5     Q.   By the date that the debtors filed for
6  bankruptcy on December 21st, there was not a deal for a
7  prepackaged claim; is that right?
8     A.   Right.
9     Q.   But on that date, the petition day, the debtors
10 were still negotiating the Asset Purchase Agreement with
11 Seacret for Seacret to be the stalking-horse bidder; is
12 that correct?
13    A.   I just don't recall whether that is correct or
14 not.  I just -- I'm sorry.  I had a lot to worry about
15 besides that.
16    Q.   Okay.  Who -- when did this deal break apart
17 where the debtors were no longer pursuing Seacret as a
18 stalking-horse bidder?
19    A.   I don't know.
20    Q.   Was it before or after the bankruptcy filing?
21         MR. SLOVAK:  Objection, form.
22    A.   I don't know.
23    Q.   (By Mr. Hoodenpyle)  Do you know whether or not
24 it was before or after the first of the year?
25    A.   No, I really don't.  I just was buried in just

Page 43

1  the business of getting the company into the bankruptcy
2  and managing there, so I just don't recall.
3     Q.   Before the bankruptcy was filed, the debtor had
4  to know whether discussions with any other suitor as a
5  potential stalking horse; is that right?
6     A.   Yes.  I believe we had had discussions with
7  other folks prior to the filing -- prior to filing.  I
8  believe we did have discussions with other folks.
9     Q.   Who had you had discussions with about being a
10 stalking-horse bidder prior to the petition date?
11         MR. SLOVAK:  Objection form.
12         And look, this is well beyond the scope of
13 what's at issue in the TI.  It was a topic that you
14 noticed for corporate representative and we objected to
15 it because it's well beyond the scope of the TI, and so
16 I'm not going to let him testify about it.  I'm going to
17 instruct him not to answer.
18         MR. HOODENPYLE:  Okay.  Well, it's issues
19 that y'all raised and are relevant to our defenses.
20    Q.   (By Mr. Hoodenpyle)  Are you going to refuse to
21 answer my questions, Mr. Poates?
22    A.   Yes, based on counsel's recommendation.
23    Q.   Okay.  I'll take you back to December 28th and
24 show you an e-mail.
25         (Counsel displays document.)

Page 44

1     Q.   (By Mr. Hoodenpyle)  You can see my screen
2  there.  I am showing you Defendant's Exhibit Number 41.
3  And this is an e-mail from Mr. Head to you on December
4  28th.
5         Do you see that?
6     A.   Yes, sir.
7     Q.   And do you recall receiving this e-mail?
8     A.   Yes, sir.
9     Q.   Okay.  And I'll give you a minute to read it.
10 Just -- you can -- is it big enough for you to read
11 there?
12    A.   Yes.  Thank you very much for that.
13         (Witness perusing document.)
14    Q.   Just let me know when you want me to scroll
15 down.
16    A.   You can scroll down.
17    Q.   (Complies.)
18    A.   Thank you.
19    Q.   There's another page.  Just let me know when
20 you're ready to move to the next page.
21    A.   Go ahead and scroll.
22    Q.   (Complies.)
23    A.   Thank you.
24         (Witness perusing document.)
25         I've completed the reading.

Page 45

1     Q.   I'm sorry.  Did you read it all?
2     A.   Yes, sir.  I'm sorry.  I said I completed it.
3     Q.   Oh, okay.  Thank you.
4         So what is your understanding of what
5  precipitated Mr. Head sending this e-mail to you?
6     A.   I'm assuming by reading the e-mail that he had
7  concerns with the bankruptcy filing and the optics that
8  it generated for the deal.
9     Q.   Okay.  And the subject matter of this e-mail
10 is:  Attributes for consideration and presenting APA.
11         So the e-mail addressing -- I guess the
12 better -- we're still in communication with Seacret and
13 negotiating the APA at that point; is that right?
14    A.   I mean, at that point in time, I just don't
15 recall.  I'm sorry.  That period between 10/21 and, you
16 know, well through the first of the year, we were pretty
17 much drinking from a firehose in a bankruptcy filing, so
18 I just don't recall.  I mean, it looks to be that he's
19 still engaged, and I know that we did have discussions
20 relative to his concern, you know, about the impact that
21 bankruptcy would have on the field, justifi- --
22 justifiably.
23    Q.   Who was leading the negotiations of the APA
24 with whose petition on behalf of WorldVentures?
25    A.   I just -- at this point in time, I just don't

---

Page 46

1  know.  I don't -- I don't recall who was taking the
2  lead.  There's a point in time it passed on to -- to
3  Eric, our general counsel, and you know, folks at the
4  Foley Lardner firm and those folks.  I don't know who
5  was dealing with it, but I just -- I don't recall,
6  frankly.
7       Q.   Okay.  Well, I see your point about Eddie's
8  concern about the field, the sales representatives.
9  Looking at the second page of this e-mail where Eddie
10  talks about the fear is growing because of the
11  bankruptcy process, and more than anything, he's hearing
12  the question of whether or not the sales representatives
13  should continue paying their fees.
14            And he said:  The answer is obviously,
15  "yes," with the explanation we've used prior given.
16            What's your understanding of what he meant
17  by "the explanation we've used prior given"?
18       MR. SLOVAK:  Objection, form.
19       A.   And I don't recall that.  I'm sorry.
20       Q.   (By Mr. Hoodenpyle)  Did you respond to this
21  e-mail?
22       A.   I don't recall.
23       Q.   I guess after this e-mail was about the next
24  day where you called Mr. Head and asked him to resign.
25            Does that sound about right?

---

Page 47

1       A.   Yeah.  I just don't recall exactly what day it
2  was past that e-mail.  I'd have to look at the e-mail to
3  make sure that I gave you an accurate answer, so I just
4  don't recall.
5       Q.   What e-mail would you need to look at to see
6  what day that call was?
7       A.   Well, I would need to look at that e-mail and
8  then look at, you know, communications to -- for the
9  estate relative to the resignation.  Then, I could
10  triangulate when the conversation occurred.
11       Q.   Okay.  Well, we've got the December 28th e-mail
12  we just looked at, and I'll show you --
13       A.   I think, earlier, you -- I'm sorry.  I'm so
14  sorry to interrupt.  Go ahead.
15            (Counsel displays document.)
16       Q.   (By Mr. Hoodenpyle)  Exhibit -- I'm showing you
17  Exhibit 45.  Is this a true and correct copy of the
18  resignation e-mail that you receive from Mr. Head?
19       A.   Yes, sir.  So this must be the 31st of
20  January -- of December, I'm sorry.
21       Q.   This e-mail was December 31st, 2020, at
22  5:16 p.m. where Mr. Head e-mailed you his resignation,
23  correct?
24       A.   Yes.
25       Q.   And he's trying to understand -- with all the

---

Page 48

1  documents that have been produced, it doesn't really
2  make any sense to me, but this is -- I'm going to show
3  you Exhibit Number 17.
4            (Counsel displays document.)
5       Q.   (By Mr. Hoodenpyle)  This is an e-mail from
6  Mr. Head to you four hours after that last e-mail with a
7  little bit different e-mail.
8            Did you receive this e-mail, Exhibit
9  Number 17?
10       A.   It looks like I did, according to the e-mail,
11  yes.
12       Q.   All right.  I just -- it looks like -- this
13  e-mail is earlier in time, but it looks like a more
14  complete e-mail.
15            Do you agree?
16       A.   But is that really an e-mail or is that just a
17  draft?
18       Q.   This is an e-mail from Mr. Head.  Apparently,
19  somebody forwarded it on to counsel or something.  Y'all
20  designated the rest of it as privileged.
21            All right.  Well, let's look at this
22  resignation e-mail.  So Mr. Head gave you two weeks'
23  notice by this resignation, correct?
24       A.   Yes.
25       Q.   And within the days preceding this resignation,

---

Page 49

1  you had had a discussion with Mr. Head that he was going
2  to go work at Seacret; isn't that correct?
3       MR. SLOVAK:  Objection, form.
4       A.   I don't recall.  I really don't recall the
5  discussion.
6       Q.   (By Mr. Hoodenpyle)  Okay.  So if Mr. Head
7  testified that y'all had a conversation in the days
8  preceding this, that he was going to go work at Seacret,
9  you have no reason to dispute that; is that correct?
10       A.   I just -- I really just don't recall that
11  discussion.
12       Q.   Okay.  Well, I guess the point I'm getting at,
13  Mr. Poates, between now and next Friday, you're going to
14  have a different recollection.
15            Is there any reason why you would dispute
16  that Mr. Head will -- if he testified that y'all
17  discussed he's going to work at Seacret, would you have
18  any reason to dispute that?
19       A.   I would say I don't recall having that
20  discussion.  That's all.
21       Q.   Okay.
22       A.   You know what, I don't recall having -- I just
23  don't recall having that discussion, sir.  I'm sorry.
24       Q.   Okay.  And it looks like in the second
25  paragraph, he notes that in the bankruptcy process,

Page 50

1  things will be streamlined and this will help reduce
2  this to an end.  His resignation would actually be a
3  benefit to the bankruptcy estate; isn't that right?
4          MR. SLOVAK:  Objection.
5      A.  You know, I considered -- no.  I would say, it
6  wouldn't be a benefit to the estate.  I think that he
7  was a good leader.  I think that from -- from my
8  perspective, anyway, he did what I had asked him to do
9  for the bankruptcy process.  That's what I'm referring
10 to in a good leader way.
11         So, yeah.  You know what, in thinking
12 about this out loud, yes, it would benefit the estate
13 because the salary would be redacted in that -- in that
14 term, yes.
15     Q.  (By Mr. Hoodenpyle)  Okay.  Let me go to the
16 second-to-the-last paragraph, the second sentence, he
17 says:  Additionally, we will need to address my removal
18 from the director role on several entities supporting
19 the business globally, any regulatory or litigation
20 subjects and the NPO board seat and further wind-down.
21         Have you addressed Mr. Head's positions on
22 various boards with these entities?
23     A.  I don't know the current status.
24     Q.  Have the debtors removed Mr. Head from all the
25 boards that he was affiliated with?

Page 51

1      A.  I can't answer that.  I just don't know.
2      Q.  Who would know?
3      A.  Likely general counsel, Eric Haynes.
4      Q.  In the -- in the lawsuit that y'all filed,
5  y'all mentioned that Mr. Head was being prosecuted in
6  Taiwan.  Are you familiar with that?
7      A.  That was before my time.
8      Q.  Okay.  Do you know why Mr. Head is being
9  prosecuted in Taiwan or he still is?
10     A.  I'm not familiar with that litigation.
11     Q.  Who would -- who would know?
12     A.  Eric Haynes, our general counsel.
13         (Counsel displays document.)
14     Q.  (By Mr. Hoodenpyle)  Mr. Poates, I'm showing
15 you Defendant's Exhibit 19.  This looks like a corporate
16 communication that you issued on January 25th of this
17 year.  Do you see that?
18     A.  Yes, sir.
19     Q.  This was a corporate communication that you
20 sent out on the -- I guess, as an update to -- who does
21 this communication go out to?
22     A.  This goes out to -- so we have three different
23 groups.  We have reps, our members, and our corporate
24 team members.  I can't -- I can't see.  We referred to
25 both team members.  I don't know if this is -- I can't

Page 52

1  tell you if this one went to team members internal to
2  the company or if this went out abroad.
3      Q.  Do you need me to scroll down or something to
4  determine that?
5      A.  Yeah, if you could, just to see.
6      Q.  (Complies.)
7      A.  Could you scroll back up just a little bit and
8  I'll be able to answer that for you.  I just --
9          Yeah.  So this particular communication --
10 thank you for the scroll -- this would have been sent to
11 the field, to the members and reps -- no, excuse me --
12 to the field representatives.
13     Q.  The sales representatives?
14     A.  Correct, sir.
15     Q.  Okay.  And you're basically giving them an
16 update on the bankruptcy process.  Is that what you were
17 doing?
18     A.  Yes.  Every week.
19     Q.  Okay.  And in this one, you mentioned that
20 you have a stalking-horse bidder who had a bid value at
21 $69.5 million.
22         Is that stalking-horse bidder still
23 pursuing the stalking-horse bid?
24     A.  Yes.
25     Q.  And who is that stalking-horse bidder?

Page 53

1          MR. SLOVAK:  I'm going to object and I
2  will instruct the witness not to answer on this point.
3  It has nothing to do with the TI.  We've objected to
4  this.
5      Q.  (By Mr. Hoodenpyle)  Are you going to refuse to
6  answer that?
7      A.  Yes, sir.
8      Q.  I am going to pull it up.
9          (Counsel displays document.)
10     Q.  (By Mr. Hoodenpyle)  Mr. Poates, I'm showing
11 you what's marked as Exhibit 48.  And there are two
12 e-mails here.  The first is an e-mail from Jeff Gwynn to
13 you on February 24th, 2021.
14         Who is Jeff Gwynn?
15     A.  Jeff Gwynn is the head of corporate
16 communications from WorldVentures, Spherature.
17     Q.  Okay.  In this e-mail, he's sending you a copy
18 of an article from MLM News that says:  WorldVentures
19 sues Eddie Head, RIP Seacret Direct merger.
20         Did you ask for a copy of this or why was
21 he sending it to you?
22     A.  He's instructed to send me any media relative
23 to the brand, so he was doing as instructed.
24     Q.  Does WorldVentures have any agreements with
25 BehindMLM blog?

Page 54

1   A.   Not that I'm aware of, sir.

2   Q.   Do you know if anybody at WorldVentures has
3   spoken to anyone at the BehindMLM about this article
4   about WorldVentures sues Eddie Head?

5   A.   Not to my knowledge.  Absolutely not.

6   Q.   So later, on February 25th, 2021, you forwarded
7   this blog article about WorldVentures showing Eddie Head
8   to Reuven Cypers at the merchantguy@yahoo.com.

9        Who is Reuven Cypers?

10  A.   Reuven is the head -- he's the owner of the --
11  of our US-based processing, credit card processing.

12  Q.   And why were you sending this article to him?

13  A.   He had asked us -- we've had large chargebacks,
14  which create -- which wreak havoc on our capacity from a
15  processing perspective, and he had asked that we provide
16  material updates to him, and so this is an update that I
17  provided him and copied our CRO and counsel on.

18  Q.   Explain what a chargeback is.

19  A.   A chargeback is where somebody disputes a --
20  disputes a charge and files with their merchant or with
21  the credit card company a claim that the charge was
22  fraudulent or unauthorized, and they request a refund
23  through a chargeback, so that -- versus a refund, which
24  we would give money back.  A chargeback would actually
25  just be a charge back onto the credit card account.

Page 55

1   Q.   Okay.  Why is this e-mail material for
2   chargebacks for the article, I should say?  Why was that
3   article material to chargeback?

4   A.   We -- we had -- we were receiving a lot of
5   pressure from our US-based processor on what is being
6   done to curtail the chargebacks.  And so this particular
7   e-mail stream discussed that we had found and noticed
8   individual or individuals -- I'm not sure if it's
9   multiple folks -- that -- that were on Facebook teaching
10  people how to scam us for three months' worth of dues.

11       And then on top of that, we -- when we
12  filed, we committed to the US processor that we would
13  provide all news and all relevant updates to them every
14  week for the weekly update.  And so I provide these
15  folks an update every single week of the brand, where
16  we're at status on -- status on the 363 and, you know,
17  any happenings of interest.

18  Q.   All right.  You're not saying that Mr. Head is
19  affiliated in any way about this scam of three months of
20  dues?

21  A.   No, absolutely not.

22  Q.   When you say that you're finalizing terms of
23  the APA with your stalking horse, are you referring to
24  the same one that you were referring to in that
25  January 25 communication with the field?

Page 56

1   A.   Yes, sir.

2   Q.   Your last sentence, you say:  We believe this
3   attached news, which you're referring to, is the lawsuit
4   against Eddie Head as the attached news, correct?

5   A.   I think, generally, I referred to the whole
6   letter.  Yes, that's part of it, but also, I'm finding
7   the folks that were asking folks -- or teaching folks
8   how to chargeback, and also, additionally, update on the
9   APA and 363 collectively made up that week's news
10  update.

11  Q.   Okay.  Well, you said "the attached news," and
12  there's an attachment.  And the attachment is the
13  article on WorldVentures' lawsuit against Eddie Head,
14  correct?

15  A.   Yes.

16  Q.   So by attached news, you were talking about the
17  article, the lawsuit against Mr. Head, right?

18  A.   That's one of the things I was talking about,
19  yes.

20  Q.   Well, that was the only thing that was
21  attached, isn't it?  That's the only thing attached to
22  that e-mail?

23  A.   Was it an attachment per se or copied?  And I'm
24  not trying to -- I just want to understand.  That's all,
25  sir.

Page 57

1   Q.   You see where it says attachments?

2   A.   Okay.  All right.  There you go.  Yes, yes.  I
3   agree with that.

4   Q.   So that lawsuit against Eddie Head was the only
5   attachment, correct?

6   A.   Correct.  Thank you.

7   Q.   All right.  So that's what you meant by "the
8   attached news"; is that right?

9   A.   Yes.

10  Q.   And you say:  We believe this attached news and
11  the possibility we engage a prior CEO and owner to
12  help bring folks back will collectively slow the
13  conveyance to Seacret.

14       The prior CEO and owner, who are you
15  referring to there?

16  A.   Dan Stammen.

17  Q.   Are the debtors working on a deal with Dan
18  Stammen to come back as an employee or to make a bid?

19       MR. SLOVAK:  Objection, form.

20       Again, this has absolutely nothing to do
21  with the TI.  I'm going to instruct him not to answer.

22  Q.   (By Mr. Hoodenpyle)  Are you going to follow
23  that instruction?

24  A.   Yes, sir.

25  Q.   You said that this will collectively slow the

Page 58

1 conveyance to Seacret.  What do you mean -- what
2 conveyance are you referring to?
3      A.   I'm referring to the -- the folks that had
4 moved to Seacret away from WorldVentures, generally, the
5 membership and the rest.
6      Q.   Do you mean -- so by collectively slowing the
7 conveyance to Seacret, you mean you're hoping to slow
8 down people leaving WorldVentures to go to work for
9 Seacret?
10     A.   We're hoping to have a fighting chance, yes,
11 sir; that we have lost quite a bit of sales since the
12 solicitation agreement and we are hoping that this news,
13 all of it there, would slow folks from leaving and going
14 to Seacret.  That was our hope.  I look at -- that
15 was -- that's generally the hope that I had.
16     Q.   And you say you're continuing to market the
17 company to potential buyers.
18          Does that include to Seacret?
19     A.   Yes.  I believe that it -- it's my
20 understanding that the -- our -- that Marcus health
21 has -- and ARIIX CRO has an Asset Purchase Agreement on
22 file potentially for -- for the purchase, but I --
23 that's just something I really can't answer.  We are
24 actively marketing, but to the extent that Seacret is
25 being discussed, if it's being discussed, it's outside

Page 59

1 of my purview personally.
2      Q.   Have the debtors exchanged any money to anyone
3 related to the BehindMLM blog or anyone affiliated with
4 it?
5      A.   Not to my knowledge, sir.
6          MR. HOODENPYLE:  Okay.  Let's go off just
7 a minute or two, Rob, see if I have anything left.
8          MR. SLOVAK:  Okay.  How long do you want?
9          MR. HOODENPYLE:  Two minutes is good.
10         MR. SLOVAK:  Okay.
11         THE VIDEOGRAPHER:  Off the record, 4:48.
12         (A recess was taken from
13         4:48 p.m. to 4:51 p.m.)
14         THE VIDEOGRAPHER:  Back on the record,
15 4:51 p.m.
16     Q.   (By Mr. Hoodenpyle)  Mr. Poates, have you
17 personally done anything to investigate whether Seacret
18 has contracted with Gini Trask or her company?
19     A.   Personally, no.  Our -- personally, no.
20     Q.   You haven't spoken to Ms. Trask or tried to
21 reach out to her or anything like that, e-mailed her?
22     A.   No, sir.  I don't believe so.  Until this --
23 until this whole thing came up, I didn't need to know
24 that.
25     Q.   Okay.  Do you know if anybody else has tried to

Page 60

1 reach out to her or determine whether or not there's
2 even a relationship -- contractual relationship there
3 with Seacret?
4      A.   I don't know.  I don't know if anybody's
5 reached out.
6      Q.   Okay.
7          MR. HOODENPYLE:  At this time, we'll pass
8 the witness for purposes of this expedited deposition.
9          MR. SLOVAK:  We are reserving our
10 questions until the time of the temporary injunction
11 hearing.
12         MR. HOODENPYLE:  Okay.  We can go off the
13 record.
14         THE WITNESS:  Thank you, sir.
15         THE VIDEOGRAPHER:  Off the record at
16 4:52 p.m.
17         (Off the record at 4:52 p.m.)
18                 - - - - -
19
20
21
22
23
24
25

Page 61

1 CHANGES AND SIGNATURE
2 WITNESS NAME:  MICHAEL POATES
3 DATE OF DEPOSITION:  MARCH 10, 2021
4
5 Please indicate changes on this sheet of paper,
  giving the change, page number, line number and reason
  for the change.  Please sign each page of changes.
6
7 PAGE/LINE     CORRECTION     REASON FOR CHANGE
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 62

1      I, MICHAEL POATES, have read the foregoing

deposition and hereby affix my signature that same is

2  true and correct, except as noted on the previous

page(s), and that I am signing under penalty of perjury.

3

4

5

6              MICHAEL POATES, VOLUME 1

7

8

9

10

11

12

13

14  _____ No changes made _____ Amendment Sheet(s) attached

15

16  IN RE:

17  SPHERATURE INVESTMENTS LLC, et al.

18  ----------------------------------

19  SPHERATURE INVESTMENTS LLC, et al. d/b/a

20  WORLD VENTURES HOLDINGS, LLC,

21  VS.

22  KENNETH E. HEAD

23

24

25  JOB NO. 2-375341

Page 63

1           IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE EASTERN DISTRICT OF TEXAS

3                   SHERMAN DIVISION

4

5   IN RE:                    )

    SPHERATURE INVESTMENTS    )  Chapter 11

6   LLC, et al.               )

                              )  CASE NO. 20-42492

7   ------------------------- )

8   SPHERATURE INVESTMENTS    )

    LLC, et al. d/b/a WORLD   )

9   VENTURES HOLDINGS, LLC,   )

         Plaintiff,           )

10                            )

    VS.                       )  Adversary No. 21-04058

11                            )

    KENNETH E. HEAD,          )

12       Defendant.           )

13    REPORTER'S CERTIFICATION OF THE ORAL, VIDEOTAPED

14         AND VIDEOCONFERENCED DEPOSITION OF

15               MICHAEL POATES

16               March 10, 2021

17      I, Jamie K. Israelow, a Certified Shorthand

18  Reporter duly commissioned and qualified in and for the

19  State of Texas, Registered Merit Reporter and Certified

20  Realtime Reporter, do hereby certify to the following:

21      That the witness, MICHAEL POATES, was duly sworn by

22  the officer and that the transcript of the oral

23  deposition is a true record of the testimony given by

24  the witness:

25      That the original transcript was delivered to Mr.

Page 64

1   Todd A. Hoodenpyle.

2       That a copy of the certificate was served on all

3   parties and/or the witness shown herein on

4   _____.

5       I further certify that pursuant to FRCP Rule

6   30(f)(1) that the signature of the deponent:

7    _X_ was requested by the deponent or a party before

8   the completion of the deposition and that signature is

9   to be before any notary public and returned within 30

10  days from date of receipt of the transcript.  If

11  returned, the attached Changes and Signature Page

12  contains any changes and the reasons therefor;

13      ___ was not requested by the deponent or a party

14  before the completion of the deposition.

15      I further certify that I am neither attorney or

16  counsel for, nor related to or employed by any of the

17  parties to the action in which this deposition is taken,

18  and further that I am not a relative or employee of any

19  attorney or counsel employed by the parties hereto, or

20  financially interested in the action.

21

22

23

24

25

Page 65

1      CERTIFIED TO BY ME on this _____ day of

2   _____, 2021.

3

4

5   _____

    Jamie K. Israelow, CSR, RMR, CRR

6   Texas CSR 3801

    Expiration Date:  4/30/2021

7   US Legal Support-Dallas

    CRCB Registration No. 343

8   8144 Walnut Hill Lane, Suite 350

    Dallas, Texas  75231

9   214.741.6001

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 66

```
 1  COUNTY OF DALLAS   )
 2  STATE OF TEXAS     )
 3          I hereby certify that the witness was notified
 4  on _____ that the witness has 30 days (or
 5  _____ days per agreement of counsel) after being
 6  notified by the officer that the transcript is available
 7  for review by the witness and if there any changes in
 8  the form or substance to be made, then the witness shall
 9  sign a statement reciting such changes and the reasons
10  given by the witness for making them;
11          That the witness's signature was/was not
12  returned as of _____ .
13          Subscribed and sworn to on this, the _____
14  day of _____, 2021.
15
16
17
18          _____
            Jamie K. Israelow, CSR, RMR, CRR
19          Texas CSR 3801
            Expiration Date:  4/30/2021
20          US Legal Support-Dallas
            CRCB Registration No. 343
21          8144 Walnut Hill Lane, Suite 350
            Dallas, Texas  75231
22          214.741.6001
23
24  Charge for transcript and exhibits $ _____
    To be paid by the Defendant / Mr. Todd A. Hoodenpyle
25  JOB NO. 2-375341
```

Michael Boatright, Vol 1
March 10, 2021

1

**$**

**$1**
  17:4  18:4
**$69.5**
  52:21

---

**1**

**1.5**
  20:9
**10/21**
  45:15
**10th**
  5:12
**11th**
  10:24
**12th**
  31:20,25
  32:23  33:1
**14**
  10:20
**17**
  19:21  48:3,9
**19**
  51:15
**1st**
  15:24

---

**2**

**2**
  10:19
**2020**
  6:9  10:24
  37:14  40:21
  47:21
**2021**
  5:13  53:13
  54:6
**21st**
  37:14  40:10
  41:24  42:6
**24**
  7:2

**24th**
  53:13
**25**
  55:25
**25th**
  51:16  54:6
**28th**
  43:23  44:4
  47:11

---

**3**

**30**
  40:20
**31st**
  38:1  40:15,
  21  41:12,21
  47:19,21
**363**
  9:19,20  34:7
  35:10  55:16
  56:9
**3:03**
  5:2,13
**3:57**
  39:18,20

---

**4**

**41**
  44:2
**45**
  47:17
**48**
  53:11
**49**
  15:17  26:9,
  12,17
**4:13**
  39:20,22
**4:48**
  59:11,13
**4:51**
  59:13,15
**4:52**
  60:16,17

---

**5**

**50**
  27:3,4
**5:16**
  47:22

---

**A**

**A-6**
  10:22
**abroad**
  52:2
**absolutely**
  16:24  36:10
  38:13  54:5
  55:21  57:20
**access**
  16:19
**account**
  54:25
**accurate**
  41:10  47:3
**acquiring**
  16:5
**Act**
  20:12
**active**
  6:13  29:6
**actively**
  30:1  58:24
**added**
  6:4  18:19
**additionally**
  15:11  50:17
  56:8
**address**
  50:17
**addressed**
  50:21
**addressing**
  45:11
**advised**
  13:25  14:2

**affiliated**
  50:25  55:19
  59:3
**agents**
  41:8
**agree**
  13:24  14:11
  41:17  48:15
  57:3
**agreed**
  12:19  34:17
**agreement**
  5:14  10:23
  12:1,18
  13:18  19:16,
  19  25:14
  30:4,20  31:8
  34:6,7,11,13
  35:2,10
  41:7,16,20
  42:10  58:12,
  21
**agreements**
  5:16  53:24
**ahead**
  44:21  47:14
**alive**
  15:10
**anticipating**
  16:8,10
  18:4,11
**anticipation**
  17:4
**anybody's**
  60:4
**APA**
  19:4  29:21
  30:11,13,17
  39:9,10
  45:10,13,23
  55:23  56:9
**Apparently**
  48:18
**application**
  10:14,22
**ARIIX**
  58:21

Seacret Direct, LLC Exhibit U
Page 47 of 61

**article**
53:18 54:3,
7,12 55:2,3
56:13,17
**asset**
16:15 22:9
25:14 31:7
32:14 33:5
34:5,7,11,12
35:10 42:10
58:21
**assets**
16:9,23 17:5
18:5 34:2,20
42:2
**Associates**
28:15
**assumed**
27:16
**assuming**
45:6
**attached**
10:21 56:3,
4,11,16,21
57:8,10
**attachment**
56:12,23
57:5
**attachments**
57:1
**attempt**
25:13
**attorney**
25:19
**attorneys**
40:4
**Attributes**
45:10
**audio**
5:5
**authorized**
18:20 27:19,
24
**aware**
26:24 27:12,
16 29:8 54:1

**B**

**back**
15:17 23:15
25:17 30:17
39:21,24
41:23 43:23
52:7 54:24,
25 57:12,18
59:14
**background**
6:4
**bad**
35:1
**Balestri**
25:19,24
26:18,22
27:5 40:1,3,
10,22
**bankruptcy**
7:6 8:15,17
9:18 10:10
16:14 17:11,
17 19:1
21:4,11,14,
23 22:10,12
23:18 24:25
25:3 31:6
35:15,23
36:4,14
37:11,13,17
41:5,24
42:6,20
43:1,3 45:7,
17,21 46:11
49:25 50:3,9
52:16
**based**
19:3 38:10
43:22
**basically**
41:4 52:15
**behalf**
11:16 12:14,
24 25:10
37:16 45:24

**Behindmlm**
53:25 54:3
59:3
**bell**
33:10,12
**Ben**
6:18 7:4,9,
11,14 8:2,9,
11,19 9:4,
11,15,25
10:5 14:19
15:2,16,18
16:1 17:3
18:3,10
19:21 20:1,
11,14,24
21:1,19
25:25 31:5,
6,20,24
32:22,25
33:7,18 34:1
35:4,13
36:3,21
**benefit**
25:3 50:3,6,
12
**bid**
16:6 52:20,
23 57:18
**bidder**
42:11,18
43:10 52:20,
22,25
**big**
44:10
**bit**
25:17 26:14
48:7 52:7
58:11
**bitter**
39:10
**blog**
53:25 54:7
59:3
**Bo**
8:22,23 9:4
16:4

**board**
35:22 50:20
**boards**
50:22,25
**bonus**
22:2,6,21,25
**bonuses**
22:2,9,11,
17,19 23:1
**borrow**
16:7
**borrowed**
16:10,18,20
17:4,13,15
18:4,11
**bought**
15:9
**brand**
8:13 16:5
19:6,13
53:23 55:15
**break**
39:13 42:16
**bring**
57:12
**brought**
41:21
**buried**
42:25
**business**
6:14 15:12
17:9,10 29:7
32:2,24
34:17 37:1
43:1 50:19
**butcher**
9:6
**buy**
16:12 17:5,
13 34:2,12,
16,20
**buyer**
34:18
**buyers**
58:17
**buying**
14:22 16:21

18:5 34:6
35:4

**C**

**call**
8:5,21,24
9:1,3,6
18:19 19:21
31:4 38:6
40:16,17,24
41:4,21 47:6
**called**
31:10,12
46:24
**calls**
29:20 30:8,
11,12,16
31:5,13,18
**capacity**
14:21 23:23
54:14
**capital**
17:18 28:15
**card**
54:11,21,25
**carried**
11:7,10
**case**
17:24 25:11
37:13
**cash**
20:21
**catch**
21:13
**cease**
25:19,24
26:21 27:18,
25 29:12
40:1
**centered**
32:14
**CEO**
6:15 57:11,
14
**challenging**
5:6

**chance**
58:10
**change**
9:20,23
10:10 41:6
**chapter**
9:18
**charge**
54:20,21,25
**chargeback**
54:18,19,23,
24 55:3 56:8
**chargebacks**
54:13 55:2,6
**chief**
6:5
**choosing**
21:20
**circulated**
12:18 13:23
**claim**
42:7 54:21
**claimed**
19:11
**clarification**
9:17
**cleanest**
34:11,16
**clear**
34:7
**clients**
40:24 41:12
**Colendra**
35:21
**collectively**
56:9 57:12,
25 58:6
**combined**
16:15
**commission**
23:9
**commissions**
20:16 21:2,
20,21 23:3,
11,13
**commit**
38:25

**commitment**
32:15
**committed**
55:12
**communicate**
23:23 25:10
**communicating**
23:21 26:20,
23
**communication**
23:18 25:6
32:25 45:12
51:16,19,21
52:9 55:25
**communications**
26:21 31:11
47:8 53:16
**companies**
34:20
**company**
6:19 8:25
9:13,16 10:2
15:18 19:19
20:21 21:4,
22 34:1,2,6
35:4,5,15,
17,18,19
36:4 39:11
43:1 52:2
54:21 58:17
59:18
**complete**
48:14
**completed**
44:25 45:2
**completely**
12:12,23
**Complies**
44:17,22
52:6
**concern**
45:20 46:8
**concerned**
20:2,12
21:3,19,21

**concerns**
45:7
**conference**
40:16,17
**confirm**
29:5,6
**confirming**
28:5
**confused**
13:16,17
**consequences**
20:12
**consideration**
45:10
**considered**
50:5
**contact**
7:10
**contemplate**
41:6
**context**
21:7
**continue**
36:16 39:8
46:13
**continued**
27:20
**continuing**
31:7 58:16
**contracted**
59:18
**contractual**
60:2
**control**
35:14,18
36:4
**conversation**
7:22 8:1,12
9:9,11 18:8
21:8,10
23:16 24:17
31:20,24
32:19,22
33:18,24
34:13 38:21,
22,25 47:10
49:7

**conversations**
6:17 18:16
20:7 23:16
31:7 32:10,
13 33:13,14
35:11

**conveyance**
57:13 58:1,
2,7

**cooperate**
25:14

**cooperative**
25:12

**copied**
26:19 27:5,
6,8 54:17
56:23

**copy**
10:23 47:17
53:17,20

**cordial**
8:20

**corporate**
5:24 6:16
13:5 18:17
43:14 51:15,
19,23 53:15

**correct**
6:6 10:12,22
12:7 15:7
36:17,23
37:14 38:1
42:12,13
47:17,23
48:23 49:2,9
52:14 56:4,
14 57:5,6

**counsel**
6:25 10:16
13:9,11 14:7
26:10 27:1
40:17 41:1
43:25 46:3
47:15 48:4,
19 51:3,12,
13 53:9
54:17

**counsel's**
43:22

**couple**
25:20

**court**
11:5,14

**courtesy**
38:12,14

**create**
54:14

**credit**
54:11,21,25

**creditors**
21:3,22

**CRO**
35:18 54:17
58:21

**current**
17:18 50:23

**curtail**
55:6

**Cypers**
54:8,9

---

**D**

---

**Dan**
57:16,17

**data**
5:5

**date**
20:5 42:5,9
43:10

**dated**
10:23

**Davies**
22:18

**day**
38:22 42:9
46:24 47:1,6

**days**
48:25 49:7

**deal**
15:8 16:8
17:4 28:3
32:2 39:8

42:1,6,16
45:8 57:17

**dealing**
46:5

**dealt**
24:21

**Dean**
5:22

**debt**
35:25

**debtor**
43:3

**debtors**
5:24 6:6 7:5
19:10 20:2,
15 37:4,16
41:23,25
42:5,9,17
50:24 57:17
59:2

**debtors'**
6:13 10:14
37:13

**December**
24:14 31:5,
20,25 32:22
33:1 37:10,
14 38:1
41:23,24
42:6 43:23
44:3 47:11,
20,21

**decision**
14:16

**declaration**
10:13,20
11:19 12:6

**Defendant's**
7:2 26:12
40:20 44:2
51:15

**defenses**
43:19

**defined**
5:25

**depo**
39:15

**deposition**
6:1,17 7:4
18:18 60:8

**designated**
48:20

**desist**
25:20,24
27:18,25
29:13 40:1

**determine**
52:4 60:1

**direct**
31:2 53:19

**directive**
27:18

**directly**
27:16

**director**
50:18

**directors**
35:19,20,22

**discuss**
8:12 14:21
23:24 35:3
38:16

**discussed**
6:17 8:13
9:19,21
15:10 31:25
38:19 39:4
49:17 55:7
58:25

**discussing**
17:7 24:3
33:25

**discussion**
7:23 14:7,24
15:22,23,24
24:9,11
25:2,5 27:20
32:6 35:8,9
38:13 41:11,
20 49:1,5,
11,20,23

**discussions**
15:14 18:9
30:4 37:9

40:4 41:6
43:4,6,8,9
45:19

**displays**
6:25 10:16
26:10 27:1
43:25 47:15
48:4 51:13
53:9

**dispute**
49:9,15,18

**disputes**
54:19,20

**distortion**
5:5

**Docket**
10:19

**document**
6:25 10:16
11:24 12:3,5
13:17,19,22,
24,25 26:10
27:1 43:25
44:13,24
47:15 48:4
51:13 53:9

**documentation**
14:2

**documents**
48:1

**dollars**
16:7,18,20
18:11

**draft**
48:17

**drill**
23:6

**drinking**
45:17

**driving**
28:24

**due**
5:3 35:25

**dues**
55:10,20

**duly**
5:18

---

**E**

---

**e-mail**
7:2,3,14 8:2
18:22 26:12,
19 27:4,5,8
28:4,9 40:9,
11,21 41:14
43:24 44:3,7
45:5,6,9,11
46:9,21,23
47:2,5,7,11,
18,21 48:5,
6,7,8,10,13,
14,16,18,22
53:12,17
55:1,7 56:22

**e-mailed**
47:22 59:21

**e-mails**
18:18 40:3
53:12

**earlier**
5:23 6:1,16
13:4 18:17
47:13 48:13

**Eddie**
7:8,10 11:5
12:16 13:20
18:19 19:5
23:22 25:9,
25 26:21
28:2,7
37:17,23
38:6,8,9
39:6 46:9
53:19 54:4,7
56:4,13 57:4

**Eddie's**
46:7

**effort**
11:8

**eliminate**
38:11

**employed**
14:20 15:3

---

**employee**
57:18

**employees**
18:20 19:22
37:10

**employment**
19:18

**end**
22:2 36:21
50:2

**enforcement**
35:1

**engage**
57:11

**engaged**
30:1,3 45:19

**engagement**
27:20

**enlarge**
7:16

**enter**
41:15

**entering**
13:25 14:2

**entertained**
16:13

**entities**
50:18,22

**entity**
14:23

**equity**
36:22 37:5,6

**Eric**
13:10 22:18
33:8,9,20
46:3 51:3,12

**estate**
25:4,10
35:25 47:9
50:3,6,12

**exact**
20:5

**EXAMINATION**
5:19

**exchanged**
59:2

---

**excuse**
52:11

**executive**
17:7

**executives**
15:18 22:2,
16 23:2

**exhibit**
5:11 6:23
7:1,2 10:17,
19,22 11:23
26:9,12,17
27:3,4 40:20
44:2 47:16,
17 48:3,8
51:15 53:11

**exit**
17:17

**expedited**
60:8

**Explain**
54:18

**explanation**
46:15,17

**extent**
30:21 31:1
58:24

**external**
13:9

**eyes**
13:8,9,13

---

**F**

---

**Facebook**
55:9

**fact**
8:14 13:4
14:16,17
19:3 24:21

**faith**
35:1

**familiar**
34:21 51:6,
10

**favor**
12:1

fear
  46:10
February
  53:13 54:6
fees
  46:13
felt
  19:5,15
  23:22
field
  23:21,22
  45:21 46:8
  52:11,12
  55:25
fighting
  58:10
figures
  22:14
file
  8:15 35:23
  58:22
filed
  37:11,13,17
  41:23 42:5
  43:3 51:4
  55:12
files
  54:20
filing
  19:1 22:12
  24:25 31:6
  42:20 43:7
  45:7,17
finalizing
  55:22
finding
  56:6
fine
  26:15
finish
  39:9
firehose
  45:17
firm
  46:4
firsthand
  30:22

flow
  20:21
Foley
  46:4
folks
  32:1,23 33:1
  43:7,8 46:3,
  4 55:9,15
  56:7 57:12
  58:3,13
follow
  57:22
follow-up
  8:23 28:23
forget-
  28:22
form
  11:21 12:15
  13:1,14
  17:18 18:6,
  13,24 19:14
  20:17 21:5,
  24 22:4
  23:4,12 24:7
  25:8 27:15
  28:8 32:3
  33:3,11,22
  34:4 35:6,16
  36:24 42:21
  43:11 46:18
  49:3 57:19
forwarded
  7:10 48:19
  54:6
found
  55:7
frankly
  17:15 34:10
  46:6
fraudulent
  54:22
free
  34:7
freezes
  5:5
Friday
  49:13

full
  5:21 23:3,
  11,14
funds
  16:11

_____

G

_____

gave
  47:3 48:22
general
  46:3 51:3,12
generally
  13:23 15:14
  25:10 39:5
  56:5 58:4,15
generated
  45:8
gentleman
  9:7
Gini
  59:18
give
  6:24 26:15
  30:14 44:9
  54:24
giving
  10:13 15:17
  52:15
globally
  50:19
go-forward
  14:23
goal
  32:18 33:5
good
  19:11,13
  23:22 50:7,
  10 59:9
governance
  19:18
government-
issued
  5:9
graceful
  39:7

group
  11:25 15:10
  19:4
groups
  51:23
growing
  46:10
guess
  41:25 45:11
  46:23 49:12
  51:20
Gwynn
  53:12,14,15

_____

H

_____

hand
  20:25
happen
  21:9 31:23
  32:18
happened
  27:17
happenings
  55:17
hard
  27:24
havoc
  54:14
Haynes
  13:10 22:18
  51:3,12
head
  7:8 10:25
  11:5,15
  12:17 14:17
  18:19,25
  19:11 22:21
  23:17,24
  24:3,16,22
  25:2,6,13,25
  26:21,23
  27:10,13
  28:7,23
  37:17,20,22
  38:1,6,16,
  22,23,25

40:2 44:3
45:5 46:24
47:18,22
48:6,18,22
49:1,6,16
50:24 51:5,8
53:15,19
54:4,7,10
55:18 56:4,
13,17 57:4

**Head's**
12:13 50:21

**heads-up**
38:12

**health**
58:20

**healthy**
34:17

**heard**
8:21,23 18:2

**hearing**
46:11 60:11

**hearsay**
26:2

**helpful**
19:5

**helping**
8:17 32:5
39:1

**high**
33:23

**Hoodenpyle**
5:16,20 7:1
9:24,25
10:8,17
11:11,13
12:2,21,22
13:4 14:1,8,
9,25 15:1,
15,16 18:10,
17,25 19:20
20:19 21:16,
18 22:1,6
23:10,15
24:10 25:13
26:4,11
27:2,21

28:11,22
29:1,17 30:7
31:19 32:9,
21 33:6,16,
17,25 34:14,
25 35:3,13
36:1,2,13,20
37:3,9
39:12,16,23
42:23 43:18,
20 44:1
46:20 47:16
48:5 49:6
50:15 51:14
53:5,10
57:22 59:6,
9,16 60:7,12

**hope**
58:14,15

**hoped**
36:15

**hoping**
58:7,10,12

**horse**
43:5 55:23

**hour**
39:13

**hours**
48:6

————————

**I**

————————

**idea**
16:2 41:15

**identificatio
n**
5:10

**identity**
5:10

**impact**
45:20

**important**
35:24

**in-person**
5:8

**include**
11:18 58:18

**including**
17:8 28:6

**independent**
35:19,20

**individual**
55:8

**individuals**
55:8

**Inevitably**
24:24

**information**
7:10

**initials**
28:16

**injunction**
28:21 34:24
60:10

**injunctive**
10:14

**insolvent**
6:20

**instance**
33:15

**instruct**
43:17 53:2
57:21

**instructed**
53:22,23

**instruction**
57:23

**intact**
15:12

**intent**
11:4,14

**interest**
8:7,24 33:20
36:15 55:17

**interested**
8:16 16:5
17:8 33:9,20

**interim**
41:7,15,20

**internal**
13:8,9,11
52:1

**internally**
15:9

**interrupt**
47:14

**intricately**
19:15

**introduction**
8:6,22

**investigate**
59:17

**investing**
8:7,25 17:8,
9 31:6

**investor**
32:5

**involuntary**
21:4,23

**involved**
11:19 13:7
19:15 26:4
27:10,11,13
28:24 29:9,
14 40:2,4
41:25

**involvement**
29:18 30:19,
24,25

**issue**
43:13

**issued**
28:1 51:16

**issues**
43:18

**item**
11:23

**iterations**
17:17

**Izhak**
6:18 15:9
17:3 25:25
31:5 36:20

————————

**J**

————————

**January**
37:24 47:20
51:16 55:25

**Jeff**
53:12,14,15

Secret Direct, LLC Exhibit 87
Page 53 of 61

**Jenkins**
22:18 33:8,
19

**Jim**
35:20

**job**
19:11,13

**John**
40:21

**joined**
40:16,25

**Judge**
35:20

**judging**
41:14

**justifi-**
45:21

**justifiably**
45:22

**Justin**
18:19

---
**K**
---

**Kelly**
40:21,22
41:11

**Kelly's**
41:14

**kind**
5:25

**knowledge**
19:17 25:23
26:3 30:22
41:19 54:5
59:5

---
**L**
---

**laid**
13:8,9,13

**Lardner**
46:4

**large**
11:25 54:13

**larger**
26:14

**late**
22:21

**lawsuit**
19:10 51:4
56:3,13,17
57:4

**lawyers**
41:2,3

**lead**
11:5,14 30:8
46:2

**leader**
50:7,10

**leadership**
13:24 22:9

**leading**
30:10 45:23

**lean**
33:4

**learned**
7:5 33:13

**learning**
6:19

**leaving**
58:8,13

**led**
30:12

**left**
59:7

**legal**
14:7

**lender**
28:13,14
29:2,7

**letter**
25:20,25
28:1 29:13
56:6

**level**
30:19,24,25

**liability**
25:4

**likelihood**
33:23

**likewise**
26:20

**limited**
10:23 12:1
13:18 30:4,9

**lines**
20:15 24:9

**lion's**
11:7,10

**list**
12:23 13:2
18:19

**listen**
19:24

**listened**
16:3 17:25

**litigation**
50:19 51:10

**logic**
27:25

**LOI**
25:21 29:10

**long**
24:18 59:8

**longer**
42:17

**looked**
7:4 40:2
47:12

**lost**
34:14 58:11

**lot**
17:16 18:9,
15 34:25
37:19 42:14
55:4

**loud**
50:12

**LSA**
11:6,16,19
12:13,24
13:7,8,10,13
14:3,11,13,
17 17:1 20:8
29:10

---
**M**
---

**made**
8:22 14:16
16:19 21:7,
10,11,13
26:6 27:16
56:9

**make**
5:6 8:6 19:7
20:22 26:13
27:7 28:5
47:3 48:2
57:18

**making**
8:14

**management**
41:7,16,20

**managing**
43:2

**March**
5:12 6:8

**Marcus**
58:20

**marked**
7:1 10:18
26:8 27:3
53:11

**market**
58:16

**marketing**
10:25 58:24

**marketplace**
17:20

**Marvin**
40:24

**material**
9:20 19:17
54:16 55:1,3

**matter**
45:9

**MCA**
28:15,18

**meant**
46:16 57:7

Seacret Direct, LLC Exhibit 17
Page 54 of 61

media
53:22
members
51:23,24,25
52:1,11
membership
58:5
mentioned
51:5 52:19
merchant
54:20
merchantguy@
yahoo.com.
54:8
merger
53:19
Michael
5:17,22
middle
7:3 29:21,24
migrate
41:8
Mike
40:25
million
16:7,18,20
17:4 18:4,11
52:21
mind
9:18
minute
37:25 39:24
44:9 59:7
minutes
59:9
mistaken
37:24
MLM
53:18
moment
35:23
money
16:10 17:13,
15 54:24
59:2
Montgomery
28:12,15

29:1,8,13,18
30:3,7,12,25
month
23:1
months
55:19
months'
55:10
morning
40:25
move
14:20 15:2
44:20
moved
32:19 58:4
moving
19:21 24:5
25:3 37:10
multiple
55:9
Mutzafer
9:7
Muzafer
9:5,8,9

———————

———————

**N**

needed
8:15 23:20
negotiate
37:4
negotiated
10:25 12:13,
17
negotiating
11:6,16,19
12:24 13:7,
21 42:10
45:13
negotiation
13:13 25:21
27:13
negotiations
11:10 13:22
29:9,18,22
30:2,3,9
45:23

negotiator
31:3
Nelms
35:20
news
53:18 55:13
56:3,4,9,11,
16 57:8,10
58:12
noncompete
35:1
nonresponsive
9:24 11:12
12:21 14:8,
25 15:15
21:17 33:16
36:1
note
5:3 40:23
notes
49:25
notice
38:17 48:23
noticed
43:14 55:7
November
10:24 19:20
20:7 24:13
NPO
50:20
Nugent
6:12,13 9:2,
12,16 10:1,5
13:6 14:13,
16 15:11
26:7 27:12
28:4 35:21
36:21 37:5
number
10:19 17:23
27:3 44:2
48:3,9

———————

**O**

———————

object
11:11 14:25

15:15 21:16
28:19 33:16
36:1 53:1
objected
43:14 53:3
Objection
9:24 10:7
11:21 12:15,
21 13:1,14
14:8 18:6,
13,24 19:14
20:17 21:5,
24 22:4
23:4,12 24:7
25:8 26:1
27:15 28:8
29:15 30:5
32:3,11
33:3,11,22
34:4,22
35:6,16
36:11,18,24
37:7 42:21
43:11 46:18
49:3 50:4
57:19
occur
14:24
occurred
8:3 33:24
47:10
October
6:18 8:4
15:24 25:17,
18 39:24
40:10,15,21
41:12,21
off-the-cuff
23:8
officer
6:5
onboard
22:9
operate
5:25
operates
21:11,15

**operating**
  6:5 14:23
**opportunities**
  17:19,21
**opposed**
  5:7 16:22,25
  17:1
**optics**
  45:7
**options**
  16:3
**organization**
  41:5
**original**
  42:3
**owner**
  54:10 57:11,
  14
**ownership**
  9:20,23
  10:10 32:24
  33:2,8,19
  35:22,23
  36:15

———————————

**P**

———————————

**p.m.**
  5:2,13
  39:20,22
  47:22 59:13,
  15 60:16,17
**package**
  23:25 24:4,
  22
**paid**
  22:2,7,11,
  14,17 23:1,8
**paragraph**
  10:20 49:25
  50:16
**part**
  13:13 17:13
  21:13 22:25
  31:16 34:13
  56:6

**participate**
  13:20
**participating**
  13:21
**parties**
  11:18
**partner**
  8:16
**pass**
  60:7
**passed**
  46:2
**past**
  47:2
**Paul**
  22:18 33:7,
  19
**pay**
  20:2 21:2,21
  22:1 23:2,
  11,13
**paying**
  20:16 21:19
  46:13
**payments**
  20:22
**penalty**
  12:7
**people**
  12:24 13:3,
  12 25:20
  30:8 34:19
  55:10 58:8
**percent**
  15:17 33:2
**percentage**
  33:8
**period**
  45:15
**perjury**
  12:7
**person**
  8:21 12:17
  13:20 28:24
**personal**
  25:23 26:2

**personally**
  13:7 30:23
  59:1,17,19
**perspective**
  50:8 54:15
**perusing**
  44:13,24
**petition**
  42:9 43:10
  45:24
**phone**
  38:21 41:21
**phrase**
  24:9
**piece**
  30:20 32:2,
  23,24
**plan**
  23:19,21
  25:7 32:5
  41:25 42:3
**planning**
  8:15
**Poates**
  5:17,22,23
  11:14 14:9
  17:23 36:2
  39:23 40:25
  43:21 49:13
  51:14 53:10
  59:16
**point**
  6:24 19:2,7
  27:9 28:5
  39:6 45:13,
  14,25 46:2,7
  49:12 53:2
**polite**
  8:20
**politely**
  16:3
**POR**
  17:11
**portion**
  11:25 23:8
**position**
  9:22 36:8,13

  37:4,5
**positions**
  50:21
**possibility**
  16:12 57:11
**Possibly**
  24:1
**post-petition**
  32:10,12
**potential**
  8:16 43:5
  58:17
**potentially**
  15:13 17:13
  32:5,16
  39:10 58:22
**preceding**
  48:25 49:8
**precipitated**
  45:5
**prefer**
  41:1
**premarked**
  5:11
**prepackaged**
  42:1,7
**prepare**
  5:6
**prepared**
  5:7
**present**
  41:1
**presenting**
  45:10
**presents**
  5:9
**pressure**
  55:5
**pretty**
  45:16
**price**
  34:17 37:1
**primary**
  12:17 13:20
**principal**
  32:6

| | | | |
|---|---|---|---|
| **prior** | **pull** | **quick** | 45:15,18 |
| 7:22 38:13 | 6:23 40:5,9 | 40:23 | 46:1,5,19,22 |
| 43:7,10 | 53:8 | **quickly** | 47:1,4 49:4, |
| 46:15,17 | **pulled** | 32:19 | 10,19,22,23 |
| 57:11,14 | 10:17 17:18 | | **receive** |
| **privileged** | **purchase** | ———————— | 22:19,21 |
| 48:20 | 16:8 25:14 | **R** | 23:25 24:4 |
| **proceedings** | 31:7 32:15, | | 47:18 48:8 |
| 5:8 | 17 34:6,7, | **raised** | **received** |
| **process** | 11,12 35:10 | 43:19 | 16:4 23:7 |
| 13:13 17:12, | 37:1 42:2,10 | **Ray** | 31:13,17 |
| 14 25:15 | 58:21,22 | 25:18,24 | **receiving** |
| 27:13 30:8 | **purchased** | 40:1,22,23 | 24:22 44:7 |
| 34:21 36:14, | 15:19 | **reach** | 55:4 |
| 16,22 46:11 | **purchasing** | 59:21 60:1 | **recess** |
| 49:25 50:9 | 16:22 | **reached** | 39:19 59:12 |
| 52:16 | **purpose** | 60:5 | **recollection** |
| **processing** | 8:5 | **read** | 19:25 26:6 |
| 54:11,15 | **purposes** | 11:2 44:9,10 | 30:10 49:14 |
| **processor** | 16:20 60:8 | 45:1 | **recommendation** |
| 55:5,12 | **pursuing** | **reading** | 43:22 |
| **produced** | 42:17 52:23 | 44:25 45:6 | **record** |
| 17:24 48:1 | **purview** | **ready** | 5:2,13 |
| **products** | 59:1 | 44:20 | 39:17,18,22 |
| 41:9 | **pushed** | **reason** | 59:11,14 |
| **professional** | 39:9 | 49:9,15,18 | 60:13,15,17 |
| 39:7 | **put** | **reasons** | **recorded** |
| **profit** | 16:7 21:3 | 29:12 | 18:7 19:23 |
| 32:7 | **putting** | **recall** | 33:14 |
| **profits** | 16:5 21:22 | 6:21 10:13 | **recording** |
| 32:24 | | 15:4 17:6,12 | 18:2,15 |
| **program** | ———————— | 18:15 19:20 | 19:24 33:15 |
| 32:7 | **Q** | 20:5,14,23 | **recordings** |
| **progress** | ———————— | 21:1,8,9,25 | 17:24 |
| 30:9 | | 22:8 24:3,18 | **redacted** |
| **proposing** | **quality** | 25:1,5,11,18 | 50:13 |
| 25:7 | 5:3 | 30:10,19 | **reduce** |
| **prosecuted** | **question** | 31:4,10,14, | 50:1 |
| 51:5,9 | 11:13 14:9 | 19,22,23,24 | **reengage** |
| **provide** | 15:1 19:9 | 32:13,17 | 28:2 |
| 15:12 38:17 | 21:18 32:21 | 33:18,25 | **reference** |
| 54:15 55:13, | 36:2 46:12 | 34:12 35:7, | 6:24 |
| 14 | **questioning** | 8,12 37:12 | **referred** |
| **provided** | 6:21 18:18 | 38:20,24 | 51:24 56:5 |
| 38:14 54:17 | 39:25 | 39:6 40:5,7, | **referring** |
| **provision** | **questions** | 8,15,18,19 | 50:9 55:23, |
| 20:8 | 20:15 23:16 | 41:22 42:13 | |
| | 28:23 43:21 | 43:2 44:7 | |
| | 60:10 | | |

Seacrest Direct, LLC Exhibit U
Page 57 of 61

24 56:3
57:15 58:2,3

**refund**
54:22,23

**refuse**
43:20 53:5

**regulatory**
50:19

**related**
37:10 59:3

**relationship**
23:22 60:2

**relative**
30:17 35:9
45:20 47:9
53:22

**relevant**
11:23,25
43:19 55:13

**reliance**
18:4

**relief**
10:14

**remember**
9:10 18:22
24:1,2,13,20
33:6 34:5,8,
9 37:18 39:6

**removal**
50:17

**remove**
9:12,16
10:1,5

**removed**
50:24

**removing**
9:22

**reorganizatio
n**
17:11 32:6

**report**
6:11

**REPORTER**
5:14 21:12
31:15

**reporter's**
5:3

**representatio
n**
41:11

**representativ
e**
5:24 6:16
13:6 18:18
43:14

**representativ
es**
20:16 21:2
23:3 46:8,12
52:12,13

**reps**
21:20,21
51:23 52:11

**request**
25:12 26:7,
17,21 27:10
28:1 37:16
54:22

**reserving**
60:9

**residual**
23:3,11,13

**resign**
37:17,20,22
38:3,7 46:24

**resignation**
38:7 39:2
47:9,18,22
48:22,23,25
50:2

**resigned**
38:1,23

**resolution**
33:5

**resolutions**
8:14

**respect**
11:8 29:21
39:9

**respond**
46:20

**responded**
7:8 14:7

**response**
8:19 16:1,4

**responsible**
11:6,15

**rest**
48:20 58:5

**restaurant**
17:19,21,22

**retention**
22:8,25

**Reuven**
54:8,9,10

**ring**
33:10,12

**RIP**
53:19

**Rob**
39:13 59:7

**role**
6:8 38:11
50:18

**roughly**
35:11

**Rovia**
14:22,23
15:8,9,11
16:12 17:9
32:14

———————

**S**

———————

**salary**
50:13

**sale**
9:19,20
21:20,21

**sales**
20:16 21:2
23:3 46:8,12
52:13 58:11

**scam**
55:10,19

**scenario**
10:11

**scope**
43:12,15

**screen**
40:14 44:1

**scroll**
7:20 44:14,
16,21 52:3,
7,10

**Seacret**
10:25 14:20
15:3,13
16:8,22 17:5
18:5,21
19:4,22
24:6,23 25:3
26:19,22
29:9,19
36:7,16
37:11 39:1
40:2,17
41:2,8 42:1,
11,17 45:12
49:2,8,17
53:19 57:13
58:1,4,7,9,
14,18,24
59:17 60:3

**seat**
50:20

**second-to-
the-last**
50:16

**section**
11:1 20:8

**secured**
28:13

**segregate**
32:16

**seller**
34:18

**selling**
41:8

**send**
53:22

**sending**
40:1 45:5
53:17,21
54:12

Seacret Direct, LLC Exhibit U
Page 58 of 61

Case 20-42492   Doc 555-21   Filed 10/18/21   Entered 10/18/21 15:57:26   Desc
Exhibit U - Page 59 of 61
Michael Boster, Vol 1
March 10, 2021

13

sends
  27:5
senior
  12:19 22:9
  28:13 32:1,
  23 33:1
sense
  19:7 21:7,
  11,13 48:2
sentence
  11:1 50:16
  56:2
services
  15:13 41:9
set
  32:7,16
  34:19
severance
  23:25 24:4,
  22
severances
  20:2
Shabat
  6:18 7:5,9,
  11,14 8:2,9,
  11 9:4,12,15
  10:1,5 14:19
  15:2,17,19
  17:3 18:3,11
  19:21 20:1,
  11,14,24
  21:1,19
  25:25 31:5,
  6,20,25
  32:22,25
  33:7,19 34:1
  35:4,14
  36:3,21
Shabat's
  8:19 16:1
share
  11:7,10
  40:14
shared
  41:4
sharing
  32:7

shell
  34:2,8,10,19
  35:5
short
  8:22 9:4
  16:4 39:13
show
  26:8 27:2
  43:24 47:12
  48:2
showing
  40:3 44:2
  47:16 51:14
  53:10 54:7
side
  11:8,9 17:9,
  10
sign
  14:17
signed
  14:13
similar
  27:6
Simon
  22:18
single
  55:15
sir
  5:22 6:3,7,
  10 7:12 8:10
  10:15 11:3
  12:8 14:15,
  18 17:2,22
  22:25 23:23
  25:16,22
  26:13,25
  27:22 28:10
  29:11 33:24
  37:15 38:2,
  5,8,18 39:3
  42:4 44:6,8
  45:2 47:19
  49:23 51:18
  52:14 53:7
  54:1 56:1,25
  57:24 58:11
  59:5,22
  60:14

sit
  24:21 33:17
six-figure
  22:19
six-month
  23:25 24:4
SLOVAK
  5:15 10:7
  11:21 12:15
  13:1,14
  18:6,13,24
  19:14 20:17
  21:5,24 22:4
  23:4,12 24:7
  25:8 26:1
  27:15 28:8,
  19 29:15
  30:5 32:3,11
  33:3,11,22
  34:4,22
  35:6,16
  36:11,18,24
  37:7 39:14
  42:21 43:11
  46:18 49:3
  50:4 53:1
  57:19 59:8,
  10 60:9
slow
  57:12,25
  58:7,13
slowing
  58:6
soft
  39:10
solely
  11:5,15
  30:11
solicitation
  10:23 12:1
  13:18 19:16
  30:4,9,20
  58:12
sort
  41:7
sound
  40:12 41:10
  46:25

speaking
  30:18
specific
  29:23
specifically
  34:5 35:8
Spherature
  53:16
spoken
  7:13,14 8:8
  54:3 59:20
stalking
  43:5 55:23
stalking-
horse
  42:11,18
  43:10 52:20,
  22,23,25
Stammen
  57:16,18
state
  5:21 8:13
status
  50:23 55:16
stay
  15:12 19:1,
  6,12 23:17
  25:6
stock
  35:4,23
stop
  25:21 26:20,
  22 27:10
strategy
  17:10
stream
  55:7
streamlined
  50:1
string
  8:2
style
  11:24 12:3
subject
  12:7 20:24
  45:9

subjects
  50:20
sues
  53:19 54:4
suitor
  43:4
support
  10:13 23:18
  25:6,14
supporting
  50:18
sworn
  5:18

**T**

Taiwan
  51:6,9
taking
  46:1
talked
  9:18 18:18
  32:4
talking
  13:17 34:5
  41:2 56:16,
  18
talks
  46:10
teaching
  55:9 56:7
team
  12:20 13:23,
  24 17:7
  28:5,6
  51:24,25
  52:1
telling
  18:3 20:23
  21:1 33:7
temporary
  28:21 34:24
  60:10
tendered
  38:7
tenure
  29:6

term
  50:14
terms
  5:25 9:21
  55:22
testified
  5:18,23
  49:7,16
testify
  43:16
testifying
  13:5
testimony
  10:4,8,21
  11:4 12:7,22
  34:14
thing
  34:9 56:20,
  21 59:23
things
  23:20 50:1
  56:18
thinking
  17:15 50:11
thought
  9:5 11:24
  19:16 38:15
TI
  43:13,15
  53:3 57:21
time
  6:19 7:13
  8:8 19:5,6,8
  20:5 24:19
  25:17 27:9
  29:22 34:20
  37:19 41:24
  45:14,25
  46:2 48:13
  51:7 60:7,10
today
  5:12,23 6:1
  13:4 24:21
  33:17
told
  10:4 33:18
  35:17 36:6,

20 37:23
  38:8 40:25
Tom
  28:11 29:20
  30:25
top
  55:11
topic
  43:13
transaction
  18:5,12
  28:17 39:1
transcript
  5:7 6:5
transmission
  5:4
Trask
  59:18,20
travel
  15:13
triangulate
  47:10
TRO
  32:19
true
  10:22 12:11,
  12,14,23,25
  13:2,12
  14:18 32:9
  37:6 47:17
two-week
  38:17

**U**

unauthorized
  54:22
understand
  12:6 27:25
  47:25 56:24
understanding
  12:20 13:16,
  19 15:5,6,7
  27:17,23
  28:2 29:16
  45:4 46:16
  58:20

untrue
  12:10
update
  51:20 52:16
  54:16 55:14,
  15 56:8,10
updates
  54:16 55:13
updating
  30:8
US-BASED
  54:11 55:5

**V**

venture
  16:11
verge
  7:6
verified
  5:10
versus
  54:23
videoconferen
ce
  5:4

**W**

Wait
  31:15
waiving
  20:8
wanted
  28:5 29:8,14
  32:1 33:8,19
  38:11
WARN
  20:12
Wayne
  6:12 9:22
  13:6 15:11
  26:6,7
  27:19,24
  28:2 35:21
  36:21,25

**Wayne's**
28:1
**ways**
17:16 34:11
**week**
8:4 37:23
52:18 55:14,
15
**week's**
56:9
**weekly**
55:14
**weeks'**
48:22
**wind-down**
50:20
**word**
34:8 39:6
**work**
8:17 18:20
22:10 24:23
49:2,8,17
58:8
**work-out**
17:14
**working**
25:21 28:6
36:7,16
57:17
**workout**
17:10
**Worldventures**
8:7 10:6,24
11:9,16
12:14,25
15:19 16:9,
21,23 17:5,
10,14,16
19:1 23:18
25:19 26:23
28:17 29:2
34:3 36:9
45:24 53:16,
18,24 54:2,
4,7 58:4,8

**Worldventures**
'
56:13
**worry**
42:14
**worth**
55:10
**wreak**
54:14
**write**
12:5
**writing**
14:10
**written**
14:1
**wrote**
12:9
**WV**
41:5,8
**WV's**
41:1,3
**WVH**
41:4

─────────────
**Y**
─────────────

**y'all**
21:1 43:19
48:19 49:7,
16 51:4,5
**year**
5:13 6:18
22:3,22
24:14 31:21,
25 40:16
42:24 45:16
51:17

─────────────
**Z**
─────────────

**Zoom**
5:4