# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **SPHERATURE INVESTMENTS LLC,** | § | **Case No.: 20-42492** |
| *et al.* | § | |
| | § | **Jointly Administered** |
| Debtors. | | |

---

| | | |
|---|---|---|
| **SPHERATURE INVESTMENTS LLC,** | § | |
| *et al.* **d/b/a WorldVentures Holdings,** | § | |
| **LLC**[1] | § | |
| **Plaintiffs,** | § | |
| | § | **Adversary No. 21-04058** |
| **vs.** | § | |
| | § | |
| **Kenneth E. Head,** | § | |
| | § | |
| **Defendant.** | | |

## PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

Plaintiffs Spherature Investments LLC, d/b/a WorldVentures Holdings, LLC together with its affiliated Debtors (collectively, "WorldVentures"), file this *Emergency Application for a Temporary Restraining Order and Preliminary Injunction and Supporting Memorandum* (the "**Application**"), seeking a temporary restraining order and a preliminary injunction to enjoin Defendant Kenneth E. Head (the "**Defendant**" or "**Head**"), immediately and pending final adjudication, from violating his Executive Employment Agreement ("**Employment Agreement**").

---

[1] The "**Debtors**" in the above-captioned jointly administered chapter 11 cases ("**Cases**") are: Spherature Investments LLC ("**Spherature**") EIN#5471; Rovia, LLC ("**Rovia**") EIN#7705; WorldVentures Marketing Holdings, LLC ("**WV Marketing Holdings**") EIN#3846; WorldVentures Marketplace, LLC ("**WV Marketplace**") EIN#6264; WorldVentures Marketing, LLC ("**WV Marketing**") EIN#3255; WorldVentures Services, LLC ("**WV Services**") EIN#2220.

In support of the Application, WorldVentures submits the declaration of Michael Poates, attached hereto as **Exhibit A**. The Employment Agreement is attached hereto as **Exhibit A-1**. [2]

## I.    EXECUTIVE SUMMARY

1.      Within weeks of his resignation as WorldVentures' President and Chief Strategy Officer ("**CSO**"), Head was named President and Chief Business Development Officer for Seacret Direct, LLC ("**Seacret**"). Although Seacret had no historical presence in the travel industry, that all changed upon Head's arrival at Seacret. Before leaving WorldVentures to compete against it at Seacret, Head helped lay the groundwork for Seacret's travel business by (among other things) encouraging WorldVentures to sign various agreements that he negotiated with Seacret that gave Seacret access to WorldVentures' confidential and proprietary information related to its travel platform—WorldVentures' core business. Upon information and belief, Head further actively solicited WorldVentures' sales representatives, employees, and vendors to work with Seacret as well. Such actions diminished the value of these bankruptcy estate assets, which are the subject of a sale in the above-captioned proceeding.

2.      Head's actions breached his Employment Agreement with WorldVentures. Further, by failing to disclose his involvement in Seacret's establishment of a competing membership-based travel business, Head breached fiduciary duties to WorldVentures. WorldVentures has suffered and will continue to suffer immediate and irreparable harm if Head is not immediately enjoined from violating his restrictive covenants and fiduciary obligations, and WorldVentures respectfully requests that this court enjoin Head from working in a competing multilevel marketing company providing membership-based travel services marketed through direct sales and from

---

[2] WorldVentures simultaneously filed an Adversary Complaint with this Application and incorporates as necessary the allegations contained therein.

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM                                                                   PAGE 2**
4844-8891-5931.7

using WorldVentures' confidential and proprietary information against WorldVentures in that competing business.

## II.   JURISDICTION AND VENUE

3.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1)(2)(A), and (O). This Application relates to the Spherature Investments LLC, et al. bankruptcy cases, jointly administered under case number 20-42492, filed under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Texas (Sherman Division). Venue is proper in this District and this Division pursuant to 28 U.S.C. § 1409(a).  The statutory predicates for relief requested herein are 11 U.S.C. § 105, Federal Rule of Civil Procedure 65, made applicable to the proceeding through Federal Rule of Bankruptcy Procedure 7065, and applicable state law.

## III.   BACKGROUND

A.      **Head executes the binding Employment Agreement with WorldVentures.**

4.      WorldVentures is a multilevel marketing company that sells "lifestyle membership products and services."[3] WorldVentures' business model centers on a membership-based travel sales network of independent sales representatives (the "**Sales Representatives**").[4] It derives its revenue from these Sales Representatives and the membership and travel-related sales that they

---

[3] WorldVentures conducts travel-related business operations in the following countries: Australia; Austria; Botswana; Brazil; Canada; Colombia; Cyprus; Czech Republic; France; Germany; Greece; Guam; Hong Kong; Hungary; Iceland; Ireland; Israel; Jamaica; Kenya; Latvia; Malaysia; Malta; Mexico; Namibia; Netherlands; New Zealand; Philippines; Poland; Puerto Rico; Romania; Russia; Serbia; Singapore; Slovenia; South Africa; Sweden; Taiwan; Uganda; United Kingdom; United States; Zambia; and Zimbabwe. *See* Ex. A, ¶ 6.

[4] In the Employment Agreement, "Sales Representative" is defined as "the independent sale representatives that are authorized by [WorldVentures] to sell its Services." "Services" is defined as "membership-based travel services marketed through direct sales." *See* Ex. A-1, Art. III, at 6.

PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION AND SUPPORTING MEMORANDUM                                                      PAGE 3
4844-8891-5931.7

Seacret Direct, LLC-Exhibit GG
Page 3 of 122

generate—thus, the "going-concern" assets of WorldVentures is mostly comprised of the Sales Representatives themselves and the sales platform through which they operate. Travel sales are booked through an online travel platform operated by WorldVentures' affiliate Rovia at www.dreamtrips.com. It is primarily through this website and other similar services that WorldVentures and its Sales Representatives booked various travel services and vacation-related transactions.

5.      In March of 2017, Head became President of WorldVentures, and he added the CSO title in October 2017. On July 12, 2018, Head executed an Executive Employment Agreement with WorldVentures. Under the Employment Agreement, Head received a large base salary and a percentage equity in the company, as well as bonuses and benefits. *See* Ex. A-1, ¶ 1.03.

6.      As President, Head was afforded unrestricted access to WorldVentures' confidential and proprietary information, including information regarding WorldVentures' multilevel marketing network structure, its travel products and services, its customers, members, employees, sales representatives, vendors, suppliers, financial information, along with WorldVentures' database managed by the direct selling software platform Exigo Office Inc. ("**Exigo**"), which contains detailed information regarding WorldVentures' sales representatives and information regarding their respective downlines. *See* Ex. A, ¶ 10; *see also* Ex. A-1, at Article III. Head also had access to a full array of WorldVentures financial statements, proprietary business methodologies, and strategies. In simple terms, the foregoing information is vital to WorldVentures' business and potentially devastating in the hands of a competitor. Indeed, during his tenure as WorldVentures' President, Head previously testified that WorldVentures' multilevel

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM                                                                                    PAGE 4**
4844-8891-5931.7

**Seacret Direct, LLC-Exhibit GG
Page 4 of 122**

marketing network structure is one of its "most viable assets."[5] *See* Ex. B, ¶ 10. Head's access to this information was tightly controlled and subject to strict prohibitions against unauthorized use and disclosure in the Employment Agreement.[6] *See id.* at ¶ 11; *see also* Ex. A-1, Article III.

7.      Further, upon termination of his employment, Head agreed to return all confidential information and work product information to WorldVentures. *See* Ex. A-1 at ¶ 2.07.

8.      Head also agreed not to compete with WorldVentures. Specifically, Head agreed to the following Non-Compete Provisions, collectively referred to herein as the "**Non-Compete Provisions**:

(a)     Refrain from participating, either directly or through an Affiliate, any current and/or former WorldVentures' employee, customer, sales representative, vendor, and/or supplier to work or otherwise perform services for a Competing Business;

(b)     Refrain from soliciting, either directly or through an Affiliate, any WorldVentures' Customers and Members;

(c)     Refrain from employing or soliciting, either directly or through an Affiliate, any WorldVentures' Employees;

(d)     Refrain from interfering with or soliciting, either directly or through an Affiliate, any WorldVentures' vendors, suppliers, or contractors; and

(e)     Refrain from soliciting WorldVentures' Sales Representatives to a Competing Business.[7]

---

[5] A true and correct copy of Head's June 4, 2018 affidavit previously filed in his capacity as company representative of WorldVentures is attached hereto as **Exhibit B**.

[6] The definitions of WorldVentures' "Confidential Information" and "Work Product" can be found in Article III of the Employment Agreement. *See* Ex. A-1, ¶ 3.1. The capitalized terms as used herein shall have the meanings respectively ascribed to them in the Employment Agreement.

[7] The Non-Compete Provisions can be found in Article III of the Employment Agreement. *See* Ex. A-1. Accordingly, as defined in Paragraph 3.01 of the Employment Agreement, the terms: (1) "Competing Business" shall mean a Person (other than the Company) that provides Services; (2) "Person" shall mean any individual, corporation, partnership, limited liability company, trust, estate, or other entity; (3) "Services" shall mean membership-based travel services through direct sales; (4) "Territory" shall mean any Open Market or any country that the Company has taken substantial steps to cause an Open Market during the Term of this Agreement; (5) "Open Market" shall mean those countries in which the Company enrolls Sales Representatives, Members, or Customers; (6) "Sales Representatives" shall mean the independent sales representatives that are authorized by the Company to sell its Services; (7) "Members" shall mean any Customer who has purchased the Company's travel club membership product; (8)

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM                                   PAGE 5**

4844-8891-5931.7

The Non-Compete Provisions are subject to a 24-month period following Head's termination (the
"**Non-Compete Period**").

9.      Head also agreed that "he will not at any time, including following the termination
of his employment with [WorldVentures] for any reason, use for his own purposes or disclose to
any Person . . . any Confidential Information of the Company, any of its Customers, or any of the
Company's or its Customers' employees." *See id.* at ¶ 3.03.

10.     Head agreed that these express covenants and restrictions "shall continue in full
force and effect" after his employment with WorldVentures. *See id.* at ¶ 2.08. Equally important,
Head acknowledged and agreed that the covenants and restrictions in the Employment Agreement
were "reasonable in their terms and do not impose any undue hardship" on his current or future
employment prospects. Head further acknowledged and agreed that the competitive use of
WorldVentures' confidential information "would cause grievous damage" to the business, and that
WorldVentures would not have hired him, disclosing its Confidential Information, "in the absence
of the protections afforded by the confidentiality and non-compete provisions" as set forth in the
Employment Agreement. *See id.* at ¶ 3.07.

**B.      Head enables Seacret's access to information necessary to compete with
WorldVentures.**

11.     On July 22, 2020, WorldVentures and Seacret executed a co-marketing agreement
("**Co-Marketing Agreement**"), through which Seacret agreed to make its products available to
WorldVentures' Sales Representatives to sell such products.[8] *See* Ex. A, ¶ 12. On November 10,

---

"Customer" shall mean any Person to whom or to which the Company is currently providing Services and shall include
a Member; and (9) "Affiliate" shall mean, with respect to a Person, any other Person in which the Person owns or
controls an equity interest equal to more than 5% of the outstanding equity interests of such Person; or any other
Person for whom the Person serves or is employed or retained as an officer, director, manager, full- or part-time
employee, consultant, independent contractor, commissioned sales representative, broker, or agent.

[8] A true and correct copy of the Co-Marketing Agreement is attached as Ex. A-4.

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION AND SUPPORTING MEMORANDUM                                                    PAGE 6**
4844-8891-5931.7

2020, WorldVentures and Seacret entered into a letter of intent for an asset purchase agreement ("**LOI**"), evidencing Seacret's intent to purchase WorldVentures' assets and effectively terminate the Co-Marketing Agreement.[9] *See* Ex. A at ¶ 13. The next day, WorldVentures and Seacret executed a Limited Solicitation Agreement ("**LSA**") negotiated by Head.[10] *See* Ex. A, ¶ 14. Under the LSA, Seacret was permitted to use WorldVentures' exclusive network of Sales Representatives and sales network to sell Seacret's line of dietary, nutritional, and skincare products. *See* Ex. A, ¶ 14. In exchange for its use of WorldVentures' Sales Representative, sales network, and information databases, Seacret agreed to pay WorldVentures a product-sales royalty based on the amount of Seacret products sold by WorldVentures' Sales Representatives. Under the LSA, WorldVentures was required to give Seacret access to WorldVentures' confidential and proprietary information, including access to one of WorldVentures' most critical revenue-generating asset: the Exigo database containing the entirety of WorldVentures' downline sales network. *See id.*

12.    Based in large part on Head's influences, WorldVentures believed these agreements would help its sales network overcome a prolonged reduction in sales revenue, providing temporary liquidity and allowing WorldVentures' Sales Representatives to generate additional income through sales of Seacret's non-travel products. *See* Ex. A, ¶ 15. Prior to executing these agreements, Seacret was never involved in the travel business. *See* Ex. A, ¶ 11. Instead, through its own downline sales network, Seacret sold dietary, nutritional, and skincare products—its business was wholly unrelated to travel. *See id.*

---

[9] A true and correct copy of the LOI is attached as Ex. A-5.

[10] A true and correct copy of the LSA is attached as Ex. A-6.

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM                                                                 PAGE 7**
4844-8891-5931.7

**Seacret Direct, LLC-Exhibit GG
Page 7 of 122**

13.     Thus, WorldVentures reasonably believed that the LSA would not be used as subterfuge to facilitate a permanent migration of Sales Representatives from WorldVentures to Seacret for Seacret to engage in a competing travel business. Nor did WorldVentures believe that the LSA would be used to poach WorldVentures' Sales Representatives, employees, or customers for the sale of travel services, or the solicitation of its vendors. Had this been disclosed to WorldVentures, it would not have signed the LSA.

### 3.     Head leaves WorldVentures' company and joins Seacret as President and Chief Development Officer.

14.     A precipitous revenue decline in 2020 due to the global pandemic, led WorldVentures to seek viable business alternatives. *See* Ex. A, ¶ 11. WorldVentures brought in an independent restructuring officer, and on December 21, 2020, WorldVentures, as debtors in possession, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby initiating the above-captioned bankruptcy cases (the "**Chapter 11 Cases**") in which this adversary proceeding is filed.[11] Front and center in the Chapter 11 Cases is the pending sale of WorldVentures' assets, including its main downline sales network database.

15.     Head resigned his position with WorldVentures on December 31, 2020—days after the bankruptcy filing—with his last day of employment on January 14, 2020. In mid-to-late January, Head resurfaced as the President and Chief Business Development Officer of Seacret.[12]

---

[11] Pursuant to the Chapter 11 Cases, the debtor-Plaintiffs intends to effectuate a sale of substantially all of their assets to the highest bidder. As such, on January 21, 2021, they filed the *Motion for Entry of Order Authorizing and Approving: (A) Bid Procedures; (B) Stalking Horse Bigger and Bid Protections' and (C) Form and Manner of Notices' (II) Scheduling an Auction and Sale Hearing' (III) Approving the Sale of Substantially all the Assets of the Debtors, Free and Clear of All Liens, Claims, Encumbrances and Interests; (IV) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (V) Granting Related Relief* [Docket No. 92] (the "**Sale Motion**"), which is set for hearing on March 2, 2021 [Docket No. 99]. Through the Sale Motion, the debtor-Plaintiffs seek an orderly sale of substantially all of their going-concern assets under section 363(b) of the Bankruptcy Code—namely, its travel sales platform. The proposed sale is the result of extensive, arms-length negotiations between the debtor-Plaintiffs and WV Holdings Co. LLC ("**WHC**") as the stalking-horse bidder.

[12] *See Team Synergy Agents*, YOUTUBE (Jan 29, 2021) https://www.youtube.com/watch?app=desktop&v=HLcXFdFkEjc ("introducing Head as new President of Seacret);
**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM                                                    PAGE 8**
4844-8891-5931.7

16.     In late January, Head participated in campaign videos to promote Seacret's new "lifestyle" company. Notably, Head appears in a video on January 29 sitting next to Seacret's managing member and Chief Executive Officer, Izhak Ben Shabat, who announced Head's position with Seacret and a partnership to create a new company with its own membership-based travel product and services. Shabat announced Seacret is "tak[ing] one of the most unique travel experiences in the world [i.e., WorldVentures' travel experience] and implement[ing] the program over here at Seacret."[13] It is beyond refute that Head is leading Seacret's implementation of WorldVentures' travel platform. Indeed, Seacret's founder publicly commended "what Eddie [Head] has done putting together this [travel] program with [Seacret's] vendors."[14]And, in reference to a travel promotional for Seacret, Seacret's founder stated that "what we were able to do was to use the community leverage power that we have" to get "a deeply discounted price."[15] Such community leverage power, upon in formation and belief, is through Head's connections at WorldVentures.

17.     The most recent promotional campaign video is telling. In it—alongside Seacret's founder—Head specifically admits (a) "we have been grooming a global team and we brought in some of the best talent we could;" (b) "we want to make sure that we partner with the very best suppliers and vendors around the planet;" (c) "we have a duty to uphold this brand and to protect this brand;" (d) "you are going to be able to take advantage of this membership all over the world;" and (e) "we're taking the knowledge of all of our wins . . . and all of our victories at the same time"

---

*Izhak 2021* Update, VIMEO (Jan. 29, 2021) https://vimeo.com/506374313 (announcing Head as President and launch of Seacret's new travel product).

[13] *See Izhak 2021* Update, VIMEO (Jan. 29, 2021) https://vimeo.com/506374313 (announcing Head as President and launch of Seacret's new travel product).

[14] *See id.*

[15] *See id.*

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM                                                   PAGE 9**
4844-8891-5931.7

**Seacret Direct, LLC-Exhibit GG
Page 9 of 122**

and will "apply everything we've learned" to provide a "membership experience and lifestyle company" for Seacret.[16] Upon information and belief, "this brand" is the WorldVentures' DreamTrips brand, and the "global team" are WorldVentures' Sales Representatives, recruited in part through Head's efforts and with access to WorldVentures' confidential and proprietary information. The promotional campaigns also encourage WorldVentures' current Sales Representatives to cease selling WorldVentures' products and services, ending their affiliation with WorldVentures, and, instead, sell Seacret's products and "newly acquired" travel services.

18.     Likewise, other former WorldVentures representatives have also publicly appeared stating "Seacret can move forward aggressively and very quickly on rolling out our own travel product . . . whether that's called Seacret Escapes . . . or Seacret Getaways, they are working on the branding for that, but we are fast-tracking our own travel product, which will be very similar to what many of us [meaning WorldVentures] are used to, [with] group trips, wholesale pricing, . . . [and] a whole-sale booking engine."[17] Seacret's travel provider is Grouply Ventures, LLC ("**Grouply**"), a newly-formed company owned by Virginia (Gini) Trask ("**Trask**"). Grouply appears to provide travel packages that are substantially similar to travel opportunities offered by Top Tier Travel, Inc. ("**Top Tier**") to WorldVentures pursuant an exclusivity agreement. Notably, Trask is also the President of Top Tier and signed the exclusivity agreement on Top Tier's behalf.

19.     Given the convenient timing of his resignation, it appears that Head has been orchestrating this effort while he remained an employee of WorldVentures. Indeed, within a few

---

[16]   *See   id.*;   *Team   Synergy   Agents*,   YOUTUBE   (Jan   29,   2021) https://www.youtube.com/watch?app=desktop&v=HLcXFdFkEjc ("introducing Head as new President of Seacret).

[17]   *See   Leadership   Zoom*,   VACATIONLEADER   (Jan.   26,   2021), https://vacationleader.wistia.com/medias/ztuypgg23g?wtime=0.

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM**                                                                    **PAGE 10**
4844-8891-5931.7

Seacret Direct, LLC-Exhibit GG
Page 10 of 122

weeks of Head's resignation, Seacret is bringing its "unique travel experiences in the world" to market.[18]

20.    By leading the effort to implement WorldVentures' travel program at Seacret, Head has breached his confidentiality, and non-compete obligations to WorldVentures. Head also breached those obligations by leading Seacret's efforts to solicit WorldVentures' Sales Representatives, customers, and vendors in a Competing Business.    Specifically, Head orchestrated Seacret's takeover of WorldVentures' business during his employment at WorldVentures. Indeed, email correspondence shows that he communicated with Seacret regarding the release of the announcement regarding "the lifestyle experience Seacret aims to create for customers", making Seacret "the largest seller of group travel in the world" and stating that "[d]istributors will be able to offer customers a Seacret travel club membership as well as the skincare, body care, personal care and nutrition products."[19] *See* Ex. A, ¶¶4-5. Had Head disclosed his intent and/or involvement with this scheme to make Seacret "the largest seller of group travel in the world", WorldVentures most assuredly would have made different choices. Head's double-dealing and unlawful competition should be enjoined.

## IV.    ARGUMENTS AND AUTHORITIES

### A.    Legal Standard

21.    Under Rule 65 of the Federal Rules of Civil Procedure, "[e]very order granting an injunction and every restraining order must: (a) state the reasons why it issued; (b) state its terms specifically; and (c) describe in reasonable detail . . . the act or acts restrained or required." Fed.

---

[18] *See Izhak 2021* Update, VIMEO (Jan. 29, 2021) https://vimeo.com/506374313 (announcing Head as President and launch of Seacret's new travel product).

[19] A true and correct copy of the December 7, 2020 email and attachment between Head and Seacret's managing member is attached as Ex. A-2.

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM**                                                            **PAGE 11**
4844-8891-5931.7

R. Civ. P. 65(d). A bankruptcy court may issue injunctions pursuant to its equitable powers in 11 U.S.C. § 105. *See In re OGA Charters, LLC*, 554 B.R. 415, 424 (Bankr. S.D. Tex. 2016) (citing 11. U.S.C. § 105); *see also In re Yukos Oil Co.*, 320 B.R. 130, 135 (Bankr. S.D. Tex. 2004) ("When determining whether to issue a temporary restraining order or preliminary injunction pursuant to 11 U.S.C. § 105(a), the bankruptcy court must consider the traditional inquiries which have a bearing on preliminary injunctions issued pursuant to Rule 65.").

22.     To obtain a preliminary injunction, an applicant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of injunctive relief will not disserve the public interest. *See, e.g.*, *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). The grant of injunctive relief is within the Court's sound discretion. *See id. at* 589–95; *Miss. Power & Light Co. v. United Gas Pipe Line Co*., 760 F.2d 618, 621 (5th Cir. 1985). The purpose of an injunction is to preserve the status quo. *See Janvey*, 647 F.3d at 600. Although a preliminary injunction is an extraordinary remedy, a movant "is not required to prove its case in full at a preliminary injunction hearing." *McAfee, LLC v. Kinney*, 2019 WL 4101199, at *3 (E.D. Tex. Aug. 29, 2019) (citation omitted).

**B.      Head's restrictive covenant obligations are enforceable, and Head has breached his non-compete and fiduciary duties owed to WorldVentures.**

23.     Head is directly violating the Non-Compete Provisions in his Employment Agreement with WorldVentures. Under Texas law, the essential elements of a breach of contract claim are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Keurig Dr. Pepper Inc. v. Chenier*, 2019 WL 3958154, at *7 (E.D. Tex.

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM**                                                                                                        **PAGE 12**
4844-8891-5931.7

**Seacret Direct, LLC-Exhibit GG**
**Page 12 of 122**

Aug. 22, 2019) (quotations and citations omitted). By accepting his position as the President and

Chief Business Development Officer for Seacret, Head has breached the Employment Agreement.

24.    The Covenants Not to Compete Act—found at Texas Business & Commerce Code

sections 15.50 through 15.52 governs the enforceability of non-compete covenants. Specifically,

section 15.50 provides:

> [A] covenant not to compete is enforceable if it is ancillary to or part
> of an otherwise enforceable agreement at the time the agreement is
> made to the extent that it contains limitations as to time,
> geographical area, and scope of activity to be restrained that are
> reasonable and do not impose a greater restraint than is necessary to
> protect the goodwill or other business interest of the promisee.

TEX. BUS. & COM. CODE § 15.50. Although the reasonableness of the restrictions is a question of

law, the inquiry itself is dependent on the facts and circumstances of the company, the legitimate

interests being protected, the relevant marketplace, and the employee's role in the company. *See*

*EMS USA, Inc. v. Shary*, 309 S.W.3d 653, 660 (Tex. App.—Houston [14th Dist.] 2010, no pet.);

*see also Henshaw v. Kroenecke*, 656 S.W.2d 416, 417-18 (Tex. 1983). Notably, a former

employee's "knowledge of a unique customer base and knowledge of . . . products used by each

of the employer's customers are legitimate protectable interests. Likewise, information concerning

acquisition strategies, compensation and benefits formulas, and payment rates may be considered

protectable interests." *Transperfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 757 (S.D.

Tex. 2009) (quotations and citations omitted). Here, the Non-Competes Provisions are reasonable

terms to which Head expressly agreed. *See Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d

644, 651 (Tex. 2006) (holding non-compete was reasonable where employee could not contact any

clients or prospective clients for one year because he was a high-level employee and could have

capitalized on goodwill that he helped develop).

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION AND SUPPORTING MEMORANDUM                                          PAGE 13**
4844-8891-5931.7

**Seacret Direct, LLC-Exhibit GG
Page 13 of 122**

25.     The Non-Compete Provisions are also ancillary to the Employment Agreement signed by Head. WorldVentures paid Head a significant amount of money and equity, and provided him with confidential, proprietary, and work product information, in exchange for Head's promise to adhere to the Non-Compete Provisions and non-disclosure covenants—post-employment restrictions Head expressly agreed would survive his resignation. *See Chenier*, 2019 WL 3958154, at *9.

**C.      Substantial Likelihood of Success on the Merits—Breach of Contract and Breach of Fiduciary duty.**

26.     To show a likelihood of success on the merits, the petitioner does not need to "prove its case with absolute certainty." *Nexstar Broad Grp., Inc. v. Lammers*, No. 3:08-cv-0953-K, 2008 WL 2620098, *4 (N.D. Tex. June 27, 2008). Rather, the petitioner must only present a prima facie case and a "reasonable probability" of success. *Id.; see also Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 WL 1744422, *5 (N.D. Tex. April 23, 2013) (explaining that the petitioner need not show it is "certain to win"); *Casarez v. Val Verde County*, 957 F. Supp. 847, 858 (W.D. Tex. 1997) (noting that there is no need to establish an "overwhelming likelihood" of success).

27.     Here, the Employment Agreement and the facts and circumstances of WorldVentures' business and bankruptcy support that the restrictions against Head are reasonably tailored and do not impose a greater restraint on trade than is necessary to protect WorldVentures' legitimate interests—including its interest in its own business and in effectuating an effective reorganization under Chapter 11 of the Bankruptcy Code. The Non-Compete Provisions applicable here exist for a 24-month period after the date of Head's termination, and prevent Head from competing with WorldVentures, soliciting its Sales Representatives, Customers and vendors, or otherwise misappropriating confidential information he had access to as President.

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM                                    PAGE 14**
4844-8891-5931.7

**Seacret Direct, LLC-Exhibit GG
Page 14 of 122**

28.     Moreover, Head expressly acknowledged that he is bound by the Non-Compete Provisions upon voluntarily terminating his position with WorldVentures. On January 4, 2021, WorldVentures' Chief Legal Officer sent an email to Head, confirming receipt of his resignation and reminding Head that the confidentiality and Non-Compete Provisions in the Employment Agreement would survive the voluntary termination of his employment. That same day, Head replied—"Received and understood."[20]

29.     In other words, Head understood that his Non-Compete Provisions would remain in full force and effect after his employment; yet, he chose to disregard them anyway. More particularly, Seacret's foray into the travel industry is a Competing Business. As Seacret's founder admitted: "what Eddie [Head] has done putting together this [travel] program with [Seacret's] vendors."[21] Plainly, Head stands in breach of the Non-Compete Provisions.

30.     Additionally, there is a substantial likelihood of success on the merits that Head breached his fiduciary duties by his actions in facilitating Seacret to become a competitor of WorldVentures in the membership-based, direct sales travel industry for his own personal benefit, causing harm to WorldVentures, its estate, and its creditors in the Chapter 11 Cases. To prove a breach of fiduciary duty, the movant must show (1) that a fiduciary duty exists, (2) that the defendant breached the duty owed, and (3) that the breach resulted in injury to the plaintiff or a benefit to the defendant. *See Pfeiffer v. Ajamie PLLC*, 469 F. Supp. 3d 752, 762 (S.D. Tex. 2019) (granting a preliminary injunction to an employer who showed a substantial likelihood of success on the merits for a claim that a former employee breached fiduciary duties to the employer).

---

[20] A true and accurate copy of the January 4, 2021 email is attached as Ex. A-3.

[21] *See Izhak 2021* Update, VIMEO (Jan. 29, 2021) https://vimeo.com/506374313 (announcing Head as President and launch of Seacret's new travel product).

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM**                    **PAGE 15**
4844-8891-5931.7

**Seacret Direct, LLC-Exhibit GG**
**Page 15 of 122**

31.     Here, WorldVentures will likely be successful on the merits in proving that in his dealings with Seacret, Head breached various past and ongoing fiduciary duties, including the duty of loyalty, the duty not to engage in self-dealing, and the duty to put WorldVentures' interests before his own. In an apparent reference to WorldVentures' brand, Head comments that: (a) "we have been grooming a global team and we brought in some of the best talent we could;" (b) "we want to make sure that we partner with the very best suppliers and vendors around the planet;" (c) "we have a duty to uphold this brand and to protect this brand;" and (d) "you are going to be able to take advantage of this membership all over the world",[22] amount to usurpation of WorldVentures' corporate brand for his and Seacret's opportunity. Similarly, Head's involvement (during his employment with WorldVentures) in the announcements explained above in which Seacret unveils its intent to be "the largest seller of group travel in the world" and to "offer customers a Seacret travel club membership" demonstrate Head's double dealing.[23] *See* Ex. A, ¶ 20. This usurpation is especially problematic given the fact that WorldVentures is a debtor in possession in the Chapter 11 Cases, and Head's actions have directly affected the value of the bankruptcy assets subject to subject to a sale under 11 U.S.C. § 363.

**D.     WorldVentures will suffer imminent and irreparable harm unless the Court implements an injunction.**

32.     An injury is irreparable if there is no adequate remedy at law, if it is not accurately measurable, if the plaintiff cannot be adequately compensated in damages. *See, e.g.*, *Janvey*, 647 F.3d at 600; *Rimkus Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417, 434 (S.D. Tex. 2008); *Pipkin v. JVM Operating, L.C.,* 197 B.R. 47, 56 (E.D. Tex. 1996). "In Texas, injury resulting from the breach of non-compete covenants is the epitome of irreparable injury." *See Chenier*, 2019 WL

---

[22] *See id.*

[23] *See* Ex. A-2.

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM                                                                                   PAGE 16**
4844-8891-5931.7

3958154, at *11 (quotations and citations omitted). With regard to this element in the context of a non-compete, Texas law provides that "proof that a highly trained employee is continuing to breach a non-competition covenant gives rise to a rebuttable presumption that the applicant is suffering irreparable injury." *In re Electro-Motor, Inc.*, 390 B.R. 859, 870 (E.D. Tex. 2008) (quotation and citation omitted); *see also Beasley v. Hub City Texas, L.P.*, 2003 WL 22254692 (Tex. App.—Houston [1ˢᵗ] Dist.] Sept. 29, 2003, no pet.) (same). Head—a former highly trained executive at WorldVentures—is engaged in activities constituting a breach of his Non-Compete Provisions under the Employment Agreement.

33.      During his employment, Head was provided access to WorldVentures' confidential, proprietary, and technical information relating to its business and multilevel marketing network, including, WorldVentures' database, sales and marketing techniques, sources of supply, price information on products and services, accounting procedures, financial information (e.g., revenues, expenses, capital expenditures, profits and losses, sources of financing, and creditor information), and records and data on its customers, employees, sales representatives, and vendors—some of which Head had access through the Exigo-managed database. *See* Ex. A, ¶ 10; *see also* Ex. A-1, Article III. Armed with this confidential information, Head negotiated and encouraged WorldVentures' execution of prepetition agreements with Seacret—all of which enabled Seacret (a company with no historical presence in the travel industry) access to WorldVentures' business operations—that is, the "going concern" "assets" in the bankruptcy. Shortly after executing the LSA, Head resigned as WorldVentures' President. A few weeks later, Head was leading Seacret's efforts to enter the membership-based direct sales travel program. Contemporaneously, Seacret hired several former members of WorldVentures'

PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM
PAGE 17
4844-8891-5931.7

Seacret Direct, LLC-Exhibit GG
Page 17 of 122

management team and its Sales Representatives. Head exerted heavy influence in pressuring WorldVentures into executing the LSA, *See* Ex. A, ¶ 14.

34.     If Head continues to work for Seacret, assisting it in obtaining and running its own Competing Business, WorldVentures' business and bankruptcy estate will suffer immediate and irreparable consequences—namely, the imminent harm to WorldVentures' business as a "going concern" and to the bidding process pursuant to section 363 of the Bankruptcy Code. Likewise, WorldVentures will suffer irreparable harm because of the irreversible loss of good will, customers and Sales Representatives, and from the potential disclosure of confidential information that Head acquired during his tenure at WorldVentures. *See* Ex. A, ¶ 20; *see also Leslie*, 594 F.Supp.2d at 757 (holding former employee's use of former employer's confidential information and possible loss of customers is sufficient to establish irreparable harm). Such harm is more than mere speculation—WorldVentures have been harmed by Head's actions in establishing a Competing Business, and the harm is ongoing. *See In re Electro-Motor, Inc.*, 390 B.R. at 859 (holder employer established irreparable injury where its former general manager, within a few weeks, had moved confidential information to his new employer, solicited former customers, and moved a significant amount of business from the former employer to his new employer).

**E.     The injury to WorldVentures' business and bankruptcy reorganization far outweighs any harm that results if the Court grants the injunction.**

35.     The irreparable harm that WorldVentures has and will sustain, absent injunctive relief, outweighs any harm Head may face as a result of the requested injunction. Indeed, as detailed above, the irreparable harm to WorldVentures through Head's violations of his contractual and fiduciary obligations has caused grievous damages to the business and irreversible effect on its business. Given that WorldVentures' threatened injury is irreparable, Head must produce "powerful evidence of harm to its interests" to show that the balance of equities remains in his

PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM                                                                     PAGE 18
4844-8891-5931.7

Seacret Direct, LLC-Exhibit GG
Page 18 of 122

favor. *See Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012). He cannot do so, as the only "harm" to Head would be to prevent him from engaging in a Competing Business for the Non-Compete Period to which he already agreed was reasonable. Head would be able to work for anyone (even in the travel industry), so long as he was not to "become an Affiliate with any Competing Business that resides in or operates in the Territory." *See* Ex. A-1, ¶ 3.02(e). As such, the balance of the equities weighs in WorldVentures' favor—the harm WorldVentures, its estate, and its creditors will face through Head's actions which are diminishing the value of WorldVentures' primary asset (its extensive downline sales network for travel services) far outweighs a restraint against Head's ability to compete with WorldVentures. *See In re OGA Charters, LLC*, 554 B.R. 415, 426 (Bankr. S.D. Tex. 2016) (explaining that an orderly administration of a bankruptcy estate is of paramount interest).

**F.      Balancing the public interest factors favor WorldVentures and their creditors.**

36.      A temporary restraining order and/or preliminary injunction would not adversely affect the public interest. To the contrary, courts emphasize that, "[i]t is in the public interest to uphold contracts and to enforce a remedy that is provided for by Texas law." *Chenier*, 2019 WL 3958154, at *12 (citation omitted); *Bok v. Cobb Sports Designs, Inc.*, 2017 WL 9807335, at *2 (E.D. Tex. 2017). "It is likewise in the public interest to enforce valid non-compete agreements." *WorldVentures Mktg., LLC v. Rogers*, 4:18-CV-00498, 2018 WL 4169049 (E.D. Tex. Aug. 30, 2018) (citing *Brink's Inc. v. Patrick*, 2014 WL 2931824, at *9 (N.D. Tex. 2014)). Here, the competition restriction WorldVentures seeks to enforce is narrowly tailored, the parties expressly agreed to it, and it does not inhibit Head from being employed—but rather from working in a multilevel marketing business selling travel services, for a 24-month period.

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM                                                                                    PAGE 19**
4844-8891-5931.7

**Seacret Direct, LLC-Exhibit GG**
**Page 19 of 122**

37.     Similarly, "[i]n bankruptcy, the public policy is to have an orderly administration of the debtor's assets via their bankruptcy estate, such that the debtor may be able to gain a fresh start." *In re OGA Charters, LLC*, 554 B.R. at 426. Thus, not only would an injunction serve to further the legitimate business interests of companies that wish to protect their proprietary assets, but it will ensure an orderly administration of the Chapter 11 Cases where protection of WorldVentures' assets has a direct effect on its bankruptcy, its ability to sell its assets under the Bankruptcy Code, and on its creditors and parties in interests who have legitimate interests in WorldVentures maximizing the value of the bankruptcy estates. *See id.* (explaining that "preventing the dissipation of . . . assets belonging to the debtor" is in the public interest). Accordingly, this factor favors issuance of an injunction.

## V.      BOND

38.     No bond is necessary here where the Application is submitted by WorldVentures as debtors in possession pursuant to Federal Rule of Bankruptcy Procedure 7056. *See* FED. R. BANKR. P. 7056 (waiving security requirement of FED. R. CIV. P. 65(c) for debtors in possession).

## VI.     PRAYER FOR RELIEF

WorldVentures respectfully request that this Court immediately enter an order granting a temporary restraining order against Defendant Head, and those persons bound under Federal Rule of Civil Procedure 65(d), to include the parties, officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with Head, who have actual notice of the order, are temporarily restrained and enjoined from:

(a)     participating, either directly or through an Affiliate, in or with a Competing Business during the Non-Compete Period, including, but not limited to, Seacret Direct, LLC; and

(b)     recruiting or encouraging, either directly or through an Affiliate, any current and/or former WorldVentures' employee, customer, sales representative, vendor, and/or

PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION AND SUPPORTING MEMORANDUM                                              PAGE 20
4844-8891-5931.7

Seacret Direct, LLC-Exhibit GG
Page 20 of 122

supplier to work or otherwise perform services as an employee or independent contractor for a Competing Business during the Non-Compete Period.

WorldVentures further request that, after notice and a hearing on the Application for a Temporary Restraining Order, the Court issue an order extending the relief under (a) and (b) above in the temporary restraining order and granting a preliminary injunction against Defendant Head, and those persons bound under Federal Rule of Civil Procedure 65(d), to include the parties, officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with Head, who have actual notice of the order, are temporarily restrained and enjoined from violating Head's Employment Agreement and the Non-Compete Provisions therein, and ceasing the following actions:

(c)     refraining from disclosing and/or using, for any reason, WorldVentures' Confidential Information, proprietary information, work product information, sales representative information, customer information, employee information, and/or its customers' employee information, or disclose or other disseminate WorldVentures' inventions, designs, creations, ideas, innovations, improvements, or discoveries relating directly to WorldVentures' business;

(d)     refraining from soliciting and interfering, either directly or through an affiliate, with WorldVentures' contracts with its Sales Representatives, vendors, suppliers, customers, and/or contractors during the Non-Compete Period; and

(e)     disparaging WorldVentures or any of its customers, officers, and employees.

Additionally, WorldVentures request that, pursuant to Paragraph 2.07 of the Employment Agreement, Head and those persons bound under Federal Rule of Civil Procedure 65(d), immediately return any and all of WorldVentures' Confidential Information and Work Product information, including but not limited to information on rate and price information on WorldVentures' products and services, records and data relating to customer, employees, independent contractors, vendors, suppliers, and other others, all WorldVentures' financial information, and records and data relating to WorldVentures' trade secrets business know-how,

PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION AND SUPPORTING MEMORANDUM                                                    PAGE 21
4844-8891-5931.7

Seacret Direct, LLC-Exhibit GG
Page 21 of 122

and sales and marketing programs, and returning same to WorldVentures, including, without limitation, all computers, electronic media, PDA's, electronic storage devices, along with all originals and copies of documents, records, reports, manuals, files, and/or materials, that contain or relate to WorldVentures' Confidential Information and/or Work Product information.

WorldVentures respectfully request such other relief as the Court may deem just and proper. WorldVentures further request that this Application be set for hearing, and after such hearing, that the Court after issue a temporary injunction, against Defendant Eddie Head.

DATED: February 22, 2021          Respectfully submitted by:

*/s/ Steven C. Lockhart*
Marcus A. Helt (TX 24052187)
Robert Slovak (TX 24013523)
Steven C. Lockhart (TX 24036981)
Aaron E. Chibli (TX 24091222)
Emily F. Shanks (TX 24110350)
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
mhelt@foley.com
rslovak@foley.com
slockhart@foley.com
achibli@foley.com
eshanks@foley.com

**COUNSEL FOR THE PLAINTIFFS
SPHERATURE INVESTMENTS LLC, *et al*
d/b/a WORLDVENTURES HOLDINGS, LLC**

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM**                                                                    **PAGE 22**
4844-8891-5931.7

**Seacret Direct, LLC-Exhibit GG
Page 22 of 122**

## CERTIFICATE OF SERVICE

I hereby certify that, on February 22, 2021, a true and correct copy of the foregoing document was served electronically on all parties in interest to these Cases by the Court's PACER system.

*/s/ Steven C. Lockhart*
Steven C. Lockhart

## CERTIFICATE OF CONFERENCE

I hereby certify that, on February 22, 2021, I communicated with counsel for Mr. Head via email regarding the relief sought herein, and we have scheduled a conferral for February 22, 2021 at 12:00 p.m. (CT) regarding the relief sought herein.

*/s/ Steven C. Lockhart*
Steven C. Lockhart

## CERTIFICATE OF CONFERENCE

I hereby certify that, on February 22, 2021, I conferred with counsel for Seacret Direct, LLC regarding the relief sought herein and counsel did not take a position as to the relief sought herein.

*/s/ Marcus H. Helt*
Marcus A. Helt

**PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM** **PAGE 23**
4844-8891-5931.7

**Seacret Direct, LLC-Exhibit GG**
**Page 23 of 122**

DocuSign Envelope ID: AA397E2A-B623-4A71-B15B-02C150E5A41A



# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **SPHERATURE INVESTMENTS LLC,** | § | **Case No.:20-42492** |
| *et al.* | § | |
| | § | **Jointly Administered** |
| **Debtors.** | | |

_____

| | | |
|---|---|---|
| **SPHERATURE INVESTMENTS LLC,** | § | |
| *et al.* **d/b/a WorldVentures Holdings,** | § | |
| **LLC**[1] | § | |
| **Plaintiffs,** | § | |
| | § | **Adversary No. [_____]** |
| **vs.** | § | |
| | § | |
| **Kenneth E. Head,** | § | |
| | § | |
| **Defendant.** | | |

## DECLARATION OF MICHAEL POATES IN SUPPORT OF PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

1.    I, Michael Poates, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the following statements are true and correct and within in my personal knowledge.

2.    I am the Chief Operating Officer ("COO") at Spherature Investments, LLC d/b/a WorldVentures Holdings, LLC ("WorldVentures"). I have reviewed the Plaintiffs' Emergency Application for a Temporary Restraining Order and Preliminary Injunction and Supporting Memorandum (the "Application"), and I make this declaration ("Declaration") in support thereof.

---

[1] The "**Plaintiffs**" in the above-captioned jointly administered chapter 11 bankruptcy cases ("**Cases**") are: Spherature Investments LLC ("**Spherature**") EIN#5471; Rovia, LLC ("**Rovia**") EIN#7705; WorldVentures Marketing Holdings, LLC ("**WV Marketing Holdings**") EIN#3846; WorldVentures Marketplace, LLC ("**WV Marketplace**") EIN#6264; WorldVentures Marketing, LLC ("**WV Marketing**") EIN#3255; WorldVentures Services, LLC ("**WV Services**") EIN#2220.

3.      This Declaration is based on my personal knowledge and upon my review of documents prepared in the ordinary course of business by WorldVentures, including Head's employment agreement, and if called as a witness, I could competently testify to the facts set forth below. I have also read the Plaintiffs' Original Complaint and Request for Preliminary Injunction filed contemporaneously herewith. By virtue of my duties and responsibilities as the COO of WorldVentures, I am familiar with and have personal knowledge of the record keeping policies and practices of WorldVentures, and I am a custodian of such records.

4.      Attached hereto as Exhibits A-1 – A-3 are 27 pages of records from WorldVentures:

| A-1 | Executive Employment Agreement, dated July 12, 2018, by and between WorldVentures and Kenneth E. Head ("Employment Agreement") |
| A-2 | December 7, 2020 email and attachment between Head and Mr. Shabat |
| A-3 | December 31, 2020 – January 4, 2021 email thread between Head and WorldVentures' Chief Legal Officer, Eric Haynes |

5.      The 27 pages of documents, marked as Exhibits A-1 – A-3, are originals or exact duplicates of the original records of WorldVentures. It was the regular practice of WorldVentures to make this type of record at or near the time of each act, event, condition, opinion, or diagnosis set forth in the record. The records were made by, or from information transmitted by, persons with knowledge of the matters set forth therein. It was the regular practice of WorldVentures to keep this type of record in the course of regularly conducted business activity. It was the regular practice of the business activity to make the records.

6.      WorldVentures is a multilevel marketing company that sells lifestyle membership products and services. WorldVentures' main business is to provide exclusive membership-based travel products and services through its network of sales representatives. WorldVentures generates

**DECLARATION IN SUPPORT OF PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM PAGE 2**

revenue primarily through these sales representatives and the membership and travel-related sales they generate. WorldVentures conducts travel-related business operations in the following countries: Australia; Austria; Botswana; Brazil; Canada; Colombia; Cyprus; Czech Republic; France; Germany; Greece; Guam; Hong Kong; Hungary; Iceland; Ireland; Israel; Jamaica; Kenya; Latvia; Malaysia; Malta; Mexico; Namibia; Netherlands; New Zealand; Philippines; Poland; Puerto Rico; Romania; Russia; Serbia; Singapore; Slovenia; South Africa; Sweden; Taiwan; Uganda; United Kingdom; United States; Zambia; and Zimbabwe.

7.     WorldVentures contracts with Exigo to provide a database to house and manage the downline sales network platform through which the sales representatives operate. Travel sales are booked through an online travel platform operated by WorldVentures' affiliate Rovia, LLC ("Rovia") at www.dreamtrips.com. It is through this website and other similar services that WorldVentures and its sales representatives booked various travel services and vacation-related transactions. WorldVentures also maintain training guides, sales aides, promotional and marketing materials, and other information relevant to facilitating and training its sales representatives in carrying out their business transacted through WorldVentures.

8.     WorldVentures provides promotions training opportunities where sales representatives would travel to training conventions and engage with other members of the sales team to promote company-wide culture, comradery, and grow the sales representative's business.

9.     In March 2017, Kenneth E. Head ("Head") became the President of WorldVentures, and later was given the title of Chief Strategy Officer in October 2017.  A true and correct copy of Head's Employment Agreement with WorldVentures is attached hereto as **Exhibit A-1**.

**DECLARATION IN SUPPORT OF PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM PAGE 3**
4825-4772-9884.1

DocuSign Envelope ID: AA397F2A-B653-4A71-B15B-02215C0F4A4A

DocuSign Envelope ID: AA397E2A-B663-4A7F-B15B-02519C8E4A4A

10.     Through his employment with WorldVentures, Head was given access to confidential information regarding WorldVentures' membership based travel products and services, its customers, members, employees, sales representatives, vendors, suppliers, along with access to WorldVentures' database managed by the direct selling software platform Exigo Office, Inc., which contains information concerning WorldVentures' sales representatives and their respective downlines. *See* Exhibit A-1, at Article III. Head also had access to WorldVentures' financial information and its business methods, techniques, and strategies. *See id.* Head's access to this information was provided under tightly controlled conditions designed to prevent unauthorized used and disclosure of WorldVentures' confidential information. *See id.*, at ¶1.04

11.     Under Head's leadership, WorldVentures' experienced a rapid decline in revenue. This decline was amplified by the pandemic in March 2020, which led WorldVentures to seek viable business alternatives, including entering into negotiations with Seacret regarding a possible acquisition or merger of the two companies. At that time, upon information and belief from information obtained from its website, Seacret had no presence in the membership-base direct sales travel industry. *See* https://www.seacretdirect.com/www/en/us/. Rather, Seacret's sales network primarily sold nutritional and skincare products. Seacret was not a competitor of WorldVentures as defined by Head's Employment Agreement. *See id.*, at ¶¶ 3.01, 3.02(e).

12.     Attached as **Exhibit A-4** is a true and correct copy of that Co-Marketing Agreement date July 22, 2020, by and between WorldVentures Marketing, LLC and Seacret ("Co-Marketing Agreement").

13.     Attached as **Exhibit A-5** is a true and correct copy of that Letter of Intent dated November 10, 2020, by and between WorldVentures and Seacret ("LOI").

**DECLARATION IN SUPPORT OF PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM PAGE 4**
4825-4772-9884.1

14.     Attached as **Exhibit A-6** is a true and correct copy of that Limited Solicitation Agreement dated November 11, 2020 by and between WorldVentures Marketing, LLC and Seacret ("LSA"), which was negotiated by Head. Several officers, including myself, at WorldVentures advised against entering into the LSA because it permitted Seacret to access WorldVentures' travel sales network through its Exigo database. The database and the information referenced therein is WorldVentures' main revenue-generating asset.

15.     WorldVentures was led to believe these agreements would help boost income and morale of the company and provide products for sales representatives to sell, while simultaneously providing a capital infusion. Head exerted heavy influence as WorldVentures' President and CSO to persuade WorldVentures into entering these agreements with Seacret.

16.     Within weeks of Head's resignation, Head publicly announced his new position as the President and Chief Business Development Officer of Seacret. *See* https://www.youtube.com/watch?app=desktop&v=HLcXFdFkEjc.  Shortly after, in late-January 2021, Seacret announced the launch of its own travel product, similar to that of WorldVentures. *See* https://vacationleader.wistia.com/medias/ztuypgg23g?wtime=0.

17.     Head has since participated in online promotional videos for Seacret in his new role. I have personally seen such videos. Head appears in a public video on January 29 in which Mr. Shabat announced Head's new position with Seacret and a partnership to create a new "lifestyle" company through which Seacret will implement travel products into its own business. In that same video, Head also promotes Seacret's new travel membership platform and offers a travel package that is substantially similar to travel opportunities offered to WorldVentures' customers. *See See Izhak 2021* Update, Vimeo (Jan. 29, 2021) https://vimeo.com/506374313.

**DECLARATION IN SUPPORT OF PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM PAGE 5**

4825-4772-9884.1

18.     In recent promotional campaign videos, several other former members and sales representatives of WorldVentures' management team announced their move to Seacret and their intention to sell Seacret products.   *See Team Synergy Agents*, Youtube (Jan 29, 2021) https://www.youtube.com/watch?app=desktop&v=HLcXFdFkEjc; *see also Leadership Zoom*, VacationLeader (Jan. 26, 2021), https://vacationleader.wistia.com/medias/ztuypgg23g?wtime=0.

19.     The promotional videos also encourage WorldVentures' current sales representatives to cease selling WorldVentures' products and services, ending their affiliation with the same, and, instead, sell Seacret's line of products and new travel products and services. *See Leadership       Zoom*,       VacationLeader       (Jan.       26,       2021), https://vacationleader.wistia.com/medias/ztuypgg23g?wtime=0.

20.     The harm caused by Head's actions described above is not only imminent, but ongoing and has caused, and will continue to cause, irreparable damage to WorldVentures. Specifically, Head's actions in enabling Seacret to have access to WorldVentures' travel sales platform and network and his actions in assisting Seacret in developing a competing travel product and services based on WorldVentures' own products and services, which Head acquired while employed at WorldVentures, have significantly diminished the value of WorldVentures' assets, including the irreversible loss of customers and sales representatives, and are endangering WorldVentures' ongoing bankruptcy proceedings.

21.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**DECLARATION IN SUPPORT OF PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM PAGE 6**
4825-4772-9884.1

DocuSign Envelope ID: AA397E2A-B663-4A7F-B15B-02519DF4A4AA

Executed in Prosper, Texas on ____2/10/2021_____, 2021.

_Michael Poates_

7B97BE54495047A...

Michael Poates
Chief Operating Officer
WorldVentures Holdings, LLC

**DECLARATION IN SUPPORT OF PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM
PAGE 7**
4825-4772-9884.1

**Seacret Direct, LLC-Exhibit GG
Page 30 of 122**

Exhibit A-1

# EXECUTIVE EMPLOYMENT AGREEMENT

## *Kenneth E. Head*

This EXECUTIVE EMPLOYMENT AGREEMENT (this "*Agreement*"), dated to be effective as of _July 12_, 2018 (the "*Effective Date*"), is made and entered into by and between WORLDVENTURES HOLDINGS, LLC, a Nevada limited liability company (together with its Affiliates, as defined herein, collectively the "*Company*"), and KENNETH E. HEAD, a Texas resident (the "*Executive*") (the Company and the Executive may sometimes herein be referred to individually as a "*Party*" and collectively as the "*Parties*").

## RECITALS

WHEREAS, the Executive has certain skills, experience, and abilities that are beneficial to the Company's business and operations; and

WHEREAS, the Company and the Executive desire to set forth the terms and conditions pursuant to which the Executive will be employed by the Company;

NOW, THEREFORE, in consideration of the foregoing premises and of the mutual covenants and undertakings contained herein, and for such other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I

## DUTIES AND COMPENSATION

1.01.   <u>Title and Duties</u>.  The Company hereby agrees to employ the Executive, and the Executive hereby agrees to be employed by the Company on an exclusive basis, as the Company's President.  The Executive shall report to the Chief Executive Officer of the Company (the "*CEO*"), and shall have such duties, functions, responsibilities, and authority as are from time to time delegated to the Executive by the CEO.  Except as provided in this <u>Section 1.01</u>, during the Term (as defined in <u>Section 1.02</u>), the Executive shall devote his entire working time, energy, skill, and best efforts to the performance of his duties hereunder in a manner that faithfully and diligently furthers the business and interests of Company.  Notwithstanding the foregoing and so long as such activities do not interfere with the performance of the Executive's responsibilities hereunder, the Executive may (i) serve on corporate, civil, or charitable boards or committees; (ii) manage personal investments, provided that such investments are passive in nature; and (iii) participate in the activities of trade organizations relating to the Company's business.

1.02.   <u>Term</u>.  The Executive's employment with the Company under this Agreement shall continue until the earlier of (i) the Executive's termination of employment as set forth in <u>Section 2.01</u> or <u>2.03</u>; or (ii) the Company's termination of the Executive's employment as set forth in <u>Section 2.02</u>, <u>2.04</u>, or <u>2.05</u> (the earliest to occur of the terminations described in Clauses

(i) and (ii) being hereinafter referred to as the "*Termination Date*"). The period commencing on the Effective Date and ending on the Termination Date shall be referred to as the "*Term*."

    1.03.   Compensation.

        (a)   Salary. The Executive's gross base salary during the Term shall be as set forth on Exhibit A attached hereto, as may be amended pursuant to the Company's employee compensation policies in effect from time to time (the "*Base Salary*"). The Base Salary shall be paid in accordance with the Company's normal payroll program. The Company shall withhold from the taxable portion of each installment all applicable federal, state, and local income and other payroll taxes.

        (b)   Bonus Plan. The Executive shall be eligible for an annualized bonus equal to 50% of the Executive's total annual Compensation (the "*Executive Bonus*"). The Executive Bonus will be based on the Company objectives and financial goals being achieved, as well as performance goals as mutually agreed upon between the Executive and the CEO, as further described on Exhibit B. The Company shall withhold from the taxable portion of each bonus all applicable federal, state, and local income and other payroll taxes.

        (c)   Equity Incentive Grant. The Executive shall be eligible to participate in the Company's 2017 Equity Incentive Plan: Liquidity Units and 2017 Equity Incentive Plan: Profits Participation Units (collectively, the "*Incentive Plans*"), as more fully described on Exhibit C attached hereto, as may be amended from time to time.

        (d)   Benefits. During the Term, the Company agrees to provide the Executive with medical health insurance coverage for himself and his family and such other fringe benefits and other benefits as are generally provided to senior officers of the Company, including without limitation, vacation, health, and insurance benefits, as more particularly described on Exhibit D attached hereto, as may be amended from time to time.

        (e)   Expense Reimbursements. The Executive shall be entitled to expense reimbursements in accordance with the Company's expense reimbursement policy for reasonable business expenses incurred by the Executive on behalf of or in furtherance of the business of the Company.

    1.04.   Security and Access; Anti-Bribery and Conflicts. The Executive covenants and agrees (i) to comply with all of the Company's security policies and procedures as in force from time to time, including without limitation, those regarding computer equipment, telephone systems, voicemail systems, facilities access, monitoring, key cards, access codes, Company intranet, internet, social media and instant messaging systems, computer systems, e-mail systems, computer networks, document storage systems, software, data security, encryption, firewalls, passwords, and any and all other Company facilities, IT resources and communication technologies (collectively, "*Facilities Information Technology and Access Resources*"); (ii) not to access or use any Facilities and Information Technology Resources except as authorized by the Company; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Executive's employment with the Company, whether

termination is voluntary or involuntary. The Executive agrees to notify the Company promptly in the event he learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction, or reverse engineering of, or tampering with, any Facilities and Information Technology Access Resources or other Company or affiliate property or materials by others. In addition, the Executive agrees to comply with the Company's anti-bribery and conflicts of interest policies as in force from time to time, the current version of which is attached hereto as Exhibit E.

## ARTICLE II

## RIGHTS ON TERMINATION OF EMPLOYMENT

2.01.  Right to Terminate Employment.  The Executive may, at his option, terminate his employment under this Agreement at any time.  In the case of a voluntary termination by the Executive, except as specified in this Agreement, the Company shall have no further obligations under this Agreement, including any obligation to pay the Executive any further compensation or provide any further employee benefits (except as may be required by applicable law) in respect of periods following the date of termination.

2.02.  Disability.  If because of the Executive's mental, physical, or other disability, the Executive shall be incapable for a period of 12 weeks in any one-year period (the "*Disability Period*") of fully performing his obligations and duties hereunder with or without reasonable accommodation (hereinafter referred to as a "*Disability*"), then, at the election of the Company's Board of Managers (the "*Board*") expressed to the Executive in writing, the Executive's employment under this Agreement shall terminate upon the later of (i) the last day of the Disability Period; or (ii) the date set forth in the written notice of termination.  Upon termination under this Section 2.02, the Company shall have no further obligations under this Agreement, including any obligation to pay the Executive any further compensation or provide any further employee benefits (except as may be required by applicable law) following the date of termination.

2.03.  Death.  In the event of the Executive's death, the Company shall have no further obligations under this Agreement (other than as set forth in Sections 2.06), including any obligation to pay the Executive any further compensation or provide any further employee benefits (except as may be required by applicable law) in respect of periods following the date of the Executive's death.

2.04.  Termination for Cause.  Unless the Executive's conduct, or any action or inaction of the Executive, is irrevocably and materially injurious to the Company (in which event no prior notice is required), the Board shall give the Executive written notice of Cause (as defined in Section 3.01) for termination of the Executive's employment under this Agreement specifying the nature of the conduct, action, or inaction giving rise to such Cause.  The Executive shall thereafter have a reasonable time, in no event greater than 10 days, to fully cure such Cause.  The Company shall be entitled to terminate the Executive's employment under this Agreement without further notice to the Executive if the Executive shall have failed to cure such Cause within such period (or immediately in the case of irrevocably injurious Cause).  In the case of a

termination for Cause, the Company shall have no further obligations under this Agreement, including any obligation to pay the Executive any further compensation or provide any further employee benefits (except as may be required by applicable law), in respect of periods following the date of termination.

2.05.   <u>Rights Upon Termination of Employment Without Cause</u>.   If the Company terminates the Executive's employment under this Agreement other than as set forth in <u>Section 2.02</u> or <u>2.04</u>, then upon the Executive's execution of an instrument releasing the Company and its Affiliates from all claims, causes, and obligations (except for the obligations set forth in this <u>Section 2.05</u>) tendered by the Executive not more than 60 days following such termination (the "<u>Release</u>"), the Company shall promptly pay to the Executive severance compensation, subject to withholding for all applicable federal, state, and local income and other payroll taxes, an amount equal to 12 months of the Executive's then-current gross base salary, payable in no more than 12 equal monthly installments following the receipt the receipt of the Executive's executed Release.

2.06.   <u>Beneficiaries of Payments</u>.   If the Executive shall die before receiving all payments to be made by the Company to him during the then-current Term of this Agreement pursuant to any of the provisions of this Agreement, all such payments, or any remaining payments, as the case may be, shall be made by the Company to such beneficiary or beneficiaries as the Executive may designate from time to time by notice in writing filed with the Company, or if the Executive shall fail or fail effectively to designate a beneficiary, or if no beneficiary shall survive the date when the last payment is to be made, any remaining payments shall be made to the Executive's estate.

2.07.   <u>Exit Obligations</u>.   Within five business days following the termination of the Executive's employment with the Company for any reason, or upon the Company's request at any time during the Executive's employment, the Executive shall (i) provide or return to the Company any and all Company property, including keys, key cards, access cards, identification cards, security devices, employer credit cards, network access devices, computers, cell phones, equipment, manuals, reports, files, books, compilations, work product, e-mail messages, recordings, tapes, disks, thumb drives or other removable information storage devices, hard drives, and data and all documents and materials belonging to the Company or its affiliates and stored in any fashion, including but not limited to, those that constitute or contain any Confidential Information or Work Product, and all Copies thereof (as such terms are defined in <u>Section 3.01</u> below) that are in the possession or control of the Executive, whether they were provided to the Executive by the Company or its affiliates or any of its business associates or created by the Executive in connection with his employment by the Company; and (ii) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Executive's possession or control, including those stored on any non-Company devices, networks, storage locations and media in the Executive's possession or control.

2.08.   <u>Termination of Employment Not a Termination of Entire Agreement</u>.   The Executive hereby acknowledges and agrees that, notwithstanding a termination of the Executive's employment with the Company for any reason, the provisions of Article III of this Agreement shall continue in full force and effect.

# ARTICLE III

## CONFIDENTIALITY AND NON-COMPETE

3.01.  <u>Additional Definitions</u>.  Whenever used in this Agreement, the following terms shall have the meanings respectively assigned to them in this Article.  The use of any of the following defined terms in their un-capitalized form shall indicate that the words have their normal meaning.

"*Affiliate*" shall mean, with respect to a Person, any other Person in which the Person owns or controls an equity interest equal to more than 5% of the outstanding equity interests of such Person; or any other Person for whom the Person serves or is employed or retained as an officer, director, manager, full- or part-time employee, consultant, independent contractor, commissioned sales representative, broker, or agent.

"*Cause*" shall mean with respect to the Executive (i) any material uncured breach of this Agreement; (ii) a conviction of, or plea of *nolo contendere* to, any felony; (iii) an indictment for theft of Company Property (as defined below); (v) unexcused absences totaling more than 20 business days in any 90-day period; (vi) gross negligence or willful misconduct in the discharge of his duties under this Agreement; (vii) inappropriate posting or commenting on Social Media (as defined below) in violation of the Company's policies, as communicated to the Executive from time to time; (viii) a credible allegation of sexual harassment or discrimination against the Executive; (ix) inappropriate behavior, whether or not during business hours, that would reasonably be expected to cast the Company in a negative light or adversely affect the Company's reputation; (x) any communication with or disclosure to one or more Sales Representatives or Customers (as such terms are defined below) of any Confidential Information of the Company or internal discussions or deliberations of the Board, other than for express use in developing sales, promotions, compensation, events, or marketing strategies with leaders serving on committees, PAC or IAC teams or contractors engaged to support these programs; and/or (xi) the Executive's failure to adhere to reasonable written policies, procedures, or directives established by the Board.

"*Competing Business*" shall mean a Person (other than the Company) that provides Services.

"*Confidential Information*" shall mean all information of a confidential or proprietary nature of a Person, including, but not limited to, rate and price information on products and services provided or offered by such Person; records and data relating to past or current customers of such Person; records and data relating to employees and independent contractors of such Person; records and data relating to vendors, suppliers, representatives, and agents of such Person; financial information of such Person, including, but not limited to, revenues, expenses, capital expenditures, profits and losses, sources of financing, tax reporting, investments, and acquisitions; records and data relating to investors, creditors, partners, and Affiliates of such Person; business know-how and trade secrets of such Person; sales and marketing programs and techniques of such Person; business, computer, employee, and other programs and systems developed or used by such Person; compensation and benefits paid or offered to any officer,

manager, employee, independent contractor, agent, or representative of such Person; and any other information designated as confidential, whether prior or subsequent to its disclosure to the Executive, provided, however, that the term "Confidential Information" shall not include any information concerning such Person that is or shall become generally known to the industry or to the public through no fault of the Executive.

"*Control*" shall mean the power to manage the business of a Person, whether through the ownership of voting securities of such Person or by contract.

"*Copy*" shall mean any reproduction or representation of a thing or information, including a reproduction or representation of a Copy, including, but not limited to, photocopies, facsimiles, handwritten transcriptions, pictures, compact discs, floppy discs, magnetic tapes, and digitally stored reproductions or representations, whether on a computer or other medium.

"*Customer*" shall mean any Person to whom or to which the Company is currently providing Services and shall include a Member.

"*Disability*" shall have the meaning that is assigned to such term in Section 2.02.

"*Member*" shall mean any Customer who has purchased the Company's travel club membership product.

"*Non-Compete Period*" shall mean the period commencing with the Effective Date and ending with the date 24 months following the termination for any reason, either by the Executive or the Company, of the Executive's employment with the Company.

"*Open Market*" shall mean those countries in which the Company enrolls Sales Representatives, Members, or Customers.

"*Person*" shall mean any individual, corporation, partnership, limited liability company, trust, estate, or other entity.

"*Prior Employer*" shall mean any Person with whom or with which the Executive was Affiliated prior to the date of this Agreement, including Persons with whom or with which the Executive continues to be Affiliated.

"*Property*" shall mean all property and assets of a Person, whether tangible or intangible, including, but not limited to, computers, peripherals, parts, accessories, software programs and copies thereof, manuals, furniture, supplies, stationery, business cards, promotional materials, and any other thing owned by such Person.

"*Sales Representative*" shall mean the independent sales representatives that are authorized by the Company to sell its Services.

"*Services*" shall mean membership-based travel services marketed through direct sales.

"*Social Media*" shall mean any online or digital forum where people can post comments, videos, or photos, whether or not anonymously, including, but not limited to, Facebook, Twitter, Instagram, Snapchat, and Reddit.

"*Territory*" shall mean any Open Market or any country that the Company has taken substantial steps to cause to be an Open Market during the Term of this Agreement.

"*Work Product*" shall mean the Company's or its affiliates' proprietary, licensed, or custom-generated information, including, but not limited to, plans, publications, research, strategies, techniques, agreements, documents, contracts, terms of agreements, negotiations, know-how, computer applications, software design, web design, work in process, databases, manuals, results, reports, graphics, market studies, notes, communications, product plans, styles, audio visual programs, original works of authorship, specifications, customer information, customer lists, marketing information, and sales information.

3.02.   Covenants Regarding Competitive Protection.   The Executive acknowledges and agrees that he holds an important, senior position with the Company and the Executive's job responsibilities have a significant impact on substantially all aspects of the Company's business. The Executive also acknowledges and agrees that the Company does business throughout the world and the Executive's job responsibilities affect the Company's operations in all markets in which the Company conducts business or has Customers.   Accordingly, the Executive hereby covenants and agrees to each and all of the following:

(a)   Solicitation of Sales Representatives.   The Executive acknowledges and agrees that in and as a result of his employment by the Company the Executive will have interaction with the Company's Sales Representatives and prospective Sales Representatives.   The Executive acknowledges and agrees that Company has expended and will continue to expend substantial time, effort, and financial resources in acquiring its Sales Representatives and in developing and maintaining its Sales Representatives relationships. Accordingly, in consideration of the foregoing and of the Company's commitments and contractual obligations to the Executive pursuant to this Agreement, the Executive hereby covenants and agrees during the Non-Compete Period not to solicit, either directly or through an Affiliate, any Sales Representatives for purposes of encouraging such Sales Representative to become Affiliated with, or offer the Services of, a Competing Business.

(b)   Solicitation of Customers.   The Executive acknowledges and agrees that in and as a result of his employment by the Company the Executive will have interaction with the Company's Customers and prospective Customers.   The Executive acknowledges and agrees that Company has expended and will continue to expend substantial time, effort, and financial resources in acquiring its Customers and in developing and maintaining its Customer relationships. Accordingly, in consideration of the foregoing and of the Company's commitments and contractual obligations to the Executive pursuant to this Agreement, the Executive hereby covenants and agrees during the Non-Compete Period not to solicit, either directly or through an Affiliate, any Person that is a Customer for purposes of offering Services to such Person.

(c)    <u>Solicitation of Employees</u>. The Executive acknowledges and agrees that in and as a result of his employment by the Company the Executive will have interaction with the Company's employees.  The Executive acknowledges and agrees that Company has expended and will continue to expend substantial time, effort, and financial resources in recruiting its employees and in maintaining the Company's relationship with such employees. Accordingly, in consideration of the foregoing and of the Company's commitments and contractual obligations to the Executive pursuant to this Agreement, the Executive hereby covenants and agrees during the Non-Compete Period not to employ or retain as an independent contractor, either directly or through an Affiliate, any current employee of the Company or any individual who was an employee of the Company during the preceding six months, and agrees not to solicit, or contact in any manner that could reasonably be construed as a solicitation, either directly or through an Affiliate, any employee of the Company for purposes of encouraging such employee to leave or terminate his employment with the Company.

(d)    <u>Non-Interference with Vendors</u>. The Executive acknowledges and agrees that in and as a result of his employment by the Company the Executive will have interaction with the Company's Sales Representatives, vendors, suppliers, and independent contractors. The Executive acknowledges and agrees that Company has expended and will continue to expend substantial time, effort, and financial resources in acquiring its Sales Representatives, vendors, suppliers, and independent contractors and in maintaining its relationships with such vendors, suppliers, and independent contractors. Accordingly, in consideration of the foregoing and of the Company's commitments and contractual obligations to the Executive pursuant to this Agreement, the Executive hereby covenants and agrees during the Non-Compete Period not to solicit, either directly or through an Affiliate, any current Sales Representative, vendor, supplier, or independent contractor of the Company for purposes of encouraging such Sales Representative, vendor, supplier, or independent contractor to cease or diminish providing products or services to the Company, or to adversely change the terms under which such current vendor, supplier, or independent contractor provides such products or services.

(e)    <u>Competing Business in the Territory</u>. The Executive acknowledges and agrees that in and as a result of his employment by the Company the Executive will have access to Confidential Information concerning the Company and its Customers that gives the Company a considerable competitive advantage.  The Executive acknowledges and agrees that Company has expended and will continue to expend substantial time, effort, and financial resources in developing its Confidential Information and in maintaining its competitive advantage. Accordingly, in consideration of the foregoing and of the Company's commitments and contractual obligations to the Executive pursuant to this Agreement, the Executive hereby covenants and agrees during the Non-Compete Period not to become an Affiliate with any Competing Business that resides in or operates in the Territory.

3.03.  <u>Confidentiality; Disparagement</u>.  The Company hereby agrees to provide the Executive with Confidential Information concerning the Company and its Customers from time to time during the Term of this Agreement. The Executive hereby agrees that he will not at any time, including following the termination of his employment with the Company for any reason, use for his own purposes or disclose to any Person, other than pursuant to a final judicial order, any Confidential Information of the Company, any of its Customers, or any of the Company's or its Customers' employees. In addition, the Executive hereby agrees that he will not at any time, including following the termination of his employment with the Company for any reason, disparage the Company or any Customer, any officer or employee of the Company or any Customer, or any business practice employed by the Company, any Customer, or any officer or employee thereof.

3.04.  <u>Executive Inventions</u>.  The Executive hereby agrees that all inventions, designs, creations, ideas, innovations, improvements, or discoveries relating directly to the business of the Company or the methods of conducting business used by the Company (including new contributions, improvements, ideas, and discoveries, whether patentable or copyrightable or not) conceived or made by the Executive during his employment with the Company shall belong exclusively to the Company, except as may be set forth in other agreements executed by the Company and the Executive (the foregoing being referred to herein as the "*Executive Inventions*"). The Executive will promptly disclose all Executive Inventions to the Board and perform all actions reasonably requested by the Board to establish and confirm the Company's ownership thereof.

3.05.  <u>Prohibition Against Use of Prior Employer's Confidential Information</u>.  The Executive hereby covenants and agrees not to use or disclose, or encourage or assist any other Person that has an Affiliation with the Company to use or disclose, or introduce into any database, file, or information system of the Company, any Confidential Information of any Prior Employer.

3.06.  <u>Prohibition Against Use of Prior Employer's Property</u>.  The Executive hereby covenants and agrees not to use or bring on to any premises of the Company, or encourage or assist any other Person that has an Affiliation with the Company to use or bring on to any premises of the Company, any Property of any Prior Employer.

3.07.  <u>Reasonableness of Covenants</u>.  The Executive hereby acknowledges and agrees that the covenants and restrictions of this <u>Article III</u> are reasonable in their terms and do not impose any undue hardship on the Executive's current or future employment prospects and are fully supported by the severance compensation in the event of a termination of the Executive's employment without Cause and the Company's disclosure to the Executive during the term of his employment of valuable Confidential Information of the Company. The Executive further acknowledges and agrees that the competitive use of the Company's Confidential Information would cause grievous damage to the Company's business, and the Company would not hire the Executive and disclose Confidential Information to him in the absence of the protections afforded by the confidentiality and non-compete provisions in this <u>Article III</u>. The Executive further agrees that if the laws of the State of Texas applicable to the provisions set forth in this <u>Article III</u> should change, or if any court of competent jurisdiction should hold any term or

provision of this <u>Article III</u> invalid or unenforceable, there shall be substituted in the place of such changed, invalid, or unenforceable term or provision a new term or provision that most nearly fulfills or promotes the purpose and intention of this <u>Article III</u> and is consistent with such law or judicial decision.

## ARTICLE IV

### MISCELLANEOUS

4.01.   <u>Further Assurances</u>.  Each Party agrees to perform any further acts and to execute and deliver any further documents that may be reasonably necessary to carry out the provisions of this Agreement.

4.02.   <u>Severability</u>.  In the event that any of the provisions, or portions thereof, of this Agreement are held to be unenforceable or invalid by any court of competent jurisdiction, the validity and enforceability of the remaining provisions, or portions thereof, shall not be affected thereby.

4.03.   <u>Construction</u>.  Whenever used herein, the singular number shall include the plural, and the plural number shall include the singular.

4.04.   <u>Gender</u>.  Any references herein to the masculine gender, or to the masculine form of any noun, adjective, or possessive, shall be construed to include the feminine or neuter gender and form, and vice versa.

4.05.   <u>Headings</u>.  The headings contained in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning of any of the provisions contained herein.

4.06.   <u>Multiple Counterparts</u>.  This Agreement may be executed in multiple counterparts, including by facsimile signature, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

**4.07.   <u>GOVERNING LAW; VENUE</u>.   THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO THE CHOICE OR CONFLICT OF LAWS RULES THEREOF OR OF ANY STATE.  VENUE FOR ANY ACTION BROUGHT HEREUNDER SHALL BE PROPER ONLY IN THE FEDERAL OR STATE COURTS HAVING JURISDICTION IN DALLAS COUNTY, TEXAS.**

4.08.   <u>Court Costs and Attorneys' Fees</u>.  If any action at law or in equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing Party shall be entitled to recover costs of court and reasonable attorneys' fees from the other Party or Parties to such action, which fees may be set by the court in the trial of such action or may be enforced in a separate action brought for that purpose, and which fees shall be in addition to any other relief that may be awarded.

4.09.   _Inurement_.   Subject to the restrictions against transfer or assignment as herein contained, the provisions of this Agreement shall inure to the benefit of, and shall be binding on, the assigns, successors in interest, personal representatives, estates, heirs, and legatees of each of the Parties.

4.10.   _Waivers_.   No waiver of any provision or condition of this Agreement shall be valid unless executed in writing and signed by the Party to be bound thereby, and then only to the extent specified in such waiver.   No waiver of any provision or condition of this Agreement shall be construed as a waiver of any other provision or condition of this Agreement, and no present waiver of any provision or condition of this Agreement shall be construed as a future waiver of such provision or condition.

4.11.   _Amendment_.   This Agreement may be amended only by the unanimous written consent of the Parties.

4.12.   _Entire Agreement_.   This Agreement, including any Exhibits hereto, contains the entire understanding between the Parties concerning the subject matter hereof.   There are no representations, agreements, arrangements, or understandings, oral or written, between the Parties relating to the subject matter of this Agreement that are not fully expressed herein.   This Agreement expressly supersedes any prior agreement, arrangement, or understanding with the Executive, whether oral or written,  concerning any aspect of the subject matter herein.

4.13.   _Construction of Agreement_.   Each Party and its counsel have participated fully in the drafting and review of this Agreement.   Any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not apply in the interpretation of this Agreement.

4.14.   _Execution_.   Each Party hereby represents and warrants to the other Party that such Party has full power and capacity to execute, deliver, and perform this Agreement, which has been duly executed and delivered by, and which evidences the valid and binding obligation of, such Party enforceable in accordance with its terms subject to applicable liquidation, conservatorship, bankruptcy, insolvency, reorganization moratorium, or similar laws affecting the enforcement of creditors' rights from time to time in effect and to general principles of equity.

4.15.   _Assignment_.   This Agreement and the Executive's obligations, duties, and responsibilities hereunder are of a personal nature.   Accordingly, the Executive may not assign this Agreement or any of his obligations, duties, or responsibilities hereunder.   A merger or consolidation of the Company, a sale of all or substantially all of the Company's assets, or a change of control of the Company shall not constitute an assignment of this Agreement.

4.16.   _Publicity_. The Executive hereby irrevocably consents to any and all uses and displays, by the Company or its affiliates  and its agents, representatives, and licensees, of the Executive's name, voice, likeness, image, appearance, and biographical information in, on, or in connection with any pictures, photographs, audio and video recordings, digital images, websites,

television programs and advertising, other advertising and publicity, sales and marketing brochures, books, magazines, other publications, CDs, DVDs, tapes, and all other printed and electronic forms and media throughout the world, at any time during or after the period of his employment by the Company, for all legitimate commercial and business purposes of the Company or its affiliates ("*Permitted Uses*") without further consent from or royalty, payment, or other compensation to the Executive. The Executive hereby forever waives and releases the Company or its affiliates and its directors, officers, managers, members, employees, and agents from any and all claims, actions, damages, losses, costs, expenses and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the period of his employment by the Company, arising directly or indirectly from the Company or its affiliates' and its agents', representatives' and licensees' exercise of their rights in connection with any Permitted Uses.

4.17.   Section 409A of the Code.   The following provisions shall apply as needed to comply with Section 409A of the Internal Revenue Code of 1986, as amended (the "*Code*"):

(a)   Separation from Service.   Notwithstanding anything herein to the contrary, the payment (or commencement of a series of payments) under this Agreement of any nonqualified deferred compensation (within the meaning of Section 409A of the Code) upon a termination of employment shall be delayed until such time as the Executive has also undergone a "separation from service" as defined in Treasury Regulation Section 1.409A-1(h), at which time such nonqualified deferred compensation (calculated as of the date of the Executive's termination of employment hereunder) shall be paid (or commence to be paid) to the Executive as set forth herein as if the Executive had undergone such termination of employment (under the same circumstances) on the date of his ultimate "separation from service."

(b)   Specified Employee.   Notwithstanding any provision in the Agreement to the contrary, any payment otherwise required to be made hereunder to the Executive at any date as a result of the termination of the Executive's employment shall be delayed for such period of time as may be necessary to meet the requirements of Section 409A(2)(B)(i) of the Code.   On the earliest date on which such payments can be made without violating the requirements of Section 409A(a)(2)(B)(i) of the Code, there shall be paid to the Executive, in a single cash lump-sum payment, an amount equal to the aggregate amount of all payments delayed pursuant to the preceding sentence.

(c)   Delay of Payment.   The Company may delay payment of a benefit hereunder upon such events and conditions as the Internal Revenue Service may permit in generally applicable published regulatory or other guidance under Section 409A of the Code, including, without limitation, payments that the Company reasonably anticipates will be subject to the application of Section 162(m) of the Code, or will violate Federal securities laws or other applicable law; provided, however, that any such delayed payment will be made at the earliest date at which the Company reasonably anticipates that the making of the payment would not cause such a violation.

(d)    Acceleration of Payment.  The time or schedule of payment hereunder may be accelerated only upon such events and conditions as the Internal Revenue Service may permit in generally applicable published regulatory or other guidance under Section 409A of the Code, including, without limitation, payment to a person other than the Executive to the extent necessary to fulfill the terms of a domestic relations order (as defined in Section 414(p)(1)(B) of the Code) or payment of the amount required to be included in income for the Executive as a result of failure of this Agreement at any time to meet the requirements of Section 409A of the Code with respect to the Executive.

(e)    Code Section 409A Compliance.  This Agreement is intended to comply with the requirements of Section 409A of the Code and the Treasury Regulations and other guidance promulgated or issued thereunder, as in effect from time to time.  To the extent a provision of this Agreement is contrary to or fails to address the requirements of Section 409A of the Code and related Treasury Regulations, this Agreement shall be construed and administered as necessary to comply with such requirements to the extent allowed under applicable Treasury Regulations until this Agreement is appropriately amended to comply with such requirements.


[The remainder of this page left intentionally blank]

THE EXECUTIVE ACKNOWLEDGES THAT PRIOR TO SIGNING THIS AGREEMENT HE READ THIS AGREEMENT IN ITS ENTIRETY. THE EXECUTIVE FURTHER ACKNOWLEDGES THAT HE HAS HAD THE OPPORTUNITY TO ASK QUESTIONS CONCERNING ANY TERM OR PROVISION OF THE AGREEMENT AND THE CONSEQUENCES THEREOF AND, TO THE EXTENT THAT HE ASKED SUCH QUESTIONS, HAS RECEIVED ANSWERS THAT HE DEEMS SATISFACTORY. THE EXECUTIVE ACKNOWLEDGES THAT HE HAS BEEN URGED TO CONSULT HIS OWN LEGAL COUNSEL CONCERNING THE INTERPRETATION AND CONSEQUENCES OF THIS AGREEMENT.

IN WITNESS WHEREOF, the Parties have set their respective hands hereto as of the date first written above.

THE COMPANY:

**WorldVentures Holdings, LLC**

By:     Joshua Raine,
        Chief Executive Officer


THE EXECUTIVE:

Kenneth E. Head

## EXHIBIT A

**Base Salary**

The Base Salary shall be $459,000.36 per annum, payable bi-weekly in accordance with the Company's standard payroll practices for salaried employees.

## EXHIBIT B

### Bonus Plan

The Executive will be eligible to earn the Executive Bonus based on milestones that will be developed and deployed within 60 days following the Effective Date.

## EXHIBIT C

### Equity Plan

The Executive will be granted 4,800,000 Liquidity Units and 4,800,000 Profits Participation Units, as defined in and governed by the Incentive Plans. The Liquidity Units will represent 4.0% of the equity of the Company on a fully-diluted basis, based on 85,179,482 units of membership interest of the Company currently issued and outstanding and 34,820,518 Liquidity Units authorized under the Incentive Plans; and the Profits Participation Units will represent 4.0% of the equity of the Company on a fully-diluted basis, based on 85,179,482 units of membership interest of the Company currently issued and outstanding and 34,820,518 Profits Participation Units authorized under the Incentive Plans.

The Liquidity Units and Profits Participation Units will 100% vested on the date of grant. The Company Value Per Unit upon the date of grant will be $0.25, which equates to a $21.3 million valuation of the Company.

The grant of the Liquidity Units and Profits Participation Units will be represented by separate agreements under the Incentive Plans.

# EXHIBIT D

## Employee Benefits

The Executive will be eligible to participate in the Company's employee benefit plans that are offered to all regular full-time employees of the Company. The current description of the Company's benefit plans, which are subject to change from time to time in the discretion of the Company, are annexed to this <u>Exhibit D</u>.

## EXHIBIT E

**Anti-Bribery and Conflicts of Interest Policies**

[attached]

**Exhibit A-2**

| | |
|---|---|
| **From:** | Izhak Benshabat <izhak@seacret.com> |
| **Sent:** | Monday, December 7, 2020 2:42 PM |
| **To:** | Eddie Head |
| **Subject:** | Fwd: CORRECTED PRESS RELEASE Mark and Tammy Smith |
| **Attachments:** | Tammy-Mark_Smith.jpg; PR Smiths_v4.docx |

Message originated from outside of the organization. More info

Izhak

IMPORTANT & CONFIDENTIAL: This message is from Seacret Direct LLC and is for the intended recipient only.  It is privileged and confidential information exempt from disclosure under applicable law.If you are not the intended recipient, any copying, use or distribution is prohibited.  If you received this message by mistake, please call me collect at 602-442-1232 and destroy the original message. Thank you. Any Terms and conditions in this email and attachments are not final and are for negotiation purposes only, and is not considered  final till such time as an agreement will be executed by both parties, till such time all terms and conditions can be changed or completely canceled  by either party!

Begin forwarded message:

> **From:** Jesse Macpherson <jessejmac@gmail.com>
> **Date:** December 7, 2020 at 9:44:53 AM MST
> **To:** Mark Smith <teamfreedom1@gmail.com>, Tammy Smith <tammycoty@yahoo.com>, Izhak Benshabat <izhak@seacret.com>, Tamara Parisio <tamara@seacretdirect.com>
> **Subject: CORRECTED PRESS RELEASE Mark and Tammy Smith**

Version 4 :)

Take Care,

Jesse Macpherson

_____

jessejmac@gmail.com

[www.jessemacpherson.com](http://www.jessemacpherson.com)
Cell 213.949.1965

# Mark & Tammy Smith & Team Freedom join Seacret Direct

This powerhouse pair unites with the Seacret family.

SCOTTSDALE, Arizona, December 2020—In a pivotal growth move, expert network marketers Mark and Tammy Smith bring two decades of experience to the Seacret Direct independent sales force. Included in their many successes, this powerful team generated over $2.5 Billion in sales and built teams with over a million distributors worldwide.

"With experience, you learn how to find the right company that aligns with your values and expectations. When you find something good you jump in with both feet and don't look back," says Tammy Smith. "With Seacret Direct there is something for everyone," adds Mark Smith.

Seacret Direct is always customer driven. The company launched with a direct-to-consumer model selling premium Dead Sea skincare products through kiosks. From the lowest point on earth, with over 20 years of expertise and mastery, Seacret Minerals from the Dead Sea unlocks the potential of this legendary beauty spa that seduced Cleopatra.

The direct-to-consumer approach proved to be a competitive advantage since Seacret products are designed to provide an immediate experience. Seacret Direct expanded the product line with plant-based nutrition in alignment with the quality ingredients of the skincare line. The nutrition products are plant-centric, vegan, non-gmo and alkalizing which is great for the health-conscious consumer.

In a unique collaboration, Seacret Direct is launching a program for 2021 that will establish the company as the largest seller of group travel in the world. Travel is almost a trillion-dollar industry and it rounds out the lifestyle experience Seacret aims to create for customers. Distributors will be able to offer customers a Seacret travel club membership as well as the skincare, bodycare, personal care and nutrition products.

On joining forces with Seacret Direct, Mark Smith responds that "the opportunity seems endless and available for just about anyone in the world! Beauty, wellness, travel and community, that's the Seacret sauce—it's a lifestyle."

ABOUT MARK & TAMMY SMITH

Tammy Smith is a wife, mother and trailblazer in the Network Marketing industry. For Tammy, it's more than just building a company. It's about building people and empowering them to reach their full potential.

Mark Smith is a husband, father, expert trainer and top leader in the Network Marketing industry. With many years of military service and over 20 years in network marketing, he has led thousands on the path to success. Mark is a passionate leader who truly believes in serving others and turning dreams into reality.

ABOUT TEAM FREEDOM

The Smiths relationship with Jesse Macpherson, one of the top distributors in Seacret Direct, began in the industry together as Team Freedom. Their paths took them to competing companies yet crossed over a decade later due to a lasting friendship and a little healthy competition. Their history, experience, respect for one another and the potential of an incredible future by joining forces and helping so many people succeed made the decision easy to make.

Decades of direct selling savvy in teambuilding and sales combined with break-through products and systematic business growth have allowed Mark and Tammy to become top income earners in the industry. The Smith's agree that what attracts incredible people to Team Freedom is the fact that the team focuses on personal development, living a life of contribution and building a culture with class.

Mark Smith | 202.409.7597
Facebook.com/OfficialMarkOSmith
Instagram.com/OfficialMarkSmith

Tammy Smith | 949.903.0283
Facebook.com/TammyCotySmith
Instagram.com/TammyCotySmith

TeamFreedom1@gmail.com

ABOUT SEACRET DIRECT

Founded in 2005, Seacret Direct develops, manufactures and sells premium nutrition and skincare products that combine Dead Sea minerals and other clean ingredients with new technologies and scientific breakthroughs. Manufactured in Israel and headquartered in Phoenix, Arizona, Seacret skincare products offer mineral combinations found only in the Dead Sea.

Seacret products were sold in many countries before the company adopted the direct selling business model in 2011. Since then, Seacret continues to be recognized on the DSN Global 100 list for its global impact of the industry on economic and social realms. For more information, visit seacretdirect.com.

**Exhibit A-3**

**Chibli, Aaron E.**

| | |
|---|---|
| **From:** | Eddie Head <ehead001@me.com> |
| **Sent:** | Monday, January 4, 2021 4:59 PM |
| **To:** | Eric Haynes |
| **Cc:** | Michael Poates; Mary Carroll |
| **Subject:** | Re: Resignation |

Message originated from outside of the organization. More info

This email was sent from outside the company and matches a name in our directory, which may be a phishing attempt. **Do not open links/attachments; do not send payments/PII**. Please adhere to company policy prohibiting the use of personal email for company tasks.

Received and understood, Eric. Thank you.
Let me know how we want to handle any public communication and I'll happily participate and drafting the language. I'm receiving multiple inquiries from the field and outside quarries as well.

Thank you,


**EDDIE HEAD**
PRESIDENT

**WorldVentures Holdings**
5100 Tennyson
Plano, TX 75024  USA

ehead@wvholdings.com


Sent from my iPhone

On Jan 4, 2021, at 5:42 PM, Eric Haynes <ehaynes@wvholdings.com> wrote:


Eddie,

The company hereby accepts your resignation but has elected to pay you through January 14 rather than having you continue as an employee during your notice period. You will receive two weeks of pay on the next regular schedule pay cycle, January 15th and then 5 days of pay on January 29th. Please know that your access has been terminated. Your benefits will be in place through January 31, 2021.

Also, please be aware that certain provisions within your employment agreement, including without limitation Article III Confidentiality and Non-Compete, survive the termination of your employment at WorldVentures.

We wish you well in your future endeavors.

Thanks

Eric

## Eric Haynes
**Chief Legal Officer**

| | |
|---|---|
| **phone** | 469-480-0230 |
| **email** | ehaynes@wvholdings.com |
| **address** | 5100 Tennyson Parkway<br>Plano, Texas 75024 |

## WorldVentures Holdings

worldventures.com

---

**From:** Eddie Head <ehead@wvholdings.com>
**Sent:** Thursday, December 31, 2020 5:16 PM
**To:** Michael Poates <mpoates@wvholdings.com>
**Cc:** Eddie Head <ehead@wvholdings.com>; Eric Haynes <ehaynes@wvholdings.com>
**Subject:** Resignation

Michael,

 Please accept this as my formal notice of resignation of my position as President and CSO of Spherature Investments, llc. I offer two weeks of notice with the last day of service being 1-14-21.

With the BK in process, streamlined management requirements, and a need for our further reduction of SG&A, I see my position as expendable.

14 years... I love our company and our family so this is not in any way an enjoyable moment and it's with true sadness that this is submitted… save for the reflection on who we've helped and how we've contributed through empowerment and service. I hope the work we all do going forward will redeem some of the tarnish of the last few years.

I would ask that my expenses submitted and approved are paid as the current process provides. Additionally, we will need to address my removal from the director role on several entities supporting the business globally, any regulatory or litigation subjects and the NPO board seat and further wind-down.

I wish you and our colleagues and employees best fortune, happiness and prosperity..

Sincerely,



**EDDIE HEAD**
President

**WorldVentures Holdings**
5100 Tennyson Parkway
Plano, TX 75024
p: 972.805.5103
c: 310.595.6954
ehead@wvholdings.com

The information contained in this email, including any attachments, may be confidential and subject to copyright. If you are not the intended recipient, please notify the sender and delete this message from your system. Email transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of email transmission.

This message contains confidential information and is intended only for the individual named. It may also be privileged or otherwise protected by work product immunity or other legal rules. If you are not the named addressee you should not disseminate, distribute or copy this email. Please notify the sender immediately by email if you have received this email by mistake and delete this email from your system. Receipt by anyone other than the intended recipient is not a waiver of confidentiality or privilege. Email transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of email transmission.

Sent by WorldVentures Marketing Holdings, LLC on behalf of its affiliates, branches, representative offices, and/or subsidiaries, including:

North America: WorldVentures Marketing, LLC, 5100 Tennyson Pkwy, Plano, TX 75024, Entity No. E0758622005-8, Guam Registration No. FLLC-2447, Puerto Rico Registration No.240; WorldVentures Canada Inc., 160 Elgin St., Ste. 2600, Ottawa, ON K1P 1C3, Canada, Registry No. 3242933, Business No. 82803 3050; WorldVentures Marketing, S. de R.L. de C.V, Avenida Oaxaca 96, 202-C, Col. Roma Norte, CP 06700, Ciudad de Mexico, IdCIF: 18080377704; WorldVentures

Marketing Jamaica Limited, The Trade Center Business Complex, 30-32 Red Hills Road, Suite 3A, Kingston 10, Saint Andrew, Jamaica, Company No. 90132. South America: WorldVentures Marketing Brasil Ltda., Rua Dom Jose de Barros, nº 177, 2º andar, Republica, 01038-100, City of Sao Paulo, State of Sao Paulo, Brasil, Company Reg. No. 18.280.186/0001-45; WorldVentures Marketing Colombia S.A.S, 7th Ave. 71-21, 5th Floor , Tower A, Avenida Chile Tower, Bogotá, Colombia, Company Reg. No. 18.280.186/0001-45; Reg No. 02855990. Europe: WorldVentures Events Ltd., 5 New Street Square, London, EC4A 3TW, United Kingdom, Company No. 06440081; WorldVentures Marketing Limited, 5 New Street Square, London, EC4A 3TW, United Kingdom, Company No. 07580413; WorldVentures Marketing B.V., de Naritaweg 127-137, 1043 BS Amsterdam, Netherlands, Dossiernummer: 50214489;

WorldVentures Marketing Poland Sp.z.o.o., ul. Plac Marsz. Jozefa Pilsudskiego, No.2, 00-073 Warsaw, Poland, KRS number: 0000619035; WorldVentures Marketing S.R.L., Bucharest, 5th District, 22 Tudor Vladimirescu Boulevard, Green Gate Office Building, 5th floor, Office 513, Romania, Trade Registry No. J40/8885/28.06.2016; WorldVentures Marketing B.V., (A representative Office in Serbia), GTC 19 Avenue, 38-40 Vladimira Popovica Street, Belgrade 11070, Serbia, Registration No. 29017425; WorldVentures Marketing SL, d.o.o., Trg Republike 3, 1000 Ljubljana, Slovenia, Registration No. 7195915000; WorldVentures Marketing s.r.o., Revolucni 764/17, Post Code 110 00, Prague, Czech Republic, Registration No. 06539378; WorldVentures Marketing Greece Limited Liability Company, Athens Towers 21st Floor, Room 2118 2-4 Messogion Avenue Athens, 11527 Greece, Registration No. 143113201000; WorldVentures Marketing France SAS, 18 Rue Pasquier, 75008 Paris, France, R.C.S. 850 443 052; WorldVentures Marketing Latvia Filiale (A branch of WorldVentures Marketing B.V.), 14-2 Terbatas Street Riga, LV-1011 Latvia, Registration No. 40103815177. Asia Pacific: WorldVentures Marketing (Hong Kong) Limited, 31/F., Tower Two, Times Square, 1 Matheson Street, Causeway Bay, Hong Kong, Registration No. 1598607; WV Services Malaysia Sdn. Bhd., Suite 17.02 & 17.03, Level 17, Centrepoint North, Mid Valley City, Lingkaran Syed Putra, 59200 Kuala Lumpur, Malaysia, Company No. 201501034065 (1159385-H) (License No. AJL 932108); WorldVentures Marketing Pte. Ltd., 38 Beach Road, #29-11 South Beach Tower, Singapore 189767, Registration No. 201208619Z; WorldVentures Marketing Pty. Ltd., Suite 2/04, Level 2, Quad 3, 102 Bennelong Parkway, Sydney Olympic Park, NSW 2127, Australia, ABN 30167886651; WorldVentures Marketing Limited, 6 Clayton Street, Newmarket, Auckland 1023, New Zealand, Company No. 6124807; WorldVentures Taiwan Ltd., 16F-1, No.456, Sec. 4, Xinyi Rd., Xinyi Dist., Taipei City, Taiwan, Company No.54657572; WorldVentures (Thailand) Limited, 17th Floor, Unit S-05, Silom Complex, 191 Silom Road, Kwaeng Silom, Khet Bangrak Bangkok,10500 Thailand, Registration No. 0105558012314; WorldVentures Marketing (Cayman) LLC (a branch in Philippine), North Unit, 22nd Floor, Marajo Tower, 312 26th Street Corner 4th Avenue, Bonifacio Global City, Brgy. Fort Bonifacio, Taguig 1634, Metro Manila, Philippines, FS 201825995. Africa: WorldVentures Marketing South Africa (Pty) Ltd., 3rd Floor, 54 Melrose Boulevard, Melrose, Arch, 2196, Johannesburg, South Africa, Company Number: 2016/060068/07;

WorldVentures Marketing (Zambia) Limited, Building 3, Acacia Park, Stand No. 22768, Thabo Mbeki Road, P.O. Box 39371, Lusaka, Zambia, Registration No. 120180008523; WorldVentures Marketing (Namibia) Proprietary Limited, 1 Charles Cathral Street, Olympia, Windhoek, Namibia, Registration No. 2018/0508


Rovia, LLC, 5100 Tennyson Pkwy, Plano, TX 75024, Entity No. E0353902008-6 [CA SOT #2094843-40, FL SOT #ST37441, HI SOT #TAR6636, WA SOT #602895305, IA SOT #934]; Rovia Pte. Ltd., 38 Beach Road, #29-11 South Beach Tower, Singapore 189767, Registration No. 201216388Z [Travel Licence No. 02572]; Rovia Australia Pty. Ltd., Suite 2/04, Level 2, Quad 3, 102 Bennelong Parkway, Sydney Olympic Park, NSW 2127, Australia, ABN 92168529664; Rovia Travel (Hong Kong) Limited, 31/F., Tower Two, Times Square, 1 Matheson Street, Causeway Bay, Hong Kong, Registration No. 2172271; Rovia Travel South Africa (Pty) Ltd., 3rd Floor, 54 Melrose Boulevard, Melrose Arch, 2196, Johannesburg, South Africa, Registration No. 2016/186728/07;


WorldVentures Foundation, located at 5100 Tennyson Pkwy, Plano, TX 75024 (a registered, US 501(c)(3) organization).

**Exhibit A-4**

## CO-MARKETING AGREEMENT

This Co-Marketing Agreement ("Agreement") dated as of July 22, 2020 (the "Effective Date") by and between WorldVentures Marketing, LLC, a Nevada limited liability company ("WVM"), with its primary place of business located at 5100 Tennyson Parkway, Plano, TX 75025 and Seacret Direct LLC, an Arizona limited liability company ("Seacret"), with its primary place of business located at 8125 N. 86th Place, Scottsdale, AZ 85258. WVM and Seacret are referred to collectively as the "Parties" and each, individually, as a "Party".

## RECITALS

Whereas, WVM is a multi-level marketing company that markets and sells lifestyle membership products and services to customers ("Members");

Whereas, Seacret sells proprietary products including dietary supplements, nutritional and skincare ("Product" or "Products") through its network of sales representatives;

Whereas, WVM wishes to make Seacret's Products available to WVM's Members, based upon available inventory, for purchase by WVM Members, in all domestic and international countries in which WVM conducts business and in which Seacret gives its approval to sell its Products ("Territory"); and

Whereas, Seacret agrees to make its Products available to WVM's Members in the Territory, to sell its Products to such Members if available and as provided herein, and to remunerate WVM for each purchase of Seacret's Products made by WVM's Members.

NOW, THEREFORE, in consideration of the premises, and the mutual covenants and conditions contained herein, WVM and Seacret agree as follows:

## AGREEMENT

1. <u>Program Description & Responsibilities.</u>

    1.1     Seacret will establish WVM as an affiliate so that WVM can refer WVM's Members to purchase Seacret's Products as VIP Customers ("VIPC").

    1.2     Seacret, at no charge to WVM, will create and manage the VIPC portal for WVM Members based on its existing platform.

    1.3     WVM's Members will be verified by WVM through a single sign-on process (SSO) to authenticate.

    1.4     Seacret agrees to make its Products available to WVM's Members for purchase in the Territory, based upon available inventory, with the understanding that Seacret will not provide that service or sell any Product to any WVM Member in any country in which WVM does not possess the appropriate network marketing licensure and/or in which WVM is not in full compliance with all local laws affecting network marketing.

    1.5     Seacret will provide "Turnkey Product" ordering, fulfillment and shipping services for VIPC orders made by WVM Members in the Territory, subject to available inventory. The Parties will review additional market expansion opportunities for their respective representatives and customers within markets already open for each.

1.6    Seacret will process all VIPC referral orders made by WVM Members as it would as a direct customer order; except that:

    1.6.1    The Parties acknowledge that Seacret has its own agents and customers to whom Seacret will also be selling Products;

    1.6.2    Seacret shall have the right to prioritize its agents and customers, in terms of processing and fulfilling orders, over WVM Members;

    1.6.3    Seacret shall have the discretion to allocate its Product to its own agents and customers, and to WVM Members, in its sole discretion; and

    1.6.4    Seacret's processing of all VIPC referral orders made by WVM Members shall be subject to available inventory, and shall not be liable to any WVM Member or to WVM for failing to fulfill an order due to the Product being out of stock or otherwise unavailable for purchase.

1.7    Seacret will provide customer service to WVM Members making VIPC purchases of Seacret's Products based on available inventory. Such customer service shall include, but not necessarily limited to, assisting WVM and WVM Members in connection with the Products, Product ordering, grievances, and complaints, and accepting reasonable Product returns consistent with Seacret's existing policies.

1.8    Seacret shall be responsible for monitoring adverse events reported by WVM or WVM Members and will report such adverse events as required by law.

1.9    Seacret agrees that during the Term of this Agreement it will not enter into any other agreements with multi-level-marketing companies to provide Seacret products under an affiliate or affiliate-like relationship similar to that established by this Agreement.

2.    **WVM's Responsibilities**

2.1    WVM agrees to actively and regularly promote Seacret and Seacret's Products to WVM's Members, via corporate website and communications, back office, and particularly social media.

2.2    WVM agrees that it will not enter into any other agreements with any third parties developing, manufacturing, distributing or selling the same or substantially similar types of Products as those sold by Seacret to WVM's Members. The Parties agree that nothing in this Section 2.2. shall prohibit WVM from selling its own products under the Dream-Body brand using any fulfillment source as they deem appropriate, so long as such "Dream-Body" products are limited to the immunity support products, meal replacement/protein bars, bcaa supplements, "flavors of the world" e.g. spices, coffee, tea and chocolate, fitness equipment, apparel and training content, and so long as WVM does not use any Seacret Intellectual Property, as defined herein, in developing, improving, marketing or selling such Dream-Body brand products. WVM will assess whether any manufacturing or fulfillment opportunities exist for Seacret with respect to such "Dream-Body" products. In the event that WVM any Dream-Body brand product, other than those product types listed above, that is the same or substantially similar to a product then sold by Seacret, WVM shall not market or sell that Dream-Body brand product without the written consent of Seacret.

2.3     WVM agrees that it shall be solely responsible for the payment of any and all commissions or other compensation to its Members, whether paid out of the WVM Commission or WVM Remuneration (as defined below) or otherwise. Seacret shall have no financial obligations to WVM Members. WVM agrees to defend, indemnify and hold Seacret harmless from and against any claims made by WVM's Members for unpaid commissions, payments or other financial obligations owed to WVM's Members.

2.4     WVM agrees to inform its Members, to be responsible for, and to ensure that its Members do not identify themselves, at any time, as Seacret agents or representatives, it being understood that WVM's Members are affiliated with WVM only, and have no employment, independent contractor, agent, representative or any other status or relationship with Seacret other than customer.

3.      **Compensation**

3.1     Seacret will pay WVM a commission (the "WVM Commission") equal to twenty percent (20%) of the "Gross Margin" (as defined herein) of any Products purchased by WVM Members during the term of this Agreement. The term "Gross Margin" shall be calculated as follows: Total Revenue collected minus uncollected shipping and fulfilment costs, minus Tax/VAT charges, minus refunds, and minus any discounts or promotion costs. Seacret will pay WVM the WVM Commissions to WVM on a weekly basis, via ACH funds, in arrears, and calculated on the prior week's sales to WVM Members.

3.2     Seacret will also separately pay WVM an amount (the "WVM Remuneration") equal to fifty percent (50%) of the "Net Margin" (as defined herein) of any Products purchased by WVM Members during the Term of this Agreement. The term "Net Margin" shall be calculated as follows: Gross Margin minus credit card processing costs, minus Cost of Goods Sold ("COGS"), minus the WVM Commission. The term "COGS" shall mean Seacret's actual cost to develop, manufacture, acquire, distribute and sell its Product, including but not limited to shipping, logistics, customs, and related legal services, based upon the prior year's actual costs, or an amount equal to twenty-three percent (23%) of the Price of the Product, whichever is greater. (Seacret's actual COGS for 2019 is attached hereto as Exhibit A.) In the event that Seacret's actual cost to develop, manufacture, acquire, distribute and sell its Product exceeds twenty-three percent (23%) of the Price of the Product, WVM may demand that Seacret provide proof of its actual cost. Seacret will pay the WVM Remuneration to WVM on a monthly basis, via ACH funds, in arrears, and calculated on the prior month's sales to WVM Members.

3.3     Seacret will provide WVM with weekly reports, in API format, of all purchases made by WVM Members, as contemplated in this Section, to including individual transaction records with statistics and characteristics of the transactions, base price, mark up (if applicable), all taxes specified separately in addition to chargebacks and returns. The weekly report shall be provided in a form that is reasonably acceptable to WVM.

{00506205.1 }

3

3.4   Secret, shall for a period of three (3) years after their creation, keep, maintain and preserve complete and accurate records and accounts, including all invoices, correspondence, ledgers, financial and other records pertaining to the sales of Products to WVM Members and to the payment of any WVM Commissions or WVM Remuneration by Seacret and such records and corporate accounts shall be available for inspection and audit at Seacret's corporate offices as designated by Seacret, at any time or times during the Term of this Agreement or within ninety (90) days thereafter, but at no time more than once per year, during reasonable business hours, by WVM or its nominee. In the event that WVM discovers and proves that WVM was paid less than ninety percent (90%) of the WVM Commission or the WVM Remuneration owed during the Term of this Agreement, Seacret shall pay such underpayment amount to WVM.

4.    **Representations and Warranties**

4.1   Seacret represents and warrants to WVM that:

4.1.1   Seacret has the full legal right, power and authority to enter into this Agreement.

4.1.2   This Agreement is the legal, valid, and binding obligation of Seacret, enforceable against Seacret in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application or by general principles of equity.

4.1.3   All Products sold to WV Members shall be manufactured and packaged in accordance with the good manufacturing practices prevailing in the industry, including the applicable provisions of the Current Good Manufacturing Practices published by the Food and Drug Administration (21 CFR Parts 110, 111 and 117), and as required by any other state or federal authorities. Seacret shall promptly notify WVM of any noncompliance with such practices or provisions. If Seacret learns of any condition that raises the possibility of finished Products being adulterated or misbranded within the meaning of any federal, state or local law, Seacret shall notify WVM within twenty-four (24) hours of first notice. Seacret shall be responsible for product recalls or market withdrawals as necessary, including notifications to affected purchasers of the Products. In the event of any Product recall or decision by Seacret, in its sole discretion, to refund the purchase price, WVM shall forfeit to Seacret any related WVM Commission payment or WVM Remuneration payment.

4.1.4   Seacret shall be responsible for ensuring compliance with the labeling requirements of the Food and Drug Administration, and similar regulatory agencies in countries in which Seacret sells its Products including claims on product labeling, packaging, inserts and other promotional materials distributed at the point of sale.

4.1.5   Seacret's Products are composed of safe ingredients, manufactured, labeled, packaged, stored, and shipped under conditions compliant with all applicable federal, state, and local requirements including but not limited to applicable laws, regulations, and guidelines adopted by (i) the Food and Drug

4

{00506205.1 }

Administration ("FDA") pursuant to the Federal Food, Drug, and Cosmetic Act, as amended (the "Act"); and the Public Health Security and Bioterrorism Preparedness and Response Act (the "Bioterrorism Act"), including but not limited to the safety, composition, labeling, registration, and manufacturing provisions and current industry good manufacturing practices; (ii) the Federal Trade Commission ("FTC"); (iii) the Standardized Information on Dietary Ingredients Work Group ("SIDI"); and (iv) applicable state and local authorities responsible for regulating the manufacture, storage, and shipment of food products and establishments, including without limitation, the California Safe Drinking Water and Toxic Enforcement Act of 1986, and all applicable laws, rules and regulations where the Products are sold.

4.1.6   All edible Products shall be merchantable and fit for human consumption, where applicable.

4.1.7   Seacret is not subject to, nor is it aware of, any pending or threatened order, injunction, enforcement action or other proceeding by any local, state or federal governmental agency regarding the manufacturing processes, storage conditions, or purity of any Products produced by Seacret.

4.1.8   Seacret agrees that this Agreement shall have no impact upon WVM's' sale of travel products to its Members, and that any fulfillment of such travel products by Seacret will be negotiated independent of this Agreement.

4.2   WVM represents to Seacret that:

4.2.1   WVM has the full legal right, power and authority to enter into this Agreement.

4.2.2   This Agreement is the legal, valid, and binding obligation of WVM, enforceable against WVM and its affiliates, including World Ventures Holdings, LLC, in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application or by general principles of equity.

4.2.3   The signing and delivery of this Agreement by WVM and the performance by WVM of all of WVM's obligations under this Agreement will not breach any agreement to which WVM is a party, or give any person the right to accelerate any obligation of WVM; violate any law, judgment, or order to which WVM is subject; or require the consent, authorization, or approval of any person, including but not limited to any governmental body.

4.2.4   WVM understands and agrees that all sales of Products by Seacret to WVM's Members shall be based on available inventory, and that Seacret shall not be responsible to WVM or its Members for any shortfall in inventory or "out of stock" items.

4.2.5   WVM understands and agrees that this Agreement shall have no impact upon Seacret's sale of its Products to its agents and customers.

5. **Indemnification**

5.1     Seacret shall defend, indemnify and hold harmless WVM, its officers, directors, officers, agents and employees from and against any and all damages, losses, liabilities, claims, suits, costs and expenses (including reasonable attorney fees) (collectively, "Claims") resulting from or relating to any breach by Seacret of any provision, warranty or covenant, under this Agreement. Seacret further agrees to indemnify and hold harmless WVM and its officers, directors and agents, from and against any and all damages, loss, cost, liability or expense (including attorney fees and costs) incurred by any such party in connection with any complaints, demands, claims, or legal actions alleging illness, injury, death, or damage as a result of the consumption or use of any Product, unless those complaints, demands, claims, or legal actions arise out of WVM's negligence.

5.2     WVM agrees to defend, indemnify and hold harmless Seacret, its directors, officers, agents and employees from and against any and all damages, losses, liabilities, claims, suits, costs and expenses (including attorney fees) (collectively, "Claims") resulting from or relating to any breach by WVM of any provision, warranty or covenant, WVM under this Agreement.

5.3     The party entitled to indemnification under this Section 5 (the "Indemnified Party") will provide the party obligated to provide indemnification (the "Indemnifying Party") with prompt notice of any third-party Claim for which its seeks indemnification, provided that the failure to do so will not excuse the Indemnifying Party of its obligations except to the extent prejudiced by such failure or delay. The Indemnifying Party will have the sole right to control the defense and settlement of the third-party Claim, provided that the Indemnifying Party may not, without the Indemnified Party's consent, enter into any settlement which admits guilt, liability or culpability on the part of the Indemnified Party. The Indemnified Party will provide reasonable cooperation to the Indemnifying Party in defending any third-party Claim.

5.4     EXCEPT WITH RESPECT TO EACH PARTY'S INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT, UNDER NO CIRCUMSTANCES SHALL EITHER PARTY OR THEIR AFFILIATES HAVE ANY LIABILITY WHATSOEVER TO THE OTHER PARTY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SUCH AS, BUT NOT LIMITED TO, LOSS OF PROFIT OR REVENUE; LOSS OF USE OF THE PRODUCTS; COST OF CAPITAL; OR CLAIMS RESULTING FROM CONTRACTS BETWEEN A PARTY'S CUSTOMERS AND/OR SUPPLIERS.

6. **Term. Termination & Effects of Termination**

6.1     Term. This Agreement shall run for a period of two (2) years from the date hereof (the "Term"), unless terminated sooner. After the end of the Term, the Agreement shall automatically renew for successive one (1) year terms unless either Party gives written notice of its intent not to renew at least ninety (90) days before the expiration of that Term.

6.2     Termination.

    6.2.1   Termination for Material Breach.  Either Party may terminate this Agreement upon written notice to the other Party, if such other Party materially breaches this Agreement and the breach remains uncured for a period of thirty (30) days after receipt of written notice of such breach.

    6.2.2   Termination for Injury to Reputation.  Neither Party nor their agents or employees will take any action which is intended, or would reasonably be expected, to harm the other Party's reputation or which would reasonably be expected to lead to unwanted or unfavorable publicity to the other Party; provided, however, the foregoing limitation shall not apply to (a) compliance with any legal process or subpoena or (b) statements in response to authorized inquiry from a court or regulatory body. Notwithstanding any other provisions of this Agreement, if either Party in its sole judgment believes that the material breach of this Agreement or the conduct of the other Party constitutes an immediate and material threat to its integrity or business reputation, it may immediately terminate this Agreement without the requirement of any notice to the other Party.

    6.2.3   Termination for Bankruptcy.  Either Party may terminate this Agreement upon written notice to the other Party, if such other Party assigns its assets and/or rights for the benefit of creditors or makes a general arrangement with creditors, commits any act of bankruptcy, files a petition under any bankruptcy of insolvency law, or, if such a petition is filed against that Party, the petition is not dismissed within sixty (60) days from filing.

6.3     Return of Confidential Information.  Immediately following termination of this Agreement, each Party shall deliver to the other all of the other Party's Confidential Information, and all copies thereof (electronic or otherwise) in its possession or under its control, or destroy the such Confidential Information, and all copies thereof (electronic or otherwise), as directed by the other Party.  In the event a Party directs the other Party to destroy its Confidential Information, and all copies thereof, the other Party shall provide it with a signed and dated statement from an officer of the company certifying that all such Confidential Information and all copies thereof have been destroyed.

7.     **Confidentiality**

7.1.   "Confidential Information" means this Agreement and all confidential or otherwise proprietary business and technical information relating to the Parties and their respective businesses, including, without limitation, ideas, know-how, trade secrets, production, manufacturing techniques, recipes and formulas, sources of supply, pricing, costing, and accounting procedures, and customer information. Confidential Information does not include information that is in the public domain at the time of disclosure by the disclosing Party; that enters the public domain after disclosure by the disclosing Party through no fault of the receiving Party; that was or is separately disclosed to the receiving Party by a third party not itself subject to an obligation of confidentiality to the disclosing Party with respect to such information; or that was in the receiving Party's possession at the time of disclosure by the disclosing Party.

7.2  Each Party agrees to maintain the other Party's Confidential Information in strict confidence and, except to the extent expressly permitted in this Agreement or otherwise consented to in writing by the other Party, that the Confidential Information will not be disclosed by it or its "Representatives" (defined to include affiliates, directors, shareholders, officers, employees, agents, subcontractors, consultants, members, managers, advisors, or other representatives including legal counsel, and accountants or any "Person" (defined to include individuals, partnerships, companies, limited liability companies, entities, corporations, or agents thereof) except with the specific prior written consent of the other.

7.3  The Parties agree that each of their downline organizations (i.e. names, addresses and other personally identifiable information commonly used in the MLM industry to identify members, agents and representatives of each organization) constitute their proprietary and confidential information. Each Party agrees that during the Term of this Agreement and for a period of one (1) year following termination neither it nor its officers, directors or senior management shall recruit or attempt to recruit a member of the other Party's downline organization to leave the other Party and join any other network marketing or direct selling business including a Party's affiliated business(es). Neither Party, nor its officers, directors or senior management shall offer, entice, encourage, solicit or attempt to influence a member of the other Party's downline organization to sign up with it and leave his or her organization in which they are currently involved. Notwithstanding the foregoing, either Party may sell its products to the other party's members or agents (as customers) after the termination of this Agreement.

7.4  Both Parties agree that during the Term of this Agreement and for a period of one (1) year after the termination hereof, unless otherwise agreed by the Parties, that each Party and its employees shall not contact, solicit, seek or in any way enter into an employment relationship with any person who was an employee of the other Party as of the date of termination.

## 8.  **Insurance**

8.1  During the Term of this Agreement, each Party shall maintain (i) Workers' Compensation and Employees' Liability Insurance (as required by law); and (ii) Public Liability Insurance including Contractual Liability and Products Liability Coverage with a combined single limit of not less than Five Million Dollars ($5,000,000). The insurance policies shall be claims based and name the other Party as an additional insured party and provide that at least thirty (30) days prior written notice of cancellation, amendment, or lapse of coverage shall be given to said additional insured by the insurer. Each Party will submit policies and/or certificates of insurance evidencing the above coverage to the other Party upon the other Party's reasonable written request.

## 9.  **Regulatory Action**

9.1  If the FDA or any other domestic or foreign federal, state or local government agency makes, with respect to any Product sold or distributed by Seacret under this Agreement, (i) an inquiry, or (ii) gives notice of or makes an inspection at Seacret's premises (including warehouses), or (iii) seizes any such Product or requests a recall, or (iv) directs Seacret to take or cease taking any action,  WVM shall be notified immediately but in no event later than the next business day. Seacret will investigate the inquiry or complaint

{00506205.1 }

8

and provide WVM with a written report within ten (10) Business Days after the notification.

## 10. Intellectual Property

10.1 <u>Seacret's Intellectual Property.</u>  Seacret is and shall be the sole owner of all intellectual property rights, including patent rights, trade secrets or other proprietary information relating to Seacret's Products ("Seacret's Intellectual Property").  WVM shall not, directly or indirectly, modify the features or functionality of, copy or create derivative products using all or any portion of, analyze or remove components from, decompile, or otherwise reverse engineer or attempt to reverse engineer or derive techniques, ingredients, know-how or processes from the Products or permit or encourage any third-party to do so.  Unless otherwise expressly stated herein, this Agreement does not confer to WVM any intellectual property or other rights with respect to Seacret's Products, brand, formulas, packaging, or any names or logos used in connection with the Products. As between Seacret and WVM, Seacret owns and shall continue to own all such intellectual property rights.

10.2 WVM's Intellectual Property.  WVM is and shall be the sole owner of all intellectual property rights, including patent rights, trade secrets or other proprietary information relating to WVM's business ("WVM's Intellectual Property").  Seacret shall not, directly or indirectly, modify the features or functionality of, copy or create derivative products using all or any portion of, analyze or remove components from, decompile, or otherwise reverse engineer or attempt to reverse engineer or derive techniques, ingredients, know-how or processes or permit or encourage any third-party to do so. Unless otherwise expressly stated herein, this Agreement does not confer to Seacret any intellectual property or other rights with respect to WVM's brand, packaging, or any names or logos used in connection with the WVM's business. As between Seacret and WVM, WVM owns and shall continue to own all such intellectual property rights.

## 11. Trademarks and Tradenames

11.1 The Parties recognize that the corporate name and respective trademarks or tradenames of the other are valuable and that all goodwill associated with use of such names and marks shall inure to the benefit of the other. Either Party shall have the right to terminate this Agreement immediately in the event that the other Party acts in a manner which would negatively impact the reputation of such Party and/or of its name or marks and/or would infringe or dilute the value of the other Party's name or marks or which is not in compliance with applicable law in the United States or any other country in which either Party conducts business as the case may be. Each Party shall be solely responsible for the registration and maintenance of its trademarks and tradenames in the Territory. During the Term of this Agreement, each Party shall grant the other Party a revocable, limited, non-assignable license to use its corporate name, trademarks or tradenames in connection with its promotion or operation of the program described hereunder.

## 12. Dispute Resolution

12.1 The Parties shall in good faith attempt to resolve any dispute arising out of or relating to this Agreement promptly by negotiations between executives who have authority to settle the controversy. A party may give the other parties written notice of any dispute not resolved in the normal course of business. Within 20 days after delivery of that

{00506205.1 }

9

notice, executives of the affected parties shall meet at a mutually acceptable time and place, or by teleconference and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute. If the matter has not been resolved within 60 days of the disputing party's notice, or if the parties fail to meet within 20 days, either party may initiate mediation of the controversy or claim as provided in Section 12.3.

12.2    Any controversy or claim arising out of or relating to this Agreement or the existence, validity, breach or termination thereof, whether during or after its Term, will be finally settled by compulsory arbitration in accordance with the Commercial Arbitration Rules and Supplementary Procedures for Commercial Arbitration of the American Arbitration Association ("AAA").

12.3    To initiate arbitration, either party will file the appropriate notice at the appropriate Regional Office of the AAA. The arbitration proceeding will take place in Phoenix, Arizona, for a period not to exceed three (3) days. The arbitration panel will consist of three (3) arbitrators, one arbitrator appointed by each Party and a third neutral arbitrator appointed by the AAA. Any communication between a Party and any arbitrator will be directed to the AAA for transmittal to the arbitrator.

12.4    The arbitral award will be the exclusive remedy of the Parties for all claims, counterclaims, issues or accountings presented or plead to the arbitrators. The award will (i) be granted and paid in U.S. Dollars exclusive of any tax, deduction or offset and (ii) include interest from the date of breach or other violation of the Agreement until the award is fully paid, computed at the then-prevailing LIBOR rate. Judgment upon the arbitral award may be entered in any court that has jurisdiction thereof. Any additional costs, fees or expenses incurred in enforcing the arbitral award will be charged against the Party that resists its enforcement.

13.    **Miscellaneous**

13.1    Relationship of Parties. Seacret and WVM are independent contractors for the purpose of this Agreement. Neither the execution, delivery nor performance of this Agreement will be construed to constitute either party as an agent or representative of the other for any purpose. Neither the execution, delivery nor performance of this Agreement will be deemed to establish a joint venture or partnership between the Parties. Except as otherwise provided herein, neither Party has the authority to (i) bind the other Party by or to any contract, representation, understanding, act or deed, (ii) represent that either Party is an agent of the other Party, or (iii) represent that either Party is responsible for the acts or omissions of the other Party.

13.2    Force Majeure. The Parties shall not be responsible for any failure to perform due to unforeseen circumstances or causes beyond their reasonable control, including but not limited to acts of God, war, riot, embargoes, acts of civil or military authorities, fires, floods, accidents, strikes, epidemics, pandemics, or shortages of transportation, facilities, fuel, energy, labor, or materials. In the event of any such delay, the Parties may defer performance hereunder for a period equal to the time of such delay.

13.3    Severability. If any provision of this Agreement shall be prohibited or unenforceable by any applicable law, the provision shall be ineffective only to the extent and for the

{00506205.1 }

10

duration of the prohibition or unenforceability, without invalidating any of the remaining provisions.

13.4    Waiver. The temporary, limited, or specific waiver of any term, provision, or condition of this Agreement or a breach thereof will not be considered a waiver of any other term, provision, or condition, or of any subsequent breach of the same term, provision, or condition.

13.5    Amendment. This Agreement may be amended only by a written document signed by the party against whom enforcement is sought.

13.6    Assignability. This Agreement shall be binding upon and be for the benefit of the Parties and their legal representatives, successors, and assigns. Neither party may assign this Agreement without the prior written consent of the other.

13.7    Choice of Law. This Agreement shall be interpreted and construed in accordance with the laws of the state of Arizona, without giving effect to, choice of law rules. The Parties consent to jurisdiction and venue in the state and federal courts located in Maricopa County, Arizona.

13.8    Notice. All Payments must be remitted via ACH funds. All notices shall be made in writing and may be given by personal delivery, via overnight courier requiring a signature for delivery, or by certified or registered mail, return receipt requested. Notices sent by mail should be addressed as follows:

> WorldVentures Marketing, LLC
> Attn: Eric Haynes, Chief Legal Officer
> 5100 Tennyson Parkway
> Plano, Texas 75024
> Email: ehaynes@worldventures.com
>
> Seacret Direct LLC
> Attn: Izhak Benshabat
> 8125 N. 86th Place
> Scottsdale, AZ 85258
> Email: izhak@seacret.com

and when so addressed shall be deemed given five (5) days after deposited in the U.S. mail, first class, postage prepaid, and postmarked. In all other instances, notices, bills, and payments shall be deemed given at the time of actual delivery. Changes may be made in the names and addresses of the person to whom notices, bills, and payments are to be given by giving notice pursuant to this section.

13.9    Construction. Section headings are included for convenience but shall not form a part of the Agreement or affect the interpretation of any part hereof. The word "including" is used in this Agreement in a non-exclusive sense and, unless otherwise expressly set forth, shall be interpreted as being illustrative and not limiting.

{00506205.1 }

11

13.10   No Third-Party Beneficiaries. Nothing herein is intended or shall be construed to confer upon any person or entity other than the Parties and their successors or assigns, any rights or remedies under or by reason of this Agreement.

13.11   Expenses. Each party shall bear its own expenses associated with this Agreement.

13.12   Compliance. Each Party will comply with all laws relating to the performance of this Agreement including federal and state laws, rules and regulations and represents and warrants that execution of this Agreement and performance of its obligations under this Agreement does not and will not breach any other agreement to which it is or will be a party, including but not limited to any agreements with its customers.

13.13   Press Releases. Neither Party shall publish any press release, make any other public announcement or otherwise communicate with any news media concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other Party; provided, however, that nothing contained herein shall prevent either Party from promptly making all filings with governmental authorities as may, in its judgment be required or advisable in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

13.14   Counterparts & Electronic Signatures. This Agreement may be signed in counterparts. A fax transmission of a signature page will be considered an original signature page. Any signature (including any electronic symbol or process attached to, or associated with, a contract or other record and adopted by a Party with the intent to sign, authenticate or accept such contract or record) hereto or to any other certificate, agreement or document related to this transaction, and any contract formation or record-keeping through electronic means shall have the same legal validity and enforceability as a manually executed signature or use of a paper-based recordkeeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the Texas State Electronic Signatures and Records Act, or any similar state law based on the Uniform Electronic Transactions Act, and the parties hereby waive any objection to the contrary.

13.15   Entire Agreement. This Agreement embodies the entire understanding of the Parties and shall supersede all previous communications, representations or understandings either oral or written between the Parties relating to the subject matter hereof.

**ACCEPTED AND AGREED:**

**SEACRET DIRECT, LLC:**                    **WORLDVENTURES MARKETING, LLC**

By:_____              By:_____
    Izhak Benshabat                            Eddie Head
    Title:  Managing Member                     Title: President, Spherature
                                                Holdings, llc,

{00506205.1 }                              12

**EXHIBIT A**

**SEACRET'S COST OF GOODS SOLD – 2019**

{00506205.1 }

13



Exhibit A-5

WORLDVENTURES

5100 Tennyson Parkway
Plano, Texas 75024

November 10, 2020

*VIA E-MAIL: izhak@seacret.com*

Mr. Izhak Ben Shabat
Chief Executive Officer
Seacret Direct, LLC
8501 N. Scottsdale Road, Suite 270
Scottsdale, Arizona 85253

Re: Terms of a Multi-Agreement Asset Purchase with Spherature Investments LLC Dear

Izhak:

Per our continuing discussions, please allow this letter to serve as a summary of the material terms pursuant to which Seacret Direct, LLC ("Seacret") would purchase certain assets from Spherature Investments LLC, a Nevada limited liability company formerly known as 'WorldVentures Holdings, LLC" (together with its subsidiaries and affiliates, "WVH"), on a cash-free/debt-free basis;; Secret would enter into new marketing agreements with the WVH's Sales Representatives, WVH would release such WVH Sales Representatives from their non-competes with WVH; and Seacret would enter into ancillary agreements with Rovia, LLC ("Rovia") and Wayne Nugent (collectively, the "Transaction"). The Parties acknowledge that the Co-Marketing Agreement between them, dated July 22, 2020, has been terminated and will remain terminated.  The Transaction will have no effect upon and will not revive the Co-Marketing Agreement or any of its terms. For purposes of this letter, WVH and Seacret will be referred to, individually, as a "Party," and collectively as the "Parties."

This letter is intended and shall be construed solely as a recitation of certain proposed deal points that the Parties intends to be part of a definitive asset purchase agreement and related documents (collectively, the "*Definitive Agreements*") based on facts known to it as of the date of this letter. Such points may or may not become part of the eventual fully executed Definitive Agreements, if any, based on the results of the Parties' due diligence on their respective businesses and entities. Except for the confidentiality, governing law/venue, and costs provisions set forth in Section II of this letter, which shall be binding on the Parties in accordance with their terms, this letter is not intended to impose any obligation whatsoever on any Party, it being expressly understood that the Parties do not intend to be bound by any agreement (other than the provisions of Section II) until all Parties agree to, sign, and deliver the Definitive Agreements.

The proposed terms and conditions of the Transaction, which are entirely subject to the terms and conditions to be set forth in the Definitive Agreements between the Parties, are as follows:

Mr. Izhak Ben Shabat
November 10, 2020
Page 2 of 7

## I.    The Transaction:

*Asset Purchase:*    At the Closing (as defined below), Seacret would purchase the following assets of WVH: only those trademarks, tradenames, technology, databases, and other related assets of WVH that are necessary to support the marketing efforts of WVH's Sales Representatives (collectively, the "Assets") on a cash-free/debt-free basis. In furtherance thereof, WVH would release its Sales Representatives from their non-competes. Following the Closing, and when entering into new marketing agreements with WVH's Sales Representatives, Seacret will ensure that WVH's Sales Representatives have resigned from their positions at WVH.

*Purchase Price:*    In consideration for its purchase of the Assets, Seacret would make royalty payments to WVH, up to a total of $12,000,000.00 (Twelve Million and no/100 Dollars) (the "Royalty Payments"), as follows, subject to the following conditions, and pursuant to the following schedule:

(a)    Seacret would pay royalties to WVH equal to five percent (5.0%) of the gross revenues derived from all sales by WVH's Sales Representatives (as defined herein) of WVH travel products and services and Seacret products and services until such time as the total amount of Royalty Payments paid to WVH equals $7,000,000.00 (Seven Million and no/100 Dollars).

(b)    Once Seacret pays WVH a total of $7,000,000.00 in Royalty Payments, as described in (a), above, then Seacret would make Royalty Payments to WVH equal to four percent (4.0%) of the gross revenues derived from all sales by WVH's Sales Representatives of WVH travel products and services and Seacret products and services until such time as the additional amount of Royalty Payments paid to WVH equals $1,500,000.00 (One Million Five Hundred Thousand and no/100 Dollars).

(c) Once Seacret pays WVH a total of $8,500,000.00 in Royalty Payments, as described in (a) and (b), above, then Seacret would make Royalty Payments to WVH equal to two and one-half percent (2.5%) of the gross revenues derived from all sales by WVH's Sales Representatives of WVH travel products and services and Seacret products and services until such time as the additional amount of Royalty Payments paid to WVH equals $1,500,000.00 (One Million Five Hundred Thousand and no/100 Dollars).

(d) Once Seacret pays WVH a total of $10,000,000.00 in royalties, as described in (a), (b) and (c), above, then Seacret would make Royalty Payments to WVH equal to two 0 percent (2.0%) of the gross revenues derived from all sales by WVH's Sales Representatives (as defined herein) of WVH travel products and services and Seacret products and services until such time as the additional amount of Royalty Payments paid to WVH equals $2,000,000.00 (Two Million and no/100 Dollars).

*New Agreements with
WVH Sales Representatives:*

The term "WVH Sales Representatives" means (i) those persons who, as independent contractors, currently market and sell WVH travel products and services, and who transition over to Seacret to continue to sell WVH travel products and services and Seacret products and services, and (ii) those persons who are subsequently recruited by WVH Sales Representatives to sell WVH travel products and services and Seacret products and services as a Seacret agent. Seacret would enter into new marketing agreements with the WVH Sales Representatives, transition them to Seacret agents/sales representatives, and pay them commissions pursuant to Seacret's standard commissions schedule. Seacret would maintain the current WVH downline structure within Seacret's sale force, and the WVH Sales Representatives would inherit their current respective downline positions within that current WVH downline structure at Seacret. WVH Sales Representatives will not be allowed to maintain duplicate positions in Seacret independent of the

Mr. Izhak Ben Shabat
November 10, 2020
Page 4 of 7

WVH tree. Seacret will terminate such duplicate positions immediately when discovered and reverse any commissions paid in violation of this policy through such positions.

In addition, and within its sole discretion, Seacret may elect to pay enhanced commissions (the "Enhanced Commissions") to the WVH Sales Representatives, as needed, for incentives. Seacret has the option of paying said Enhanced Commissions once the entire amount of Royalty Payments ($12,000,000.00) is paid, or earlier, at its sole discretion.

For WVH Sales Representatives who enter into new marketing agreements with Seacret, WVH would release such WVH Sales Representatives from their non-compete covenants with WVH in exchange for such WVH Sales Representatives releasing WVH from all claims, including past-due commissions.

Following the Closing, Seacret will develop an applied programming interface ("API") to report sales data to WVH on a real-time basis or as close to on a real-time basis as is technologically possible. Until it develops such API, Seacret will provide WVH with bi-monthly sales data of Seacret product sales to WVH Sales Representatives and customers; provide WVH with bi-monthly sales data of DreamTrip membership sales to Seacret sales representatives and customers; provide bi-monthly reporting of WVH Sales Representatives and customer new enrollments, resignations, chargebacks, and payment failures.

*Agreement with Rovia:*   Seacret would enter into a membership and travel-fulfillment agreement with Rovia including travel pricing, service levels and performance requirements, pursuant to which Rovia would support Seacret's travel membership and trip fulfillment products and services for a minimum period of two (2) years. On an interim basis, and prior to of the execution of a Master Services Agreement between Seacret and Rovia, Seacret would provide consideration by paying Rovia a fee of 20% of the monthly and initial fees charged by Seacret to each WVH DreamTrips member (or travel memberships consisting of the same or materially similar benefits by another name) and Seacret customers who are or become members with the exception of so-called, "free billed" accounts (for example Get 4 pay no more). After the first 18 months,

Seacret would have the right to terminate its agreement with Rovia upon 90 days' prior written notice, subject to paying any monthly fees due up to the date of termination. Seacret will promote WVH travel products and services to all of its customers where legally supported.

*Agreement with Wayne Nugent:*

Seacret would enter into an agreement with Wayne Nugent whereby Mr. Nugent would provide ongoing services to Seacret. It is anticipated that in consideration for these services and his agreement not to compete with Seacret or solicit Seacret's agents or employees (or the WVM Sales Representatives), Mr. Nugent would receive the following consideration:

a. Mr. Nugent's current top position in the WVH downline structure would be moved over to Seacret in the same capacity such that he would hold the same position within that WVH downline structure.

b. Mr. Nugent would be engaged as a Seacret Visionary Leader and would serve on an advisory board of global sales leaders.

c. Seacret would provide Mr. Nugent with a sales override equal to two and one-half percent (2.5%) of the gross revenue received by Seacret from all sales made by WVH Sales Representatives of WVH travel-related products and services and Seacret products and services. Once Seacret pays WVH a total of $8,500,000.00 in Royalty Payments, as described in section (c) of the Purchase Price section, above, then Seacret would make Royalty Payments to Mr. Nugent equal to one-half percent (0.5%) of the gross revenues derived from all sales by WVH's Sales Representatives of WVH travel products and services and Seacret products and services until such time as all Royalty Payments paid to WVH and/or Mr. Nugent equal $12,000,000.00 (Twelve Million and no/100 Dollars).

d. The issuance of membership interest options in Seacret to Mr. Nugent equal to 5% of Seacret when total sales by the WVH Sales Representatives and customers post-Closing equals at least $200 million and equal to an additional 5% (non-dilutive of the initial 5%, for a total of 10%) when at least $400

Mr. Izhak Ben Shabat
November 10, 2020
Page 6 of 7

|  |  |
|---|---|
|  | million in total revenue is derived from all sales attributed to the WV representative and customer audience. |
| *Credit* | The Parties acknowledge that they entered into a separate agreement (the "Interim Agreement") whereby Seacret agreed to pay certain royalties to WVM on an interim basis pending the consummation and closing of the Transaction. The Parties agree that any royalties paid by Seacret to WVH in connection with that Interim Agreement shall be credited against the Purchase Price set forth herein. |
| *Closing Date:* | The Parties anticipate that the closing of the Transaction will occur no later than November [_], 2020 (the "Closing Date"). |

## II.   Operative Provisions of this letter

Following the date upon which this letter is signed by WVH and by Seacret (the "*Execution Date*"), this letter shall survive and remain in full force and effect until the earliest of (i) the Closing Date; (ii) the date on which Seacret notifies WVH in writing that it no longer desires to pursue the Transaction; or (iii) November [ ], 2020, unless WVH and Seacret mutually agree to extend such time period. The period that this letter is in effect shall be referred to as the "*Effective Period*."

During the Effective Period and subject to applicable law, WVH will provide Seacret and its attorneys and accountants with reasonable access to all information, books, records, and data relating to their respective businesses and assets. All due diligence materials and information obtained as a result of such examination shall be treated as confidential information subject to paragraph 4 of this Section II.

During the Effective Period, no Party shall disclose information concerning this letter, the Definitive Agreement, or the transactions contemplated hereby or thereby without the prior written consent of the other Party, and each Party shall consult with and obtain the prior written consent of the other Party as to the form and substance of any press release or other disclosure; provided that nothing contained herein shall prevent any Party from disclosing any information to its attorneys, accountants, bankers, and lenders or as may be required to be disclosed in accordance with any law, regulation, or order of a court or regulatory agency of competent jurisdiction.

All information that is furnished to either Party (the "*Receiving Party*") by the other Party (the "*Disclosing Party*") during the Effective Period shall be treated as confidential, and the Receiving Party shall take normal and reasonable precautions to preserve the confidentiality of such information until the Closing Date.  If a closing of the Transaction does not occur, this provision shall remain in effect indefinitely following the expiration or termination of the Effective Period and, upon termination of this letter, the Receiving Party shall return all documents and other materials containing, reflecting, and referring to such information and shall take normal and reasonable precautions to preserve the confidentiality of such information. The Receiving Party's obligations hereunder shall not apply to any information that: (i) was already in its possession prior to the disclosure thereof by the Disclosing Party; (ii) was then generally known to the public; (iii) became known to the public through no fault of the Receiving Party or any of its

Mr. Izhak Ben Shabat
November 10, 2020
Page 7 of 7

agents or representatives; or (iv) was disclosed to the Receiving Party by a third party unaffiliated with the Disclosing Party who was not bound by an obligation of confidentiality to the Disclosing Party.

This letter supersedes all prior or contemporaneous negotiations, understandings, and agreements between WVH, Seacret, and representatives of WVH.

Arizona law shall govern any dispute under this letter or the Definitive Agreement, and venue for any action under this letter or the Definitive Agreement shall be proper only in Maricopa County, Arizona. The Parties shall provide, in the Definitive Agreement, for the mediation of any disputes prior to the institution of litigation.

WVH and the Sellers agree to bear their own costs and expenses in connection with the Transaction contemplated by this letter, including any costs associated with any finder, broker, sales agent, or investment banker retained by such Party in connection herewith.

Except for the agreements regarding confidentiality, governing law/venue, and costs set forth in this Section II, neither Party will have any obligation regarding the Transaction contemplated herein unless and until the Definitive Agreement is executed and delivered by them after necessary corporate or other organizational authorization.

If this letter meets with your approval, please so indicate by executing this letter in the space provided below.

**WorldVentures Holdings, LLC**

By:     Wayne Nugent,
         Chief Executive Officer

*Agreed and Acknowledged:*

**Seacret Direct, LLC**

By:     Izhak Ben Shabat,
         Chief Executive Officer

**Exhibit A-6**

# LIMITED SOLICITATION AGREEMENT

This Agreement ("Agreement"), dated  November 11, 2020 (the "Effective Date"), is entered into by and between WorldVentures Marketing, LLC, a Nevada limited liability company ("WVM"), with its primary place of business located at 5100 Tennyson Parkway, Plano, TX 75025, and Seacret Direct LLC, an Arizona limited liability company ("Seacret"), with its primary place of business located at 8125 N. 86th Place, Scottsdale, AZ 85258.  WVM and Seacret are referred to herein, collectively, as the "Parties," and individually, as a "Party".

## RECITALS

Whereas, WVM is a multi-level marketing company that markets and sells lifestyle membership products and services to customers ("Members");

Whereas, Seacret sells proprietary products including dietary supplements, nutritional and skincare ("Product" or "Products") through its network of sales representatives;

Whereas, WVM and Seacret are parties to a Co-Marketing Agreement dated July 22, 2020 (the "Co-Marketing Agreement");

Whereas, due to its current financial situation, WVM has requested that Seacret assist it in protecting and maintaining its sales force, including all members of WVM's downline organization (collectively, the "WVM Sales Representatives"), by allowing WVM Sales Representatives to join Seacret's downline organization in order to sell, and directly receive a commission for selling, Seacret products;

Whereas, in addition to providing commissions to WVM Sales Representatives, Seacret is willing to pay a royalty to WVM to assist WVM with its current financial situation; and

Whereas, Seacret is willing to assist WVM in that regard pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises, and the mutual covenants and conditions contained herein, WVM and Seacret agree as follows:

## AGREEMENT

1.     **Right to Solicit WVM Sales Representatives Only**

    1.1    Seacret is immediately allowed to solicit any WVM Sales Representatives and enlist only such WVM Sales Representatives to join Seacret's downline organization and otherwise be associated with Seacret, as independent contractors, in order to sell current and future Seacret products and services and directly receive a commission or other compensation from Seacret for such sales.  In connection therewith, WVM waives, and agrees not to enforce, any non-competition provisions or similar restrictions that might exist in any agreements between WVM and the WVM Sales Representatives.

{00523096.1 }

For the sake of clarity, WVM Sales Representatives may continue to sell WVM products and services while also selling Seacret products and services.

1.2   Seacret will enter into new marketing agreements with the WVM Sales Representatives, register them as Seacret agents/sales representatives, and pay them commissions pursuant to Seacret's standard commissions schedule. Seacret will maintain the current WVM downline structure within Seacret's sales force, and the WVM Sales Representatives would inherit their current respective downline positions within that current WVM downline structure at Seacret.

1.3   WVM agrees that Seacret shall have unfettered access to WVM's database (or other electronic materials and information) related to WVM's downline structure for the WVM Sales Representatives. Seacret agrees that such information is confidential and will treat it as such pursuant to the terms of this Agreement.

1.4   The Parties agree that during the term of this Agreement, WVM shall be responsible for assisting the WVM Sales Representatives in continuing to market and sell WVM's lifestyle membership products and services to customers, and that WVM shall be solely responsible for fulfilling such sales. Subject to the provisions of Section 8.2, WVM shall retain all direct commissions, indirect commissions and overrides produced by WVM Sales Representatives selling WVM's lifestyle membership products and services to customers.

1.5   Seacret shall not, and shall cause their respective affiliates not to, directly or indirectly or through any other person or entity: (i) induce or attempt to induce any employee of WVM, including but not limited to, Paul Jenkins, Jenny Trask, Eddie Head, Justin Call, John Halcomb, Gayle Bock, Michael Poates, (each, an "**Employee**") to leave the employment or other retention of WVM or any of its affiliates, or in any way interfere adversely with the relationship between any Employee and WVM or any of its affiliates, (ii) induce or attempt to induce any Employee to work for, render services or provide advice to, or supply confidential business information or trade secrets of WVM or any of its affiliates to any person or entity, (iii) employ, or otherwise pay for services rendered by, any Employee in any business enterprise with which Seacret or any affiliate thereof may be associated, connected, or affiliated, or (iv) induce or attempt to induce any vendor, including, but not limited to, Grapestar International, Inc., Club Swan/AU Card, Corp., AU Card, Ltd., AU Card, LLC, and Nvayo, Ltd. or any supplier, to cease doing business with WVM or any of its affiliates, or in any way interfere with the relationship between any such vendor or supplier and WVM or any of its affiliates.

2.   **Termination of Co-Marketing Agreement**

{00523096.1 }

2.1   WVM and Seacret hereby mutually agree to terminate the Co-Marketing Agreement with immediate effect, as of the Effective Date, with the express intent and understanding that neither Party shall have any rights against, or continuing obligations to the other Party (financial or otherwise) under the Co-Marketing Agreement as of the Effective Date; provided, however, that only the following sections of the Co-Marketing Agreement shall continue to apply between the Parties in full force and effect: 5.1, 5.2, 5.3, 5.4, 7.1, 7.2, 12.1, 12.2. 12.3, 12.4, 13.1, 13.7, 13.8, 13.9, 13.10, 13.11, 13.14 and 13.15.

3.   **Compensation**

3.1   In consideration for the agreements and covenants exchanged herein, and during the Term of this Agreement, Seacret will make royalty payments to WVM, up to a total of $12,000,000.00 (Twelve Million and no/100 Dollars) (the "Royalty Payments"), as follows, subject to the following conditions, and pursuant to the following schedule:

(a)   Seacret will pay royalties to WVM equal to five percent (5.0%) of the Gross Revenues ("Gross Revenues" is defined as all revenue generated from sales of Seacret Products by WVM Sales Representatives, minus sales tax, credit card processing fees and shipping and handling costs) until such time as the total amount of Royalty Payments paid to WVM equals $7,000,000.00 (Seven Million and no/100 Dollars).

(b)   Once Seacret pays WVM a total of $7,000,000.00 in Royalty Payments, as described in (a), above, then Seacret would make Royalty Payments to WVM equal to four percent (4.0%) of the Gross Revenues derived from all sales by WVM Sales Representatives of Seacret Products until such time as the additional amount of Royalty Payments paid to WVM equals $1,500,000.00 (One Million, Five Hundred Thousand and no/100 Dollars).

(c)   Once Seacret pays WVM a total of $8,500,000.00 in Royalty Payments, as described in (a) and (b), above, then Seacret would make Royalty Payments to WVM equal to three percent (3.0%) of the Gross Revenues derived from all sales by WVM Sales Representatives of Seacret Products until such time as the additional amount of Royalty Payments paid to WVM equals $1,500,000.00 (One Million, Five Hundred Thousand and no/100 Dollars).

(d)   Once Seacret pays WVM a total of $10,000,000.00 in Royalty Payments, as described in (a), (b) and (c), above, then Seacret would make Royalty Payments to WVM equal to three percent (2.5%) of the Gross Revenues derived from all sales by WVM Sales Representatives of Seacret Products until such time as the additional amount of Royalty Payments paid to WVM equals $2,000,000.00 (Two Million and no/100 Dollars).

3.2   Seacret, shall for a period of four (4) years after their creation, keep, maintain and preserve complete and accurate records and accounts,

including all invoices, correspondence, ledgers, financial and other records pertaining to the sales of Seacret Products by WVM Sales Representatives covered hereunder and to the payment of any Royalty Payments by Seacret and such records and corporate accounts shall be available for inspection and audit at Seacret's corporate offices as designated by Seacret, at any time or times during the Term of this Agreement or within ninety (90) days thereafter, but at no time more than once per year, during reasonable business hours, by WVM or its nominee.

3.3     As additional consideration to WVM, Seacret agrees to make and diligently pursue the offer to purchase certain of WVM's assets as outlined in the attached Letter of Intent; provided however, Seacret reserves the right to require "stalking horse" protections if such purchase proceeds pursuant to a marketing and auction process, including in connection with a section 363 bankruptcy sale. Seacret will also be entitled to credit any amount it pays to WVM under this Agreement towards the purchase price in any definitive documentation to purchase certain of WVM's assets.

4.     **Representations and Warranties**

4.1     Seacret represents and warrants to WVM that:

4.1.1     Seacret has the full legal right, power and authority to enter into this Agreement.

4.1.2     This Agreement is the legal, valid, and binding obligation of Seacret, enforceable against Seacret in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application or by general principles of equity.

4.1.3     Seacret is not subject to, nor is it aware of, any pending or threatened order, injunction, enforcement action or other proceeding by any local, state or federal governmental agency that would limit this Agreement or its ability to enter this Agreement.

4.1.4     Seacret agrees that this Agreement shall have no impact upon WVM's' sale of travel products to its Members or through the WVM Sales Representatives, and that any fulfillment of such travel products by Seacret will be negotiated independent of this Agreement.

4.2     WVM represents to Seacret that:

{00523096.1 }

4.2.1 WVM has the full legal right, power and authority to enter into this Agreement.

4.2.2 This Agreement is the legal, valid, and binding obligation of WVM, enforceable against WVM and its affiliates, including World Ventures Holdings, LLC, in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application or by general principles of equity.

4.2.3 The signing and delivery of this Agreement by WVM and the performance by WVM of all of WVM's obligations under this Agreement will not breach any agreement to which WVM is a party, or give any person the right to accelerate any obligation of WVM; violate any law, judgment, or order to which WVM is subject; or require the consent, authorization, or approval of any person, including but not limited to any governmental body.

4.2.4 WVM is not subject to, nor is it aware of, any pending or threatened order, injunction, enforcement action or other proceeding by any local, state or federal governmental agency that would limit this Agreement or its ability to enter this Agreement..

4.2.5 WVM understands and agrees that this Agreement shall have no impact upon Seacret's sale of its Products to its agents and customers.

5. **Indemnification**

5.1 Seacret shall defend, indemnify and hold harmless WVM, its officers, directors, officers, agents and employees from and against any and all damages, losses, liabilities, claims, suits, costs and expenses (including reasonable attorney fees) (collectively, "Claims") resulting from or relating to any breach by Seacret of any provision, warranty or covenant, under this Agreement.

5.2 WVM agrees to defend, indemnify and hold harmless Seacret, its directors, officers, agents and employees from and against any and all damages, losses, liabilities, claims, suits, costs and expenses (including reasonable attorney fees) (collectively, "Claims") resulting from or relating to any breach by WVM of any provision, warranty or covenant under this Agreement.

5.3 The party entitled to indemnification under this Section 5 (the "Indemnified Party") will provide the party obligated to provide

{00523096.1 }

indemnification (the "Indemnifying Party") with prompt notice of any third-party Claim for which its seeks indemnification, provided that the failure to do so will not excuse the Indemnifying Party of its obligations except to the extent prejudiced by such failure or delay. The Indemnifying Party will have the sole right to control the defense and settlement of the third-party Claim, provided that the Indemnifying Party may not, without the Indemnified Party's consent, enter into any settlement which admits guilt, liability or culpability on the part of the Indemnified Party. The Indemnified Party will provide reasonable cooperation to the Indemnifying Party in defending any third-party Claim.

5.4    EXCEPT WITH RESPECT TO EACH PARTY'S INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT, UNDER NO CIRCUMSTANCES SHALL EITHER PARTY OR THEIR AFFILIATES HAVE ANY LIABILITY WHATSOEVER TO THE OTHER PARTY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SUCH AS, BUT NOT LIMITED TO, LOSS OF PROFIT OR REVENUE; LOSS OF USE OF THE PRODUCTS; COST OF CAPITAL; OR CLAIMS RESULTING FROM CONTRACTS BETWEEN A PARTY'S CUSTOMERS AND/OR SUPPLIERS.

6.    **Term, Termination & Effects of Termination**

6.1    Term. This Agreement shall be effective unless and until Seacret consummates, and closes on, a purchase of certain of WVM's assets as outlined in the attached Letter of Intent (the "Term"), unless terminated sooner.

6.2    Termination.

6.2.1    Termination for Material Breach. Either Party may terminate this Agreement upon written notice to the other Party, if such other Party materially breaches this Agreement and the breach remains uncured for a period of thirty (30) days after receipt of written notice of such breach.

6.3    Effect of Termination. The Parties agree that the termination of this Agreement shall not prevent Seacret from continuing to solicit and have WVM Sales Representatives market and sell Seacret products and services, or release Seacret from continuing to pay such WVM Sales Representatives commissions or other compensation in connection with such sales.

7.    **Confidentiality**

{00523096.1 }

7.1. "<u>Confidential Information</u>" means this Agreement and all confidential or otherwise proprietary business and technical information relating to the Parties and their respective businesses, including, without limitation, ideas, know-how, trade secrets, production, manufacturing techniques, recipes and formulas, sources of supply, pricing, costing, and accounting procedures, and customer information. Confidential Information does not include information that is in the public domain at the time of disclosure by the disclosing Party; that enters the public domain after disclosure by the disclosing Party through no fault of the receiving Party; that was or is separately disclosed to the receiving Party by a third party not itself subject to an obligation of confidentiality to the disclosing Party with respect to such information; or that was in the receiving Party's possession at the time of disclosure by the disclosing Party.

7.2   Each Party agrees to maintain the other Party's Confidential Information in strict confidence and, except to the extent expressly permitted in this Agreement or otherwise consented to in writing by the other Party, that the Confidential Information will not be disclosed by it or its "Representatives" (defined to include affiliates, directors, shareholders, officers, employees, agents, subcontractors, consultants, members, managers, advisors, or other representatives including legal counsel, and accountants or any "Person" (defined to include individuals, partnerships, companies, limited liability companies, entities, corporations, or agents thereof) except with the specific prior written consent of the other.

7.3   The Parties agree that each of their downline organizations (i.e. names, addresses and other personally identifiable information commonly used in the MLM industry to identify members, agents and representatives of each organization) constitute their proprietary and confidential information.

## 8.   Insurance and Commissions

8.1   During the Term of this Agreement, each Party shall maintain (i) Workers' Compensation and Employees' Liability Insurance (as required by law); and (ii) Public Liability Insurance including Contractual Liability and Products Liability Coverage with a combined single limit of not less than Five Million Dollars ($5,000,000). The insurance policies shall be claims based and name the other Party as an additional insured party and provide that at least thirty (30) days prior written notice of cancellation, amendment, or lapse of coverage shall be given to said additional insured by the insurer. Each Party will submit policies and/or certificates of insurance evidencing the above coverage to the other Party upon the other Party's reasonable written request.

8.2    During the Term of this Agreement, each Party shall timely pay any commissions due from such Party to the WVM Sales Representatives for products or services sold during the Term of this Agreement.  Nothing in this

{00523096.1 }

section obligates Seacret to pay commissions due from WVM to the WVM Sales Representatives, and nothing in this section obligates WVM to pay commissions due from Seacret to the WVM Sales Representatives.

## 9.  Reserved

## 10.  Intellectual Property

10.1  Seacret's Intellectual Property.  Seacret is and shall be the sole owner of all intellectual property rights, including patent rights, trade secrets or other proprietary information relating to Seacret's Products ("Seacret's Intellectual Property").  WVM shall not, directly or indirectly, modify the features or functionality of, copy or create derivative products using all or any portion of, analyze or remove components from, decompile, or otherwise reverse engineer or attempt to reverse engineer or derive techniques, ingredients, know-how or processes from the Products or permit or encourage any third-party to do so.  Unless otherwise expressly stated herein, this Agreement does not confer to WVM any intellectual property or other rights with respect to Seacret's Products, brand, formulas, packaging, or any names or logos used in connection with the Products. As between Seacret and WVM, Seacret owns and shall continue to own all such intellectual property rights.

10.2  WVM's Intellectual Property. WVM is and shall be the sole owner of all intellectual property rights, including patent rights, trade secrets or other proprietary information relating to WVM's business ("WVM's Intellectual Property").  Seacret shall not, directly or indirectly, modify the features or functionality of, copy or create derivative products using all or any portion of, analyze or remove components from, decompile, or otherwise reverse engineer or attempt to reverse engineer or derive techniques, ingredients, know-how, travel booking platforms, software, patents, formulas, or processes or permit or encourage any third-party to do so.  Unless otherwise expressly stated herein, this Agreement does not confer to Seacret any intellectual property or other rights with respect to WVM's travel booking platforms, software, patents, formulas, brand, packaging, or any names or logos used in connection with the WVM's business. As between Seacret and WVM, WVM owns and shall continue to own all such intellectual property rights.

## 11.  Trademarks and Tradenames

11.1  The Parties recognize that the corporate name and respective trademarks or tradenames of the other are valuable and that all goodwill associated with use of such names and marks shall inure to the benefit of the other. Either Party shall have the right to terminate this Agreement immediately in the event that the other Party acts in a manner which would negatively impact the reputation

of such Party and/or of its name or marks and/or would infringe or dilute the value of the other Party's name or marks or which is not in compliance with applicable law in the United States or any other country in which either Party conducts business as the case may be. Each Party shall be solely responsible for the registration and maintenance of its trademarks and tradenames in the Territory. During the Term of this Agreement, each Party shall grant the other Party a revocable, limited, non-assignable license to use its corporate name, trademarks or tradenames in connection with its promotion or operation of the program described hereunder.

12.   **Dispute Resolution**

12.1   The Parties shall in good faith attempt to resolve any dispute arising out of or relating to this Agreement promptly by negotiations between executives who have authority to settle the controversy. A party may give the other parties written notice of any dispute not resolved in the normal course of business. Within 20 days after delivery of that notice, executives of the affected parties shall meet at a mutually acceptable time and place, or by teleconference and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the dispute. If the matter has not been resolved within 60 days of the disputing party's notice, or if the parties fail to meet within 20 days, either party may initiate mediation of the controversy or claim as provided in Section 12.3.

12.2   Any controversy or claim arising out of or relating to this Agreement or the existence, validity, breach or termination thereof, whether during or after its Term, will be finally settled by compulsory arbitration in accordance with the Commercial Arbitration Rules and Supplementary Procedures for Commercial Arbitration of the American Arbitration Association ("AAA").

12.3   To initiate arbitration, either party will file the appropriate notice at the appropriate Regional Office of the AAA. The arbitration proceeding will take place in Plano, Texas, for a period not to exceed three (3) days. The arbitration panel will consist of three (3) arbitrators, one arbitrator appointed by each Party and a third neutral arbitrator appointed by the AAA. Any communication between a Party and any arbitrator will be directed to the AAA for transmittal to the arbitrator.

12.4   The arbitral award will be the exclusive remedy of the Parties for all claims, counterclaims, issues or accountings presented or plead to the arbitrators. The award will (i) be granted and paid in U.S. Dollars exclusive of any tax, deduction or offset and (ii) include interest from the date of breach or other violation of the Agreement until the award is fully paid, computed at the then-prevailing LIBOR rate. Judgment upon the arbitral award may be entered in any court that has jurisdiction thereof. Any additional costs, fees

{00523096.1 }

or expenses incurred in enforcing the arbitral award will be charged against the Party that resists its enforcement.

13. **Miscellaneous**

13.1 <u>Relationship of Parties</u>. Seacret and WVM are independent contractors for the purpose of this Agreement. Neither the execution, delivery nor performance of this Agreement will be construed to constitute either party as an agent or representative of the other for any purpose. Neither the execution, delivery nor performance of this Agreement will be deemed to establish a joint venture or partnership between the Parties. Except as otherwise provided herein, neither Party has the authority to (i) bind the other Party by or to any contract, representation, understanding, act or deed, (ii) represent that either Party is an agent of the other Party, or (iii) represent that either Party is responsible for the acts or omissions of the other Party.

13.2 <u>Force Majeure</u>. The Parties shall not be responsible for any failure to perform due to unforeseen circumstances or causes beyond their reasonable control, including but not limited to acts of God, war, riot, embargoes, acts of civil or military authorities, fires, floods, accidents, strikes, epidemics, pandemics, or shortages of transportation, facilities, fuel, energy, labor, or materials. In the event of any such delay, the Parties may defer performance hereunder for a period equal to the time of such delay.

13.3 <u>Severability</u>. If any provision of this Agreement shall be prohibited or unenforceable by any applicable law, the provision shall be ineffective only to the extent and for the duration of the prohibition or unenforceability, without invalidating any of the remaining provisions.

13.4 <u>Waiver</u>. The temporary, limited, or specific waiver of any term, provision, or condition of this Agreement or a breach thereof will not be considered a waiver of any other term, provision, or condition, or of any subsequent breach of the same term, provision, or condition.

13.5 <u>Amendment</u>. This Agreement may be amended only by a written document signed by the party against whom enforcement is sought.

13.6 <u>Assignability</u>. This Agreement shall be binding upon and be for the benefit of the Parties and their legal representatives, successors, and assigns. Neither party may assign this Agreement without the prior written consent of the other.

13.7 <u>Choice of Law</u>. This Agreement shall be interpreted and construed in accordance with the laws of the state of Arizona, without giving effect to,

{00523096.1 }

choice of law rules. The Parties consent to jurisdiction and venue in the state and federal courts located in Collin County, Texas.

13.8    Notice. All Payments must be remitted via ACH funds. All notices shall be made in writing and may be given by personal delivery, via overnight courier requiring a signature for delivery, or by certified or registered mail, return receipt requested. Notices sent by mail should be addressed as follows:

>    WorldVentures Marketing, LLC
>    Attn: Eric Haynes, Chief Legal Officer
>    5100 Tennyson Parkway
>    Plano, Texas 75024
>    Email: ehaynes@worldventures.com

>    Seacret Direct LLC
>    Attn: Izhak Benshabat
>    8125 N. 86th Place
>    Scottsdale, AZ 85258
>    Email:  izhak@seacret.com

and when so addressed shall be deemed given five (5) days after deposited in the U.S. mail, first class, postage prepaid, and postmarked. In all other instances, notices, bills, and payments shall be deemed given at the time of actual delivery. Changes may be made in the names and addresses of the person to whom notices, bills, and payments are to be given by giving notice pursuant to this section.

13.9    Construction. Section headings are included for convenience but shall not form a part of the Agreement or affect the interpretation of any part hereof. The word "including" is used in this Agreement in a non-exclusive sense and, unless otherwise expressly set forth, shall be interpreted as being illustrative and not limiting.

13.10    No Third-Party Beneficiaries. Nothing herein is intended or shall be construed to confer upon any person or entity other than the Parties and their successors or assigns, any rights or remedies under or by reason of this Agreement.

13.11    Expenses. Each party shall bear its own expenses associated with this Agreement.

13.12    Compliance.  Each Party will comply with all laws relating to the performance of this Agreement including federal and state laws, rules and

{00523096.1 }

regulations and represents and warrants that execution of this Agreement and performance of its obligations under this Agreement does not and will not breach any other agreement to which it is or will be a party, including but not limited to any agreements with its customers.

13.13   <u>Press Releases</u>.  Neither Party shall publish any press release, make any other public announcement or otherwise communicate with any news media concerning this Agreement or the transactions contemplated hereby without the prior written consent of the other Party; provided, however, that nothing contained herein shall prevent either Party from promptly making all filings with governmental authorities as may, in its judgment be required or advisable in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

13.14   <u>Counterparts & Electronic Signatures</u>. This Agreement may be signed in counterparts. A fax transmission of a signature page will be considered an original signature page. Any signature (including any electronic symbol or process attached to, or associated with, a contract or other record and adopted by a Party with the intent to sign, authenticate or accept such contract or record) hereto or to any other certificate, agreement or document related to this transaction, and any contract formation or record-keeping through electronic means shall have the same legal validity and enforceability as a manually executed signature or use of a paper-based recordkeeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the Texas State Electronic Signatures and Records Act, or any similar state law based on the Uniform Electronic Transactions Act, and the parties hereby waive any objection to the contrary.

13.15   <u>Entire Agreement</u>. This Agreement embodies the entire understanding of the Parties and shall supersede all previous communications, representations or understandings either oral or written between the Parties relating to the subject matter hereof.

**ACCEPTED AND AGREED:**

**SEACRET DIRECT, LLC:**

By: _____
Izhak Benshabat
Title:  Managing Member

**WORLDVENTURES MARKETING, LLC**

By: _____
Wayne Nugent
Title: Chief Executive Officer

{00523096.1 }



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| WORLDVENTURS HOLDINGS, LLC, WORLDVENTURES MARKETING, LLC, WORLDVENTURES MARKETING LIMITED, WORLDVENTURES CANADA INC., WORLDVENTURES MARKETING B.V., WORLDVENTURES MARKETING (HONG KONG) LIMITED, WORLDVENTURES MARKETING PTE. LTD., WORLDVENTURES TAIWAN LTD., WORLDVENTURES MARKETING PTY. LTD., WORLDVENTURES MARKETING JAMAICA LIMITED, WORLDVENTURES SERVICES, LLC, WORLDVENTURES COOPERATIEF U.A., WORLDVENTURES MARKETING SP.ZO.O, WORLDVENTURES MARKETING SOUTH AFRICA (PTY.)LTD, WORLDVENTURES ENTERPRISES LLC, WV SERVICES MALAYSIA SDN BHD, WORLDVENTURES MARKETING SRL, WORLDVENTURES | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED**<br><br>CIVIL ACTION NO.<br><br>4:18-cv-00393<br><br>**JURY TRIAL DEMANDED**<br><br><br>**EMERGENCY APPLICATION FOR EX PARTE TEMPORARY RESTRAINING ORDER** |

---

**EMERGENCY APPLICATION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND BRIEF IN SUPPORT** **PAGE 1**

MARKETING (CYPRUS)            )
LIMITED,                                      )
WORLDVENTURES                       )
MARKETING D.O.O.                      )
BEOGRAD,                                  )
WORLDVENTURES                      )
MARKETING SL, D.O.O.,            )
AND WORLDVENTURES            )
MARKETING LIMITED               )
WORLDVENTURES                     )
MARKETPLACE, LLC                 )
WORLDVENTURES                     )
HOLDINGS (NETHERLANDS)    )
B.V.                                               )
WORLDVENTURES                     )
MARKETING LIMITED (NEW    )
ZEALAND)                                  )
WORLDVENTURES                     )
MARKETING COLOMBIA          )
S.A.S                                            )
WORLDVENTURES                     )
HOLDINGS ASIA PTE. LTD.      )
                                                     )
Plaintiffs,                                    )
                                                     )
v.                                                  )
                                                     )
MAVIE, ARIIX, LLC                   )
ARIIX HOLDINGS, LLC,            )
ARIIX INTERNATIONAL,          )
INC.                                             )
ADVANCED WELLNESS           )
SOLUTIONS PTE LTD.             )
ABBOUD BARAKAT               )
individually,                               )
JONATHAN MCKILLIP,
individually,
KYLE LOWE, individually,
ANTHONY FITZGERALD,

---

**EMERGENCY APPLICATION FOR EX PARTE TEMPORARY RESTRAINING
ORDER AND BRIEF IN SUPPORT                                              PAGE 2**

individually,
MICHELLE SIDDY,
individually, KEMBLE
MORGAN, individually,
and
DANIEL AUDET, individually,

Defendants.

---

## EMERGENCY APPLICATION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND BRIEF IN SUPPORT

---

# EXHIBIT 1

---

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| WORLDVENTURS HOLDINGS, LLC, WORLDVENTURES MARKETING, LLC, WORLDVENTURES MARKETING LIMITED, WORLDVENTURES CANADA INC., WORLDVENTURES MARKETING B.V., WORLDVENTURES MARKETING (HONG KONG) LIMITED, WORLDVENTURES MARKETING PTE. LTD., WORLDVENTURES TAIWAN LTD., WORLDVENTURES MARKETING PTY. LTD., WORLDVENTURES MARKETING JAMAICA LIMITED, WORLDVENTURES SERVICES, LLC, WORLDVENTURES COOPERATIEF U.A., WORLDVENTURES MARKETING SP.ZO.O, WORLDVENTURES MARKETING SOUTH AFRICA (PTY.)LTD, WORLDVENTURES ENTERPRISES LLC, WV SERVICES MALAYSIA SDN BHD,  WORLDVENTURES | **JURY TRIAL DEMANDED**<br><br>CIVIL ACTION NO.<br><br>_____<br><br>**JURY TRIAL DEMANDED**<br><br>**EMERGENCY APPLICATION FOR EX PARTE TEMPORARY RESTRAINING ORDER** |

MARKETING SRL,                      )
WORLDVENTURES                       )
MARKETING (CYPRUS)                  )
LIMITED,                            )
WORLDVENTURES                       )
MARKETING D.O.O.                    )
BEOGRAD,                            )
WORLDVENTURES                       )
MARKETING SL, D.O.O.,               )
AND WORLDVENTURES                   )
MARKETING LIMITED                   )
WORLDVENTURES                       )
MARKETPLACE, LLC                    )
WORLDVENTURES                       )
HOLDINGS                            )
(NETHERLANDS) B.V.                  )
WORLDVENTURES                       )
MARKETING LIMITED                   )
(NEW ZEALAND)                       )
WORLDVENTURES                       )
MARKETING COLOMBIA                  )
S.A.S                               )
WORLDVENTURES                       )
HOLDINGS ASIA PTE. LTD.             )
                                    )
Plaintiffs,                         )
                                    )
v.                                  )
                                    )
MAVIE, ARIIX, LLC                   )
ARIIX HOLDINGS, LLC,                )
ARIIX INTERNATIONAL,                )
INC.                                )
ADVANCED WELLNESS                   )
SOLUTIONS PTE LTD.                  )
ABBOUD BARAKAT                      )
individually,
JONATHAN MCKILLIP,

individually,
KYLE LOWE, individually,
ANTHONY FITZGERALD,
individually,
MICHELLE SIDDY,
individually, KEMBLE
MORGAN, individually,
and
DANIEL AUDET, individually,

Defendants.

---

## AFFIDAVIT IN SUPPORT OF PLAINTIFFS' EMERGENCY APPLICATION FOR EXPARTE TEMPORARY RESTRAINING ORDER

---

STATE OF TEXAS

COUNTY OF COLLIN

Before me, the undersigned notary, on this day personally appeared Kenneth Edward Head, the affiant, a person whose identity is known to me. After I administered an oath, affiant testified as follows:

1. My name is Kenneth Edward Head. I do hereby swear under penalty of perjury that the facts stated in this Affidavit are within my personal knowledge and are true and correct.

2. Am over the age of 18 years, of sound mind, and a resident of the City of Frisco, Texas. I make this affidavit based upon my personal knowledge and if

called upon to testify as to the contents of this Affidavit, I am legally competent to testify to the contents of the Affidavit in a court of law.

3. I am currently employed by WorldVentures Holdings, LLC ("WorldVentures") in the capacity of President. The other Plaintiffs are affiliated with WorldVentures. In my capacity as President of WorldVentures I have responsibility for global sales, business development, market expansion, events and recognition and customer service. I also have responsibility for international markets and business with respect to the other Plaintiffs in the above referenced lawsuit.

4. I am making this affidavit in my capacity as a company representative of WorldVentures and the other Plaintiffs and based, in part, on information known to WorldVentures.

5. As part of my responsibilities at WorldVentures I am responsible for contracts that are executed between WorldVentures and third parties. I am also responsible for the WorldVentures Statement of Policies and Procedures for WorldVentures Representatives (the "Statement of Policies"). I am also responsible for the WorldVentures Employee Handbook and employee policies and procedures (the "Employee Handbook").

6. I am also responsible for overseeing and ensuring compliance with the Statement of Policies, the Employee Handbook and all contracts by and between WorldVentures and its employees, Representatives, vendors, and other third parties.

7. WorldVentures is a multilevel marketing company with its principal place of business in Plano, Texas and operating in the United States and multiple international markets. WorldVentures is in the lifestyle membership industry and markets and sells lifestyle membership products and services through WorldVentures' network of Representatives.

8. To become a WorldVentures Representative, a person is required to sign a contract or registration and agree to the WorldVentures Statement of Policies. The Statement of Policies sets forth the terms and conditions of the contract between WorldVentures and WorldVentures' Representatives.

9. As a WorldVentures Representative, the Representative can (1) purchase WorldVentures products and services, (2) sell WorldVentures products and services, and (3) solicit or recruit others to become a WorldVentures Representative. As a Representative solicits others to join WorldVentures as a Representative, the Representative will create a down line network of other Representatives and will receive compensation for the sales production of the

downline Representatives in accordance with the WorldVentures compensation plan for Representatives. The multilevel marketing network structure is often referred to as the genealogy, tree, or line of sponsorship in the multilevel marketing industry.

10. WorldVentures' genealogy is one of WorldVentures' most viable assets. The genealogy is proprietary and confidential and is a trade secret belonging exclusively to WorldVentures. WorldVentures has spent considerable time, effort and expense in acquiring its genealogy and trade secrets, as well as WorldVentures' confidential and proprietary information.

11. WorldVentures goes to great lengths to protect the secrecy of WorldVentures' trade secrets and proprietary and confidential information and has policies in place to limit who may have access to the trade secrets, genealogy and proprietary and confidential information.

12. WorldVentures has lawful and enforceable contracts with its Representatives which WorldVentures has spent significant money to invest in.

13. WorldVentures by contract has allowed WorldVentures' Representatives to use WorldVentures' trade secrets and proprietary and confidential information but only for the purpose of WorldVentures' business. WorldVentures' Representatives agreed in their contract with WorldVentures to

protect WorldVentures' trade secrets and proprietary and confidential information. WorldVentures' Representatives agreed in their contract with WorldVentures not to recruit other WorldVentures Representatives for any other network marketing or multilevel marketing business.

14. WorldVentures' has a no solicitation policy/contract with WorldVentures' Representatives. WorldVentures' Representatives agreed in their contract with WorldVentures that they would not recruit or solicit other WorldVentures' Representatives for any other network marketing or multilevel marketing business during the term of their agreement and for a period of one (1) year following termination of the Representative's contract.

15. WorldVentures' and WorldVentures' Representatives agreed in the contract that the term "recruit" means actual or attempted solicitation, enrollment, encouragement, or effort to influence in any other way, either directly or through a third party, another WorldVentures Representative to enroll or participate in another multilevel marketing, network marketing or direct sales opportunity. The Representative contract expressly prohibits solicitation and recruitment during the term of the agreement and for a period of one (1) year following termination.

16. WorldVentures' has learned that the Defendants in the above referenced lawsuit, while being aware of the no solicitation contract terms,

nevertheless, have encouraged and recruited WorldVentures' Representatives to solicit or recruit other WorldVentures' Representatives to join Defendants' network marketing or multilevel marketing business.

17. WorldVentures' has learned that WorldVentures' Representatives who have been recruited by Defendants are recruiting and soliciting other WorldVentures' Representatives to join Defendants' network marketing or multilevel marketing business. This is a violation of the Representatives' contract.

18. WorldVentures' Representatives agreed in their contract with WorldVentures that they would not sell, or attempt to sell, any competing non-WorldVentures products or services to WorldVentures customers or Representatives and that any product or service in the same generic category as a WorldVentures product or service would be deemed to be competing.

19. WorldVentures' Representatives agreed in their contract with WorldVentures that WorldVentures' down line activity reports and genealogy reports and the information contained therein are confidential and proprietary information and trade secrets belonging to WorldVentures. WorldVentures' Representatives agreed in their contract with WorldVentures that they would not directly or indirectly disclose any information contained in the WorldVentures down line activity report or genealogy.

20. WorldVentures' Representatives agreed in their contract with WorldVentures that they would not use the information contained in the WorldVentures down line activity report and genealogy report to compete with WorldVentures or for any purpose other than promoting or supporting the WorldVentures business. WorldVentures' Representatives agreed in their contract with WorldVentures that they would not recruit or solicit any WorldVentures Representatives or customer in any manner to attempt to influence or induce any Representative or customer to alter his or her business relationship with WorldVentures.

21. WorldVentures' Representatives agreed in their contract with WorldVentures that WorldVentures' confidential information may not be used, shared, disseminated, directly or indirectly, without the prior written approval to do so from WorldVentures.

22. WorldVentures' has learned that WorldVentures' Representatives are being encouraged by Defendants to violate these provisions of the WorldVentures' Representatives' contract and many Representatives are breaching their contract with WorldVentures' in response to Defendants' solicitation and encouragement to do so.

23. Jonathan McKillip ("McKillip"), Kyle Lowe ('Lowe"), Anthony Fitzgerald ("Fitzgerald"), Michelle Siddy ("Siddy"), Kemble Morgan ("Morgan") and Daniel Audet ("Audet") are former employees of WorldVentures or its affiliated companies. They each enter into agreements with WorldVentures or its affiliated companies.

24.    McKillip was employed by WorldVentures on May 1, 2008 and resigned on December 31, 2017. McKillip was employed by WorldVentures as President of WorldVentures Marketing, LLC. McKillip had responsibility for all global sales and global expansion of WorldVentures' business. Lowe reported to McKillip, and Fitzgerald, Siddy, Kemble, and Audet reported to McKillip through Lowe.

25.    On April 4, 2011, McKillip entered into a "Confidentiality and Proprietary Rights Agreement" with WorldVentures (hereinafter referred to as the "Proprietary Rights Agreement."). Pursuant to the Proprietary Rights Agreement, McKillip promised to keep secret and not to disclose WorldVentures' confidential information. McKillip acknowledged that the confidential information was of great competitive importance and of commercial value to WorldVentures. McKillip agreed that the confidential information including, but was not limited to business processes, practices, methods, policies, plans, publications, documents, research,

operations, strategies, techniques, agreements, contracts, transactions, negotiations, trade secrets, know-how, computer programs, work in progress, supplier information, vendor information, marketing information, advertising information, personnel information, employee lists, supplier lists, sales information, revenues, customer information, customer lists, client information, sales representative information, sales representative lists and genealogies, distributor lists and buyer lists.

26.    McKillip also acknowledged and agreed to the provisions of the employee handbook of WorldVentures which prohibited the use and disclosure of WorldVentures' confidential and proprietary information and trade secrets.

27.    WorldVentures has learned that McKillip has breached his promises to WorldVentures and is involved in a concert of action with the other Defendants to solicit and recruit WorldVentures' Representatives to breach their contracts with WorldVentures and solicit other WorldVentures' Representatives for Defendants' network marketing multilevel business which competes with WorldVentures.

28.    WorldVentures has learned that in the summer of 2017, while still employed with WorldVentures, McKillip met with representatives from MAVIE, ARIIX, Advanced and Barakat to plot a plan of action to conspire to misappropriate WorldVentures' confidential and proprietary information and trade secrets and to

use that information to compete against WorldVentures. The conspiracy continued

through the end of 2017 when McKillip resigned his position with WorldVentures.

29.    WorldVentures has learned that in 2018, and through the date of the

filing of WorldVentures' Original Complaint, McKillip has continued to

misappropriate WorldVentures' confidential and proprietary information and trade

secrets and to use such information, in conspiracy with the other Defendants, to harm

WorldVentures and to compete against WorldVentures.

30.    WorldVentures has learned that McKillip has recruited in the past and

continues to recruit employees of WorldVentures to join the conspiracy and to harm

WorldVentures and to compete against WorldVentures.

31.    WorldVentures has learned that McKillip has targeted top-ranking

Representatives of WorldVentures through video chats, online social media,

Facebook, email, text messages, and other forms of electronic communication to

breach their contracts with WorldVentures and to join the multilevel marketing

organizations of MAVIE and ARIIX and to solicit other WorldVentures

Representatives.

32.    WorldVentures has learned that as an inducement to leave

WorldVentures and to join MAVIE and ARIIX, McKillip has disparaged

WorldVentures and has made exaggerated and unfounded income projections if the

recruits join up with MAVIE and ARIIX. McKillip has made false, misleading and deceptive statements in order to induce top-ranking Representatives of WorldVentures to breach their contracts with WorldVentures and to join Defendants in the conspiracy.

33.    Lowe was employed by WorldVentures on June 1, 2009 and was employed until February 13, 2018. Lowe was employed by WorldVentures as SVP of Global Sales & International Expansion. On June 11, 2009, Lowe entered into a written contract with WorldVentures to serve as a Director of International Sales. Lowe reported to McKillip. Fitzgerald, Siddy, Kemble, and Audet reported directly to Lowe.

34.    On April 4, 2011, Lowe entered into a "Confidentiality and Proprietary Rights Agreement" with WorldVentures (hereinafter referred to as the "Proprietary Rights Agreement."). Pursuant to the Proprietary Rights Agreement, Lowe promised to keep secret and not to disclose WorldVentures' confidential information. Lowe acknowledged that the confidential information was of great competitive importance and of commercial value to WorldVentures. Lowe agreed that the confidential information including, but was not limited to business processes, practices, methods, policies, plans, publications, documents, research, operations, strategies, techniques, agreements, contracts, transactions, negotiations, trade secrets, know-how, computer

programs, work in progress, supplier information, vendor information, marketing information, advertising information, personnel information, employee lists, supplier lists, sales information, revenues, customer information, customer lists, client information, sales representative information, sales representative lists and genealogies, distributor lists and buyer lists.

35.    Lowe also acknowledged and agreed to the provisions of the employee handbook of WorldVentures which prohibited the use and disclosure of WorldVentures' confidential and proprietary information and trade secrets.

36.    WorldVentures has learned that Lowe has breached his promises to WorldVentures and is involved in a concert of action with the other Defendants to solicit and recruit WorldVentures' Representatives to breach their contracts with WorldVentures and solicit other WorldVentures' Representatives for Defendants' network marketing multilevel business which competes with WorldVentures.

37.    WorldVentures has learned that in 2018, and through the date of the filing of WorldVentures' Original Complaint, Lowe, in conspiracy with the other Defendants, has continued to misappropriate WorldVentures' confidential and proprietary information and trade secrets and to use such information, in conspiracy with the other Defendants, to harm WorldVentures and to compete against WorldVentures.

38.     WorldVentures has learned that Lowe, in conspiracy with the other Defendants, has recruited in the past and continues to recruit employees of WorldVentures to join the conspiracy and to harm WorldVentures and to compete against WorldVentures.

39.     WorldVentures has learned that Lowe has breached his promises to WorldVentures.

40.     On March 16, 2015, Fitzgerald entered into a written contract with WorldVentures to serve as its Asia-Pacific Sales Director. He reported to Lowe who in turn reported to reported to McKillip. On January 1, 2016, Fitzgerald became an employee of WorldVentures and was employed until March 9, 2018. He was employed as Director of Sales and Marketing.

41.     Fitzgerald had a duty to protect WorldVentures' confidential information and trade secrets and was aware that he must keep the confidential information secret and not to disclose WorldVentures' confidential information.

42.     WorldVentures has learned that Fitzgerald has breached his promises to WorldVentures.

43.     WorldVentures has learned that prior to his resignation of employment with WorldVentures, and while still employed with WorldVentures, Fitzgerald plotted with the other Defendants a plan of action to conspire to misappropriate

WorldVentures' confidential and proprietary information and trade secrets and to use that information to compete against WorldVentures. The conspiracy began in 2017 and is continuing to this day.

44.    WorldVentures has learned that in 2018, and through the date of the filing of WorldVentures' Original Complaint, Fitzgerald has continued to misappropriate WorldVentures' confidential and proprietary information and trade secrets and to use such information, in conspiracy with the other Defendants, to harm WorldVentures and to compete against WorldVentures.

45.    WorldVentures has learned that Fitzgerald breached his duty of loyalty and his fiduciary duty to WorldVentures.

46.    On September 26 2015, Siddy entered into a written contract with WorldVentures to serve as Director of Sales & Marketing- Northern Europe. She reported to Lowe who in turn reported to reported to McKillip. Siddy was employed until August 31, 2017. Siddy was the Director of Sales & Marketing for Northern Europe.

47.    Siddy was aware that WorldVentures had confidential information which must keep secret and not disclosed. Siddy understood that WorldVentures' confidential information was of great competitive importance and of commercial value to WorldVentures.

48.    WorldVentures has learned that Siddy has breached her promises to WorldVentures.

49.    WorldVentures has learned that prior to her resignation of employment with WorldVentures, and while still employed with WorldVentures, Siddy plotted with the other Defendants a plan of action to conspire to misappropriate WorldVentures' confidential and proprietary information and trade secrets and to use that information to compete against WorldVentures. The conspiracy began in 2017 and is continuing to this day.

50.    WorldVentures has learned that in 2018, and through the date of the filing of this Original Complaint, Siddy has, in conspiracy with the other Defendants, continued to misappropriate WorldVentures' confidential and proprietary information and trade secrets and to use such information, in conspiracy with the other Defendants, to harm WorldVentures and to compete against WorldVentures.

51.    WorldVentures has learned that Siddy, in conspiracy with the other Defendants, has recruited in the past and continues to recruit employees of WorldVentures to join the conspiracy and to harm WorldVentures and to compete against WorldVentures.

52.    WorldVentures has learned that Siddy, in conspiracy with the other Defendants, has targeted top-ranking Representatives of WorldVentures to breach

their contracts with WorldVentures and to join the multilevel marketing organizations of MAVIE and ARIIX.

53.    WorldVentures has learned that Siddy breached her duty of loyalty and her fiduciary duty to WorldVentures.

54.    On May 5, 2016, Morgan entered into a written contract with WorldVentures to serve as general manager. Morgan was employed by WorldVentures between May 1, 2016 and April 9, 2018. Morgan was the Country Manager for Africa for WorldVentures. Morgan reported to Lowe who in turn reported to reported to McKillip.

55.    Morgan was aware that WorldVentures had confidential information which must be kept secret and disclosed.

56.    WorldVentures has learned that Morgan has breached promises to WorldVentures.

57.    WorldVentures has learned that prior to Morgan's resignation of employment with WorldVentures, and while still employed with WorldVentures, Morgan plotted with the other Defendants a plan of action to conspire to misappropriate WorldVentures' confidential and proprietary information and trade secrets and to use that information to compete against WorldVentures. The conspiracy began in 2017 and is continuing to this day.

58.    WorldVentures has learned that in 2018, and through the date of the filing of this Original Complaint, Morgan has continued to misappropriate WorldVentures' confidential and proprietary information and trade secrets and to use such information, in conspiracy with the other Defendants, to harm WorldVentures and to compete against WorldVentures.

59.    WorldVentures has learned that Morgan has recruited in the past and continues to recruit employees of WorldVentures to join the conspiracy and to harm WorldVentures and to compete against WorldVentures.

60.    WorldVentures has learned that Morgan, in conspiracy with the other Defendants, has targeted top-ranking Representatives of WorldVentures to join the multilevel marketing organizations of MAVIE and ARIIX and to compete against WorldVentures.

61.    WorldVentures has learned that Morgan breached his duty of loyalty and his fiduciary duty to WorldVentures.

62.    On December 19, 2013, Audet entered into a written contract with WorldVentures to serve as International Operations Consultant. Audet was employed by WorldVentures between March 17, 2014 and November 30, 2016. Audet served as Senior Director of Global Operations for WorldVentures. Audet reported to Lowe who in turn reported to reported to McKillip.

63.    On March 17, 2014, Audet entered into a "Confidentiality and Proprietary Rights Agreement" with WorldVentures (hereinafter referred to as the "Proprietary Rights Agreement."). Pursuant to the Proprietary Rights Agreement, Audet promised to keep secret and not to disclose WorldVentures' confidential information. Audet acknowledged that the confidential information was of great competitive importance and of commercial value to WorldVentures. Audet agreed that the confidential information including, but was not limited to business processes, practices, methods, policies, plans, publications, documents, research, operations, strategies, techniques, agreements, contracts, transactions, negotiations, trade secrets, know-how, computer programs, work in progress, supplier information, vendor information, marketing information, advertising information, personnel information, employee lists, supplier lists, sales information, revenues, customer information, customer lists, client information, sales representative information, sales representative lists and genealogies, distributor lists and buyer lists.

64.    Audet was aware that WorldVentures possessed confidential information. Audet understood that WorldVentures' confidential information was of great competitive importance and of commercial value to WorldVentures.

65.    WorldVentures has learned that Audet has breached promises to WorldVentures.

66.    WorldVentures has learned that Audet has plotted with the other Defendants a plan of action to conspire to misappropriate WorldVentures' confidential and proprietary information and trade secrets and to use that information to compete against WorldVentures. The conspiracy began in 2017 and is continuing to this day.

67.    WorldVentures has learned that in 2018, and through the date of the filing of this Original Complaint, Audet has continued to misappropriate WorldVentures' confidential and proprietary information and trade secrets and to use such information, in conspiracy with the other Defendants, to harm WorldVentures and to compete against WorldVentures.

68.    WorldVentures has learned that Audet has recruited in the past and continues to recruit employees of WorldVentures to join the conspiracy and to harm WorldVentures and to compete against WorldVentures.

69.    WorldVentures has learned that Audet, in conspiracy with the other Defendants, has targeted top-ranking Representatives of WorldVentures to join the multilevel marketing organizations of MAVIE and ARIIX.

70.    WorldVentures has learned that Audet breached his duty of loyalty and his fiduciary duty to WorldVentures.

71.    As employees of WorldVentures, Jonathan McKillip, Kyle Lowe, Anthony Fitzgerald, Michelle Siddy, Kemble Morgan and Daniel Audet had access to proprietary and confidential information of WorldVentures.

72.    Jonathan McKillip, Kyle Lowe, Anthony Fitzgerald, Michelle Siddy, Kemble Morgan and Daniel Audet are now working for, consulting for and participating with the other Defendants in the development of a network marketing or multilevel marketing business which competes with WorldVentures.

73.    WorldVentures' trade secrets and proprietary and confidential information would give Defendants a competitive advantage.

74.    Upon information and belief, WorldVentures has learned that Defendants have entered into contracts with Representatives of WorldVentures to compete against WorldVentures.

75.    MAVIE and the ARIIX entities who are Defendants operate a network marketing or multilevel marketing business enterprise and are competitors of WorldVentures.

76.    Effective July 21, 2017 Advanced Wellness Solutions Pte Ltd ("Advanced") by and through Abboud Barakat entered into a Mutual Confidentiality

Agreement with WorldVentures (hereinafter referred to as the "Confidentiality Agreement"). The Confidentiality Agreement broadly defined "confidential information" including, but not limited to, WorldVentures' customers, suppliers, third parties, products, services, supplier information, and business, marketing, development and sales and other commercial strategies. It also included unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, confidential and proprietary intellectual property, third-party confidential information and other confidential and proprietary information and trade secrets of WorldVentures. Advanced and Barakat promised not to disclose the confidential information as defined in the Confidentiality Agreement.

77.    WorldVentures in accordance with the confidentiality agreement and based upon the promises made in the confidentiality agreement, disclosed "confidential information" to Advanced and Barakat. Advanced and Barakat promised to safeguard WorldVentures s confidential information but failed to do so.

78.    Upon information and belief, WorldVentures has learned that instead, Advanced and Barakat are using WorldVentures' confidential information to compete with WorldVentures and have disclosed the confidential information to the other Defendants.

79.    Upon information and belief, WorldVentures has learned that Advanced and Barakat are using WorldVentures' confidential information as part of a business association with MAVIE and ARIIX who are competitors of WorldVentures.

80.    Advanced and Barakat traveled to Collin County Texas and met with representatives from WorldVentures at WorldVentures' offices in Plano, Texas in accordance with the business negotiations of the parties.

81.    Effective July 28, 2017, Advanced and entered into a written business proposal with WorldVentures which concerned WorldVentures' Asian business (hereinafter referred to as the "Proposal"). Pursuant to the Proposal, Advanced and Barakat agreed to jurisdiction and venue for any dispute arising out of the Proposal in the United States District Court for the Eastern District of Texas and agree that Texas law would govern the proposal and any disputes. Although the Proposal was never finalized, during the process of the due diligence, "confidential information" as defined in the Confidentiality Agreement was given to Advanced and Barakat by WorldVentures.

82.    Upon information and belief, WorldVentures has learned that Advanced and Barakat have used in the past and are currently using WorldVentures'

confidential information to compete against WorldVentures and are jointly in conspiracy working with the other Defendants to compete against WorldVentures.

83.    Upon information and belief, WorldVentures has learned that Advanced and Barakat formed and created MAVIE as a new multilevel marketing business enterprise involved in the lifestyle membership industry to compete against WorldVentures and Advanced and Barakat, in conspiracy with the other Defendants, are using WorldVentures' confidential information in the development of their MAVIE business.

84.    Upon information and belief, WorldVentures has learned that Advanced and Barakat have recruited current and former employees of WorldVentures to assist them in the development of their new competitive business enterprise -- MAVIE.

85.    Upon information and belief, WorldVentures has learned that Advanced and Barakat have recruited ARIIX as part of the enterprise and conspiracy to use WorldVentures' confidential information and to compete against the WorldVentures.

86.    Upon information and belief, WorldVentures has learned that Advanced and Barakat, in conspiracy with the other Defendants, and as part of their joint enterprise, are soliciting WorldVentures' top-ranking sales Representatives in

all international markets and enticing and soliciting them to breach their contract with WorldVentures and to solicit other WorldVentures Representatives in their downline organizations to breach their contract with WorldVentures and to join the multilevel marketing enterprise of MAVIE and ARIIX.

87.    Upon information and belief, WorldVentures has learned that Defendants are using false, misleading and deceptive representations regarding their new business enterprise to induce WorldVentures' top-ranking Representatives to cease their business relationship with WorldVentures and to join Defendants.

88.    MAVIE and ARIIX are multilevel marketing competitors of WorldVentures.  MAVIE and ARIIX market lifestyle membership services and a lifestyle membership using a multilevel marketing downline organization and network of independent sales representatives. The basic structure of the sales organizations of MAVIE and ARIIX mirrors the multilevel marketing structure of the sales organization of WorldVentures.

89.    Upon information and belief, WorldVentures has learned that MAVIE plans to "launch" its new competitive multilevel marketing network in July 2018 in the lifestyle membership industry. And, ARIIX also plans to launch a new service which it refers to as "ARIIX travel."

90.     On June 3, 2018, Defendant, Jonathan McKillip, and James Lee, a former Representative of WorldVentures both made written Facebook posts and posted a MAVIE solicitation video soliciting others in their social media network and Facebook community, including many Representatives and employees of WorldVentures, to join them in the MAVIE multilevel marketing business which competes with WorldVentures.

91.     WorldVentures believes that WorldVentures' Representatives who are under contract with WorldVentures and employees of WorldVentures may unknowingly rely on the unlawful, unfair and false actions and representations of Defendants and make employment and business decisions on those false representations, making it extremely difficult, if not impossible, for WorldVentures to fully rectify the damage to WorldVentures and WorldVentures' Representatives.

92.     Upon information and belief, WorldVentures has learned that MAVIE and ARIIX are working together in a joint enterprise and conspiracy to compete against WorldVentures in the lifestyle membership industry.

93.     Upon information and belief, WorldVentures has learned that MAVIE and ARIIX, in conspiracy and in joint enterprise with other Defendants are raiding or soliciting Representatives who are under contract with WorldVentures to breach

their contract with WorldVentures, stop selling WorldVentures' goods and services and to join MAVIE and ARIIX in competition against WorldVentures.

94.    Upon information and belief, WorldVentures has learned that MAVIE and ARIIX, in conspiracy and in joint enterprise with Advanced and Barakat, and the other Defendants have induced, and continued to induce employees and former employees of WorldVentures to terminate their employment with WorldVentures and to use their knowledge of WorldVentures' confidential and proprietary information and trade secrets to promote and build the MAVIE and ARIIX multilevel marketing businesses in competition with WorldVentures.

95.    Upon information and belief, WorldVentures has learned that MAVIE and ARIIX, in conspiracy and joint enterprise with Advanced and Barakat, have induced and continued to induce employees and former employees of WorldVentures to misappropriate WorldVentures' trade secrets and to utilize those trade secrets in developing and building the MAVIE and ARIIX multilevel marketing businesses in competition with WorldVentures.

96.    Upon information and belief, WorldVentures has learned that MAVIE and ARIIX, in conspiracy with the other Defendants, have already succeeded in interfering with contracts between WorldVentures and its sales employees and contracts between WorldVentures and WorldVentures' Representatives, and are

continuing to do so as of the filing of this Original Complaint, and if not stopped, they will continue to solicit and induce employees and Representatives of WorldVentures to breach their contracts with WorldVentures and to utilize their knowledge of WorldVentures' confidential and proprietary information and trade secrets to further the conspiracy and to further compete with WorldVentures.

97.    Upon information and belief, WorldVentures has learned that Defendants have misappropriated WorldVentures' proprietary and confidential information and trade secrets.

98.    Upon information and belief, WorldVentures has learned that it is inevitable that Representatives of WorldVentures and the Defendants who are former employees of WorldVentures who have entered into contracts or agreements with Defendants will disclose WorldVentures' proprietary and confidential information and trade secrets while working with Defendants.

99.    Upon information and belief, WorldVentures has learned that Defendants have entered into an agreement and conspiracy, and are soliciting WorldVentures Representatives who are under contract with WorldVentures (a) to terminate their contract with WorldVentures, (b) to enter into a network marketing or multilevel marketing contract with Defendants, (c) to misappropriate trade secrets of WorldVentures, (d) to disclose WorldVentures' proprietary and confidential

information, and (e) to recruit or solicit other WorldVentures Representatives to do likewise.

100. Upon information and belief, WorldVentures has learned that Defendants have wrongfully interfered with, and continue to wrongfully interfere with, the contracts between WorldVentures and WorldVentures Representatives who are under contract with WorldVentures.

Kenneth Edward Head

SWORN to and SUBSCRIBED before me by _Kenneth Edward Head_ on this ___4th___ day of June, 2018.

MORLENE F. BLACK
Notary Public, State of Texas
Comm. expires 03-13-2021
Notary ID 3184958

Notary Public in and for

the State of _Texas_